**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Judge Randal S. Mashburn |

**NOTICE OF DURA DEBTORS' STATEMENT FILED IN THE
UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
REGARDING THE SCHEDULING CONFERENCE ON THE VENUE MOTION**

**PLEASE TAKE NOTICE** that, on October 21, 2019, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Dura Debtors' Statement Regarding Scheduling Conference Scheduled for October 21, 2019, at 2:00 P.M. (ET)* [DE Docket No. 1011] (the "Scheduling Statement") with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), in the case captioned *In re Zohar III, Corp., et al.*, Case No. 18-10512 (KBO).

**PLEASE TAKE FURTHER NOTICE** that a copy of the Scheduling Statement filed with the Delaware Bankruptcy Court is attached hereto as **Exhibit A**.

---

[1] The debtor entities in these chapter 11 cases, along with the last faour digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

| | |
|---|---|
| Dated: October 21, 2019<br>Nashville, Tennessee | RESPECTFULLY SUBMITTED: |
| */s/ William L. Norton III*<br>William L. Norton III (TN 10075)<br>**BRADLEY ARANT BOULT CUMMINGS LLP**<br>1600 Division Street, Suite 700<br>Nashville, Tennessee 37203<br>Telephone: (615) 252-2397<br>Facsimile: (615) 244-6380 | James H.M. Sprayregen, P.C.<br>Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)<br>Gregory F. Pesce (admitted *pro hac*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br><br>- and -<br><br>Christopher Marcus, P.C. (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br><br>*Proposed Co-Counsel to the Debtors and Debtors in Possession* |

# Exhibit A

**Scheduling Statement**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| ZOHAR III, CORP., *et al.*,[1] | ) Case No. 18-10512 (KBO) |
| Debtors. | ) (Jointly Administered) |
| | ) **Related to Docket Nos. 999, 1001, 1003** |

## DURA DEBTORS' STATEMENT REGARDING SCHEDULING CONFERENCE SCHEDULED FOR OCTOBER 21, 2019, AT 2:00 P.M. (ET)

1. Dura Automotive Systems, LLC and its subsidiaries (collectively, "Dura" or the "Dura Debtors")[2] that are debtors and debtors in possession in the cases styled as *In re Dura Automotive Systems, LLC, et al.*, No. 19-06741 (RSM) (the "Dura Chapter 11 Cases"), which are pending before the United States Bankruptcy Court for the Middle District of Tennessee (the "Tennessee Bankruptcy Court") respectfully represent as follows:

### Preliminary Statement

2. The Dura Debtors have properly decided on venue for their chapter 11 cases in the Middle District of Tennessee through an independent process, with two independent managers making that decision without those managers having spoken to or contacted Ms. Lynn Tilton, and for reasons of justice and convenience.

---

[1] The Zohar Debtors in these chapter 11 cases, along with the last four digits of each Zohar Debtor entity's federal tax identification number, are: Zohar III, Corp. (9612); Zohar II 2005-1, Corp. (4059); Zohar CDO 2003-1, Corp. (3724); Zohar III, Limited (9261); Zohar II 2005-1, Limited (8297); and Zohar CDO 2003-1, Limited (5119). The Zohar Debtors' service address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] The Dura Debtors in their chapter 11 cases, along with the last four digits of each Dura Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

3.  The Dura Debtors are a complex, operating business with significant operations, employees, and vendors in Tennessee – and no operations or employees in Delaware – and the Dura Debtors are in immediate need of financing to avoid irreparable harm. Moreover, the Dura Debtors: (a) operate completely separately from the Zohar Debtors; and (b) are not subject to the Zohar settlement agreement invoked by the Zohar Debtors. To be sure, the Dura Debtors do not believe they are subject to the Zohar settlement agreement at all and, in any event, pursuant to paragraph 20 of the Zohar settlement agreement, it is clear that because the "15-month window" has expired, there are no restrictions on Ms. Tilton or the Patriarch or related non-bankrupt funds, including related non-bankrupt entities, providing financing to any of the Zohar portfolio companies, including Dura. The Dura Debtors need liquidity now, and the terms provided by Ms. Tilton's affiliated entities are commercially reasonable, and indeed economically favorable.

4.  For those reasons, in addition to simply working out a scheduling order, the Dura Debtors urge this Court to unshackle the Dura Debtors and the Tennessee Bankruptcy Court from the previously entered *ex parte* injunction and allow the Dura Debtors to move forward with its independent process to maximize value under the supervision of Dura's two independent managers and the Tennessee Bankruptcy Court. Such relief is necessary because, regardless of the outcome of the venue transfer motion, it cannot be disputed that ensuring that the Dura Debtors continue to operate and preserve and maximize value for all stakeholders is paramount. And this goal will be frustrated by an inability to obtain court relief from the Tennessee Bankruptcy Court other than on a laborious, contentious, and expensive day-to-day basis.

5.  Dura is a dynamic global manufacturing business enterprise that designs and manufactures various automotive systems, including mechatronic systems, exterior systems, and

lightweight structural systems. Dura and its non-debtor affiliates employ approximately 7,400 people, including 822 in the United States, of which 329 are located in Tennessee, 384 are in Michigan, 96 in Missouri, and 13 in Texas. Indeed, after Dura commenced its prior bankruptcy case in Delaware in 2006, by June 2008, Dura had made a substantial operational shift, relocating their shifters production, cable manufacturing, and production capacity to Tennessee. Additionally, as highlighted below, of Dura's five U.S. manufacturing facilities, two are located in Tennessee, and Dura conducts business with 20 customers and 458 suppliers in Tennessee. In contrast, the Dura Debtors have no operations or employees whatsoever in Delaware.



6.  Dura's ability to operate and grow its business has been negatively affected by its funded indebtedness and the overhang of the Zohar bankruptcy cases. More specifically, earlier this year, despite an extensive process to refinance its European credit facilities, Dura was unable to obtain any committed financing because potential lenders were unwilling or unable to provide

financing given the pendency of ongoing disputes in the Zohar chapter 11 proceeding and the Zohar term loan having matured and defaulted without extension or repayment. Additionally, Dura was denied credit insurance by two leading credit insurance providers in 2018 and lost coverage from the last leading provider in August of 2019 due to the overhang of the Zohar dispute. Indeed, five original equipment manufacturers ("OEMs")—three in Detroit and two in Europe—have placed Dura on "no-bid" status due to these issues.

7. Dura's inability to refinance its funded debt and tighter risk management standards created a liquidity crisis, which forced Dura to owe its trade vendors tens of millions of dollars as of the chapter 11 filing date. Dura filed for chapter 11 with approximately $15,000 remaining in its bank accounts. Dura's operational difficulties resulted in shipping delays and limited Dura's ability to make certain capital investments necessary for future growth.

8. By September 2019, Dura determined that it would likely exhaust all of its remaining liquidity by the end of October and that a chapter 11 filing may be necessary to obtain access to new capital. As a result, Dura retained Jefferies LLC ("Jefferies") as financial adviser, Kirkland & Ellis LLP as restructuring counsel, and Portage Point Partners, LLC ("Portage Point") as restructuring adviser to assess restructuring alternatives.

9. At the same time, Dura determined that its CEO Lynn Tilton—whose affiliates include Dura's largest equity owner, prepetition revolving lender, and a prospective bidder—could not be the sole manager. Accordingly, two independent managers were appointed, who were selected without Ms. Tilton's involvement other than agreeing to the principle of appointing independent managers. On October 12, 2019 Dura appointed Marc Beilinson and Jill Frizzley as independent managers. Mr. Beilinson is the managing partner of Beilinson Advisory Group and has served as independent director, chief restructuring officer, or similar positions for dozens of

distressed companies. Ms. Frizzley is the president of Wildrose Partners LLC and has over twenty years of experience in corporate governance and debt restructuring situations, including as an attorney at Shearman & Sterling and Weil Gotshal. Mr. Beilinson and Ms. Frizzley are fully independent from Ms. Tilton—indeed, neither has spoken to Ms. Tilton in connection with this matter, nor do they know Ms. Tilton personally.

10. Mr. Beilinson and Ms. Frizzley directed the Dura Debtors and their advisors to evaluate consensual refinancing options in an attempt to avoid a chapter 11 filing. However, notwithstanding Dura's good-faith efforts, Mr. Beilinson and Ms. Frizzley determined that it was likely necessary to file for chapter 11 to access additional capital. More specifically, with the assistance of Portage Point, the independent managers determined that Dura required $20 million in DIP financing over the initial 21-day interim period following a chapter 11 filing, and an additional $30 million—for a total of $50 million—of DIP financing to, among other things, honor employee, vendor, and customer obligations, and make necessary capital expenditure investments necessary to retain certain key customer contracts.[3] Dura obtained a $50 million financing commitment from Ark II CLO 2001-1, Ltd., one of Ms. Tilton's funds, At the same time, Dura's advisors, at the direction of the independent managers, continued to evaluate other financing options; however, the only other indication of interest received by Dura (from Bardin Hill and the Zohar Debtors) had significant execution and timing issues that could not be

---

[3] Indeed, unlike the Zohar Debtors, who are not operating companies and do not own any of the Dura Debtors' assets or property, the independent managers of the Dura Debtors owe a fiduciary duty to maximize the value of the Dura Debtors' estate for the benefit of *all* of the Dura Debtors' stakeholders. *See, e.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (debtor in possession owes "essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"); *In re Layne*, 2012 WL 5258874, at *1 (Oct. 23, 2012) (explaining that "this duty to maximize the estate often trumps other duties the debtor-in-possession may owe to individual creditors or third parties"); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 209–10 (3d Cir. 2010); *c.f.*, Zohar Settlement Agreement, Docket No. 266, Ex. A, ¶ 10 ("It is acknowledged that the CRO will act *in the best interests of the Zohar Funds* . . . But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies").

5

satisfied before Dura ran out of liquidity, and the proposed financing was on worse terms economically. Ultimately, Patriarch's $50 million DIP commitment was the only viable financing option available to Dura at the time. Indeed, the Patriarch proposal contemplates a holistic restructuring: more specifically, Patriarch's offer of DIP financing is stapled to a "stalking horse" purchase agreement that contemplates that the Patriarch purchaser entity would assume substantially all of Dura's trade obligations and purchase substantially all of Dura's assets. This initial purchase offer will provide comfort and greater certainty to Dura's customers, vendors, and employees that Dura's business is going to continue as a going concern following Dura's chapter 11 cases.[4]

11. To lock in these commitments, on October 16, 2019, the independent managers authorized the Dura Debtors to file for chapter 11. In connection with the chapter 11 filing, Dura's independent managers, with the assistance of Dura's advisors, carefully evaluated the venue in which Dura should file. The independent managers considered the substantial operational and financial headwinds that the disputes in the Zohar bankruptcy had caused for Dura over many months, and they determined in their business judgment that getting some distance from the Zohar bankruptcy would be beneficial for Dura's ongoing relationships with its customers and vendors, who would otherwise be concerned that Dura would be dragged into the morass of the litigation feud in Delaware. Additionally, as noted above, Dura has strong ties to Tennessee: nearly half of its U.S. workforce and two of its five U.S. plants are located there, and the independent managers believed that having the chapter 11 cases filed close to Dura's operations would also be beneficial. Accordingly, the independent managers determined that the

---

[4] Additionally, Dura plans to deliver a holistic restructuring solution by filing a proposed chapter 11 plan with the Tennessee Bankruptcy Court in the near term.

Middle District of Tennessee was the most appropriate venue, and authorized Dura to file its chapter 11 cases there.

12. Dura's desire to maximize the value of its assets notwithstanding, the Zohar Debtors immediately launched a litigation blitz against Dura and its restructuring strategy, which is designed to draw Dura—a living, breathing operating business with thousands of employees and dozens of facilities around the world—into the morass of a bankruptcy litigation in Delaware involving collateralized loan obligation vehicles that originated loans to Dura – a dispute that has nothing to do with Dura's business, based on the pretense that Dura's bankruptcy filing violated a settlement agreement to which Dura is not even a party.

13. As Dura will demonstrate in its forthcoming objection to the venue motion, there are numerous legal and procedural flaws in the Zohar Debtors' motion to transfer venue, and the Zohar Debtors will not be able to satisfy their significant burden of demonstrating by a preponderance of the evidence that the Dura Debtors' chapter 11 cases should be transferred from the Tennessee Bankruptcy Court to this Court.[5]

14. First, Dura has properly established venue in the Middle District of Tennessee because debtor Dura G.P. has its "principal assets" in that district (its plant in Lawrenceburg, Tennessee), and each other Dura Debtor is an affiliate of that entity. *See* 28 U.S.C. § 1408(1)-(2). And where venue is proper, a debtor's choice of venue is entitled to significant deference.

---

[5] *See In re Buffets Holdings Inc.*, 397 B.R. 725, 727 (Bankr. D. Del. 2008) ("The moving party must demonstrate by a preponderance of the evidence that transfer of venue is warranted."); *In re Visteon Corp.*, No. 09-11786, 2011 WL 5025004 at *1 (Bankr. D. Del. Oct. 21, 2011) ("GBSI, as defendant, bears the burden of demonstrating, by a preponderance of the evidence, that a transfer of venue is warranted."); *In re Hayes Lemmerz Intern Inc.*, 312 B.R. 44, 46 (Bankr. D. Del. 2004) ("The party seeking a transfer bears the burden of demonstrating by a preponderance of the evidence that a transfer of venue is warranted."); *In re Hechinger Inv. Co. of Delaware Inc.*, 296 B.R. 323, 324 (Bankr. D. Del. 2003) ("The decision of whether venue should be transferred lies within the sound discretion of the Court, though the moving party must demonstrate by a preponderance of the evidence that such change is warranted.").

*See, e.g.*, *In re Caesars Ent'mt Op. Co., Inc.*, 2015 WL 495259, at *7 (Bankr. D. Del. Feb. 2, 2015) (Gross, J.) (collecting cases).  In *Enron*, the court recognized that "[a] debtor's choice of forum is entitled to great weight if venue is proper," and rejected an attempt to disrupt that choice. *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y 2002).  As the *Enron* court cautioned, "[t]ransferring venue of a bankruptcy case is not to be taken lightly." *Id.*  "Where a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." *Id.* at 342-43 (citation omitted). This Court has acknowledged the same black letter principle. *See In re Rehoboth Hosp. LP,* No. 11-12798 (KG), 2011 WL 5024267, *3 (Bankr. D. Del. Oct. 19, 2011) (Gross, J.) ("Generally, there is a presumption in favor of maintaining the debtor's choice of forum.").

15.    The Zohar Debtors' invocation of Bankruptcy Rule 1014 also rings hollow.  The first requirement under that rule is an affiliate relationship.  Notwithstanding the Zohar Debtors' view, this issue of an affiliate relationship between the Zohar Debtors and the Dura Debtors is not straightforward.  In fact, in the only contract the Zohar Debtors have with the Dura Debtors, the Zohar Debtors contractually agreed that they are not affiliates. Specifically, in the Dura term loan credit agreement, pursuant to which the Zohar Debtors are the lenders, and the Dura Debtors are the borrowers, there is an explicit acknowledgment that neither the Zohar Debtors nor any affiliate of the Zohar lenders were "Affiliates" of the Dura Debtors for purposes of the credit agreement.   *See* Term Loan Credit Agreement, attached hereto as <u>Exhibit A</u>.[6]

---

[6]  Term Loan Credit Agreement § 1.1, definition of "Affiliate" ("<u>Affiliate</u>" means, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds ten (10%) percent or more of any class of Voting Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds ten (10%) percent or more of any class of Voting Stock or in which such Person

8

Furthermore, as the term loan credit agreement makes clear, there is significant factual and legal dispute as to whether the Dura Debtors are affiliates of the Zohar Debtors. Even if one were to disregard the term loan agreement, other aspects of Dura Buyer's ownership structure are subject to litigation. Resolving this dispute will require discovery, briefing, and a trial, which will require time before it is resolved, either consensually or by court order, and could even be appealed, requiring even more time to reach a resolution.

16.     Handcuffing the Dura Debtors to this lengthy process will only serve to harm Dura's ongoing operations. As key players in the automotive industry, the Dura Debtors rely on shipments of "just-in-time" inventory from their suppliers to create Dura's products. Any late or cancelled shipments from its suppliers could force Dura's product lines to shut down, wasting millions of dollars, angering its customer base, and permanently damaging Dura's ability to remain a prominent competitor in the industry. The ongoing and time-consuming Zohar litigation in Delaware could negatively impact Dura's critical relationships with its suppliers, relationships that Dura simply cannot afford to lose. Thus, the Dura Debtors cannot wait for the Delaware Bankruptcy Court to resolve the complex question of affiliate status between the Zohar Debtors and the Dura Debtors because doing so could risk significant immediate and irreparable harm to Dura's operations, a result that cannot possibly satisfy the interests of justice. In any event, there can be no question that as between Tennessee and Delaware, the convenience of the parties element heavily, if not entirely, weighs in favor of the Tennessee Bankruptcy Court.

---

beneficially owns or holds ten (10%) percent or more of the equity interests and (iii) any director or executive officer of such Person. For the purposes of this definition and the definition of "Voting Stock", the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise. ***Notwithstanding the foregoing, for purposes of this Agreement, none of the Agent, any Lender or any Affiliate of any Lender shall be an Affiliate of the Borrower or any of its Subsidiaries.***") (emphasis added).

17. Indeed, the only purported connection between Delaware and Dura is the Zohar Debtors' settlement agreement with Ms. Tilton and Patriarch. Dura is not a party to that agreement. And, this surely is inadequate to satisfy the "convenience of the parties" element of Rule 1014(b). Furthermore, to the extent there are purported violations of such settlement agreement by any party subject to that settlement agreement, the Dura Debtors believe that this Court could and should resolve such dispute without regard to whether the Dura Debtors' cases are pending in Tennessee or Delaware.

## Scheduling Matters

18. On Sunday afternoon, the Zohar Debtors advised the Dura Debtors that the Zohar Debtors will insist that the Court adjudicate this significant dispute by Wednesday morning—the same day on which the Dura Debtors have a second interim DIP hearing in Tennessee. The Dura Debtors will require an additional injection of liquidity no later than Wednesday; payroll is paid on Friday and must be funded by early Thursday morning in order for payments to be made. Additionally, there are other required capital investments that must be made in order to keep the Dura Debtors on track for certain customer contracts.

19. There is no basis to expedite the consideration of the venue motion.[7] The Zohar Debtors' rush to contest the Dura Debtors' venue notwithstanding, there is little urgency to adjudicate their venue transfer motion on such an emergency basis. There is no harm to the Zohar Debtors by allowing Dura to have a second interim DIP order entered and incremental financing advanced to protect the business and maximize value for Dura's stakeholders.

---

[7] Indeed, as Judge Gerber found in *Houghton Mifflin*, even where venue did not exist at all, there is no requirement to transfer venue by any particular time, and a court may decide to transfer a case at a later date in order to "mitigate[e] the resulting damage to the creditor community." *In re Houghton Mifflin Harcourt Pub. Co.*, 474 B.R. 122 (Bankr. S.D.N.Y. 2012).

Accordingly, the Dura Debtors respectfully submit that the venue motion should be heard on not less than regular notice.

20. Moreover, there would be no imminent harm to the Zohar Debtors by allowing the Dura Debtors' operational restructuring and sale process to proceed in the Tennessee Bankruptcy Court. The Zohar Debtors are adequately represented and are already involved in the Dura Debtors' chapter 11 cases, and the Dura Debtors are not a party to the settlement agreement between Ms. Tilton and the Zohar Debtors in this Court. Finally, this Court will have jurisdiction over the disposition of any proceeds of the Dura Debtors' asset sale that flow to the Zohar Debtors. There is no need to transfer the Dura Debtors' cases to this Court in order for the Court to rule on the ownership of those sale proceeds in connection with the Zohar Debtors' chapter 11 cases.

## Conclusion

21. The Dura Debtors respectfully submit that the Court should (a) lift its October 17, 2019 *ex parte* order so as to permit the Tennessee Bankruptcy Court to consider the Dura Debtors' proposal for bidding procedures and an expedited sale process, (b) set a briefing schedule on the venue motion that is consistent with regular notice requirements, and (c) at the appropriate time, deny the venue motion.

| | |
|---|---|
| Dated: October 21, 2019<br>Wilmington, Delaware | RESPECTFULLY SUBMITTED: |
| */s/ Justin R. Alberto*<br>Justin R. Alberto (DE 5126)<br>**BAYARD, P.A.**<br>600 North King Street, Suite 400<br>Wilmington, Delaware 19801<br>Telephone:   (302) 655-5000<br>Facsimile:    (302) 658-6395<br>Email:           JAlberto@bayardlaw.com | James H.M. Sprayregen, P.C.<br>Ryan Blaine Bennett, P.C. (*pro hac vice* pending)<br>Gregory F. Pesce (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200<br><br>- and -<br><br>Christopher Marcus, P.C. (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br><br>*Proposed Co-Counsel to the Dura Debtors* |