# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | Case No. 19-06741 (RSM) |
| Debtors. | (Jointly Administered) |
|  | Judge Randal S. Mashburn |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO PERFORM OBLIGATIONS RELATED TO THE STALKING HORSE BID, (II) APPROVING BIDDING PROCEDURES WITH RESPECT TO SUBSTANTIALLY ALL ASSETS, (III) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, (IV) SCHEDULING BID DEADLINES, AN AUCTION, AND THE HEARINGS AND OBJECTION DEADLINES RELATED THERETO, AND (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion").

## Introduction

1.     Following increasing liquidity constraints and operational difficulties, the Debtors, at the direction of their independent managers, commenced these chapter 11 cases to effectuate a holistic restructuring that will preserve jobs, stabilize tenuous relationships with customers and suppliers, and prosecute a value-maximizing sale of substantially all of their assets that allows the Debtors' operations to continue in the ordinary course and also includes trade vendors being paid in full. The Debtors file these proposed bidding procedures with a

---

[1]     The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

"stalking horse" bid in hand to set the floor on the price for these assets, provide assurance to the Debtors' suppliers and customers that trade creditors will be paid in full and executory contracts will be assumed, and approve a marketing and auction process that will yield the highest and best bid for these assets.

2.      This proposed sale process is the product of substantial discussion and planning by the Debtors.  Facing an increasingly dire liquidity position and operational difficulties associated with their financial distress, the Debtors engaged with advisors regarding possible restructuring alternatives.  As the Debtors explored these alternatives, they determined that their CEO Lynn Tilton—whose affiliates include the Debtors' largest equity owner, prepetition revolving lender, and a prospective bidder—could not be the sole manager.  Accordingly, two independent managers were appointed, who were selected without Ms. Tilton's involvement other than agreeing to the principle of appointing independent managers.  On October 12, 2019 the Debtors appointed Marc Beilinson and Jill Frizzley as independent managers.  Mr. Beilinson and Ms. Frizzley are fully independent from Ms. Tilton—indeed, neither has spoken to Ms. Tilton in connection with this matter, nor do they know Ms. Tilton personally.  Mr. Beilinson and Ms. Frizzley initially directed the Debtors and their advisors to explore all consensual out-of-court refinancing options, but despite these good-faith efforts, the independent managers ultimately determined it was necessary to file for chapter 11 to access additional capital.

3.      In evaluating the potential paths forward in these chapter 11 cases, the independent managers determined in their reasonable business judgment that the best course forward is to pursue a competitive sale process, backstopped by the commitment of a stalking horse bidder (subject to certain qualifications) to pay trade creditors and assume executory contracts, in an effort to assuage concerns of customers, suppliers, and employees that they will be paid in full and that the business will continue as a going-concern after the sale.  As

2

concerned customers and suppliers have reached out to the Debtors in the days following the chapter 11 filing, the fact that the Debtors are working to sign up an initial bid (the "Stalking Horse Bid") has been instrumental in assuaging these parties' concerns and stabilizing these important relationships.

4.     Indeed, this sale process is part of the Debtors' broader restructuring strategy. In particular, the DIP Facility, which was approved on a limited basis at the Debtors' first day hearing, provides a clear path forward regarding a going-concern sale of the Debtors' assets. Specifically, the DIP Lender (the "Stalking Horse Bidder") has agreed to provide a Stalking Horse Bid for substantially all of the Debtors' assets in the form of a credit bid of the DIP Claims and ABL Claims, plus certain cash consideration.

5.     The Debtors, acting at the direction of the independent managers, and the Stalking Horse Bidder have memorialized the terms of the Stalking Horse Bid in the Stalking Horse Purchase Agreement, to be market-tested through an auction and section 363 sale process. Notably, under the terms set forth in the Stalking Horse Bid, executory contracts will be assumed and assigned to the Stalking Horse Bidder (subject to certain qualifications), jobs will be preserved, and trade creditors will be paid in full within 60 days of the closing of the sale transaction. By providing assurance to the vendors and customers that trade creditors will be paid, the Debtors can ensure that their operations will continue uninterrupted and the value of the enterprise is maximized. Importantly, there is ***no break-up fee***—the Stalking Horse Bidder merely seeks a capped expense reimbursement in connection with the Stalking Horse Purchase Agreement (as defined below). Indeed, stalking horse bids "bring[] value to the estate by setting a floor on the price and providing a structure for potential competing bids." *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009); *see also In re Nashville Senior Living*, No. 08-07254, 2008 WL 5062366, at *2 (Bankr. M.D. Tenn. Oct. 22, 2008) (finding "no substance"

to assertions that a stalking horse bid would "provide a chilling effect to the sale"). Moreover, the Stalking Horse Bid will "provide comfort to the Debtors' employees and customers that the company [is] entering the auction with a locked-in bid." *Id.*

6. With the assistance of their advisors, the Debtors will immediately begin to engage with interested parties and will market test the Stalking Horse Bid to ensure that they obtain the highest or otherwise best offer or combination of offers for the assets. Previously, in 2018, the Debtors' proposed financial advisor, Jefferies LLC ("Jefferies") conducted a marketing process for these assets that yielded some preliminary indications of interest. Jefferies, as well as the Debtors' other advisors, will actively market these assets on a postpetition basis. Notwithstanding the Stalking Horse Bid, the Debtors and their advisors will continue to market these assets in search of the highest and best offer, including prior to the entry of the Bidding Procedures Order (as defined below). To the extent that the Debtors and their advisors secure a higher and better offer for the assets that complies with the terms set forth in the DIP Facility, they reserve their rights to pursue an alternative sale transaction, in accordance with their fiduciary duties. If approved, the proposed Bidding Procedures will enable the Debtors to expeditiously sell their assets and emerge from chapter 11 shortly after.[2] As set forth in further detail below, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors respectfully request that the Court grant this Motion.

## Relief Requested

7. By this motion (this "Motion"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

---

[2] The Debtors expect to file a liquidating chapter 11 plan in the near term.

4

(i)     authorizing the Debtors to enter into that certain Asset Purchase Agreement attached to the Bidding Procedures Order as **Exhibit 4** (the "Stalking Horse Purchase Agreement");

(ii)    authorizing and approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures") in connection with the sale of substantially all assets of the Debtors free and clear of liens, claims, encumbrances, and other interests (the "Sale");

(iii)   approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"), and approving the form and manner of notice thereof, attached as **Exhibit 2** to the Bidding Procedures Order (the "Cure Notice");

(iv)    scheduling (a) bid deadlines, (b) an auction in connection with the Sale (the "Auction"), (c) hearing dates (the "Sale Hearing"), and (d) objection deadlines for the Sale Hearing; and

(v)     approving the form and manner of notice of the Auction and Sale Hearing, attached as **Exhibit 3** to the Bidding Procedures Order (the "Sale Notice").

8.      The Debtors also seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order") approving the Sale following the Sale Hearing.

## Jurisdiction and Venue

9.      The United States Bankruptcy Court for the Middle District of Tennessee (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested herein are sections 105(a) and 363 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Bankruptcy Rules 2002,

5

6004, and 6006, and rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the Middle District of Tennessee (the "Local Rules").

## Background

12.     Dura Automotive Systems, LLC, together with its Debtor and non-Debtor affiliates (collectively, the "Company"), is a leading independent designer and manufacturer of automotive systems, including mechatronic systems, exterior systems, and lightweight structural systems, among others.  The Company's main product lines generate approximately $1.1 billion in global sales annually.  Headquartered in Auburn Hills, Michigan, the Company employs approximately 7,400 individuals.  As of October 17, 2019 (the "Petition Date"), the Debtors' aggregate prepetition indebtedness totaled approximately $130 million.

13.     On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Proposed Sale and Bidding Procedures

### I.     Summary of Key Terms of the Stalking Horse Purchase Agreement.[3]

14.     The pertinent terms of the Stalking Horse Purchase Agreement are summarized in the following table.[4]

| Term | Summary Description |
|------|---------------------|
|      |                     |

---

[3]     Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.

[4]     The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control in all respects.

| Term | Summary Description |
|---|---|
| **Parties** | <u>Sellers</u>: Dura Automotive Systems, LLC, Dura Operating, LLC, Dura Mexico Holdings, LLC, NAMP, LLC, Dura Automotive Systems Cable Operations, LLC, Dura Fremont L.L.C., Dura Holding Germany GmbH and Dura G.P.<br><br><u>Buyer</u>: Dura Automotive Angels, LLC |
| **Purchase Price[5]** | The consideration includes (in addition to the assumption of the Assumed Liabilities):<br><br>(i)       a credit bid in an amount equal to the outstanding Credit Agreement Indebtedness (the "<u>Credit Bid Amount</u>"); *plus*<br><br>(ii)       $5,000,000 (the "<u>Wind-Down Amount</u>"). |
| **Bid Protections** | <u>Expense Reimbursement</u>: Up to $2,000,000 |
| **Purchased Assets** | Assets to be purchased include the capital stock and other equity interests of certain non-U.S. Subsidiaries (the "<u>Transferred Stock</u>") and all right, title and interest of the Asset Sellers to or under the properties and assets of the Asset Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, other than the Excluded Assets (including, e.g., Transferred Contracts, real and personal property, intellectual property, receivables, machinery, equipment, inventories, permits, books and records, distribution lists, cash in excess of the Wind-Down Amount and the Professional Fee Amount, and goodwill). |
| **Excluded Assets** | The "<u>Excluded Assets</u>" include the following, among other assets:<br><br>(i)       the Asset Sellers' documents, written files, papers, books, reports and records (x) prepared in connection with the Stalking Horse Purchase Agreement or the Bankruptcy Case or (y) that any Asset Seller is required by Law to retain;<br>(ii)       all accounting records and internal reports to the extent relating to the business activities of the Asset Sellers unrelated to the Business;<br>(iii)       claims for relief under state fraudulent conveyance, fraudulent transfer or similar Laws (other than Bankruptcy Code avoidance actions, which are included in the Transferred Assets);<br>(iv)       all insurance policies and binders;<br>(v)       all rights, claims and causes of action relating to any Excluded Asset or any Excluded Liability;<br>(vi)       capital stock or other equity interests of any Asset Seller<br>(vii)       all assets under the Excluded Plans;<br>(viii)       the Rejected Contracts;<br>(ix)       all retainers or similar prepaid amounts paid to professional service providers of the Sellers; and<br>(x)       an amount of cash equal to the Wind-Down Amount *plus* the aggregate amount of Professional fee claims and other unpaid fees and expenses the Professionals estimate they have incurred or will incur in rendering services to the Sellers prior to and as of the Closing Date(in no event exceeding the Carve Out Reserve Amount) (the "<u>Professional Fee Amount</u>").<br><br>Until the 3rd Business Day after the Auction, the Buyer may designate any Transferred Asset or the Transferred Stock of any Subsidiary as an Excluded Asset. |

---

[5]    Pursuant to the Bidding Procedures and the DIP Term Sheet attached to the DIP Motion, the DIP Facility will be paid in full in cash pursuant to the Sale Order.

| Term | Summary Description |
|---|---|
| **Sale of Assets Free and Clear of Interests** | The Sellers have determined in their sound business judgment that the transactions contemplated by the Stalking Horse Purchase Agreement is in the best interest of their estates. The Sellers request the Court approve the proposed sale of the Transferred Stock and the Transferred Assets to the Successful Bidder or, if applicable, the Back-Up Bidder, free and clear of claims, liens, encumbrances, and other interests, except as expressly set forth in the Stalking Horse Purchase Agreement. |
| **Assumed Liabilities** | The Buyer will assume and pay, discharge, perform or otherwise satisfy only the following Liabilities: <br><br> (i)    all Liabilities under the Transferred Contracts and the transferred Business Permits that become due or are to be performed on or after the Closing Date; <br> (ii)    Cure Claims up to the Cure Claims Cap; <br> (iii)    all current Liabilities, including all accounts payable and trade payables existing on the Closing Date; <br> (iv)    all Liabilities arising out of, resulting from, or relating to (A) the employment or termination of employment of the Transferred Employees following the Closing Date, (B) the Employee Incentive Plan or (C) the Transferred Plans, including sponsorship thereof; <br> (v)    all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by the Buyer under the Stalking Horse Purchase Agreement; and <br> (vi)    any and all Liabilities arising from or related to (1) the ownership or operation of the Business or the Transferred Assets from and after the Closing or (2) any condition first occurring or arising from and after the Closing with respect to the Business or the Transferred Assets. |
| **Excluded Liabilities** | The Buyer is not assuming any Liability that is not an Assumed Liability. |
| **Designation of Executory Contracts as Transferred Contracts to be Assumed by the Buyer** | Buyer shall assume and be responsible for Contracts designated as Transferred Contracts. Buyer's obligation to pay Cure Claims in connection with the Transferred Contracts shall not exceed the Cure Claims Cap. <br><br> Until the 3rd Business Day after the Auction or, if the aggregate value of the Cure Claims exceeds the Cure Claims Cap, 1 Business Day prior to the Closing Date, the Buyer may designate any Contract or Seller Lease (except for any licenses included in the transferred Intellectual Property, collective bargaining agreements or purchase orders) as a Rejected Contract not to be assumed by Buyer, and the Buyer shall not acquire any rights or assume any Liabilities with respect thereto. |
| **Employment Provisions** | Prior to the Closing, the Buyer shall offer to each Business Employee employment for a position comparable to the position then held by such Business Employee. Buyer shall assume and pay all earned or accrued unpaid wages and salaries in respect of Transferred Employees, and shall assume and honor such Transferred Employees' accrued and unused vacation and paid time off. Buyer shall provide each Transferred Employee with credit for after the Closing for continuous service under benefit plans, including for purposes of eligibility, vesting and determination of the level of benefits). <br><br> The parties may seek Bankruptcy Court authorization to implement a mutually agreed employee incentive plan, the Liability under which shall be an Assumed Liability. |
| **Closing Conditions** | <u>Seller</u>: The closing conditions are generally typical and customary for transactions of |

| Term | Summary Description |
|------|---------------------|
| | this kind, including (i) the Bankruptcy Court having entered the Sale Order and the Sale Order and the Sale Procedures each being a Final Order; (ii) accuracy of the Buyer's representations and warranties both when made and as of the Closing Date, subject to certain materiality standards; and (iii) the Buyer's compliance, in all material respects, with its respective covenants.<br><br>Buyer: The closing conditions are generally typical and customary for transactions of this kind, and include conditions requiring (i) the Bankruptcy Court's entry of the Sale Order and the Sale Order and the Sale Procedures each being a Final Order; (ii) accuracy of the Sellers' representations and warranties, subject to certain materiality standards; (iii) the Sellers' compliance, in all material respects, with their respective covenants; (iv) the "Termination Date" under the DIP Credit Agreement not having occurred and the indebtedness outstanding under the DIP Credit Agreement not having otherwise been paid off; (v) with respect to Customer Contracts representing at least 80% of the booked business of the Business as of the date of the Stalking Horse Purchase Agreement, the valid assignment to the Buyer of each such Contract and each such Contract being in full force and effect, along with the absence of any (w) material breach or material default by the Asset Sellers or Transferred Subsidiaries under such Contract, (x) written threat of default, breach, violation, cancellation or termination by any counterparty to such Contract, (y) written notice from any applicable counterparty that any such Contract has terminated or will be terminating or alleging that any Asset Seller or Transferred Subsidiary is in material breach of, or material default under any such Contract, or (z) written notice of or, to the Knowledge of the Sellers, engagement in, any re-sourcing under any such Contract; (vi) no Material Adverse Effect; (vii) the Bankruptcy Court having approved and authorized the Buyer's ability to credit bid the Credit Bid Amount in satisfaction of the Credit Bid Amount portion of the Purchase Price; and (viii) the approval of the transfer of a Permit related to radioactive waste storage. |
| **Termination Events** | Typical customary termination provisions are included, including termination upon mutual agreement of the parties and under the following circumstances:<br><br>(i) by either Seller Parent or the Buyer if (a) a Legal Restraint is in effect that has become final and nonappealable; (b) any Seller enters into a definitive agreement with respect to an Alternative Transaction with the Successful Bidder (provided that if the Buyer is the Back-Up Bidder, it may not terminate for 90 days from the entry of an Order of the Bankruptcy Court approving such definitive agreement); or (c) the Closing shall not have occurred on or before March 2, 2020[6];<br><br>(ii) by the Buyer if (a) the Sellers breach or fail to perform their representations, warranties or covenants in a manner that (1) would give rise to the failure of a closing condition and (2) cannot be or has not been cured by the earlier of 15 days after notice and 1 day prior to the Outside Date; (b) the Sale Hearing is not held on or before February 5, 2020; (c) the Auction is not held on or before January 27, 2020; (d) the Bankruptcy Court has not entered the Sale Order on or before February 7, 2020; (e) if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (f) the Sellers withdraw or seek to withdraw the Sale Motion; (g) the DIP Credit Agreement "Termination Date" occurs or the indebtedness outstanding under the DIP Credit Agreement is otherwise paid off; (h) a Material Adverse Effect has occurred; (i) notices of assumption of the Transferred Contracts are not served on all material parties by the 28th Business Day following the Sale Procedures Hearing; (j) the Sellers publicly announce or |

---

[6] Process milestones referred to throughout are to be consistent with DIP.

| Term | Summary Description |
|------|---------------------|
| | support any plan of reorganization or plan of liquidation (except related to the wind-down and that would not prevent or materially delay the Closing); or (k) Buyer is legally prohibited to credit bid up to the full Credit Bid Amount in satisfaction of all or any portion of the Purchase Price; |
| | (iii) by Seller Parent, if (a) the Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants in a manner that (1) would give rise to the failure of a closing condition and (2) cannot be or has not been cured before the earlier of 15 days after notice and 1 day prior to the Outside Date; (b) Buyer fails to close after satisfaction (or waiver) of the conditions to Closing; or (c) any Seller determines that proceeding with the transactions contemplated by the Stalking Horse Purchase Agreement would be inconsistent with its applicable fiduciary duties. |
| Representations, Warranties and Covenants | The Stalking Horse Purchase Agreement includes representations, warranties and covenants that are generally typical and customary for transactions of this kind, including representations and warranties concerning organization, authority, noncontravention and consents, condition and sufficiency of assets, subsidiaries, financial statements, absence of undisclosed liabilities, litigation, material contracts, compliance with laws, environmental matters, labor, employee and benefits matters, real property, intellectual property, taxes, environmental matters, absence of certain changes, no liability to brokers and exclusivity of representations and warranties, and covenants with respect to conduct of business prior to the Closing Date, cooperation, access, notification, efforts to obtain regulatory approvals and the satisfaction of applicable closing conditions, post-Closing name changes and wind-down of trademark usage and further assurances. |

## II. The Bidding Procedures.

15. The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the timeline of these chapter 11 cases, to confirm that the Stalking Horse Bid is the best offer, or promptly identify the alternative bid that is higher or otherwise better.

16. The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Sale Hearing. The Debtors and their advisors have already commenced a marketing and sale process to confirm the market value of their assets. In creating the Bidding Procedures, the Debtors are seeking to balance their interests in consummating the Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a floor offer while at the same time preserving the opportunity to attract the highest or otherwise best offer. The Bidding Procedures are designed to encourage all

prospective bidders to put their best bid forward, bring finality to the Debtors' restructuring process, and create a path towards entry of an order approving the sale (the "Sale Order") that embodies the highest or otherwise best available recoveries to the Debtors' stakeholders.

17. Because the Bidding Procedures are attached as **Exhibit 1** to the proposed Bidding Procedures Order, they are not restated fully herein. Generally speaking, however, the Bidding Procedures establish, among other things:[7]

- the Debtors will serve the Bidding Procedures Order (setting forth the Sale Schedule), Bidding Procedures, Sale Notice, and Cure Notice upon the Notice Parties as soon as practicable after entry of the Bidding Procedures Order;

- the availability of, access to, and conduct during due diligence by Acceptable Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the initial leading Qualified Bid for the Auction;

- the conditions for having the Auction and procedures for conducting the Auction, if any; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights.

18. Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the

---

[7] The following summary is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects. Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.

Debtors' estates. Moreover, through the Bidding Procedures, the Debtors have agreed to provide substantial information about the ongoing sale process to their stakeholders to ensure that they are apprised of the status and determinations related to the sale, including the Committee (if one is appointed in these chapter 11 cases), the DIP Lenders, the prepetition ABL Lenders, and the prepetition term loan lenders.

## III. Proposed Sale Schedule.

19.     The Debtors are seeking approval of the Bidding Procedures and the Sale Schedule (as defined herein) in parallel to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate a sale of substantially all of their assets.

20.     The key dates and deadlines the Debtors seek to establish pursuant to the Bidding Procedures Order are as follows (the dates set forth below, collectively, the "Sale Schedule"), subject to the right of the Debtors, in consultation with the Consultation Parties,[8] and the orders approving the Debtors' postpetition financing facility, to modify the following dates:

    a.    **Bid Deadline**: **January 14, 2020, at 5:00 p.m. (prevailing Central Time)** is the deadline by which all "Qualified Bids" (as defined in the Bidding Procedures) must be **actually received** by the parties specified in the Bidding Procedures (the "Bid Deadline");

    b.    **Selection of Qualified Bids**: **January 16, 2020**;

    c.    **Auction**: **January 27, 2020, at 10:00 a.m. (prevailing Eastern Time)** is the date and time the Auction, if one is needed, will be held at the offices of counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022;

---

[8]     "Consultation Parties" means the following parties: (i) members of the Committee (if any), and the Committee's professionals, (ii) the holders of DIP Claims, (iii) the holders of claims under the Debtors' ABL facility, and (iv) the holders of claims under the Debtors' prepetition term loan facility, and their respective agents and professionals, except that if any of such parties submit a Bid, including a credit bid, then the Debtors, prior to the Auction, are permitted but not required to disclose the identity of the other Bidders to such party but shall not disclose the terms of any other Bid.

d. **Deadline to File Notice Designating Successful Bidder**: immediately upon the Debtors' identification and designation of the Successful Bidder (which shall be no later than two business days after the conclusion of the Auction);

e. **Sale Objection Deadline**: The deadline by which all objections to any Successful Bids (as defined in the Bidding Procedures) must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties (the "Sale Objection Deadline") is January 30, 2020, at 5:00 p.m. (prevailing Central Time);

f. **Sale Hearing**: The Sale Hearing approving the Sale to the Successful Bidder is scheduled to commence before the Court on **February 5, 2020**, or such other date as agreed to by the Court.[9]

21. On or before the commencement of the Sale Hearing is the deadline by which an objection to any Successful Bids must be filed with the Court and served so as to be actually received by the Notice Parties (as defined herein).

22. A party's failure to timely file or make an objection in accordance with the Bidding Procedures Order shall forever bar such a party from asserting any objection to the Disclosure Statement Motion or the Plan, including the consummation of the Sale with the Successful Bidder, and the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder, and such failure shall be deemed to constitute consent by such contract counterparty (each a "Contract Counterparty" and collectively, the "Contract Counterparties") to (a) the assumption and assignment of such executory contracts and unexpired leases, and (b) consummation of the Sale.

**IV.     Form and Manner of Sale Notice**.

23. The Auction, if any, shall take place at 10:00 a.m. (prevailing Eastern Time) on January 27, 2020, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York,

---

[9] The Debtors reserve the right to seek an alternative schedule pursuant to an order setting the schedule for a disclosure statement hearing, solicitation, and plan confirmation process.

New York 10022, or such later date and time or other place as selected by the Debtors in consultation with the Consultation Parties.

24.     As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 3** to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known (collectively, the "Notice Parties"): (a) the office of the U.S. Trustee for the Middle District of Tennessee; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agent under the Debtors' prepetition secured revolving credit agreement; (d) counsel to the agent under the Debtors' prepetition secured term loan credit agreement; (e) counsel to the agent under the Debtors' debtor-in-possession financing facility; (f) the offices of the attorneys general for the states in which the Debtors operate; (g) the United States Attorney's Office for the Middle District of Tennessee; (h) the Internal Revenue Service; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002

25.     In addition, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in *The New York Times (National Edition)*, the *Detroit Free Press*, and the *Tennessean* to provide notice to any other potential interested parties.

26.     The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held), the Bidding Procedures and the dates and deadlines related thereto, and the dates and deadlines related to the Sale Hearing.  Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction or the Sale Hearing is required.

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document      Page 14 of 174

## V.    Summary of the Assumption and Assignment Procedures.

27.    The Debtors propose the procedures set forth below (the "Assumption and Assignment Procedures") for notifying the Contract Counterparties to executory contracts and unexpired leases of proposed cure amounts in the event the Debtors decide to assume and assign such contracts or leases in connection with the Sale.

### A.    Notice of Assumption and Assignment.

28.    As soon as practicable after entry of the Bidding Procedures Order (any such date, the "Assumption and Assignment Service Date"), the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the Cure Notice annexed as **Exhibit 2** to the Bidding Procedures Order on all executory contract and unexpired lease Contract Counterparties (other than any Debtor) and, include as **Exhibit A** to the Cure Notice, a list (the "Assigned Contracts Schedule") that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (*i.e.*, the Assigned Contracts), including the name of the Contract Counterparty to each such contract, and whether or not the underlying agreement would be considered an executory contract or unexpired lease under applicable nonbankruptcy law; (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (c) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto.  The Debtors shall serve, via first class mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (w) instructions (the "DCL Instructions") regarding how to view the Assigned Contracts Schedule on the Debtors' case website (the "Case Website");[10] (x) information necessary and appropriate to provide notice of

---

[10]    The URL is: https://cases.primeclerk.com/DuraAutomotive.

15

the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (y) Cure Costs, if any; and (z) the procedures for objecting thereto ((x)-(z) collectively, the "Necessary Notice Information"), on each Contract Counterparty to the Assigned Contracts. The Debtors shall serve on all parties that requested notice pursuant to Local Bankruptcy Rule 2002-1, via ECF, a modified version of the Cure Notice that contains the DCL Instructions and Necessary Notice Information. Pursuant to the Bidding Procedures Order, service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice will be necessary.

29.     A Contract Counterparty listed on the Assigned Contract Schedule may file an objection (an "Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Assigned Contract Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and actually received no later than January 30, 2020, at 5:00 p.m. (prevailing Central Time) (the "Cure Objection Deadline").

30.     If a Contract Counterparty files an Assigned Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be resolved at the Sale Hearing or such later date as determined by the Court. To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and

16

assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion. To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing. If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

### B. Supplemental Cure Notice.

31.     If (i) the Debtors discover contracts inadvertently omitted from the Assigned Contracts Schedule, or (ii) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, the Debtors may, in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the Debtors and the Successful Bidder, at any time after the Assumption and Assignment Service Date and before the closing of the Sale: (a) supplement the Assigned Contracts Schedule with previously omitted Assigned Contracts; (b) remove an Assigned Contract from the list of contracts ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale; and/or (c) modify the previously stated Cure Costs associated with any Assigned Contract.

32.     In the event that the Debtors exercise any of the rights reserved above, the Debtors shall promptly serve a supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Contract Counterparty, and its attorney, if known, at the last known address available to the Debtors (a "Supplemental Cure Notice"). Each

17

Supplemental Cure Notice shall include the same information with respect to listed Assigned Contracts as would have been included in the Notice of Assumption and Assignment.

33. Any Contract Counterparty listed on the Assigned Contract Schedule as amended and attached to a Supplemental Cure Notice may file an objection (a "Supplemental Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

34. If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court (a "Supplemental Assigned Contract Order") fixing the Cure Costs and approving the assumption and assignment of any Assigned Contract listed on a Supplemental Cure Notice.

**C. Additional Notice of Assumption and Assignment Procedures.**

35. If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental

18

Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

36.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the earlier of (a) the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable, and (b) 4:00 p.m. (prevailing Central Time) on the date that is 14 days following (i) the Assumption and Assignment Service Date, or (ii) the date of Service of the Supplemental Cure Notice, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable. The Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing.

37.     The inclusion of an Assigned Contract on the Notice of Assumption and Assignment (or Supplemental Cure Notice) will not: (a) obligate the Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract. Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive agreement of the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document      Page 19 of 174

## Basis for Relief

**I.     The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Are Consistent with the Debtors' Reasonable Business Judgment**.

38.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See*, *e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al.* (*In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale."); *see also In re FirstEnergy Solutions Corp.*, 591 B.R. 688, 694 (Bankr. N.D. Ohio 2018) (holding that the bankruptcy court must expressly find from the evidence a good business reason to grant an application to use, sell, or lease property of the estate outside the ordinary course of business).

39.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008) (citing *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998)) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with

20

respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

40. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

41. The Debtors, in consultation with their advisors and the independent managers, have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates. This process includes both the Stalking Horse Purchase Agreement and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for substantially all of the Debtors' assets while at the same time providing assurance to the Debtors' customers, vendors, and employees that obligations to them will be paid and that they will be taken care of through the sale process. The Debtors are confident that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct the sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the assets and who can demonstrate the ability take on the assets, obligations, and liabilities being transferred. In particular, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide potential bidding parties with

21

sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

42.    The Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in cases of similar size and complexity.  *See, e.g.*, *In re Curae Health, Inc.*, No. 18-05665 (CMW) (Bankr. M.D. Tenn. Nov. 30, 2018) (approving similar bidding procedures); *In re Sumner Regional Health Systems, Inc.*, No. 10-04766 (MFH) (Bankr. M.D. Tenn. May 18, 2010) (same); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 3, 2019); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 11, 2018) (same); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (same).[11]

43.    Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures:  (a) will encourage robust bidding for the assets; (b) are consistent with other procedures previously approved by courts in this District; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

## II.    The Expense Reimbursement Provision Has Sound Business Purpose and Should be Approved.

44.    The Debtors are also requesting approval of expense reimbursement up to a maximum amount of $2.0 million (the "Bid Protections").  The expense reimbursement will be paid to the Stalking Horse Bidder upon the occurrence of certain "triggering events" typical and

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document      Page 22 of 174

customary for transactions of this kind. It is important to note that the Debtors are not requesting approval of any break-up fees or other bid protections.

45.     Bankruptcy courts analyze the appropriateness of bidding incentives such as expense reimbursement under the "business judgment rule" standard, and generally consider whether: (a) the relationship of the parties who negotiated the fee was tainted by self-dealing or manipulation; (b) the fee hampers, rather than encourages, bidding; and (c) the amount of the fee is unreasonable relative to the proposed purchase price. *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014) (citing *Metaldyne*, 409 B.R. at 670); *see also Integrated Res.*, 147 B.R. at 657–58 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment). The Debtors submit that the Bid Protections are appropriate under each of the three foregoing factors.

46.     First, the Bid Protections are the product of good faith, arm's-length negotiations between several parties, including the Debtors who were acting not in their own self-interest, but rather, in the interest of their bankruptcy estates consistent with their fiduciary duties. The independent managers have also considered and approved the Bid Protections. The decision to commence these chapter 11 cases and file this Motion were both approved by the Debtors' independent managers upon a review of the facts and circumstances, and after receiving advice from the Debtors' advisors. The Stalking Horse Purchase Agreement provisions relating to the Bid Protections (as well as the other Stalking Horse Purchase Agreement provisions) were scrutinized and approved by the independent managers, reviewed and vetted with outside advisors.

47.     Second, the Debtors believe, based on their reasoned business judgment, that the presence of the Bid Protections enhances their ability to maximize value without chilling

bidding. The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Purchase Agreement. Granting these Bid Protections convinced the Stalking Horse Bidder to enter into the Stalking Horse Purchase Agreement, which assures the Debtors and their stakeholders of a Sale to a contractually-committed bidder at a price the Debtors believe is fair and reasonable. Additionally, the Stalking Horse Purchase Agreement provides the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer at the Auction which, absent such a bid floor, might otherwise never have been realized. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.").

48. Accordingly, the Debtors respectfully submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**III.    The Form and Manner of the Sale Notice Should Be Approved**.

49. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing or auction where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein. As required under Bankruptcy Rule 2002(b) and Local Rule 2002-1, the Debtors seek approval of the Sale Notice as proper notice of the Auction.

50. The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for

24

herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors seek approval of the Sale Notice as proper notice of the Auction. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

## IV.     The Sale Should be Approved as an Exercise of Sound Business Judgment.

51.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Section 363(b) does not, however, provide a standard for determining when such a sale should be authorized if proposed outside confirmation of a chapter 11 plan.  Generally, courts hold that a debtor's decision to sell assets outside the ordinary course of business must be based upon sound business judgment.  *See, e.g.*, *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir. 1986); *In re FirstEnergy Sols. Corp.*, 591 B.R. at 69495; *In re Fodale*, No. 10-69502, 2013 WL 663729, at *5 (Bankr. E.D. Mich. Feb. 21, 2013); *In re MF Glob. Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); *Genco*, 509 B.R. at 464; *Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Integrated Res.*, 147 B.R. at 656 (law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that in making a business decision, the directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company).

52.     When determining whether to approve a proposed sale under section 363 of the Bankruptcy Code, courts generally apply a business judgment test.  *See*, *e.g.*, *Stephens Indus., Inc.*, 789 F.2d at 389; *MF Glob.*, 535 B.R. at 605; *Genco*, 509 B.R. at 464; *In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003).  In *Lionel*, the Court of Appeals for the Second Circuit set forth several non-exclusive factors bankruptcy courts in this district may consider in

25

conducting a section 363(b) analysis, including, whether: (a) a "sound business purpose" exists that justifies the sale; (b) adequate and reasonable notice has been provided to interested parties; (c) the sale value obtained is fair and reasonable; and (d) the debtor acted in good faith. *See Stephens Indus., Inc.*, 789 F.2d at 389 (adopting the reasoning in *In re Lionel Corporation* and concluding that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action); *Glob. Crossing*, 295 B.R. at 744 (citing *Lionel*, 722 F.2d at 1071).

### A. A Sound Business Purpose Exists for the Sale.

53. The Debtors have a sound business justification for entering into this transaction. The proceeds from the Sale will be utilized to maximize creditor recoveries while the certainty of a Stalking Horse Bid that will assume executory contracts and pay trade creditors in full preserves the Debtors' value as a going concern.

54. Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the Stalking Horse Purchase Agreement (or the asset purchase agreement with another Successful Bidder, as the case may be) constitutes (or will constitute) the highest or otherwise best offer, on balance of the facts and circumstances of the moment, and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound reasonable business judgment.

### B. Adequate and Reasonable Notice of the Sale Will Be Provided.

55. As described above, the Sale Notice (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale or the assumption and assignment of certain executory contracts, and (c) otherwise includes all information relevant to parties interested in or

affected by the Sale in accordance with the Sale Guidelines. Accordingly, the Debtors submit that the Sale Notice will provide adequate notice of the Sale by the time of service thereof.

### C. The Auction Process Will Yield a Fair Value Transaction.

56. It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In Re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "§ 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

57. The Debtors and their advisors will continue an independent marketing process for the assets and solicit offers consistent with the Bidding Procedures and subject to the Stalking Horse Purchase Agreement, including, for example, by contacting parties who expressed in these assets during a prior marketing process in 2018, providing acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Purchase Price purchase price will, conclusively, be fair value.

### V. The Assumption and Assignment of the Contracts Should Be Approved.

### A. The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment.

58. To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Assigned Contracts to the Successful Bidder to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults

27

under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *In re Beare Co.*, 177 B.R. 879, 882 (Bankr. W.D. Tenn. 1994) (finding that the assumption of an executory contract would benefit debtor's bankruptcy estate and was within the debtor's reasonable business judgment), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume unexpired lease); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard.").

59. Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. *First*, the Assigned Contracts are necessary to run the business and, as such, they are essential to inducing the highest or otherwise best offer for the Debtors' assets. *Second*, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. *Third*, the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

60.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

### B.     Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale.

61.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (citing *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980) (overturned on other grounds)).

62.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

63.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts

and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from [section 2-609(1) of the Uniform Commercial Code]" and is "to be given [a] practical, pragmatic construction" based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982); *see also In re Yardley*, 77 B.R. 643, 646 (Bankr. M.D. Tenn 1987) ("What constitutes adequate assurance is a factual question to be determined on a case-by-case basis with due regard to the nature to the parties, their past dealings and present commercial realities."). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985); *see also In re Yardley*, 77 B.R. at 646. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

64. The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document      Page 30 of 174

provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

## **Reservation of Rights**

65.     Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense or other priority claim; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or any other applicable law; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

## **Waiver of Rule 6004(h) and 6006(d)**

66.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders

31

otherwise." Fed. R. Bankr. P. 6006(d). The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bank. ¶ 6004.11 (16th rev. ed. 2010). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

68. To maximize value, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

69. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the Middle District of Tennessee; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agent under the Debtors' prepetition secured revolving credit agreement; (d) counsel to the agent under the Debtors' prepetition secured term loan credit agreement; (e) counsel to the agent under the Debtors' debtor-in-possession financing facility; (f) the offices of the attorneys general for the states in which the Debtors operate; (g) the United States

Attorney's Office for the Middle District of Tennessee; (h) the Internal Revenue Service; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and enter the Sale Order following the Sale Hearing, and such other relief as the Court deems appropriate under the circumstances.

Dated: October 23, 2019
Nashville, Tennessee

RESPECTFULLY SUBMITTED:

/s/ William L. Norton III

William L. Norton III (TN 10075)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1600 Division Street, Suite 700
Nashville, Tennessee 37203
Telephone:     (615) 252-2397
Facsimile:      (615) 244-6380

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

- and -

Christopher Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Judge Randal S. Mashburn |

**ORDER (I) AUTHORIZING THE DEBTORS**
**TO PERFORM OBLIGATIONS RELATED TO THE**
**STALKING HORSE BID, (II) APPROVING BIDDING**
**PROCEDURES WITH RESPECT TO SUBSTANTIALLY**
**ALL ASSETS, (III) APPROVING CONTRACT ASSUMPTION AND**
**ASSIGNMENT PROCEDURES, (IV) SCHEDULING BID DEADLINES,**
**AN AUCTION, AND THE HEARINGS AND OBJECTION DEADLINES RELATED**
**THERETO, AND (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

Upon the motion (the "**Motion**")[2] filed on October 23, 2019 by the above-captioned

debtors and debtors in possession (each a "**Debtor**" and collectively, the "**Debtors**"), pursuant to

sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the

"**Bankruptcy Code**"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), for entry of an order (this "**Bid Procedures Order**"):

(i) approving the bid procedures in the form annexed hereto as **Exhibit 1** (as amended or

modified, the "**Bid Procedures**") to be implemented in connection with a sale (the "**Sale**") of all

or substantially all of the Debtors' assets (the "**Assets**"); (ii) scheduling an auction and hearing to

---

[1]     The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax
identification number, are:  Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive
Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188);
Dura Operating, LLC (2304); and NAMP, LLC (3693).  Dura Automotive Systems, LLC's service address
is:  1780 Pond Run, Auburn Hills, Michigan 48326.

[2]     Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings
ascribed thereto in the Motion, the Stalking Horse Purchase Agreement, or the Bid Procedures, as applicable. In
the event of a discrepancy between the definitions contained in the Motion, the Stalking Horse Purchase
Agreement and the Bid Procedures, those contained in the Stalking Horse Purchase Agreement shall control.

consider the sale of the Assets; (iii) approving procedures for the assumption and assignment of executory contracts and unexpired leases; (iv) approving the form and manner of notice of the foregoing; and (v) authorizing the Debtors' entry into the Stock and Asset Purchase Agreement, by and between the Debtors and Dura Automotive Angels, LLC (the "**Stalking Horse Bidder**"), dated [Date] (the "**Stalking Horse Purchase Agreement**"), which is attached hereto as **Exhibit 4**, and approving the related Expense Reimbursement Amount, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; the Court, having determined that the relief provided herein is in the best interests of the Debtors, their estates, creditors and other parties in interest and calculated to result in the highest or otherwise best offer for the Assets, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and due and adequate notice of the Motion having been given under the circumstances; and upon the record of the hearing to consider approval of the Motion and the arguments and representations of counsel made, and the evidence proffered or adduced at such hearing, and the full record of these chapter 11 cases; and after due deliberation thereon; and good and sufficient cause appearing therefore:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     The Court has jurisdiction to consider the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  Consideration of the Motion and the requested relief is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to U.S.C. §§ 1408 and 1409.

2

B.       The Motion and the Bid Procedures comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

C.       The notice given by the Debtors of the Motion and the hearing with respect to the Motion constitutes proper, timely, adequate, and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules, and applicable Local Rules, and no other or further notice is necessary, except as set forth herein with respect to the Auction and Sale Hearing.

D.       A reasonable opportunity to object or to be heard regarding the relief provided herein with respect to the Motion has been afforded to parties in interest.

E.       The proposed Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Bid Procedures to be employed in connection therewith, the Sale and the Sale Hearing. The Notice Procedures comply with Bankruptcy Rule 2002 and constitute sufficient notice to all interested parties and provide sufficient notice of the proposed Sale and related transactions.

F.       The Debtors have articulated good and sufficient business reasons for this Court to approve (i) the Bid Procedures; (ii) the scheduling of the Auction and the Sale Hearing; (iii) procedures for the assumption and assignment of executory contracts and unexpired leases; (iv) entry into the Stalking Horse Purchase Agreement and approval of the Expense Reimbursement Amount; and (v) related notices and deadlines in connection with each of the foregoing.  Such good and sufficient reasons were set forth in the Motion or have been described at the hearing, are incorporated by reference herein, and, among other things, form the basis of the findings of fact and conclusions of law set forth herein. The Debtors have demonstrated that the Bid Procedures are fair, reasonable and appropriate and are designed to maximize the value of the Debtors' estates.

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document      Page 38 of 174

G.     The Expense Reimbursement Amount: (i) shall, if triggered, be deemed actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) is reasonable and appropriate, including in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the proposed Sale is subject to better and higher offers; (iv) was necessary to induce the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Purchase Agreement; and (v) has been negotiated by the parties and their respective advisors at arm's length and in good faith.

H.     The Debtors' decision to enter into the Stalking Horse Purchase Agreement and grant the Expense Reimbursement Amount is a sound exercise of business judgment.  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Assets will be received. Accordingly, the Bid Procedures and the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

I.     The Bid Procedures are reasonably designed to enable the Debtors to receive bids for the Assets and represent the best method for maximizing the realizable value of the Transferred Assets and the Transferred Stock (together, the "**Assets**") and serve to maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and parties in interest.

J.      The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Auction, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and certain dates and deadlines related thereto, and no other or further notice of the Auction shall be required.

K.      The Assumption and Assignment Procedures are reasonable and appropriate.

L.      Entry of this Bid Procedures Order and the granting of relief set forth herein are in the best interests of the Debtors, their estates, creditors and other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion as it relates to the Bid Procedures and Bid Protections and the scheduling of and notice to be approved with respect to the Auction and the Sale Hearing is granted and approved as set forth in this Bid Procedures Order.

2.      All objections and responses to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      The Bid Procedures, attached hereto as **<u>Exhibit 1</u>**, are incorporated herein and are approved in their entirety, and shall apply with respect to the sale of the Assets. The failure to specifically include or reference a particular provision of the Bid Procedures in the Motion or in this Bid Procedures Order shall not diminish or impair the effectiveness of such provision. The Debtors are authorized to take all actions necessary or appropriate to implement the Bid Procedures. Notwithstanding the foregoing, the consummation of the Sale shall remain subject to entry of a further order of this Court (the "**Sale Order**") which shall serve as an order approving the Sale of the Assets, as applicable, free and clear of any interests under section 363(f) of the

5

Bankruptcy Code. In the event of an inconsistency between this Bid Procedures Order and the Bid Procedures, the Bid Procedures Order shall control.

4. The Debtors are hereby authorized to pursue a Sale of the Assets in accordance with the Bid Procedures.

5. Dura Automotive Angels, LLC is approved to be the Stalking Horse Bidder and the Debtors are hereby authorized to execute the Stalking Horse Purchase Agreement. The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse Purchase Agreement is deemed a Qualified Bid.

6. The Expense Reimbursement Amount is approved in its entirety. The Debtors are hereby authorized and directed to pay the Expense Reimbursement Amount in accordance with the terms of the Stalking Horse Purchase Agreement without further order of the Court. The Expense Reimbursement Amount shall constitute an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative priority claims. The Debtors' obligation to pay the Expense Reimbursement Amount shall be the joint and several obligations of the Debtors and shall survive termination of the Stalking Horse Purchase Agreement, dismissal or conversion of any of the Chapter 11 Cases, and confirmation of any plan of reorganization or liquidation.

7. The process for submitting Qualified Bids (as defined in the Bid Procedures) is fair, reasonable, and appropriate and is designed to maximize recoveries for the benefit of the Debtors' estates, their creditors and other parties in interest. Any disputes as to the selection of a Qualified Bidder, the Successful Bidder and the Backup Bidder (as defined in the Bid Procedures) shall be resolved by this Court.

8.     All information relating to the Assets provided to assist a person or entity in evaluating whether to participate in the Auction is confidential. Any person or entity that is provided with such information (i) shall use such information solely for the purpose of evaluating whether to participate in the Auction, (ii) shall not use such information for any other purpose, (iii) shall hold such information in strict confidence, (iv) shall not, directly or indirectly, disclose any of such information, subject to certain limited exceptions, (v) shall undertake reasonable precautions to protect the confidentiality of such information, and (vi) shall be solely responsible for any ramifications resulting from any disclosure of such information.

9.     As further described in the Bid Procedures, the deadline for submitting Bids (as defined in the Bid Procedures) for the Assets (the "**Bid Deadline**") is **January 14, 2020 at 5:00 p.m. (prevailing Central Time).**

10.     The Debtors are authorized to conduct the Auction in the event they receive one or more timely and acceptable Qualified Bids. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), then (a) the Debtors will not hold the Auction, (b) the Stalking Horse Bidder will be deemed to be the Successful Bidder, and (c) the Debtors shall seek approval of the Stalking Horse Purchase Agreement at the Sale Hearing, subject to the fiduciary out provision in the Bid Procedures and the Stalking Horse Purchase Agreement.

11.     If there are two or more Qualified Bids received in accordance with the Bid Procedures, the Auction shall take place on **January 27, 2020 at 10:00 a.m. (prevailing Central Time)** at the offices of Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, or such other place and time as the Debtors shall notify all parties in interest attending the Auction.  The Auction shall be conducted in accordance with the Bid Procedures, will be conducted openly, and bidding at the Auction will be transcribed.

7

12.     The Sale Hearing shall be held before this Court on **February 3, 2020 at [Time] (prevailing Central Time)** or as soon thereafter as counsel and interested parties may be heard. Objections, if any, to the Sale of the Assets to any Successful Bidder and/or the relief requested in the Motion, other than the relief approved in this Order, must be in writing and filed with the Court **on or before January 7, 2020 at [Time] (prevailing Central Time)**; <u>provided</u>, <u>however</u>, that objections solely stemming from the identity of the Successful Bidder (if different than the Stalking Horse Bidder) must be filed by January 30, 2020 at 5:00 p.m. (**prevailing Central Time**).

13.     The Debtors shall file and serve a statement with the Court promptly after the close of the Auction (and in any event no later than two business days after the conclusion of the Auction) with the identity of the Successful Bidder and Backup Bidder for the Assets and the terms of the Successful Bid and Backup Bid, as applicable.

14.     Except as otherwise provided in this Bid Procedures Order, the Debtors, in their business judgment, further reserve the right as they may reasonably determine to be in the best interests of their estates, subject to the terms and conditions under the Bid Procedures, to: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal, the Successful Bid, and which is the next highest or otherwise best proposal, the Backup Bid, in each case in accordance with the Bid Assessment Criteria; (d) reject any bid that is (i) not in conformity with the requirements of the Bid Procedures or the requirements of the Bankruptcy Code, or (ii) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under the Bid Procedures; (f) impose additional terms and conditions with respect to all Qualified

Bidders other than the Stalking Horse Bidder; and (g) modify the Bid Procedures or withdraw the request to sell the Assets, as applicable, to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice. For the avoidance of doubt, the foregoing neither provides the Debtors with any rights to modify the Stalking Horse Bid without the written consent of the Stalking Horse Bidder nor the right to modify this Bid Procedures Order or the Bid Procedures in any manner that is inconsistent with the terms of the orders approving the Debtors' debtor-in-possession financing facility.

15.    For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Bid Procedures Order, the Bid Procedures or the Motion shall, or shall be construed to, in any way amend, impair, prejudice, alter or otherwise modify the terms of the Stalking Horse Purchase Agreement or the Stalking Horse Bidder's rights thereunder, and the Stalking Horse Purchase Agreement shall remain in full force and effect unless terminated in accordance with its terms.

16.    The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.  As soon as practicable after entry of this Order, the Debtors shall serve the Bidding Procedures, Sale Notice, and Cure Notice upon the Notice Parties.  In addition, as soon as practicable after entry of this Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in *The New York Times (National Edition)*, [*The Detroit Free Press*, and *The Tennessean*] to provide notice to any other potential interested parties.

17.    The Assumption and Assignment Procedures set forth in the Bidding Procedures Motion regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by the Debtors and assigned to a Successful Bidder are approved.

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document    Page 44 of 174

18.     As soon as practicable after entry of this Order, the Debtors, with the consent of the Stalking Horse Bidder (such consent not to be unreasonably withheld or conditioned) and subject to consultation with the Consultation Parties, shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice annexed as **Exhibit 3** to this Order on all Contract Counterparties, and post the Cure Notice to the Case Website (https://cases.primeclerk.com/DuraAutomotive).

19.     The Cure Notice shall notify the applicable Contract Counterparties that the Assigned Contracts may be subject to assumption and assignment in connection with a proposed sale transaction, and contain the following information: (i) a list of the Assigned Contracts; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the Cure Costs; and (iv) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned to the Successful Bidder.

20.     Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be **actually received** by counsel to the Debtors prior to **January 9, 2020, at 5:00 p.m.**

**(prevailing Central Time)** (*i.e.*, **three business days before the Bid Deadline of January 14, 2020)**; *provided* that the Debtors, subject to the consultation with the Consultation Parties, may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

21.     A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the objection, but will not constitute an objection to the remaining relief requested in the Sale to the Successful Bidder.

22.     Any objection to the proposed assumption and assignment of an Assigned Contract, or Cure Costs, that remain unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at such later date as may be fixed by the Court). Upon entry of an order by the Court resolving such Assigned Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the later of either (i) the date such Contract Counterparty receives the Cure Notice, or (ii) the Closing Date. To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion. To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing. If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not

assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

23.     The Debtors reserve the right, with the consent and direction of the Successful Bidder(s) and subject to consultation with the Consultation Parties, at any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, to: (a) supplement the Assigned Contract Schedule attached to the Cure Notice with previously omitted Assigned Contracts in accordance with the definitive agreement for a Sale; (b) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Cost associated with any Assigned Contracts. In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly provide the Consultation Parties with notice and an opportunity to object to any such actions, and thereafter will serve a Supplemental Cure Notice by electronic transmission, hand delivery, or overnight mail on the applicable Contract Counterparty, and its attorney, if known, to each impacted Assigned Contract at the last known address available to the Debtors. Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice. Any Assigned Contract Counterparty listed on a Supplemental Cure Notice may file a Supplemental Assigned Contract Objection only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state with specificity the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (b) include appropriate documentation in support of the objection; and (c) be filed and served on

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document    Page 47 of 174

the Objection Recipients no later than fourteen days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

24.     If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek a Supplemental Assigned Contract Hearing to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.  If there is no such objection, then the Debtors will obtain a Supplemental Assigned Contract Order, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Assigned Contract listed on a Supplemental Cure Notice.

25.     If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them, and (c) the Contract Counterparty will be deemed to have consented to the Debtors' standard terms and conditions and payment terms for any post-Closing purchases.

26.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the earlier of (a) the Objection Deadline or Supplemental Assigned Contract Hearing, as applicable, and (b) 5:00 p.m. (prevailing Central Time) on the date that is 14 days following (i) the Assumption and Assignment Service Date, or (ii) the date of Service of the Supplemental Cure Notice, as applicable. Such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable. The Debtors may adjourn the resolution of any such objection to a later hearing.

27.     The inclusion of an Assigned Contract in the Cure Notice (or Supplemental Cure Notice) will not: (a) obligate the Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease. Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

28.     The 14-day stay provided for in Bankruptcy Rule 6004(h) is waived, for cause, and this Bid Procedures Order shall be effective immediately upon its entry.

29.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of the Court, to allow the Debtors or the Stalking Horse Bidder to deliver any notice provided for in the Stalking Horse Purchase Agreement, including, without limitation, a notice terminating the Stalking Horse Purchase Agreement, and allow the Debtors and the Stalking Horse Bidder to

take any and all actions permitted under the Stalking Horse Purchase Agreement in accordance with the terms and conditions thereof.

30.    All time periods set forth in this Bid Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the interpretation and implementation of this Bid Procedures Order.

**This Order Was Signed and Entered Electronically As Indicated At The Top Of The First Page**

**APPROVED FOR ENTRY:**

*/s/ William L. Norton III*

| | |
|---|---|
| William L. Norton III (TN 10075) | James H.M. Sprayregen, P.C. |
| **BRADLEY ARANT BOULT CUMMINGS LLP** | Ryan Blaine Bennett, P.C. (admitted *pro hac vice*) |
| 1600 Division Street, Suite 700 | Gregory F. Pesce (admitted *pro hac vice*) |
| Nashville, Tennessee 37203 | **KIRKLAND & ELLIS LLP** |
| Telephone:    (615) 252-2397 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Facsimile:    (615) 244-6380 | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

- and -

Christopher Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit 1**

**Bid Procedures**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Judge Randal S. Mashburn |

## BIDDING PROCEDURES

By the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Perform Obligations Related To The Stalking Horse Bid, (II) Approving Bidding Procedures With Respect to Substantially All Assets, (III) Approving Contract Assumption And Assignment Procedures, (IV) Scheduling Bid Deadlines, an Auction, and the Hearings and Objection Deadlines Related Thereto, and (V) Approving the Form and Manner of Notice Thereof*, filed on October 23, 2019 [Docket No. [●]] (the "Bidding Procedures Motion"), the Debtors sought approval of, among other things, the procedures through which they will determine the highest or otherwise best price for the purchase of substantially all of the assets of the Debtors, including the equity interests in their non-Debtor affiliates (collectively, the "Assets").

The Debtors intend to use the Stalking Horse Purchase Agreement with Dura Automotive Angels, LLC (the "Stalking Horse Bidder"), attached to the Bidding Procedures Order (as defined below) as Exhibit 1, as the basis for bids in connection with this sale process. Capitalized terms used in these Bidding Procedures and not otherwise defined shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

On November [●], 2019, the United States Bankruptcy Court for the Middle District of Tennessee (the "Court") entered an order (the "Bidding Procedures Order") in the Debtors' jointly-administered chapter 11 cases (the "Chapter 11 Cases") approving these bidding procedures (these "Bidding Procedures"). The Bankruptcy Court will have jurisdiction with respect to any dispute that may arise with respect to these Bidding Procedures.

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction") for the sale (the "Sale") of the Assets. The Debtors may consider bids for the Assets (or any portion thereof) in a single bid from a single bidder, or in multiple bids from multiple bidders. The Sale will be subject to the approval of the Bankruptcy

---

[1] The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

Court, pursuant to sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

## I.    Submissions to the Debtors.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "Debtors' Representatives"):

A. **Counsel.** Proposed Counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Ryan Blaine Bennett (rbennett@kirkland.com) and Christopher Marcus (cmarcus@kirkland.com);

B. **Investment Banker.** Proposed investment banker to the Debtors, Jefferies LLC, 520 Madison Avenue, 10th Floor, New York, New York 10022, Attn.: Richard W. Morgner (rmorgner@jefferies.com) and Thomas Fennimore (tfennimore@jefferies.com).

## II.    Important Dates.

The following is a table setting forth key dates and deadlines with respect to the sale process:

| Event or Deadline | Date and Time |
|---|---|
| Sale Objection Deadline (for all objections other than those stemming from the identity of the Successful Bidder (if different than the Stalking Horse Bidder)) | **January 7, 2020 at 5:00 p.m. (CT)** |
| Contract Objection Deadline (for all objections other than adequate assurance of future performance, including to any proposed Cure Amount) | **January 7, 2020 at 5:00 p.m. (CT)** |
| Bid Deadline | **January 14, 2020 at 5:00 p.m. (CT)** |
| Selection of Qualified Bids | **January 16, 2020** |
| Auction (if necessary) | **January 27, 2020 at 10:00 a.m. (ET)** |

| | |
|---|---|
| Deadline to File Notice Designating Successful Bidder | Immediately upon the Debtors' identification and designation of the Successful Bidder (which shall in any event be no later than two business days after the conclusion of the Auction) |
| Deadline to Object to Adequate Assurance of Future Performance and Raise Any Additional Cure Cost Objections | **January 30, 2020 at 5:00 p.m. (CT)** |
| Deadline to Object to the Sale based on the Identity of the Successful Bidder (if different than the Stalking Horse Bidder) | **January 30, 2020 at 5:00 p.m. (CT)** |
| Sale Hearing (subject to the Court's availability) | **February 3, 2020 at [●] (CT)** |

## III.    Participation Requirements.

### A.  Potential Bidders.

To participate in the bidding process or otherwise be considered  in connection with the Sale, a person or entity interested in the Assets (a "Potential Bidder") must first deliver to each of the Debtors' Representatives the following documents (collectively, the "Preliminary Bid Documents"):

- an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

- preliminary proof by the Potential Bidder of its financial capacity to close the proposed transaction (including current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), as well as an overview of any recent transactions), the adequacy of which must be acceptable to the Debtors; and

- details regarding the ownership and capital structure of the Potential Bidder, including identification of the Potential Bidder and its beneficial owners, and/or any of the principals, corporate officers or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction.

### B.  Notice of Acceptable Bidder.

Promptly after a Potential Bidder delivers the Preliminary Bid Documents, the Debtors, in consultation with the Consultation Parties (as defined below), will determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct due diligence with respect to the Assets, and the Debtors will provide counsel to each of the Consultation Parties with copies of such notices. Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents, as determined by the Debtors in consultation with the Consultation Parties (each, an "Acceptable Bidder") may submit bids. The Stalking Horse Bidder shall not have to submit Preliminary Bid Documents and is an Acceptable Bidder.

### IV.  Due Diligence Access.

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. The Debtors will provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room. The due diligence period will end on the Bid Deadline (as defined herein) and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information; *provided that* Qualified Bidders will retain access to the Debtors' electronic data room and any due diligence information provided prior to the Bid Deadline until commencement of the Auction.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors' assets or liabilities, or otherwise relating to the Sale to any person except to an Acceptable Bidder or to such Acceptable Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors and their advisors will coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided that* the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate the Sale; *provided, further, that* if the Debtors decline to provide such information to an Acceptable Bidder, they will promptly provide notice of such to the Consultation Parties.

**All due diligence requests must be directed to Jefferies LLC, Attn: Richard W. Morgner (rmorgner@jefferies.com) and Thomas Fennimore (tfennimore@jefferies.com).**

**A. Communications with Acceptable Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications with Acceptable Bidders shall be through the Debtors' Representatives. No Acceptable Bidder may correspond with any other Acceptable Bidder regarding the terms of the Bids or the Auction, or otherwise collude in any way regarding the Bids or the Auction.

**B. Due Diligence from Acceptable Bidders.**

Each Acceptable Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding such Acceptable Bidder and its contemplated transaction. Failure by an Acceptable Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine in consultation with the Consultation Parties that such bidder is no longer an Acceptable Bidder or that a bid made by such bidder is not a Qualified Bid (as defined herein).

**V.     Bid Requirements.**

To become a Qualified Bidder and participate in the Auction, if any, a Potential Bidder must deliver to counsel to the Debtors an irrevocable written offer (each, a "<u>Bid</u>") that the Debtors determine to be a Qualified Bid as set forth herein.  To be deemed a "Qualified Bid", a Bid must be determined by the Debtors, in their reasonable business judgment, and in consultation with the Consultation Parties, to have satisfied the following requirements (collectively, the "<u>Bid Requirements</u>"):

1. *Delivery*. Be transmitted via email to the Debtors' Representatives (in .pdf or similar format) so as to be *actually received* on or before **January 14, 2020 at 5:00 p.m.** (prevailing Central Time) (the "<u>Bid Deadline</u>").

2. *Purchase Agreement.* Each Bid must be in writing and must include: (a) a purchase agreement signed by the Acceptable Bidder (a "<u>Modified Purchase Agreement</u>"); and (b) a marked version, or blackline, of the Modified Purchase Agreement reflecting any variations to the Stalking Horse Purchase Agreement.

3. *Assets and Liabilities.* Each Bid may be a partial bid for only some of the Assets, or a bulk bid to purchase all or substantially all of the Assets. Additionally, each Bid must clearly state which liabilities of the Debtors the Acceptable Bidder is agreeing to assume.

4. *Total Consideration.* Each Bid must clearly set forth the amount of the total consideration to be provided to the Debtors, including and identifying separately any cash and non-cash components (the "<u>Bid Value</u>"). The Bid must confirm that such consideration is not subject to any contingencies.

5. *Minimum Bid.* Provide for a Purchase Price equal to or greater than the Purchase Price stated in the Stalking Horse Purchase Agreement (which is comprised of (A) the Credit

Bid Amount (as defined in the Stalking Horse Purchase Agreement), (B) the Assumed Liabilities (as defined in the Stalking Horse Purchase Agreement) and (C) cash consideration in the amount of the Wind Down Amount and Cure Claims (each as defined in the Stalking Horse Purchase Agreement), plus (x) the Expense Reimbursement Amount (as defined in the Stalking Horse Purchase Agreement), plus (y) the minimum overbid amount of $500,000. A Qualified Bid (other than those bids by the Stalking Horse Purchaser) must provide for a cash amount of the Purchase Price sufficient to repay all outstanding obligations under the DIP Facility (including any rolled-up amounts) and the Prepetition ABL Obligations (to the extent not discharged).

6. ***Deposit.*** Each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the cash consideration of the Bid Value, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit"); *provided,* that no Deposit shall be required with respect to any Bid that is a credit bid (in whole or in part) by the agent for the DIP Lenders and/or the agent for the holders of DIP Claims.

7. ***Pro Forma Capital Structure.*** Each Bid must include a description of the Bidder's pro forma capital structure.

8. ***Non-Contingent Bid.*** In addition to the signed purchase agreement, each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include a schedule of executory contracts and unexpired leases to be assumed to the extent applicable to the Bid, as well as all other material documents integral to such Bid.

9. ***Employees.*** The Bid must detail the treatment of the employees of the Debtors and their subsidiaries.

10. ***Conditions to Closing.*** The Bid must identify with particularity each and every condition to Closing.

11. ***No Financing, Approval, or Diligence Outs.*** The Bid must not be conditioned on obtaining any of the following: (a) financing; (b) board of directors or other similar approval; or (c) the outcome or completion of a due diligence review by the Acceptable Bidder.

12. ***Due Diligence Acknowledgement.*** The Bid must include a written acknowledgement and representation that the Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Sale before making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale in making its Bid; (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets, Sale, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's proposed form of definitive agreement; and (d) the Bidder did not engage in any

6

collusive conduct with respect to any Bids, the Auction, or the Sale and acted in good faith in submitting its Bid.

13. ***Irrevocable.*** The Bid is irrevocable until (i) the closing of the Sale, if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Successful Bidder (as defined below), or (ii) if such Potential Bidder is designated as a Backup Bidder (as designed below), until the earlier of (x) two (2) business days after the closing of the transaction(s) by which all of the Interests or Assets that were subject to such Backup Bid (as defined below) have been transferred to one or more Qualified Bidders pursuant to these Bidding Procedures and (y) ninety days after the date of the Auction (the "<u>Backup Bid Expiration Date</u>").

14. ***No Break-Up Fee or Expense Reimbursement.*** The Bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; provided, however, that the Stalking Horse Purchase Agreement with the Stalking Horse Bidder shall contain expense reimbursement, as approved in the Bidding Procedures Order.

15. ***Designation of Assumed or Assumed and Assigned Contracts and Leases and Adequate Assurance of Future Performance.*** The Bid must contain a list of any and all executory contracts and unexpired leases of Dura Automotive Systems, LLC, that are to be assumed and assigned in connection with a Sale (each a "<u>Contract</u>" and, collectively, the "<u>Contracts</u>" and once assumed, or assumed and assigned, an "<u>Assigned Contract</u>") to the extent such list is not included in the Modified Purchase Agreement. The Potential Bidder must also include written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance for the benefit of the non-Debtor parties to the Contracts on the list, including, without limitation, (i) the specific name of the entity to whom the Contract will be assigned; (ii) if available, audited financial statements and annual reports of the proposed purchaser and any other assignee for the past three (3) years, including all supplements or amendments thereto; (iii) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, and any financial projections, calculations and/or pro formas prepared in contemplation of purchasing the assets, including the Assigned Contracts; (iv) all documents and other evidence of the proposed assignee's experience in the Debtors' industry; and (v) a contact person for the proposed assignee whom non-Debtor parties may contact directly in connection with adequate assurance of future performance. Should the Potential Bidder be a newly formed entity (a "<u>Newco</u>"), written evidence of adequate assurance of future performance should also include when such Newco was formed, the relevant financial information of the equity sponsors of the Newco, how it will be financed together with evidence of firm financial commitments, and identify what credit enhancements will be available to guarantee the obligations under the Assigned Contracts. Non-Debtor parties to the Contracts will have until the commencement of the Sale Hearing to object on adequate assurance grounds.

16. ***Identity.*** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or

other financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s) and counsel whom Jefferies LLC and Kirkland & Ellis LLP should contact regarding such Bid.

17. ***Committed Financing***. To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, after consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient non-contingent debt and/or equity funding commitments to satisfy the Acceptable Bidder's Bid Value and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

18. ***Same or Better Terms***.  Be on terms that, in their totality, are determined by the Debtors, in their business judgment, to be the same or better than the terms set forth in the Stalking Horse Purchase Agreement in their totality.

19. ***Time Frame for Closing.*** A Bid by an Acceptable Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated on or before [Date], unless otherwise agreed to by the Debtors in consultation with the Consultation Parties.

20. ***Authorization.*** Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, notwithstanding any contrary terms in its Bid, to abide by and honor the terms of the Bidding Procedures and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction. The submission of a Bid shall constitute a binding and irrevocable offer, but such Bid shall automatically terminate if it is not selected as the Successful Bid or Backup Bid at the conclusion of the Auction.

For the avoidance of doubt, the Stalking Horse Bid (and any bid of the Stalking Horse Bidder at the Auction) shall be deemed a Qualified Bid regardless of the foregoing requirements.

## VI.    Qualified Bidders.

A Bid that satisfies the Bid Requirements, as determined in the Debtors' business judgement, in consultation with the Consultation Parties, shall constitute a "Qualified Bid," and such Acceptable Bidder shall be a "Qualified Bidder." Within two business days after the

Bid Deadline, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder. Notwithstanding anything to the contrary herein or in the Sale Order, the Stalking Horse Bidder shall be a Qualified Bidder. No party that, in the reasonable judgment of the Debtors, after consultation with the Consultation Parties, either is not negotiating or acting in good faith or acting in accordance with its contractual obligations, in its dealings with any Debtor or any of its subsidiaries may be a Qualified Bidder.

The Debtors may, in consultation with the Consultation Parties, extend the Bid Deadline or postpone the Auction.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit and all accumulated interest thereon on or before the date that is five business days after the Bid Deadline.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided,* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (a) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Acceptable Bid prior to the Bid Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction. The Debtors reserve the right to cooperate with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

## VII.    Auction.

If the Debtors have determined that there are one or more Qualified Bidders (other than the Stalking Horse Bidder), the Debtors shall conduct an Auction to determine the highest and otherwise best Qualified Bid. This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes requested by the Qualified Bidder to the Stalking Horse Purchase Agreement that the Debtors will make available in the electronic data room, including the type and amount of Assets sought and Assumed Obligations to be assumed in the Bid; (b) the amount and nature of the total consideration proposed by the Qualified Bid; (c) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof; (d) any excluded assets, executory contracts, or unexpired leases; (e) any purchase-price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; (g) whether the Bid is a bulk bid or a partial

Case 3:19-bk-06741   Doc 154   Filed 10/23/19   Entered 10/23/19 08:24:34   Desc Main
Document   Page 60 of 174

bid for only some of the Debtors' assets; and (h) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

Other than the Stalking Horse Bid, as approved by order of the Court, no Qualified Bidder shall be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid, the Qualified Bidder (solely in its capacity as a Qualified Bidder) is deemed to have waived the right to request or file with the Court any request for expense reimbursement or any fee of any nature, including under section 503(b) of the Bankruptcy Code.

The Auction shall take place at 10:00 a.m. (Eastern Prevailing Time) on January 27, 2020 at the offices of Kirkland & Ellis LLP, 601 Lexington Ave., New York, New York 10022, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures.

**A. The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the leading Qualified Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the initial leading Qualified Bid, all Overbids, the Successful Bid, and the Backup Bid.

Only Qualified Bidders, the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (if any) (the "Committee"), the holders of DIP Claims, the agent under the Debtors' ABL facility, and the agent under the Debtors' term loan facility, and each of their legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction. Bids at the Auction will be transcribed.

**B. Procedures for Auction.**

The Auction shall be governed by the following procedures:

1. Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

2. Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures Order, the Stalking Horse Purchase Agreement, the Financing Orders, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of

10

Bankruptcy Court for the Middle District of Tennessee, or any order of the Bankruptcy Court entered in connection with these Chapter 11 Cases, (ii) disclosed to each Qualified Bidder, and (iii) designed, in the Debtors' business judgment, to result in the highest and otherwise best offer for the Assets.

3.  The Debtors will arrange for the actual bidding at the Auction to be transcribed. Each Qualified Bidder shall designate a single individual to be its spokesperson during the Auction.

4.  Each Qualified Bidder participating in the Auction must confirm on the record, at the commencement of the Auction and again at the conclusion of the Auction that (i) it has not engaged in any collusion with the Debtors or any other Qualified Bidder regarding these Bidding Procedures, the Auction or any proposed transaction relating to the Assets, and (ii) its bid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bid.

5.  Prior to the Auction, the Debtors shall identify the highest and best of the Qualified Bids received (the "Opening Qualified Bid"). Subsequent bidding will continue in minimum increments valued at not less than $500,000 cash or in such other amounts as to be determined by the Debtors (after consultation with the Consultation Parties) and announced at the Auction. A Qualified Bid and any subsequent bids (other than those bids by the Stalking Horse Purchaser) must provide for a cash amount of the Purchase Price sufficient to repay all outstanding obligations under the DIP Facility that are credit bid pursuant to the Stalking Horse Purchase Agreement. Each Qualified Bidder (other than the Stalking Horse Bidder) shall provide evidence of its financial wherewithal and ability to consummate the Sale at the increased Purchase Price.

6.  All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then-current highest and best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then-current highest and best bid.

7.  In the Debtors' discretion, all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Stalking Horse Purchase Agreement or Modified Purchase Agreement, as applicable, at the Auction in accordance with the terms and provisions of these Bidding Procedures; provided, however, that any such modifications to the Stalking Horse Purchase Agreement or Modified Purchase Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors, in their business judgment.

8.  Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, (i) identify and determine in their business judgment the highest and best Qualified Bid for the Interests or Assets (a "Successful Bid")

and the entity or entities submitting such Successful Bid (the "Successful Bidder"), (ii) advise the Qualified Bidders of such determination, (iii) require the Successful Bidder to deliver an executed final purchase agreement, which reflects its bid and any other modifications submitted and agreed to during the Auction, prior to commencement of the Sale Hearing, and (iv) file with the Court a designation of the Successful Bidder, the terms of the Successful Bid, the designation of any Backup Bidder, and the terms of any Backup Bid. Once the Auction is closed, no further bids shall be considered by the Debtors.

9. In addition, the Debtors will determine, which Qualified Bid, if any, is the next highest and best Qualified Bid to the Successful Bid, and will designate such Qualified Bid as a "Backup Bid" in the event the Successful Bidder fails to consummate the contemplated Sale. A Qualified Bidder who submitted a Qualified Bid and is designated a Backup Bid is a "Backup Bidder". Each Backup Bid shall remain open and binding until the Backup Bid Expiration Date.

10. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

## VIII.   Highest or Otherwise Best Bid.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type, and nature of any changes to the form asset Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and Assumed Obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction, the conditions thereto, and the timing thereof; (d) any purchase-price adjustments; (e) indemnification or similar such provisions; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; (g) whether the Qualified Bid is a bulk bid or a partial bid for only some of the Debtors' assets; and (h) the tax consequences of such Qualified Bid.

## IX.   Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation:

(a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) to the extent not inconsistent with the Bidding Procedures, adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) to the extent not inconsistent with the Bidding Procedures, rejecting any or all Bids or Qualified Bids.

## X.  Consent to Jurisdiction.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XI.  Sale Hearing.

A hearing to consider approval of the Sale of the Debtors' Assets to the Successful Bidder (the "Sale Hearing") is currently scheduled to take place on February 3, 2020, at [Time] (Central Prevailing Time), before the Randal S. Mashburn, at the United States Bankruptcy Court for the Middle District of Tennessee, 701 Broadway, Room 170, Nashville, Tennessee 37203.

At the Sale Hearing, the Debtors shall present the Successful Bid and any Backup Bid to the Court for approval.

Objections to the Sale Motion (which shall be filed by the Debtors with the Court at a later date), if any, must be made on or before January 7, 2020, at 5:00 p.m. (prevailing Central time) (the "Sale Motion Objection Deadline"); *provided that* objections specific to the Auction or the Successful Bidder, if any, must be made on or before January 30, 2020, at 5:00 p.m. (Central Prevailing Time) (the "Auction Objection Deadline"). All objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be actually received no later than the Sale Objection Deadline or the Auction Objection Deadline, as applicable, by the following parties (the "Notice Parties"): Debtors' counsel, Debtors' co-counsel, the U.S. Trustee, counsel to the Committee, and counsel to the holders of DIP Claims.

## XII.  Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is three business days after the Auction.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited

13

by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors, in consultation with the Consultation Parties, shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## XIII. Consultation Parties.

The term "Consultation Parties" as used in these Bidding Procedures shall mean (i) members of the Committee (if any), and the Committee's professionals, (ii) the holders of DIP Claims, (iii) the agent under the Debtors' ABL facility, (iv) the agent under the Debtors' term loan facility, and (v) Joseph Farnan, Jr., in his capacity as independent director of Zohar III Corp. and its affiliated debtors in the cases captioned *In re: Zohar III Corp. et al.*, Case No. 18-10512 (KBO), and the respective agents and professionals of the foregoing, except that if any of such parties submit a Bid, including a credit bid, then the Debtors, prior to the Auction, are permitted but not required to disclose to any such party the terms of any Bid submitted by another party.

Subject to the Debtors' fiduciary duties and the Fiduciary Out set forth below, the Debtors shall use their commercially reasonable best efforts to consult with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

The Debtors may not modify the consultation rights of any of the Consultation Parties set forth herein or in the Bidding Procedures Order without the consent of such affected party; *provided that* that the Debtors may, in the exercise of their business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting the consultation rights of a Consultation Party that is or becomes (or is affiliated with) a Qualified Bidder.

## XIV. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to take any action or to refrain from taking any action related to any sale transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, however, that the Debtors shall provide the Consultation Parties with notice of such action or inaction within two (2) business days of such action or inaction if practicable. If, at the Auction, the Debtors exercise the foregoing right to take any action or refrain from taking any action to the extent failing to do so would be inconsistent with applicable law or their fiduciary obligations under applicable law, the Debtors shall provide the Consultation Parties with notice of such action or inaction as soon as practicable.

14

Further, notwithstanding anything to the contrary in these Bidding Procedures, through the date of the Auction, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Debtors' assets (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor, any other party in interest in these chapter 11 cases (including any official committee and the United States Trustee), or any other entity regarding Alternate Proposals.

Dated: [Date]
     [Location]

859468-WILSR01A - MSW

**Exhibit 2**

**Sale Notice**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Judge Randal S. Mashburn |

## NOTICE OF AUCTION FOR THE SALE OF
## SUBSTANTIALLY ALL ASSETS OF THE DEBTORS FREE
## AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession in these chapter 11 cases (collectively, the "Debtors") are soliciting offers for the purchase of substantially all of the Debtors' assets and assumption of certain liabilities of the Debtors consistent with the bidding procedures (the "Bidding Procedures")[2] approved by the United States Bankruptcy Court for the Middle District of Tennessee (the "Court") by entry of an order on [●], 2019 [Docket No. [●]] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

---

**Copies of the Bidding Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to the Debtors Notice and Claims Agent, Prime Clerk LLC, by calling (877) 468-4591 or visiting the Debtors' restructuring website at (https://cases.primeclerk.com/DuraAutomotive).**

---

**PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **January 14, 2020**, at **5:00 p.m.**

**(prevailing Central Time)**, and that any person or entity who wishes to participate in the Auction must

---

[1]   The debtor entities in these chapter 11 cases, along with the last four digits of each debtor entity's federal tax identification number, include:  Dura Automotive Systems Cable Operations, LLC (7052), Dura Automotive Systems, LLC (8111); Dura Fremont, L.L.C. (1252), Dura G.P. (8092), Dura Mexico Holdings, LLC (4188), Dura Operating, LLC (2304), and NAMP, LLC (3693).  The location of Dura Automotive Systems, LLC's service address is:  1780 Pond Run, Auburn Hills, Michigan 48326.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which time they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **January 27, 2020**, at **[10:00 am.] (prevailing Eastern Time)** at Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of the Sale at the Sale Hearing, which is presently scheduled to commence on **February 3, 2020**, at **[●].m. (prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable Randal S. Mashburn at the United States Bankruptcy Court for the Middle District of Tennessee, 701 Broadway, Courtroom 1, Nashville, Tennessee 37203.

      **PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Assigned Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court, so that it may be **actually received** by the following parties, prior to January 30, 2020, at 5:00 p.m. (prevailing Central Time) (the "Sale Objection Deadline"); *provided* that if the Auction occurs after January 27, 2020, the Sale Objection Deadline shall be automatically extended through 5:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction.

| Counsel to the Debtors | The United States Trustee |
|---|---|
| Kirkland & Ellis LLP | Office of the United States Trustee |
| 300 North LaSalle | for the Middle District of Tennessee |
| Chicago, Illinois 60654 | 701 Broadway, Room 170 |
| Attn.: Ryan Blaine Bennett (rbennett@kirkland.com) | Nashville, Tennessee 37203 |
| Gregory F. Pesce (gregory.pesce@kirkland.com) and | Attn.: Natalie Cox |
| Christopher S. Koenig (chris.koenig@kirkland.com) | (Natalie.Cox@usdoj.gov) |

| Counsel to the DIP Lenders | Counsel to the Official Committee of Unsecured Creditors |
|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP<br>55 North Upper Wacker Drive<br>Chicago, IL 60606<br>Attn: Ron E. Meisler<br>(ron.meisler@skadden.com)<br><br>920 N. King Street<br>Wilmington, DE 19801<br>Attn: Carl T. Tullson<br>(carl.tullson@skadden.com) | [●] |

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).**

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, in their reasonable business judgment and subject to the exercise of their fiduciary duties, to modify the Bidding Procedures and/or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, are available: (a) free of charge upon request to Prime Clerk LLC (the notice and claims agent retained in these chapter 11 cases) by calling (877) 468-4591; (b) by visiting the website maintained in these chapter 11 cases at (https://cases.primeclerk.com/DuraAutomotive); or (c) for a fee via PACER by visiting (http://www.tnmb.uscourts.gov).

3

Dated: _____, 2019          RESPECTFULLY SUBMITTED:
Nashville, Tennessee

*/s/ Draft*
William L. Norton III (TN 10075)    James H.M. Sprayregen, P.C.
**BRADLEY ARANT BOULT CUMMINGS LLP**    Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
1600 Division Street, Suite 700      Gregory F. Pesce (admitted *pro hac vice*)
Nashville, Tennessee 37203           **KIRKLAND & ELLIS LLP**
Telephone:    (615) 252-2397          **KIRKLAND & ELLIS INTERNATIONAL LLP**
Facsimile:    (615) 244-6380          300 North LaSalle Street
                                       Chicago, Illinois 60654
                                       Telephone:    (312) 862-2000
                                       Facsimile:    (312) 862-2200

                                       - and -

                                       Christopher Marcus, P.C. (admitted *pro hac vice*)
                                       **KIRKLAND & ELLIS LLP**
                                       **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                       601 Lexington Avenue
                                       New York, New York 10022
                                       Telephone:    (212) 446-4800
                                       Facsimile:    (212) 446-4900

                                       *Proposed Co-Counsel to the Debtors and Debtors in
                                       Possession*

**Exhibit 3**

**Cure Notice**

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Judge Randal S. Mashburn |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY
## ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN
EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

---

**PLEASE TAKE NOTICE** that on [●], 2019, the United States Bankruptcy Court for the Middle District of Tennessee (the "Court") entered the *Order (I) Authorizing the Debtors to Perform Obligations Related to the Stalking Horse Bid, (II) Approving Bidding Procedures with Respect to Substantially All Assets, (III) Approving Contract Assumption and Assignment Procedures, (IV) Scheduling Bid Deadlines and an Auction, (V) Scheduling Hearings and Objection Deadlines with Respect to the Sale Hearing, and (VI) Approving the Form and Manner of Notice Thereof* [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors-in-possession (the "Debtors") to conduct an auction (the "Auction") to select the party to purchase substantially all of the Debtors' assets. The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as **Exhibit 1**, the "Bidding Procedures").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain of the Assigned Contracts listed on the Assigned Contracts Schedule, attached hereto as

---

[1] The debtor entities in these chapter 11 cases, along with the last four digits of each debtor entity's federal tax identification number, include: Dura Automotive Systems Cable Operations, LLC (7052), Dura Automotive Systems, LLC (8111); Dura Fremont, L.L.C. (1252), Dura G.P. (8092), Dura Mexico Holdings, LLC (4188), Dura Operating, LLC (2304), and NAMP, LLC (3693). The location of Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

**Exhibit A**, to which you are a counterparty, upon approval of the Sale. The Assigned Contracts Schedule can also be viewed on the Debtors' Case Website (https://cases.primeclerk.com/DuraAutomotive). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "Cure Costs").

    **PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to a proposed assignment to the Successful Bidder of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) if you object to proposed Cure Costs or a proposed assignment to the Successful Bidder of any Assigned Contract, be filed with the Court and served and **actually received no later than January 30, 2020**, at [**5:00] p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") and if you object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, be filed with the Court and **actually received no later than the earlier of (a) the Sale Objection Deadline or Supplemental Assigned Contract Hearing, as applicable, and (b) 5:00 p.m. (prevailing Central Time) on the date that is 14 days following (x) the Assumption and Assignment Service Date, or (y) the date of Service of the Supplemental Cure Notice, as applicable**, in each case, by the following parties: (a) counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Gregory F. Pesce and Christopher S. Koenig; (b) counsel to the DIP Agent and the Prepetition Term Loan Secured Parties, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Upper Wacker Drive, Chicago, IL 60606, Attention: Ron E. Meisler, ron.meisler@skadden.com and 920 N. King Street, Wilmington, DE 19801, Attention: Carl T. Tullson, carl.tullson@skadden.com; (c) counsel to the Official Committee of Unsecured Creditors, [●]; and (d) Office of the United States Trustee for the Middle District of Tennessee, 701 Broadway, Suite 318, Nashville, TN 37203, Attn.: Natalie Cox.

    **PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

    **PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Assigned Contract or related Cure Costs in connection with the Successful Bid that

2

otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

3

Dated: _____, 2019          RESPECTFULLY SUBMITTED:
Nashville, Tennessee

*/s/ Draft*
_____
William L. Norton III (TN 10075)      James H.M. Sprayregen, P.C.
**BRADLEY ARANT BOULT CUMMINGS LLP**  Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
1600 Division Street, Suite 700       Gregory F. Pesce (admitted *pro hac vice*)
Nashville, Tennessee 37203            **KIRKLAND & ELLIS LLP**
Telephone:      (615) 252-2397        **KIRKLAND & ELLIS INTERNATIONAL LLP**
Facsimile:      (615) 244-6380        300 North LaSalle Street
                                      Chicago, Illinois 60654
                                      Telephone:      (312) 862-2000
                                      Facsimile:      (312) 862-2200

                                      - and -

                                      Christopher Marcus, P.C. (admitted *pro hac vice*)
                                      **KIRKLAND & ELLIS LLP**
                                      **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                      601 Lexington Avenue
                                      New York, New York 10022
                                      Telephone:      (212) 446-4800
                                      Facsimile:      (212) 446-4900

                                      *Proposed Co-Counsel to the Debtors and Debtors in
                                      Possession*

**Exhibit 4**

**Stalking Horse Purchase Agreement**

**STOCK AND ASSET PURCHASE AGREEMENT[1]**

by and among

**DURA AUTOMOTIVE SYSTEMS, LLC,**

**DURA OPERATING, LLC,**

**DURA MEXICO HOLDINGS, LLC,**

**NAMP, LLC,**

**DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC,**

**DURA FREMONT L.L.C.,**

**DURA HOLDING GERMANY GMBH**

**AND**

**DURA G.P.,**

as the Sellers

and

**DURA AUTOMOTIVE ANGELS, LLC,**

as the Buyer

Dated as of [●], 2019

---

[1]   This Stock and Asset Purchase Agreement is a form agreement.  Execution and delivery of this Agreement is subject to review of, and agreement on, Disclosure Schedules and forms of Exhibits.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS ......................................................................................2

    Section 1.1    Certain Defined Terms................................................................2
    Section 1.2    Table of Definitions ...............................................................12

ARTICLE II PURCHASE AND SALE ...................................................................14

    Section 2.1    Purchase and Sale ...................................................................14
    Section 2.2    Excluded Assets......................................................................15
    Section 2.3    Assumed Liabilities ................................................................16
    Section 2.4    Excluded Liabilities................................................................17
    Section 2.5    Consents to Certain Assignments ...........................................19
    Section 2.6    Contract Designation ..............................................................19
    Section 2.7    Consideration ..........................................................................21
    Section 2.8    Closing ....................................................................................21
    Section 2.9    Tax Allocation ........................................................................22
    Section 2.10   Designated Buyer(s)................................................................23
    Section 2.11   Exclusion of Transferred Assets or Transferred Subsidiaries...................24
    Section 2.12   Wind-Down Amount ...............................................................24
    Section 2.13   Withholding ............................................................................24

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER .......................25

    Section 3.1    Organization............................................................................25
    Section 3.2    Authority.................................................................................25
    Section 3.3    No Conflict; Required Filings and Consents ............................25
    Section 3.4    Transferred Assets ..................................................................26
    Section 3.5    Transferred Subsidiaries .........................................................26
    Section 3.6    Financial Statements; No Undisclosed Liabilities ...................27
    Section 3.7    Absence of Certain Changes or Events....................................27
    Section 3.8    Compliance with Law; Permits...............................................28
    Section 3.9    Litigation.................................................................................28
    Section 3.10   Employee Benefit Plans...........................................................28
    Section 3.11   Labor and Employment Matters ..............................................29
    Section 3.12   Real Property ..........................................................................31
    Section 3.13   Intellectual Property................................................................31
    Section 3.14   Taxes ......................................................................................32
    Section 3.15   Environmental Matters............................................................35
    Section 3.16   Material Contracts...................................................................35
    Section 3.17   Certain Payments....................................................................36
    Section 3.18   Brokers....................................................................................36
    Section 3.19   Exclusivity of Representations and Warranties .......................36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER .........................37

    Section 4.1    Organization.................................................................................37
    Section 4.2    Authority .....................................................................................37
    Section 4.3    No Conflict; Required Filings and Consents .............................37
    Section 4.4    Financing....................................................................................38
    Section 4.5    Investment Intent ........................................................................38
    Section 4.6    Brokers .......................................................................................38
    Section 4.7    Buyer's Investigation and Non-Reliance ..................................38

ARTICLE V COVENANTS.............................................................................................39

    Section 5.1    Conduct of Business Prior to the Closing ................................39
    Section 5.2    Covenants Regarding Information..............................................41
    Section 5.3    Notification of Certain Matters..................................................42
    Section 5.4    Employee Matters .......................................................................42
    Section 5.5    Consents and Filings; Further Assurances ................................45
    Section 5.6    Refunds and Remittances...........................................................47
    Section 5.7    Public Announcements ...............................................................48
    Section 5.8    Bankruptcy Court Filings and Approval....................................48
    Section 5.9    Name Change..............................................................................50
    Section 5.10   Assumed Liabilities; Adequate Assurance of Future Performance ...........50
    Section 5.11   Sale Free and Clear ....................................................................50
    Section 5.12   Intellectual Property Registrations.............................................50
    Section 5.13   Employee Incentive Plan ...........................................................51

ARTICLE VI TAX MATTERS........................................................................................51

    Section 6.1    Transfer Taxes ...........................................................................51
    Section 6.2    Tax Cooperation.........................................................................51
    Section 6.3    Bulk Sales ..................................................................................51

ARTICLE VII CONDITIONS TO CLOSING ................................................................51

    Section 7.1    General Conditions ....................................................................51
    Section 7.2    Conditions to Obligations of the Sellers ...................................52
    Section 7.3    Conditions to Obligations of the Buyer ....................................52

ARTICLE VIII TERMINATION ....................................................................................54

    Section 8.1    Termination.................................................................................54
    Section 8.2    Effect of Termination.................................................................56
    Section 8.3    Expense Reimbursement Amount...............................................56

ARTICLE IX GENERAL PROVISIONS ........................................................................57

    Section 9.1    Nonsurvival of Representations, Warranties and Covenants.....................57
    Section 9.2    Fees and Expenses .....................................................................57

ii

Section 9.3    Transition of Permits...........................................................................58
Section 9.4    Amendment and Modification ................................................................58
Section 9.5    Waiver ....................................................................................................58
Section 9.6    Notices ...................................................................................................58
Section 9.7    Interpretation.........................................................................................59
Section 9.8    Entire Agreement...................................................................................60
Section 9.9    Parties in Interest...................................................................................60
Section 9.10   Governing Law ......................................................................................60
Section 9.11   Submission to Jurisdiction ....................................................................60
Section 9.12   Disclosure Generally.............................................................................61
Section 9.13   Personal Liability ..................................................................................61
Section 9.14   Assignment; Successors.........................................................................61
Section 9.15   Enforcement...........................................................................................62
Section 9.16   Currency.................................................................................................62
Section 9.17   Severability ...........................................................................................62
Section 9.18   Waiver of Jury Trial ..............................................................................62
Section 9.19   Counterparts...........................................................................................62
Section 9.20   Facsimile or .pdf Signature ...................................................................62
Section 9.21   No Presumption Against Drafting Party .................................................63


Exhibit 1     Form of Sale Order
Exhibit 2     Form of Sale Procedures Order
Exhibit 3     Form of Assignment Agreement
Exhibit 4     Form of IP Assignment Agreement

iii

# STOCK AND ASSET PURCHASE AGREEMENT

**STOCK AND ASSET PURCHASE AGREEMENT**, dated as of [●], 2019 (this "Agreement"), by and among (i) Dura Automotive Systems, LLC, a Delaware limited liability company ("Seller Parent"), Dura Operating, LLC, a Delaware limited liability company ("Dura Operating"), Dura Mexico Holdings, LLC, a Delaware limited liability company ("Dura Mexico"), NAMP, LLC, a Delaware limited liability company ("NAMP"), Dura Automotive Systems Cable Operations, LLC, a Delaware limited liability company ("DASCO"), Dura Fremont L.L.C., a Michigan limited liability company ("Dura Fremont"), Dura Holding Germany GmbH, a German limited liability company ("Dura Germany"), and Dura G.P., a Delaware general partnership ("Dura GP") (Seller Parent together with the foregoing entities, each a "Seller" and collectively, the "Sellers"), and (ii) Dura Automotive Angels, LLC, a Delaware limited liability company (the "Buyer").

## RECITALS

A. The Sellers directly and indirectly through their Subsidiaries, including the Transferred Subsidiaries, are engaged in the business of design, engineering, and manufacturing of automotive mobility products (the "Business").

B. Seller Parent owns, directly or indirectly, issued and outstanding shares of capital stock and other equity interests (collectively, the "Transferred Stock") of certain entities organized in jurisdictions outside the United States, which are set forth on Section 1.1(a) of the Disclosure Schedules (such entities, together with their respective Subsidiaries, if any, the "Transferred Subsidiaries").

C. Seller Parent and each of the other Sellers (other than Dura Germany) intend to file voluntary petitions for relief commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court").

D. The Sellers are parties to (i) that certain Loan and Security Agreement (the "Prepetition ABL Credit Agreement"), dated as of January 21, 2010 (as later modified or amended), among Seller Parent, the other borrowers and guarantors party thereto, the lenders party thereto, and Patriarch Partners Agency Services, LLC (as successor by assignment to Wells Fargo Capital Finance, LLC, successor by merger to Wachovia Capital Finance Corporation (Central)), as agent (the "Prepetition ABL Administrative Agent") and (ii) that certain Superpriority Senior Debtor-in-Possession Loan and Security Agreement (the "DIP Credit Agreement"), dated as of [●], 2019, among Seller Parent, the other borrowers and guarantors party thereto, the lenders party thereto, and Patriarch Partners Agency Services, LLC, as agent (and together with the Prepetition ABL Administrative Agent, the "Agent").

E. Subject to the Permitted Liens (as described in the Financing Order), if any, Agent holds (i) valid, binding and perfected first-priority senior secured priming liens securing all of the DIP Credit Agreement Indebtedness and (ii) valid, binding and perfected (a) first-priority senior secured liens on all Revolving Loan Priority Collateral (as defined in the

Prepetition Intercreditor Agreement) and (b) second-priority senior secured liens on all Term Loan Priority Collateral (as defined in the Prepetition Intercreditor Agreement) securing all of the Prepetition ABL Credit Agreement Obligations (as defined in the Prepetition Intercreditor Agreement) on substantially all of the assets of Sellers (collectively, the "Encumbered Assets").

F.      Buyer, as duly appointed subagent of Agent, in consideration of the Encumbered Assets and in satisfaction of the Encumbrances thereon, desires to credit bid, for the benefit of and on behalf of the holders of the outstanding Credit Agreement Indebtedness, the outstanding Credit Agreement Indebtedness pursuant to section 363(k) of the Bankruptcy Code, the Sale Procedures Order, and the Sale Order (collectively, the "Credit Bid Amount") with respect to the assets that are Encumbered Assets.

G.      The Sellers desire to sell to the Buyer all of the Transferred Stock and Transferred Assets and transfer to the Buyer the Assumed Liabilities and the Buyer desires to purchase from the Sellers the Transferred Stock and Transferred Assets and assume the Assumed Liabilities, on the terms and subject to the conditions herein and in the Sale Order.

H.      The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, sections 363 and 365 of the Bankruptcy Code, as further set forth herein.  The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1      Certain Defined Terms.[2]  For purposes of this Agreement:

"Action" means any claim, charge, investigation, audit, complaint, action, suit, arbitration or proceeding by or before any Governmental Authority, other than an Avoidance Action.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

---

[2]      **Note to Draft**:  DIP terms to be conformed to DIP credit agreement.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of a material portion of Sellers' assets (including, for the avoidance of doubt, the Transferred Subsidiaries), in a transaction or series of transactions with one or more Persons other than the Buyer.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment Agreement and the IP Assignment Agreement.

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Asset Sellers" means Seller Parent, Dura GP, Dura Operating, Dura Mexico, NAMP, DASCO and Dura Fremont.

"Auction" has the meaning set forth in the Sale Procedures.

"Avoidance Actions" means any and all claims for relief of the Sellers under chapter 5 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws.

"Back-Up Bidder" has the meaning set forth in the Sale Procedures.

"Bankruptcy Case" means, collectively, the bankruptcy cases commenced by the Sellers under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et seq., as in effect or as may be amended from time to time.

"Bid Deadline" has the meaning set forth in the Sales Procedures.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the city of New York.

"Business Employees" means all (i) Transferred Subsidiary Employees and (ii) individuals employed by the Sellers immediately prior to the Closing Date who are not Transferred Subsidiary Employees and whose duties relate primarily to the Business regardless of the company payroll on which such individuals are listed.

"Buyer Material Adverse Effect" means any event, change, occurrence or effect that would materially and adversely affect the ability of the Buyer to perform its obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby.

3

"Carve Out Reserve Amount" has the meaning set forth in the DIP Credit Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"Contract" means any contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"Credit Agreement Indebtedness" means all Prepetition ABL Credit Agreement Indebtedness and all DIP Credit Agreement Indebtedness outstanding as of the Closing Date, including all interest due and owing thereunder and all accrued and unpaid fees and expenses.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Transferred Contracts to be assumed and assigned to the Buyer, as determined pursuant to the process set forth in the Sale Procedures Order.

"Cure Claims Cap" means $[●].[3]

"DIP Credit Agreement Indebtedness" has the meaning set forth in the Financing Order.

"DIP Credit Parties" has the meaning set forth in the Financing Order.

"Employee Benefit Plans" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Asset Seller or Transferred Subsidiary is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement, plan, practice, policy, contract, program, and arrangement, in each case, (a) that is sponsored or maintained or contributed to by any Asset Seller or Transferred Subsidiary or any of their ERISA Affiliates in respect of any current or former employees, directors, independent contractors, consultants or leased employees of any Asset Seller or Transferred Subsidiary or (b) with respect to which any Asset Seller or Transferred Subsidiary has any actual or contingent Liability.

---

[3] **Note to Draft**: Parties to agree on amount within 10 days of the filing of this Agreement with the Bankruptcy Court.

"Encumbrance" means any charge, claim, mortgage, lien, encumbrance, option, pledge, security interest, preemptive right, right of first refusal or other restriction of any kind.

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"Equity Sellers" means Dura Mexico, Dura Operating and Dura Germany.[4]

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means all employers, trades or businesses (whether or not incorporated) that would be treated together with the Sellers as a single employer for purposes of Section 4001 of ERISA or Section 414 of the Code.

"European Loan Agreements" means, collectively (i) the Loan and Security Agreement, dated as of January 25, 2019, by and between Dura Automotive Holdings U.K., Ltd. and Ark II CLO 2001-1, Ltd., and (ii) the Loan and Security Agreement, dated as of January 25, 2019, by and between Dura Automotive CZ, K.S. and Ark II CLO 2001-1, Ltd.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) no motion or application for a stay of the Order shall be

---

[4] **Note to Draft**: Dura Germany to sell to the Buyer only its minority equity interests in Dura Automotive Portuguesa, Industia de Componentes para Automovels, Lda. and Dura Automotive CZ, k.a. and will not sell to the Buyer its direct subsidiary, Dura Automotive Body & Glass Systems GmbH, or its indirect subsidiary, Dura Automotive Plettenberg Leisten & Blenden GmbH.

**Note to Draft**: Subject to confirmation that Dura Germany does not own any assets other than equity interests.

filed and pending or such motion or application shall have been denied, or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that the Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by the Buyer.

"Financing Order" means the Interim Financing Order (as defined in the DIP Credit Agreement) as it may be modified by the Final Financing Order (as defined in the DIP Credit Agreement).

"Fundamental Representations" means the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.4, Section 3.5 and Section 3.18.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency, court or commission or any other judicial or arbitral body, including the Bankruptcy Court.

"Hazardous Materials" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law relating to pollution, hazardous or toxic waste, or protection of the environment; or (b) forms the basis of any Liability under any Law relating to pollution, hazardous or toxic waste, or protection of the environment

"Intellectual Property" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S. and foreign (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("Patents"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"); (d) rights in computer programs (whether in source

code, object code, or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing ("Software"); (e) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies; (f) rights of publicity, privacy rights, and rights to personal information; (g) all rights in the foregoing and in other similar intangible assets; (h) all applications and registrations for any of the foregoing; and (i) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" with respect to the Sellers means the actual (but not constructive or imputed) knowledge of the persons listed in Section 1.1(c) of the Disclosure Schedules as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) after reasonable inquiry of such person's direct reports having responsibility for the applicable subject matter.

"Law" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority.

"Lease" means the Seller Leases and the Transferred Subsidiary Leases.

"Leased Real Property" means the Seller Leased Real Property and the Transferred Subsidiary Leased Real Property.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on (a) the business, properties, liabilities, financial condition or results of operations of the Business, including the Transferred Subsidiaries, Transferred Assets and Assumed Liabilities, taken as a whole, or (b) the ability of the Sellers to perform their obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby, in each case of the preceding clauses (a) and (b), other than any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war), (iii) natural disasters or calamities, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (v) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vi) the filing and pendency of the Bankruptcy Case, any objections in the Bankruptcy Court to (1) this Agreement

7

or any of the transactions contemplated hereby, (2) the reorganization of the Sellers and any related plan of reorganization or disclosure statement, (3) the Sale Procedures and Sale Motion or (4) the assumption of any Transferred Contract or any actions approved by the Bankruptcy Court, (vii) any action taken by the Sellers or the Transferred Subsidiaries at the written request of Buyer or that is required by this Agreement, (viii) the identity of Buyer or any of its Affiliates, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof; provided, however, that changes or developments set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in determining whether there has been or is Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice of the Sellers and Transferred Subsidiaries, as such practice and custom is, or may have been, modified as a result of the Bankruptcy Case, in each case subject to (a) the filing of the Bankruptcy Case, (b) any Orders of the Bankruptcy Court, and (c) the conduct of the auction process as contemplated by the bidding procedures set forth in the Sale Procedures Order.

"Owned Real Property" means the Seller Owned Real Property and the Transferred Subsidiary Owned Real Property, including all improvements and structures thereon and appurtenances belonging thereto.

"Party" or "Parties" means, individually or collectively, the Buyer and the Sellers.

"Permitted Encumbrance" means (a) statutory liens for current Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, in each case for which adequate reserves have been established and for which there is no material risk of seizure of any property or asset, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations (i) as to which there is no default on the part of the Seller or the Transferred Subsidiaries, (ii) for a period with respect to amounts not yet overdue (provided that such amounts arising or accruing prior to Closing remain Excluded Liabilities) and (iii) that are not individually or in the aggregate material to the continued use, value or operation of the Transferred Assets in the conduct of the Business as currently conducted, or pledges, deposits or other liens securing the performance of bids, trade Contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) with respect to the Real Property, minor title defects or irregularities that do not, individually or in the aggregate, materially impair the value or the current use of such Real Property, (d) as to any Lease, any Encumbrance affecting solely the interest of the landlord thereunder and not the

8

interest of the tenant thereunder that does not materially impair the value or the current use of such Lease, (e) other exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and encumbrances that do not materially interfere with the use or value of the Owned Real Property subject to such encumbrances, (f) zoning, building codes and other land use Laws regulating the use or occupancy of the Owned Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over the Owned Real Property which are not violated by the current use or occupancy of such Owned Real Property, and (g) any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Petition Date" means the date on which the Sellers commence the Bankruptcy Case.

"Prepetition ABL Credit Agreement Indebtedness" has the meaning set forth in the Financing Order.

"Prepetition Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of January 21, 2010 (as later modified or amended), among the Prepetition ABL Administrative Agent and the other agents named therein.

"Professional" means a Person: (a) employed in the Bankruptcy Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the closing or dismissal of the Bankruptcy Cases pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"Professional Fee Amount" means the aggregate amount of Professional fee claims and other unpaid fees and expenses the Professionals estimate they have incurred or will incur in rendering services to the Sellers prior to and as of the Closing Date but in no event shall such amount exceed the Carve Out Reserve Amount.

"Professional Fee Escrow Account" means an interest-bearing account funded with cash on the Closing Date in an amount equal to the Professional Fee Amount.

"Qualified Leave Recipient" means any Business Employee who is not a Transferred Subsidiary Employee and who is absent from active employment as of immediately prior to the Closing Date as a result of an approved leave of absence, including (a) those on military leave and family and medical leave, (b) those on other approved leaves of absence, but only to the extent they have reemployment rights under federal or state Law, under any applicable collective bargaining agreement or under any leave of absence policy of the Asset Sellers and (c) those on short-term disability under the Asset Sellers' short-term disability program.

"Real Property" means the Leased Real Property and the Owned Real Property.

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" means collectively the voluntary petitions for relief commencing the Bankruptcy Case and motions seeking approval of the Sale Procedures Order and the Sale Order, filed with the Bankruptcy Court on October 17, 2019 and October [●], 2019, respectively.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, the form of which Order is attached hereto as Exhibit 1, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to the Buyer and the Sellers.

"Sale Procedures" means the bidding procedures set forth in the Sale Procedures Order, to be approved by the Bankruptcy Court pursuant to the Sale Procedures Order.

"Sale Procedures Hearing" means the hearing conducted by the Bankruptcy Court to approve the Sales Procedures Order.

"Sale Procedures Order" means the form of order attached hereto as Exhibit 2, or once entered, the Order of the Bankruptcy Court, approving the Sale Procedures, which Order shall be substantially in the form attached hereto as Exhibit 2, with such changes as may be required by the Bankruptcy Court that are in form and substance reasonably satisfactory to the Buyer and the Sellers.

"Seller Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which an Asset Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Seller Leased Real Property" means the leasehold interests held by an Asset Seller under a Seller Lease (other than any Leases withdrawn pursuant to Section 2.6).

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its

10

Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Successful Bidder" shall have the meaning set forth in the Sale Procedures.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, foreign, and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, export and import fees and charges, registration fees, tonnage, vessel, deposits, or other taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls, or charges of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto, wherever and whenever imposed, (b) any and all liability for the payment of any items described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group (or being included) in any Tax Return related to such group, (c) any and all liability for the payment of any amounts as a result of any successor or transferee liability, in respect of any items described in clause (a) or (b) above, and (d) any and all liability for the payment of any items described in clause (a) or (b) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Transferred Contracts" means all Contracts and Seller Leases of each Asset Seller that relate to the Business and are listed in Section 1.1(d) of the Disclosure Schedules, which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6.

"Transferred Subsidiary Benefit Plan" means each Employee Benefit Plan that is solely sponsored or maintained by a Transferred Subsidiary.

"Transferred Subsidiary Employees" means all individuals employed by the Transferred Subsidiaries.

"Transferred Subsidiary Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Transferred Subsidiary is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Transferred Subsidiary Leased Real Property" means the leaseholder interests held by a Transferred Subsidiary under a Transferred Subsidiary Lease.

11

"Wind-Down Amount" means $5,000,000, subject to adjustment in accordance with Section 2.12.

Section 1.2    Table of Definitions. The following terms have the meanings set forth in the Sections referenced below:

| Definition | Location |
| --- | --- |
| Agent | Recitals |
| Agreement | Preamble |
| Allocation | Section 2.9 |
| Antitrust Authority | Section 5.5(a) |
| Assignment Agreement | Section 2.8(b)(i) |
| Assumed Employee Liabilities | Section 2.3(a)(iv) |
| Assumed Liabilities | Section 2.3(a) |
| Balance Sheet Date | Section 3.6(a) |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Business Permits | Section 2.1(g) |
| Buyer | Preamble |
| Buyer Plan | Section 5.4(g) |
| Carve Out Reserve Amount | Section 1.1 |
| Closing | Section 2.8(a) |
| Closing Date | Section 2.8(a) |
| Copyrights | Section 1.1 |
| Credit Bid Amount | Recitals |
| Customer Contracts | Section 8.1(a) |
| DASCO | Preamble |
| Designated Buyer | Section 2.10(a) |
| DIP Credit Agreement | Recitals |
| Disclosure Limitations | Section 5.3 |
| Disclosure Schedules | ARTICLE III |
| Disputed Cure Claims | Section 2.6(c) |
| Dura Fremont | Preamble |
| Dura Germany | Preamble |
| Dura GP | Preamble |
| Dura Mexico | Preamble |
| Dura Operating | Preamble |
| Employee Incentive Plan | Section 5.13 |
| Employment Offer | Section 5.4(a) |
| Encumbered Assets | Recitals |
| Enforceability Exceptions | Section 3.2 |
| Estimated Cure Claims | Section 2.6(a) |
| European Loan Agreements | Section 1.1 |
| Excluded Assets | Section 2.2 |
| Excluded Liabilities | Section 2.4 |
| Excluded Plans | Section 2.2(i) |

12

Excluded Subsidiaries ............................................................Section 2.11(b)
Executory Contract ................................................................Section 2.6(a)
Executory Contract List .........................................................Section 2.6(a)
Expense Reimbursement Amount..........................................Section 8.3(a)
Foreign Benefit Plan ..............................................................Section 3.10(e)
HSR Act .................................................................................Section 3.3(b)
Inventory ................................................................................Section 2.1(f)
IP Assignment Agreement ......................................................Section 2.8(b)(ii)
Legal Restraint .......................................................................Section 7.1(a)
Material Contract ...................................................................Section 3.16
NAMP .....................................................................................Preamble
Outside Date...........................................................................Section 8.1(b)(iii)
Patents ....................................................................................Section 1.1
Permits ...................................................................................Section 3.8(b)
Prepetition ABL Administrative Agent ..................................Recitals
Prepetition ABL Credit Agreement .......................................Recitals
Purchase Price .......................................................................Section 2.7(a)
Regulatory Concession ..........................................................Section 5.5(c)
Rejected Contract...................................................................Section 2.6(f)
Securities Act.........................................................................Section 4.5
Seller ......................................................................................Preamble
Seller Customer Contracts .....................................................Section 8.1(a)
Seller Financial Statements ...................................................Section 3.6(a)
Seller Owned Real Property...................................................Section 3.12(a)
Seller Parent...........................................................................Preamble
Sellers.....................................................................................Preamble
Software .................................................................................Section 1.1
Trademarks .............................................................................Section 1.1
Transfer Taxes ........................................................................Section 6.1
Transferred Assets .................................................................Section 2.1
Transferred Employee............................................................Section 5.4(a)
Transferred Plans ...................................................................Section 2.1(r)
Transferred Stock ...................................................................Recitals
Transferred Subsidiaries ........................................................Recitals
Transferred Subsidiary Owned Real Property .......................Section 3.12(a)
WARN Act...............................................................................Section 5.4(k)
Wind-Down Amount ..............................................................Section 1.1

13

# ARTICLE II
# PURCHASE AND SALE

Section 2.1    Purchase and Sale.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Asset Sellers shall sell, assign, transfer, convey and deliver to the Buyer all of the Asset Sellers' right, title and interest as of the Closing Date in and to the Transferred Assets and the Equity Sellers shall sell, assign, transfer, convey and deliver to the Buyer all of the Equity Sellers' right, title and interest as of the Closing Date in and to the Transferred Stock, and the Buyer shall purchase, acquire and accept the Transferred Stock and the Transferred Assets and assume the Assumed Liabilities. "Transferred Assets" shall mean all right, title and interest of the Asset Sellers to or under the properties and assets of the Asset Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, including all right, title and interest of the Asset Sellers in, to or under (but excluding in each case, any Excluded Assets):

(a)    all Transferred Contracts, but only to the extent designated as Transferred Contracts pursuant to Section 2.6; provided, however, that Transferred Contracts shall include (and in no event shall Rejected Contracts include, irrespective of Section 2.6 or Section 2.11) (i) licenses included in the Intellectual Property contemplated by Section 2.1(c), (ii) any collective bargaining agreement and (iii) purchase orders;

(b)    all Seller Owned Real Property and Seller Leased Real Property (subject to Section 2.6) and other interests in real property, together in each case with the Asset Sellers' right, title and interest in and to all structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances relating to the foregoing;

(c)    all Intellectual Property owned, licensed, used or held for use by or on behalf of an Asset Seller, including all Intellectual Property listed on Section 3.13(a) of the Disclosure Schedules;

(d)    all accounts receivable, notes receivable and other receivables due to the Asset Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(e)    all machinery, equipment, furniture, furnishings, parts, spare parts, vehicles and other tangible personal property owned or leased (to the extent the underlying lease is a Transferred Contract) by the Asset Sellers;

(f)    all raw materials, works-in-progress, finished goods, supplies, packaging materials and other inventories owned by the Asset Sellers (the "Inventory");

(g)    all Permits held by the Asset Sellers (the "Business Permits"), but only to the extent such Permits may be transferred under applicable Law;

(h)    all books of account, general, financial, accounting and personnel records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, manuals, technical information, control plans and customer and supplier correspondence owned by the Asset Sellers relating to the Business;

14

(i)     telephone, telex and telephonic facsimile numbers and other directory listings used by the Asset Sellers;

(j)     all goodwill associated with the Transferred Assets or the Business;

(k)     except for the Wind-Down Amount and the Professional Fee Amount, all of the Asset Sellers' cash and cash equivalents, and bank accounts;

(l)     to the extent related to the Transferred Assets or Business and except as set forth in Section 2.2(d), all rights, claims or causes of action of the Asset Sellers against third parties arising out of events occurring prior to the Closing, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to the Asset Sellers;

(m)     all Tax Returns of, with respect to, or related to the Transferred Assets, the Business or the Assumed Liabilities (and all Tax books and records, including note papers and work papers, related thereto);

(n)     all Tax assets (including refunds, rebates or credits of Taxes, or other Tax benefits) relating to the Transferred Assets, the Business or the Assumed Liabilities;

(o)     all of the rights and claims of the Asset Sellers available under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, including with respect to trade obligations paid prior to the Petition Date, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing (such rights and claims not to be prosecuted by the Buyer or any other Person);

(p)     all net insurance proceeds to be received in respect of Transferred Assets;

(q)     to the extent transferable, all rights of the Asset Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with the Transferred Employees or with third parties to the extent relating to the Business or the Transferred Assets (or any portion thereof);

(r)     all assets under each Transferred Subsidiary Benefit Plan and each Employee Benefit Plan that is not an Excluded Plan (collectively, the "Transferred Plans"), together with all funding arrangements thereto (including all assets, trusts, insurance policies and administrative service Contracts), to the extent any such assets are held by the Asset Sellers; and

(s)     all credits, prepaid expenses, security deposits, other deposits, refunds, prepaid assets or charges, rebates, setoffs, and loss carryforwards of the Asset Sellers.

Section 2.2     Excluded Assets.     Notwithstanding anything contained in Section 2.1 to the contrary, the Asset Sellers are not selling, and the Buyer is not purchasing, any

of the following assets of the Asset Sellers, all of which shall be retained by the Asset Sellers (collectively, the "Excluded Assets"):

(a)     all assets expressly excluded or excepted from the definition of Transferred Assets pursuant to Section 2.1;

(b)     the Asset Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case or (ii) that any Asset Seller is required by Law to retain;

(c)     all accounting records and internal reports to the extent relating to the business activities of the Asset Sellers unrelated to the Business;

(d)     except those described in Section 2.1(o), all Avoidance Actions;

(e)     all insurance policies and binders;

(f)     all rights, claims and causes of action relating to any Excluded Asset or any Excluded Liability;

(g)     shares of capital stock or other equity interests of any Asset Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Asset Seller;

(h)     all assets under each Employee Benefit Plan set forth on Section 2.2(h) of the Disclosure Schedules (collectively, the "Excluded Plans"), together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts);

(i)     the Rejected Contracts;

(j)     all retainers or similar prepaid amounts paid to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers;

(k)     the assets of the Asset Sellers listed in Section 2.2(k) of the Disclosure Schedules;

(l)     an amount of cash equal to the Wind-Down Amount plus the Professional Fee Amount, and the bank account set forth on Schedule 2.2(l); and

(m)     all rights of the Asset Sellers under this Agreement and the Ancillary Agreements.

Section 2.3     Assumed Liabilities.

(a)     In connection with the purchase and sale of the Transferred Assets pursuant to this Agreement, at the Closing, the Buyer shall assume and pay, discharge, perform or otherwise satisfy only the following Liabilities (the "Assumed Liabilities"):

16

(i)    all Liabilities of the Asset Sellers under the Transferred Contracts and the transferred Business Permits that become due or are to be performed on or after, or in respect of periods following, the Closing Date;

(ii)    the Cure Claims up to the Cure Claims Cap unless agreed as set forth in Section 2.6;

(iii)    all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable) of the Asset Sellers;

(iv)    all Liabilities (1) arising out of, resulting from, or relating to (A) the employment or termination of employment of the Transferred Employees following the Closing Date, (B) the Employee Incentive Plan or (C) the Transferred Plans, including sponsorship thereof, and (2) assumed by the Buyer pursuant to Section 5.4 (collectively, the "Assumed Employee Liabilities");

(v)    all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by the Buyer under this Agreement; and

(vi)    any and all Liabilities arising from or related to (1) the ownership or operation of the Business or the Transferred Assets from and after the Closing or (2) any condition first occurring or arising from and after the Closing with respect to the Business or the Transferred Assets.

(b)    The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Buyer or the Asset Sellers as compared to the rights and remedies that such third party would have had against the Asset Sellers or the Buyer absent the Bankruptcy Case or the Buyer's assumption of such Assumed Liabilities. Other than the Assumed Liabilities, the Buyer is not assuming and shall not be liable for any Liabilities of the Asset Sellers.

Section 2.4    Excluded Liabilities. Notwithstanding any other provision of this Agreement to the contrary, the Buyer is not assuming any Liability that is not an Assumed Liability (the "Excluded Liabilities"), including the following:

(a)    any and all Liabilities for Taxes related to or arising from or with respect to (i) the Transferred Assets, the Assumed Liabilities or the operation of the Business, in each case that are incurred in, or attributable to, any taxable period, or portion thereof, ending on or prior to the Closing Date, including any such Taxes which are not due or assessed until after the Closing Date, (ii) any Transfer Taxes for which any Seller is responsible pursuant to Section 6.1 or (iii) the Excluded Assets or Excluded Liabilities;

(b)    any and all Liabilities of the Asset Sellers under any Contract of the Asset Sellers that is not a Transferred Contract whether accruing prior to, at, or after the Closing Date;

(c)    any and all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

17

(d)     any Liabilities, other than Assumed Employee Liabilities, arising out of, resulting from or relating to (i) the employment or service or termination of employment or service of any current or former employees, officers, directors or service providers of the Asset Sellers, whenever arising, (ii) the employment or termination of employment of any Transferred Employee by the Asset Sellers on or prior to the Closing, (iii) the employment or termination of employment of any Business Employee by the Asset Sellers on or prior to the Closing, including any gratuity payment, severance, notice or other payment or benefit due on the termination of employment of any such Business Employee by the Asset Sellers at the Closing, (iv) any Excluded Plans, whenever arising, and (v) Liabilities expressly retained by the Asset Sellers pursuant to Section 5.4;

(e)     any indebtedness for borrowed money, or guarantees thereof, of the Asset Sellers;

(f)     any Liability to distribute to any Asset Seller's shareholders (or other equity holders) or otherwise apply all or any part of the consideration received hereunder;

(g)     any and all Liabilities arising under any Environmental Law or with respect to Hazardous Materials or any other environmental matter and arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of the Asset Sellers or any third party relating to the Business or Transferred Assets on or before the Closing Date, (iii) any formerly owned, leased or operated properties of the Asset Sellers that are not the Real Property, or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(h)     any and all Liability for: (i) costs and expenses incurred by the Asset Sellers or owed in connection with the administration of the Bankruptcy Case (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Asset Sellers, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of the Asset Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and (iii) all costs and expenses arising out of or related to any third party claims against the Asset Sellers, pending or threatened, including any warranty or product claims;

(i)     any and all Liabilities for Taxes of the Sellers or any of their direct or indirect record holders or beneficial owners  (including, for the avoidance of doubt, any such Liabilities arising out of the transactions contemplated by this Agreement);

(j)     any Liability of the Asset Sellers under this Agreement or the Ancillary Agreements; and

(k)     any Liability or obligation to the extent relating to an Excluded Asset;

provided that in the event of any conflict between the terms of Section 2.3 and the terms of Section 2.4, the terms of Section 2.3 will control.

18

Section 2.5    Consents to Certain Assignments.

(a)    Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which any Asset Seller is a party or by which it is bound, or materially and adversely affect the rights of the Asset Sellers or, upon transfer, the Buyer under such asset, permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, permit, claim, or right irrespective of the consent or lack thereof of a third party. If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers shall, through the earlier of such time as such consent or assignment is so obtained and six (6) months following the Closing (or the remaining term of any such binding agreement or the closing of the Bankruptcy Case, if shorter), use their reasonable best efforts, and the Buyer shall cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing.

(b)    If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the reasonable best efforts of the Sellers, any consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder, (ii) any attempted assignment of a Transferred Asset would adversely affect the rights of the Asset Sellers thereunder so that the Buyer would not in fact receive all the rights and benefits contemplated, or (iii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Sellers shall, or the closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with Buyer in any lawful and commercially reasonable arrangement under which the Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer. Seller Parent shall as promptly as practicable pay to the Buyer when received all monies received by the Asset Sellers attributable to such Transferred Asset from and after the Closing Date and the Buyer shall indemnify and promptly pay the Asset Sellers for all Liabilities of the Asset Sellers associated with such arrangement.

Section 2.6    Contract Designation.

(a)    No later than one (1) Business Day prior to the Sale Procedures Hearing, the Sellers shall deliver to the Buyer a true, correct and complete, to the Sellers' knowledge, list (the "Executory Contract List") of (i) all Contracts to which any Asset Seller is party that are related to the Transferred Assets or otherwise used, or held for use, in connection with the Business as it is conducted by the Sellers (each, an "Executory Contract") and (ii) the Sellers' good faith estimate of the monetary amounts that must be paid and nonmonetary obligations that

19

otherwise must be satisfied pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code in order for the Buyer to assume the Transferred Contracts pursuant to this Agreement ("Estimated Cure Claims").  The Sellers will use commercially reasonable efforts to provide the Buyer with copies of each such Contract so as to permit the Buyer to review such Contracts to determine such other commercial information related to the Contracts listed thereon as the Buyer desires.

(b)  Subject to the entry of the Sale Procedures Order and to the terms and provisions thereof, no later than the tenth (10th) Business Day following entry of the Sale Procedures Order, a copy of the Executory Contract List shall be served on all necessary parties. The Executory Contract List shall identify the Estimated Cure Claim, if any, associated with each Contract listed therein, shall identify the Buyer, and shall indicate that the Buyer will, if necessary, provide evidence of adequate assurance of future performance at the Sale Hearing.

(c)  To the extent a counterparty to an Executory Contract objects or otherwise challenges the Estimated Cure Claims determined by the Sellers and asserts a different monetary amount that must be paid and/or nonmonetary obligations that otherwise must be satisfied (including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code) in order for the Buyer to assume such Executory Contract pursuant to this Agreement, the difference between the Estimated Cure Claims and such amounts and/or nonmonetary obligations determined by such counterparty shall be referred to as the "Disputed Cure Claims."

(d)  On or prior to the third (3rd) Business Day after the date of the Auction, the Buyer may designate in writing any Executory Contract as a Transferred Contract to be assumed by the Sellers and assigned to Buyer pursuant to this Agreement.  The Buyer shall be obligated to pay within sixty (60) days after the Closing Date any Estimated Cure Claims associated with the assumption of a Transferred Contract that is an Executory Contract or such other amount as agreed to between the Buyer and such counterparty. The Disputed Cure Claims shall only be paid pursuant to an Order of the Bankruptcy Court or mutual agreement between the Buyer and the counterparty to the applicable Transferred Contract. To the extent any Transferred Contract is subject to a Cure Claim, the Buyer shall pay such Cure Claim directly to the applicable counterparty; provided, however, that the Buyer's obligation to pay Cure Claims in connection with the Transferred Contracts shall not exceed the Cure Claims Cap unless otherwise agreed by the Buyer.  In no event shall the Sellers be responsible for curing any defaults under the Transferred Contracts or satisfying any Cure Claims relating to the Transferred Contracts.  Notwithstanding anything contained herein to the contrary, the Buyer shall only assume, and shall only be responsible for, Contracts designated by it as Transferred Contracts, and which Transferred Contracts are in fact assumed and assigned to the Buyer at Closing, pursuant to this Section 2.6.

(e)  The Sellers shall use commercially reasonable efforts to reduce, and shall use commercially reasonable efforts to cooperate with the Buyer in its efforts to reduce, the Disputed Cure Claims and negotiate rent reductions with respect to Seller Leases that are Transferred Contracts.  Such efforts shall include providing the Buyer with access to relevant business records, personnel, equipment, and the Buyer's other reasonable requests in order to allow the Buyer to assist with evaluating the Disputed Cure Claims, but shall not require the Sellers or any of their respective Affiliates to incur any out of pocket costs or expenses (other

20

than *de minimis* costs and expenses), commence any litigation or arbitration proceeding or grant any accommodation (financial or otherwise) to any third party.

(f)     At any time on or prior to (i) the third (3rd) Business Day after the date of the Auction or (ii) if the aggregate value of the Cure Claims (including all Disputed Cure Claims) exceeds the Cure Claims Cap as of the third (3rd) Business Day after the date of the Auction, one (1) Business Day prior to the Closing Date, the Buyer, by written notice to the Sellers, may exclude any Contracts or Seller Leases (each, a "Rejected Contract") (but, in the case of the foregoing clause (ii), solely to the extent necessary to exclude Transferred Contracts and Seller Leases with respect to which the Cure Claims cause the aggregate value of all Cure Claims to exceed the Cure Claims Cap), including any Executory Contract previously designated by the Buyer as a Transferred Contract, from being assigned pursuant to this Agreement, and, in such circumstances, such Contracts or Seller Leases shall not constitute Transferred Contracts and shall be Excluded Assets, and the Buyer shall not acquire any rights or assume any Liabilities with respect thereto pursuant to Section 2.3. Upon the Buyer's reasonable request, the Sellers shall use commercially reasonable efforts to provide additional information as to the Liabilities under the Contracts and Seller Leases.

Section 2.7     Consideration.  The consideration for the sale and transfer of the Transferred Stock and the Transferred Assets from the Sellers to the Buyer shall be as follows:

(a)     the Credit Bid Amount;

(b)     the Wind-Down Amount (together with the Credit Bid Amount, the "Purchase Price"); and

(c)     the direct assumption of the Assumed Liabilities and the indirect assumption of the Liabilities held by the Transferred Subsidiaries.

At Closing, the Professional Fee Amount will be deposited into the Professional Fee Escrow Account designated by the Sellers in writing to Buyer prior to Closing.

Section 2.8     Closing.

(a)     The sale and purchase of the Transferred Stock and the Transferred Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606) at 10:00 a.m. Chicago time on the fourth (4th) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Sellers and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."

(b)     At or prior to the Closing, the Sellers shall deliver or cause to be delivered to the Buyer:

(i)     the bill of sale, assignment and assumption agreement substantially in the form of Exhibit 3 (the "Assignment Agreement"), duly executed by the applicable Sellers;

(ii)    the intellectual property assignment agreement substantially in the form of Exhibit 4 (the "IP Assignment Agreement"), duly executed by the applicable Sellers;

(iii)   a certified copy of the Sale Order;

(iv)    certificates evidencing the Transferred Stock, duly endorsed in blank (or with stock powers in form and substance reasonably satisfactory to Buyer, acting in good faith, duly executed by the Sellers), or instruments of transfer reasonable and customary for the jurisdiction applicable to such Transferred Stock, in each case free and clear of all Encumbrances (except for Encumbrances under applicable securities Laws);

(v)     an Internal Revenue Service Form W-9, duly executed by Seller Parent (provided that, notwithstanding anything to the contrary contained herein, if Seller Parent fails to provide such form, the Buyer shall proceed with the Closing and shall be entitled to withhold from the consideration payable pursuant to this Agreement to Seller Parent the requisite amounts in accordance with Section 1445 of the Code);

(vi)    quitclaim deeds in recordable form for all Seller Owned Real Property, duly executed by the applicable Sellers;

(vii)   a duly executed certificate of a duly authorized officer of Seller Parent certifying the satisfaction of the conditions set forth in Section 7.3(a), Section 7.3(b), and Section 7.3(g); and

(viii)  all other documents, instruments or writings of conveyance reasonably necessary or customary to consummate the Agreement.

(c)     At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Sellers:

(i)     an amount in cash equal to the Wind-Down Amount;

(ii)    the Assignment Agreement, duly executed by the Buyer;

(iii)    the IP Assignment Agreement, duly executed by the Buyer;

(iv)    a duly executed certificate of an executive officer of the Buyer certifying the satisfaction of the conditions set forth in Section 7.2(a) and Section 7.2(b); and

(v)     all other documents, instruments or writings of conveyance reasonably necessary or customary to consummate the Agreement.

Section 2.9    Tax Allocation.  The portion of the Purchase Price paid to any Seller (plus the applicable Assumed Liabilities and any other consideration payable to such Seller pursuant to this Agreement, to the extent properly taken into account under the Code),

22

shall be allocated among the applicable Transferred Assets and the applicable Transferred Stock (and, to the extent necessary under applicable Tax Law, to the assets of any applicable Transferred Subsidiary) in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (any such allocation, an "Allocation"). Each Allocation shall be prepared by the Buyer and delivered to the Sellers as promptly as reasonably practicable following the Closing Date. The Buyer and the Sellers agree to, and to cause their respective Affiliates to, (a) timely file with each relevant Governmental Authority all forms and Tax Returns required to be filed in connection with the applicable Allocation, (b) be bound by the applicable Allocation for the purpose of determining Taxes, (c) prepare and file, and cause their respective Affiliates to prepare and file, all Tax Returns on a basis consistent with the applicable Allocation, and (d) not take any position, or cause their respective Affiliates to take any position, inconsistent with the applicable Allocation in any Tax Return, in any audit or proceeding relating to Taxes before any Governmental Authority or in any report made for Tax purposes; provided, however, that notwithstanding anything in this Section 2.9 to the contrary, the Parties shall be permitted to take a position inconsistent with the applicable Allocation if required to do so by a determination within the meaning of Section 1313 of the Code.

Section 2.10    Designated Buyer(s).

(a)    In connection with the Closing, without limitation on the terms of Section 9.14, the Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.10, one (1) or more Affiliates to exercise certain of the Buyer's rights and assume certain of the Buyer's Liabilities hereunder, including to (i) purchase specified Transferred Stock or Transferred Assets (including specified Transferred Contracts) and pay the Cure Claims, as applicable, (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Affiliate of the Buyer that shall be properly designated by the Buyer in accordance with this Section 2.10, a "Designated Buyer"). At and after the Closing, the Buyer shall, or shall cause its Designated Buyer(s) to, honor the Buyer's obligations at the Closing. After the Closing, any reference to the Buyer made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any. After the Closing, all obligations of the Buyer and its Designated Buyer(s) under this Agreement shall be several and not joint and the only Party with Liability as to a particular Assumed Liability is the Buyer or the Designated Buyer assuming such obligation at the Closing and no other Buyer or Designated Buyer. Notwithstanding the foregoing, nothing herein shall release the Buyer of its Liabilities under this Agreement except to the extent of payment or performance by such Designated Buyer.

(b)    The designation of a Designated Buyer in accordance with Section 2.10(a) shall be made by the Buyer by way of a written notice to be delivered to the Sellers in no event later than three (3) Business Days prior to Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Subsidiaries, Transferred Assets, Assumed Liabilities and Transferred Employees the Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement in a form reasonably acceptable to the Sellers, pursuant to which the Designated Buyer(s) agree to be bound by the terms of this

23

Agreement as it relates to such Designated Buyer(s) and which authorizes the Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.

Section 2.11   Exclusion of Transferred Assets or Transferred Subsidiaries. At any time on or prior to the third (3rd) Business Day after the date of the Auction, the Buyer may, in its discretion by written notice to the Sellers, designate any of:

(a)   the Transferred Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Assets so designated; provided that there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Asset as an Excluded Asset.  Notwithstanding any other provision hereof, the Liabilities of the Asset Sellers under or related to any Transferred Asset excluded under this paragraph will constitute Excluded Liabilities; or

(b)   the Transferred Subsidiaries as Subsidiaries of Seller Parent that would not be sold, assigned, transferred, conveyed or delivered to the Buyer pursuant to this Agreement (any such Transferred Subsidiaries, the "Excluded Subsidiaries"), which notice shall set forth the Excluded Subsidiaries, and such Excluded Subsidiaries shall not be assigned, transferred, conveyed or delivered to the Buyer; provided that there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Subsidiary as an Excluded Subsidiary.  The parties will reasonably cooperate to amend, or add parties to, this Agreement, or reorganize any assets, liabilities or Subsidiaries of Seller Parent, as appropriate, and to reflect the designation of any Transferred Subsidiary as an Excluded Subsidiary and otherwise the intent of the parties to transfer the Business to the Buyer, excluding the Excluded Assets, Excluded Liabilities and Excluded Subsidiaries, provided that any such amendment or reorganization shall not increase the Liabilities or Taxes of Sellers other than in a *de minimis* respect or the Liabilities held by any such Excluded Subsidiary.

Section 2.12   Wind-Down Amount.  If the Buyer elects to exclude any Contracts or Seller Leases in accordance with Section 2.6(f) or exclude any Transferred Assets pursuant to Section 2.11(a), and any such exclusion would be reasonably be expected to increase the Liabilities of the Sellers (other than in a *de minimis* respect), the Buyer will negotiate in good faith with the Sellers to agree on an adjustment to the Wind-Down Amount to account for such increased Liabilities.

Section 2.13   Withholding.  Notwithstanding anything in this Agreement to the contrary, the Buyer and any Affiliate or agent of the Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as may be required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S. or foreign Tax Law.  To the extent that any amounts are so deducted or withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

Except as set forth in the Disclosure Schedules attached hereto (collectively, the "Disclosure Schedules"), each of the Sellers jointly and severally represents and warrants to the Buyer as follows:

Section 3.1    Organization.  Each Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to own, lease and operate its properties and assets and to carry on the Business as it is now being conducted and to perform its obligations hereunder and under any Ancillary Agreement.  Each Seller is qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing is the result of the filing of the Bankruptcy Case or as would not be material to the conduct of the Business.

Section 3.2    Authority.  Subject to the Bankruptcy Case and to the extent that any Bankruptcy Court approval is required (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

Section 3.3    No Conflict; Required Filings and Consents.

(a)    The execution, delivery and performance by each Seller of this Agreement and each of the Ancillary Agreements to which such Seller will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by each Seller with any of the provisions hereof, do not and will not:

(i)    conflict with or violate the certificate of incorporation or bylaws or other similar organizational documents of such Seller;

25

(ii)　　conflict with or violate any Law applicable to such Seller, Transferred Subsidiary, the Business or any of the Transferred Assets or by which such Seller, Transferred Subsidiary, the Business or any of the Transferred Assets may be bound or affected;

(iii)　　conflict with or violate any Order of any Governmental Authority; or

(iv)　　conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract of the Sellers and the Transferred Subsidiaries;

except (A) in each case, for the Bankruptcy Case and to the extent that any Bankruptcy Court approval is required, and (B) in the case of clause (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)　　The Sellers are not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the Ancillary Agreements to which any Seller will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for any filings required to be made under the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) for requisite Bankruptcy Court approval, (iii) for entry of the Sale Order, and (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.4　　Transferred Assets.

(a)　　Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business, each Asset Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b)　　This Agreement and the instruments and documents to be delivered by the Sellers to the Buyer at the Closing shall be adequate and sufficient to transfer (i) Asset Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to the Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims, and interests, other than Assumed Liabilities, subject to (A) the Bankruptcy Case and (B) entry of the Sale Order.

Section 3.5　　Transferred Subsidiaries.

(a)　　Each Transferred Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Transferred Subsidiary is qualified or authorized to do business and is in good standing under the Laws of each

26

jurisdiction in which the conduct of its business or the ownership of its properties or assets requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing is the result of the filing of the Bankruptcy Case or as would not be material to the conduct of the Business.

(b)     All of the outstanding shares of capital stock of (or comparable interest in) each Transferred Subsidiary (i) are owned directly or indirectly by Seller Parent, (ii) are free and clear of any Encumbrance and (iii) have been validly issued and are fully paid and, as applicable, non-assessable.    Section 3.5(b) of the Disclosure Schedule lists all of the Transferred Subsidiaries and the outstanding shares of capital stock or voting securities of, or other equity securities therein and, in each case, the owner(s) thereof.    There are no accumulated but unpaid dividends or distributions with respect to any of the Transferred Stock.    There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Transferred Stock (other than this Agreement) obligating any Seller or any Transferred Subsidiary to issue or sell any shares of capital stock of, or any other comparable interest in, a Transferred Subsidiary (other than this Agreement).    No Transferred Subsidiary owns, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any other Person (other than a Transferred Subsidiary). There are no voting trusts or other agreements or understandings with respect to the equity interests of the Transferred Subsidiaries.

Section 3.6     Financial Statements; No Undisclosed Liabilities.

(a)     The audited consolidated balance sheets of Seller Parent as of December 31, 2018 and 2017, together with the related consolidated statements of income, stockholders' equity and cash flows ended December 31, 2018 and 2017, and (ii) the unaudited consolidated balance sheets of Seller Parent as of August 31, 2019 (the "Balance Sheet Date"), together with the related consolidated statements of income, stockholders' equity and cash flows for the eight-months ended August 31, 2019 (the "Seller Financial Statements") have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of Seller Parent and its Subsidiaries and the Business at the respective dates thereof and the results of their operations and cash flows for the periods indicated.

(b)     Neither Seller Parent nor any of its Subsidiaries has any Liabilities, whether required by GAAP to be disclosed or reflected on or reserved against a consolidated balance sheet (or the notes thereto) of Seller Parent and its Subsidiaries, except for Liabilities (i) reflected or reserved against in the Seller Financial Statements, (ii) incurred in the Ordinary Course of Business since the Balance Sheet Date, (iii) incurred pursuant to the transactions contemplated by this Agreement and (iv) that have not, or would not reasonably be expected to have, a Material Adverse Effect.

Section 3.7     Absence of Certain Changes or Events.    Since December 31, 2018 through the date of this Agreement, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect.

27

Section 3.8    Compliance with Law; Permits.

(a)    The Business is being conducted in material compliance with, and Sellers and the Transferred Subsidiaries have in all material respects complied with, all applicable Laws relating to the operation of the Business and the Transferred Assets.  There are no pending or, to the Knowledge of the Sellers, threatened, claims from any Governmental Authority relating to any material non-compliance of the Business, the Transferred Subsidiaries or the Transferred Assets.

(b)    The Asset Sellers and the Transferred Subsidiaries are in possession of all material permits, licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties and to carry on the Business as currently conducted.  All material Permits held by the Asset Sellers and the Transferred Subsidiaries: (i) are valid and in full force and effect and no Asset Seller or Transferred Subsidiary is in default under, or in violation of, any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with the Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to Sellers' Knowledge, threatened and (ii) subject to entry of the Sale Order, each such Permit may be transferred or reissued to the Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

Section 3.9    Litigation.  Except for the Bankruptcy Case, and any Order entered in the Bankruptcy Case, there is no Action by or against any Asset Seller or Transferred Subsidiary in connection with the Business or the Transferred Assets pending, or to the Knowledge of the Sellers, threatened other than any Action pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to be material to the Sellers or the Transferred Subsidiaries taken as a whole.

Section 3.10    Employee Benefit Plans.

(a)    With respect to the Employee Benefit Plans, (i) except as would not, individually or in the aggregate, reasonably be expected to result in a material Liability to the Business, (i) each of the Employee Benefit Plans has been operated and administered in all respects in accordance with applicable Law and administrative or governmental rules and regulations, including ERISA and the Code and (ii) there are no pending or threatened claims by, on behalf of or against any Employee Benefit Plan (other than routine claims for benefits).

(b)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of the Sellers, no event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification.

28

(c)     None of the Sellers or any of their ERISA Affiliates has ever maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to, or has any Liability with respect to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA, (ii) a plan subject Title IV of ERISA or Section 412 of the Code or to the minimum funding standards of Section 302 of ERISA, or (iii) a "multiemployer plan," as defined in Section 3(37) of ERISA.

(d)     The consummation of the transactions contemplated by this Agreement will not (i) entitle any Business Employee to severance pay, unemployment compensation or any other compensation, (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Business Employee or (iii) result in any payment or benefit that would constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code).

(e)     With respect to each Transferred Plan and each other Employee Benefit Plan established or maintained by any Transferred Subsidiary outside of the United States of America primarily for benefit of current or former employees, officers, directors or service providers of Sellers, the Transferred Subsidiaries or any of their respective Subsidiaries residing outside the United States of America (a "Foreign Benefit Plan"): (i) all employer and employee contributions to each Foreign Benefit Plan required by law or by the terms of such Foreign Benefit Plan have been made in all material respects, or, if applicable, accrued, in accordance with normal accounting practices; and (ii) each Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

(f)     All contributions and premiums required by Law or by the terms of any Employee Benefit Plan have been timely made to any funds or trusts established thereunder or in connection therewith in all material respects.

Section 3.11    Labor and Employment Matters.

(a)     The Sellers are neither party to, nor bound by, any organized labor agreement, collective bargaining agreement, or any similar labor-related agreements or arrangements with any labor union, labor organization, or works council applicable to the Business Employees; there are no labor agreements, collective bargaining agreements, or any similar labor-related agreements or arrangements that pertain to any Business Employees; and no Business Employees are represented by any labor union, labor organization or works council with respect to their employment with the Sellers or the Transferred Subsidiaries.

(b)     There are no material unfair labor practice charges, work stoppages, slowdowns, strikes, lockouts, grievances, picketings, or other similar material activities relating to labor matters pending, or to the Knowledge of the Sellers, threatened against any Seller or Transferred Subsidiary that pertain to the Business Employees.

(c)     No labor union, labor organization, works council or group of Business Employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority pertaining to the

29

Business Employees. To the Knowledge of the Sellers, there are no labor union organizing activities with respect to any Business Employees.

(d)    As of the Closing Date, the Asset Sellers and the Transferred Subsidiaries will have satisfied any material legal or contractual requirement to provide notice to, or to enter into any consultation procedure with, any labor union, labor organization or works council, which is representing any Business Employee, in connection with the execution of this Agreement or the transactions contemplated by this Agreement.

(e)    Each Asset Seller and Transferred Subsidiary is in compliance in all material respects with all applicable Laws respecting employment and employment practices pertaining to the Business Employees, including all Laws respecting terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, the payment of social security and other employment Taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance.

(f)    Each of the Asset Sellers and the Transferred Subsidiaries is not and has not been: (i) a "contractor" or "subcontractor" (as defined by Executive Order 11246), (ii) required to comply with Executive Order 11246 or (iii) required to maintain an affirmative action plan.

(g)    To the Knowledge of the Sellers, no employee of any of the Sellers is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation: (i) to any of the Sellers or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by any such Seller or (B) to the knowledge or use of trade secrets or proprietary information.

(h)    The Sellers have not received (i) written notice of any unfair labor practice charge or complaint pending or threatened before the National Labor Relations Board or any other Governmental Authority against them, (ii) written notice of any complaints, grievances, or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances, or arbitration procedures against them, (iii) written notice of any charge or complaint with respect to or relating to them pending before the Equal Employment Opportunity Commission or any other Governmental Authority responsible for the prevention of unlawful employment practices, (iv) written notice of the intent of any Governmental Authority responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health laws to conduct an investigation with respect to or relating to them or notice that such investigation is in progress, or (v) written notice of any Action pending or threatened in any forum by or on behalf of any present or former employee of such entities, any applicant for employment, or classes of the foregoing alleging breach of any express or implied contract of employment, any applicable law governing employment or the termination thereof, or other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

30

(i)    The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any collective bargaining agreement, employment agreement, consulting agreement or any other labor-related any other labor-related agreement to which the Asset Sellers or the Transferred Subsidiaries are a party that is applicable to the Business Employees.

Section 3.12    Real Property.

(a)    Section 3.12(a)(i) of the Disclosure Schedules lists the street address of each parcel of Owned Real Property owned by the Sellers (the "Seller Owned Real Property"). Section 3.12(a)(ii) of the Disclosure Schedules lists the street address of each parcel of Owned Real Property owned by a Transferred Subsidiary (the "Transferred Subsidiary Owned Real Property"). The applicable Asset Seller or Transferred Subsidiary has good and valid fee simple title to the Owned Real Property and, subject to the entry of the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    Section 3.12(b)(i) of the Disclosure Schedules sets forth each Seller Lease and Section 3.12(b)(ii) of the Disclosure Schedules sets forth each Transferred Subsidiary Lease. The Asset Seller or Transferred Subsidiary party thereto has a valid leasehold estate in all Leased Real Property, and, subject to the entry to the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances.

(c)    The Asset Sellers and Transferred Subsidiaries have not granted to any Person (other than pursuant to this Agreement) any right to occupy or possess or otherwise encumber any portion of the Real Property. No Seller or Transferred Subsidiary has vacated or abandoned any portion of the Real Property or given notice to any Person of their intent to do the same.

(d)    No Asset Seller or Transferred Subsidiary is a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than the Buyer.

Section 3.13    Intellectual Property.

(a)    A true, correct and complete list of all U.S. and foreign (1) issued Patents and pending Patent applications, (2) registered Trademarks and applications to register any Trademarks, (3) registered Copyrights and applications for registration of Copyrights, and (4) domain name registrations, in each case, which are owned by or registered to an Asset Seller or a Transferred Subsidiary is set forth on Section 3.13(a)(i) of the Disclosure Schedules and Section 3.13(a)(ii) of the Disclosure Schedules, respectively. The Asset Sellers or the Transferred Subsidiaries, as applicable, are the sole and exclusive beneficial and record owners of all of the Intellectual Property set forth in Section 3.13(a)(i) and Section 3.13(a)(ii) of the Disclosure Schedules, and all such Intellectual Property are subsisting, enforceable and, to the Knowledge of the Sellers, valid (and in the past three (3) years there has been no Action asserted or, to the Knowledge of the Sellers, threatened challenging the scope, validity or enforceability of any such Intellectual Property).

31

(b)     The Asset Sellers or a Transferred Subsidiary own, or have a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances), all material Intellectual Property used or held for use in the Business.

(c)     The conduct of the Business (including the products and services of the Sellers and Transferred Subsidiaries) does not infringe, misappropriate or otherwise violate(and, in the past three (3) years, has not infringed, misappropriated or otherwise violated), in any material respect, any Person's Intellectual Property rights, and in the past three (3) years there has been no such Action asserted or, to the Knowledge of the Sellers, threatened against any Seller or Transferred Subsidiary or, to the Knowledge of the Sellers, any other Person.

(d)     To the Knowledge of the Sellers, no Person is infringing, misappropriating or otherwise violating in any material respect, any Intellectual Property owned by or exclusively licensed to Asset Sellers or Transferred Subsidiaries in the conduct of the Business, and in the past three (3) years no such Actions have been asserted or threatened against any Person by any Asset Seller or Transferred Subsidiary or, to the Knowledge of the Sellers, any other Person.

(e)     Each Asset Seller and Transferred Subsidiary has at all times in the past three (3) years complied, in all materials respects, with all applicable Laws, as well as its own rules, policies, and procedures, relating to privacy, data protection, and the collection and use of personal information collected, used, or held for use by the Asset Sellers or Transferred Subsidiaries.  In the past three (3) years, no Actions have been asserted or, to the Knowledge of the Sellers, threatened against an Asset Seller or Transferred Subsidiary alleging a violation of any Person's privacy or personal information or data rights.

(f)     In the past three (3) years, (i) the Asset Sellers and Transferred Subsidiaries have not experienced any material defects in the Software used in the Business that have not been remediated in all material respects as of the date hereof, (ii) to the Knowledge of the Sellers, there have been no material security breaches in the Asset Sellers' or the Transferred Subsidiaries' information technology systems, and (iii) there have been no disruptions in any of the Asset Sellers' or Transferred Subsidiaries' information technology systems that materially adversely affected the Business and that have not been remediated in all material respects as of the date hereof.

Section 3.14   Taxes.   Except as set forth in Section 3.14 of the Disclosure Schedules:

(a)     All Tax Returns required to be filed by or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets, the Assumed Liabilities or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects.  All Taxes due and payable by or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets, the Assumed Liabilities or the Business, in each case whether or not shown as due on any Tax Return, have been timely paid in full to the proper Governmental Authority.   Other than in respect of any obligation to withhold on account of payments made to employees, contractors, or other parties, adequate accruals have been made on the Seller Financial Statements for all Taxes not yet due and payable by or with respect to the Transferred Subsidiaries.  No Tax Liability has been incurred outside the Ordinary Course of

32

Business by or with respect to the Transferred Subsidiaries since the date of the Seller Financial Statements.

(b)     All Taxes relating to or arising in connection with the Transferred Assets, the Assumed Liabilities or the Business, or of or with respect to the Transferred Subsidiaries, in each case that are required to be withheld and paid under applicable Law (including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party), have been timely withheld and remitted to the appropriate Governmental Authority, and all IRS Forms W-2 and 1099 and other applicable forms required with respect thereto have been properly completed and timely filed. Each of the Transferred Subsidiaries has timely collected all material sales, use and value added Taxes required to be collected by them, and has timely remitted all such Taxes to the appropriate Governmental Authority.

(c)     There is no action, suit, claim, assessment, or audit pending, proposed (tentatively or definitively), contemplated, asserted or threatened by any Governmental Authority with respect to Taxes or Tax Returns of or with respect to the Transferred Subsidiaries or with respect to the Transferred Assets, the Assumed Liabilities or the Business, and no Governmental Authority has indicated an intent to investigate, commence or open such an action, suit, claim or audit with respect to any such Tax or Tax Return.

(d)     There are no Encumbrances for Taxes upon the Transferred Assets or any of the assets of the Transferred Subsidiaries, in each case other than Permitted Encumbrances described in clause (a) of the definition thereof.

(e)     Neither the Business nor any of the Transferred Assets, Assumed Liabilities or Transferred Subsidiaries is subject to any Tax allocation, indemnity or sharing agreement or similar agreement, arrangement or understanding, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not to address Taxes. There is no "gain recognition agreement" under Section 367 of the Code, or the Treasury Regulations promulgated thereunder, currently in effect with respect to any asset of, or equity interest in, any Transferred Subsidiary (or any similar agreement or arrangement under any state, local or foreign Tax Law).

(f)     No closing agreements (as described in Section 7121 of the Code or any corresponding, analogous or similar provision of state, local or foreign Law), private letter rulings, technical advice memoranda or similar agreements or rulings have been entered into or requested by or with respect to the Transferred Subsidiaries or with respect to the Business or with respect to any Transferred Assets or Assumed Liabilities.

(g)     No Tax election has been made by or with respect to the Transferred Subsidiaries or with respect to any of the Transferred Assets, the Assumed Liabilities or the Business, in each case that has, or may have, continuing effect after the Closing Date.

(h)     None of the Transferred Assets is, nor is any property relating to the Business, "tax-exempt use property" within the meaning of Section 168(h) of the Code or property that the Buyer will be required to treat as being owned by another Person pursuant to

33

Section 168(f)(8) of the Internal Revenue Code of 1954 as in effect immediately prior to the enactment of the Code.

(i)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any Taxes or Tax Returns of or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets, the Assumed Liabilities or the Business is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent.  No power of attorney has been granted with respect to any matter relating to Taxes payable by or with respect to the Transferred Subsidiaries, or with respect to any of the Transferred Assets, Assumed Liabilities or the Business, in each case that is currently in force.

(j)     None of the Transferred Subsidiaries has agreed or is required to make any adjustments pursuant to Section 481(a) of the Code or any similar provision of applicable Law by reason of a change in method of accounting initiated by it or any other relevant party, and none of the Transferred Subsidiaries will be required to make any such adjustment as a result of the transactions contemplated by this Agreement.

(k)     None of the Transferred Subsidiaries (nor any beneficial owner of any interest in a Transferred Subsidiary) will be required to include any item of income in, or exclude any item of deduction from, taxable income with respect to the Transferred Subsidiaries for any taxable period (or portion thereof) beginning after the Closing Date as a result of (i) any installment sale or open transaction disposition made on or prior to the Closing Date or (ii) any prepaid amount received on or prior to the Closing Date.

(l)     The issued and outstanding equity of each of the Transferred Subsidiaries immediately prior to the Closing represents the only issued and outstanding equity of each such Transferred Subsidiary for U.S. federal and applicable state income Tax purposes.

(m)     Each of the Transferred Subsidiaries is in material compliance with the requirements for any Tax exemption, Tax holiday, Tax concession or other Tax reduction agreement or arrangement with or granted by any Governmental Authority to which such Transferred Subsidiary is subject, and the transactions contemplated by this Agreement will not have a materially adverse effect on the continued validity and effectiveness of any such Tax exemption, Tax holiday, Tax concession or other Tax reduction agreement or arrangement, as applicable.

(n)     Each of the Transferred Subsidiaries has in its possession official government receipts for any material Taxes paid by it to any foreign Governmental Authority.

(o)     None of the Transferred Subsidiaries has distributed stock of another entity, or had its stock distributed by another entity, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code (i) in the two years immediately preceding the date of this Agreement or (ii) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in connection with the transactions contemplated by this Agreement.

(p)     No claim has been made by any Governmental Authority in a jurisdiction in which a Transferred Subsidiary does not file Tax Returns or pay Taxes to the effect that such

34

Transferred Subsidiary is or may be subject to taxation by, or required to file any Tax Return in, such jurisdiction. No Transferred Subsidiary currently has or has had a permanent establishment (within the meaning of an applicable Tax treaty) or other office or fixed place of business, nor has any Transferred Subsidiary ever engaged in a trade or business, in any country other than the country in which it is organized and resident. No Transferred Subsidiary currently has or has had nexus (within the meaning of the applicable Law of any applicable state) in any state where Seller does not currently, or did not at the applicable time, file Tax Returns and pay Taxes with respect to such Transferred Subsidiary.

(q)     None of the Transferred Subsidiaries has entered into, participated in or engaged in any "listed transaction" (as defined in Treasury Regulations Section 1.6011-4(b) or any similar provision under any state, local or foreign Tax Law).

(r)     None of the Transferred Subsidiaries (i) is or has been a member of a group filing an affiliated, consolidated, combined or unitary Tax Return, nor has any Transferred Subsidiary been included in any similar arrangement for relief under applicable Law, such as a loss sharing regime, or (ii) has any liability for Taxes of another Person under Treasury Regulations section 1.1502-6 (or any analogous, comparable or similar provision of state, local or non-U.S. Law).

(s)     No Transferred Asset or Assumed Liability that will be transferred by any Seller (other than Seller Parent) pursuant to this Agreement is a "United States real property interest" under Section 897 of the Code.

Section 3.15    Environmental Matters.

(a)     The Asset Sellers, the Transferred Subsidiaries, the Transferred Assets and the Business are, and have for the three (3) years prior to the date hereof been, in material compliance with all applicable Environmental Laws, which compliance includes the possession of, and compliance with the terms of, with all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets. There is no claim or action currently pending or, to the Knowledge of the Sellers, threatened, that is or would reasonably be expected to result in the cancellation, revocation or other adverse or limiting modification of any such Environmental Permit.

(b)     There is no material Environmental Claim pending or, to the Knowledge of the Sellers, threatened against or affecting any Asset Seller, Transferred Subsidiary, Transferred Asset or the Business. There are no circumstances or environmental conditions, including the presence of any Hazardous Material at the Real Property, which would be reasonably likely to form the basis of any material Liability of the Business, any Transferred Asset or any Transferred Subsidiary or of any Environmental Claim against or affecting any Asset Seller, Transferred Subsidiary or the Business.

Section 3.16    Material Contracts.    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Asset Seller of the applicable Contract in accordance with applicable Law, and except as a result of the commencement of the Bankruptcy Case, (i) each Transferred Contract and each other Contract to which any Transferred Subsidiary

is a party or by which its assets are bound, in each case that is material to the operation of the Business as currently conducted by the Sellers and their Subsidiaries (each, a "Material Contract") is valid and binding on the applicable Asset Seller or Transferred Subsidiary and, to the Knowledge of the Sellers, the counterparties thereto, and is in full force and effect, except as may be limited by the Enforceability Exceptions, (ii) none of the Assets Sellers or Transferred Subsidiaries is in material breach of or default under any Material Contract, and no event has occurred or circumstance exists that would, with or without notice or lapse of time or both, be a material breach or default or give rise to a termination or acceleration right under any Material Contract, (iii) to the Knowledge of the Sellers, there is no threatened default, breach, violation, cancellation or termination by any party to a Material Contract and (iv) to the Knowledge of the Sellers, no party has given written notice that a Material Contract has terminated or will be terminating or alleging that any Asset Seller or Transferred Subsidiary is in breach of, or default under a Material Contract. To the Knowledge of the Sellers, the consummation of the transactions contemplated by this Agreement will not result in any penalty, premium or variation of the rights, remedies, benefits or obligations of any party under any Material Contract.

Section 3.17 <u>Certain Payments</u>. Since January 1, 2016, none of the Asset Sellers or the Transferred Subsidiaries (nor, to the Knowledge of the Sellers, any of their respective Representatives) (a) has used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) has violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) has established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

Section 3.18 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Sellers or the Transferred Subsidiaries.

Section 3.19 <u>Exclusivity of Representations and Warranties</u>. None of the Sellers, the Transferred Subsidiaries or any of their Affiliates or Representatives is making, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied (including any relating to financial condition or results of operations of the Business or maintenance, repair, condition, design, performance, value, merchantability or fitness for any particular purpose of the Transferred Assets), except as expressly set forth in this <u>Article III</u> (as modified by the Disclosure Schedules), and the Sellers hereby disclaim all Liability and responsibility for any such other representations or warranties, including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of Sellers or any of their Affiliates).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

Section 4.1    Organization.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement.

Section 4.2    Authority.  The Buyer has the corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will constitute, the legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3    No Conflict; Required Filings and Consents.

(a)    The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by the Buyer with any of the provisions hereof, do not and will not:

(i)    conflict with or violate the certificate of incorporation or bylaws or other similar organizational documents of such Buyer;

(ii)    conflict with or violate any Law applicable to such Buyer or by which any property or asset of such Buyer is bound or affected;

(iii)    conflict with or violate any Order of any Governmental Authority; or

(iv)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which such Buyer is a party;

37

except, in the case of clause (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

(b)     The Buyer is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for any filings required to be made under the HSR Act or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

Section 4.4    <u>Financing</u>.  The Buyer shall have at the Closing sufficient funds to permit the Buyer to consummate the transactions contemplated hereby and the Ancillary Agreements, and to pay all related fees and expenses.  Notwithstanding anything to the contrary contained herein, the Buyer acknowledges and agrees that its obligations to consummate the transactions contemplated hereby are not contingent upon its ability to obtain any third-party financing.

Section 4.5    <u>Investment Intent</u>.  The Buyer acknowledges that neither the offer nor the sale of the Transferred Stock has been registered under the Securities Act of 1933 (together with the rules and regulations promulgated thereunder, the "<u>Securities Act</u>") or under any state or foreign securities Laws.  The Buyer is acquiring the Transferred Stock for its own account for investment, without a view to, or for a resale in connection with, the distribution thereof in violation of the Securities Act or any applicable state or foreign securities Laws and with no present intention of distributing or reselling any part thereof.

Section 4.6    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any fee, commission or expense from the Buyer that would be payable by the Sellers in connection with the transactions contemplated hereby.

Section 4.7    <u>Buyer's Investigation and Non-Reliance</u>.  The Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Business, the Transferred Subsidiaries, the Transferred Assets, the Assumed Liabilities and the transactions contemplated hereby, which investigation, review and analysis was conducted by the Buyer together with expert advisors, including legal counsel, that it has engaged for such purpose.  The Buyer and its Representatives have been provided with reasonable access to the Representatives, properties, offices, plants and other facilities, books and records of the Sellers and the Transferred Subsidiaries relating to the Business and other information that they have requested in connection with their investigation of the Business, the Transferred Subsidiaries. the Transferred Assets, the Assumed Liabilities and the transactions contemplated hereby.  None of the Sellers, the Transferred Subsidiaries or any of their Affiliates or Representatives has made, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty, express or implied, as to the accuracy or completeness of any information concerning the Business, the Transferred Subsidiaries, the Transferred Assets or the Assumed Liabilities contained herein or made available in connection

with the Buyer's investigation of the foregoing, except as expressly set forth in this Agreement. The Buyer acknowledges that, should the Closing occur, the Buyer shall acquire the Business, the Transferred Subsidiaries and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE V
## COVENANTS

Section 5.1 <u>Conduct of Business Prior to the Closing</u>. From the date of this Agreement until the Closing Date or earlier termination of this Agreement,

(a) except (1) as otherwise expressly contemplated by this Agreement, (2) as required by Law or any Order, (3) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or the DIP Credit Agreement or (4) with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing Date or earlier termination of this Agreement, the Sellers and the Transferred Subsidiaries shall use commercially reasonable efforts to:

(i) conduct the Business in the Ordinary Course of Business and preserve the material business relationships with customers, suppliers, distributors and others with whom the Sellers or the Transferred Subsidiaries deal in the Ordinary Course of Business; and

(ii) maintain the Transferred Assets in good working condition and repair (normal wear and tear excepted).

(b) the Sellers and the Transferred Subsidiaries shall not, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed):

(i) sell, transfer, lease, sublease, encumber or otherwise dispose of (1) any Transferred Assets or (2) any assets of a Transferred Subsidiary, in each case other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business;

(ii) issue, sell, grant, pledge, dispose or transfer any equity interests in any Seller or Transferred Subsidiary;

(iii) acquire any corporation, partnership, limited liability company, other business organization or division thereof;

(iv) merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(v) split, combine, consolidate, subdivide or reclassify any of their capital stock, other equity interests or voting securities, or securities convertible into or exchangeable or exercisable for capital stock or other equity interests or voting securities, or

issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its capital stock, other equity interests or voting securities;

(vi)    declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities of any Transferred Subsidiary or Seller, or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any capital stock or voting securities of, or equity interests in, any Transferred Subsidiary or Seller or any securities of any Transferred Subsidiary or Seller convertible into or exchangeable or exercisable for capital stock or voting securities of, or equity interests in, any Transferred Subsidiary or Seller, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests, other than any transfers among Transferred Subsidiaries, among Sellers, or between any Transferred Subsidiary and any Seller;

(vii)    amend the certificate of incorporation, bylaws or comparable organizational documents of any Seller or Transferred Subsidiary;

(viii)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business, the Transferred Assets or the Transferred Subsidiaries;

(ix)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of the Sale Procedures or the Sale Order;

(x)    (1) reject or terminate (other than by expiration in accordance with its terms) any Material Contract or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract, except in each case, to the extent the Buyer has indicated in writing that it wishes the Sellers to reject such Contract;

(xi)    with respect to any Transferred Asset (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (2) fail to use reasonable best efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xii)    change, make or revoke any Tax election, change any method of accounting with respect to Taxes, file any amended Tax Return, surrender or compromise any right to claim a Tax refund, settle or compromise any claim, notice, audit, assessment or other proceeding related to Taxes, enter into any agreement affecting any Tax Liability or any refund or file any request for rulings or special Tax incentives with any Governmental Authority, enter into any Tax allocation, sharing or indemnity agreement, extend or waive the statute of limitations period applicable to any Tax or Tax Return or take or cause (or cause any other Person to take or cause) any action which could increase the Buyer's or any of its Affiliates' Liability for Taxes with respect to the Transferred Subsidiaries, the Transferred Assets, the Assumed Liabilities or the Business;

40

(xiii)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(xiv)    fail to maintain in full force and effect existing insurance policies;

(xv)    make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller or Transferred Subsidiary);

(xvi)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(xvii)    subject any of the Transferred Assets to any Encumbrance (other than any Encumbrance under the DIP Credit Agreement and Permitted Encumbrances);

(xviii)    other than the DIP Credit Agreement, incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness, in each case that would constitute an Assumed Liability; or

(xix)    agree or commit to any of the foregoing.

Section 5.2    <u>Covenants Regarding Information</u>.

(a)    From the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, the Sellers shall afford the Buyer and its Representatives reasonable access to make investigation of the properties, offices, plants and other facilities, books and records (including Tax books and records) of the Sellers and the Transferred Subsidiaries, and shall furnish the Buyer with such financial, operating and other data and information, and access to all the officers, employees, accountants and other Representatives of the Sellers and the Transferred Subsidiaries as the Buyer may reasonably request and to make extracts and copies of such books and records. Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be required to disclose any information to the Buyer or its Representatives if such disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws (the "<u>Disclosure Limitations</u>"); <u>provided</u> that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Sellers after consultation with outside counsel) reasonably be likely to cause such privilege to be undermined with respect to such information.

(b)    The Sellers shall use, and shall cause the Transferred Subsidiaries to use, commercially reasonable efforts to cause their respective employees to, on a timely basis, cooperate as reasonably requested by the Buyer and/or any potential lender to assist the Buyer in connection with such financing, including (i) requesting its certified independent auditors to provide auditors' reports and customary comfort letters with respect to financial information relating to the Sellers or the Transferred Subsidiaries in customary form, (ii) causing appropriate personnel of the Sellers or the Transferred Subsidiaries to participate at reasonable times in a reasonable number of sessions with prospective lenders, (iii) furnishing the Buyer and such

41

potential lenders, as promptly as reasonably practicable, with such customary financial and other pertinent information regarding the Sellers or the Transferred Subsidiaries as may be reasonably requested by the Buyer in connection with such financing, (iv) assisting in the preparation of and to execute and deliver definitive financing documents, including guarantee and collateral documents and customary closing certificates as may be required by such financing and (v) providing all customary documentation and other information about the Sellers or the Transferred Subsidiaries requested by the Buyer or such potential lenders in connection with such financing and required under applicable "know your customer," sanctions and anti-money-laundering rules and regulations. Any and all reasonable and documented out-of-pocket costs and expenses incurred at the request of the Buyer in connection with any cooperation, investigation or other matter related to this <u>Section 5.2(b)</u> shall be borne by the Buyer.

(c)     From and after the Closing, for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), the Buyer will provide the Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of the Buyer or the Business, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Bankruptcy Cases and the wind down of the Sellers' estates (including reconciliation of claims), (iii) making insurance claims or (iv) complying with applicable Laws; <u>provided</u> that the Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of the Buyer, conflict with the Disclosure Limitations. Unless otherwise consented to in writing by Seller Parent, the Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller Parent such books and records or any portion thereof that the Buyer may intend to destroy, alter or dispose of, <u>provided</u> that the Buyer shall be entitled to dispose of books and records in accordance with its document retention policies. From and after the Closing, the Buyer will, at Sellers' sole expense, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down of the Sellers' operations and related activities (<i>e.g.</i>, helping to locate documents or information related to prosecution or processing of insurance/benefit claims). This Section 5.2(c) shall not apply with respect to Taxes.

Section 5.3     <u>Notification of Certain Matters</u>. Each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in <u>Section 7.2(a)</u>, <u>Section 7.2(b)</u>, <u>Section 7.3(a)</u>, <u>Section 7.3(a)(i)</u> or <u>Section 7.3(a)(ii)</u> becoming incapable of being satisfied.

Section 5.4     <u>Employee Matters</u>.

(a)     Buyer shall, or shall cause one of its Affiliates to, continue the employment of each then-current Business Employee who is employed by a Transferred

42

Subsidiary as of immediately prior to the Closing in accordance with applicable Law and on the terms set forth in this Section 5.4.

(b)     Where applicable Law provides for the automatic transfer of employment of any Business Employee, including the Transferred Subsidiaries Employees, upon the consummation of the transactions contemplated hereby, the parties (i) shall take or cause to be taken such actions as are required under applicable Law to accomplish such transfer of employment of such Business Employee to Buyer or a Subsidiary of Buyer by operation of Law as of the Closing and (ii) shall not take and shall not cause to be taken any such actions that would result in the employment of such Business Employee not transferring to Buyer or a Subsidiary of Buyer by operation of Law as of the Closing.  Where applicable Law does not provide for the automatic transfer of employment of any Business Employee upon the consummation of the transactions contemplated hereby, Buyer shall, or shall cause a Subsidiary of Buyer to, make offers of employment to such Business Employee in accordance with the provisions of Section 5.4(c), to be effective as of the Closing.

(c)     Prior to the Closing, the Buyer shall provide (or cause one of its Subsidiaries to provide) to each Business Employee who is employed by an Asset Seller (including each Qualified Leave Recipient) an offer of employment for a job position that is comparable to the type of position held by each such Business Employee and with such terms and conditions that are substantially similar to the terms and conditions of such Business Employee immediately prior to the Closing Date (the "Employment Offer"), in each case with such employment to commence immediately following the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; provided that such Qualified Leave Recipient returns to active status within thirty (30) days following the Closing Date (or such later date with respect to which they have reemployment rights under applicable Law). Each Business Employee who is employed by an Asset Seller (including each Qualified Leave Recipient) who accepts the Employment Offer or who automatically transfers employment pursuant to Section 5.4(a) shall be a "Transferred Employee."  The Sellers shall reasonably cooperate with the Buyer in effecting the Transferred Employees' transfer of employment from the Sellers to the Buyer or a Subsidiary of the Buyer as contemplated hereby. Within ten (10) days prior to the anticipated Closing Date, Sellers shall provide Buyers with a list of any applicable individuals who are expected to be Qualified Leave Recipients as of the Closing Date and shall update that list from time to time through the Closing Date as necessary.  Each offer of employment made pursuant to this Section 5.4 shall be contingent upon the Closing and the issuance of the Sale Order. Each offer of employment made pursuant to this Section 5.4 shall be contingent upon the Closing and the issuance of the Sale Order.

(d)     Notwithstanding anything in this Agreement to the contrary, immediately following the Closing, the Buyer shall assume each collective bargaining agreement or other labor-related agreement and any and all Liabilities thereunder, whether arising before, on or after the Closing, and provide to the Transferred Employees whose employment is subject to a collective bargaining agreement or other labor-related agreement, terms and conditions of employment in accordance with such collective bargaining agreement or other labor-related agreement until its expiration, modification, or termination in accordance with its terms and applicable Law.

43

(e) The Buyer shall assume and pay all unpaid wages and salaries, in respect of Transferred Employees, which are earned or accrued during the payroll period in which the Closing Date occurs. The Sellers shall retain all Liabilities relating to unpaid wages, salaries, commissions and other amounts, earned or accrued by or in respect of Business Employees that are not assumed by the Buyer as described in the preceding sentence.

(f) To the extent permitted by Law, all unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date or, if later, the date on which such Transferred Employee becomes an employee of the Buyer, be transferred to and assumed by the Buyer and the Buyer shall honor such accrued vacation and paid time off on the same basis as under the Sellers' vacation and paid time off policy(ies) as in effect immediately prior to the Closing.

(g) The Buyer shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with any Sellers or their Affiliates or predecessors prior to the Closing for all purposes, including for purposes of eligibility, vesting, and determination of the level of benefits (including, for purposes of vacation and severance but excluding for purposes of benefit accruals under any defined benefit pension plan or retiree medical plan), under any benefit plan sponsored or maintained by the Buyer or any of their Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "<u>Buyer Plan</u>"); <u>provided</u>, <u>however</u>, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits. With respect to each Buyer Plan that is a health or welfare plan, the Buyer shall, and shall cause its Affiliates to, (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Employee Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

(h) The Parties shall cooperate in good faith to cause the assignment of those Transferred Plans that are sponsored or maintained by an Asset Seller from the respective Asset Seller to Buyer or its Affiliates, which assignment shall be effective as of the Closing.

(i) The Parties intend that the transactions contemplated by this Agreement shall not constitute a separation, termination or severance of employment of any Business Employee prior to or upon the Closing and that the Business Employees will have continuous and uninterrupted employment immediately before and immediately after the Closing, and Buyer shall, and shall cause its Subsidiaries to, comply with any requirements under applicable Law or binding agreement to ensure the same. Buyer shall bear any costs related to, and shall indemnify and hold harmless Sellers from and against, any claims made by any Business Employee for any statutory, contractual or common law severance or separation benefits and other legally mandated payment obligations (including the employer portion of any employment Taxes, together with any compensation payable during any mandatory termination notice period related thereto), in each case, arising out of or in connection with the failure of Buyer or its Subsidiaries

44

to make offers of employment to any Business Employee in accordance with this Agreement or as otherwise required by applicable Law.

(j)     Without limitation of Section 9.9, nothing express or implied in this Section 5.4 or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, Buyer Plan or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by the Buyer, the Sellers or their respective Affiliates, as applicable, or (iii) obligate the Buyer, the Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

(k)     No later than five (5) Business Days prior to the Closing Date, the Sellers shall provide the Buyer with a list setting forth the number of employees terminated from each site of employment applicable to the Business Employees during the ninety (90)-day period ending on the Closing Date for reasons qualifying the termination as "employment losses" under the Worker Adjustment and Retraining Notification Act or any similar Law (the "WARN Act") and the date of each such termination with respect to each termination; provided that this sentence shall not apply with respect to any site of employment at which sufficient employees have not been employed at any time in such ninety (90)-day period for terminations of employment at such site to be subject to the WARN Act.  For a period of ninety (90) days following the Closing Date, none of Buyer nor any of its Affiliates shall take any action that would cause any termination of employment of any Business Employee to create any Liability or penalty to Sellers or their Affiliates under the WARN Act.

Section 5.5     Consents and Filings; Further Assurances.

(a)     Each of the Parties shall use reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm the Buyer's ownership of the Transferred Assets as promptly as practicable, including to use commercially reasonable efforts to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from customers and other parties.  Without limiting the generality of the previous sentence, the Parties shall (i) use reasonable best efforts to obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act or any other applicable Law, including any other Antitrust Law; (iii) use reasonable best efforts to comply at the earliest practicable date with any request under the HSR Act, or other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "Antitrust Authority"); (iv) cooperate with each other in connection with any such filing or request (including, to the

45

extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities under the HSR Act or other Antitrust Law with respect to any such filing; (v) not extend any waiting period under the HSR Act or enter into any agreement with an Antitrust Authority not to consummate the transactions contemplated hereby; (vi) defend and resolve any investigation or other inquiry of any Governmental Authority under all applicable Laws, including by defending against and contesting administratively and in court any litigation or adverse determination initiated or made by a Governmental Authority under applicable Law. This Section 5.5(a) does not apply with respect to Taxes.

(b)      Each of the Parties shall promptly notify the other Parties of any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority.  No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting.  The Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods, including under the HSR Act.  Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.  This Section 5.5(b) does not apply with respect to Taxes.

(c)      In furtherance, and without limiting any, of the covenants and agreements under Section 5.5(a) and Section 5.5(b), each Party shall take all actions necessary, proper or advisable to (i) avoid or eliminate each and every impediment that may be asserted by a Governmental Authority related to any filings or consents contemplated by this Section 5.5, as soon as practicable and (ii) to enable the Closing to occur as soon as practicable and in any event prior to the Outside Date, in each case, which actions shall include (1) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, settlement or otherwise, the sale, divestiture, licensing or disposition of any assets or businesses of the Buyer or its Affiliates (including, after the Closing, the Transferred Subsidiaries), (2) terminating existing relationships, contractual rights or obligations of the Buyer or its Affiliates (including, after the Closing, the Transferred Subsidiaries), (3) agreeing to any limitation on the conduct of the Buyer or its Affiliates (including, after the Closing, the Transferred Subsidiaries), (4) taking any other action as may be required by a Governmental Authority in order to obtain any consent thereof that is necessary, appropriate or advisable to consummate the Closing or avoiding the entry of, or having vacated, lifted, dissolved, reversed or overturned Legal Restraint, in each case, as soon as possible (each of the actions described in the foregoing clauses (1)–(4), a "Regulatory Concession").  Notwithstanding the foregoing, nothing in this Agreement shall require, or be construed to require, the Buyer or its Affiliates (including, after the Closing, the Transferred Subsidiaries), to make or agree to any Regulatory Concession, to the extent that it, individually or in the aggregate, would reasonably be expected to have a material adverse effect on the

46

financial condition, results of operations, business or reasonable prospects of the Buyer or its Affiliates, the Transferred Subsidiaries or their Affiliates or the Business (with materiality, for purposes of this provision, being measured in relation to the size of the Business taken as a whole without giving effect to the transactions contemplated hereby).

(d)     From time to time, whether at or following the Closing, the Sellers and the Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in the Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide the Buyer and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.  Each of the Parties will use its commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

(e)     The Sellers and the Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement use reasonable best efforts to obtain the transfer or reissuance to the Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall use reasonable best efforts to respond promptly to any requests for additional information made by such agencies, use their respective commercially reasonable efforts to participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits, and use respective reasonable best efforts to cause regulatory approval to be obtained as soon as practicable after the date of filing.  Each Party will bear its costs of the preparation and review of any such filing.  The Sellers and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection any filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

Section 5.6     Refunds and Remittances.

(a)     After the Closing: (i) if the Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to the Buyer in accordance with the terms of this Agreement, the Sellers promptly shall remit, or shall cause to be remitted, such amount to the Buyer and (ii) if the Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Sellers or any of their Affiliates in accordance with the terms of this Agreement, the Buyer promptly shall remit, or shall cause to be remitted, such amount to the Sellers.

(b)     In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset as contemplated by this Agreement, then, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to the Buyer or its designees, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and

47

transfer such Transferred Asset to the Buyer or its designees or (ii) any Excluded Asset has been conveyed to or is received by the Buyer, then, without any consideration payable to the Buyer or any of its Affiliates, the Buyer shall convey, assign or transfer promptly such Excluded Asset to the Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designees.

Section 5.7    Public Announcements.  From and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyer nor the Sellers shall make any press release or any public statement prior to obtaining Seller Parent's (in the case of the Buyer) or the Buyer's (in the case of the Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure is made in any filing made to any court or may be required by applicable Law or by the Bankruptcy Court.

Section 5.8    Bankruptcy Court Filings and Approval.

(a)    Seller Parent and each of the other Sellers shall use reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order on or prior to the date that is one hundred and ten (110) days after the Petition Date, which Sale Order shall approve a sale to the Successful Bidder at any Auction conducted under the Sale Procedures Order or to the Buyer if there are no other qualified bidders.

(b)    The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Procedures Order and the Sale Order and, consistent with Section 5.10, a finding by the Bankruptcy Court of adequate assurance of future performance by the Buyer.

(c)    The Sellers and the Buyer acknowledge that this Agreement and the sale of the Transferred Stock and the Transferred Assets and the assumption of the Assumed Liabilities are subject to Bankruptcy Court approval.  The Sellers and the Buyer acknowledge that to obtain such approval, (i) the Sellers must demonstrate that they have taken reasonable steps to obtain the highest, best, or otherwise financially superior offer possible for the Transferred Stock and the Transferred Assets and (ii) the Buyer must provide adequate assurance of future performance with respect to the Transferred Contracts.

(d)    From the date hereof until the entry of the Sale Procedures Order, the Buyer agrees and acknowledges that the Sellers and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to the Buyer and its Affiliates, agents and Representatives) relating to a Competing Bid; provided that Sellers shall (i) with respect to any Competing Bid that does not provide for each of (A) the payoff of all principal, interest and other amounts due under the DIP Credit Agreement and the Prepetition ABL Credit Agreement and the assumption of, or payoff of all principal, interest and other amounts due under, the European

48

Loan Agreements, and (B) the assumption of current and employment related liabilities in a manner substantially provided for in this Agreement, reasonably consult with the Buyer prior to determining such Competing Bid is a "Qualified Bid" in accordance with the Sale Procedures, (ii) substantially concurrently with the delivery of any written information regarding a Competing Bid to another Person making any written Competing Bid or its Representatives, provide such information to the Buyer, and (iii) substantially concurrently with making available any written due diligence information to any Person making any written Competing Bid or its Representatives that has not been made available to the Buyer, make available such information to the Buyer, provided, further, that the foregoing proviso shall not require the Sellers to take any action in contravention of the Sale Procedures.

(e)     The Buyer agrees and acknowledges that, after entry of the Sale Procedures Order, the Sellers and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to the Buyer and its Affiliates, agents and Representatives) in accordance with the terms of the Sale Procedures Order.

(f)     The Sellers shall, to the extent reasonably practicable, give the Buyer advanced notice and proposed drafts of all pleadings, motions, orders, other papers, hearings, and other proceedings relating to this Agreement and the transactions contemplated hereby, and shall provide the Buyer and its counsel with a reasonably opportunity to review such papers prior to filing with the Bankruptcy Court.

(g)     The Sellers shall use reasonable best efforts to serve notices of assumption of the Transferred Contracts, including designation of Cure Claims, on all necessary parties by the twenty-eighth (28th) Business Day following the Sale Procedures Hearing.

(h)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, the Sellers shall promptly notify the Buyer of such appeal or stay request and shall provide to the Buyer promptly a copy of the related notice of appeal or order of stay. The Sellers shall also provide the Buyer with written notice of any motion or application filed in connection with any appeal from such orders. The Sellers agree to take all action as may be reasonable and appropriate to defend against such appeal or stay request and the Sellers and the Buyer agree to use their reasonable efforts to obtain an expedited resolution of such appeal or stay request; provided that nothing herein shall preclude the Parties from consummating the transactions contemplated hereby, if the Sale Order shall have been entered and has not been stayed and the Buyer, in its sole and absolute discretion, waives in writing the condition that the Sale Order be a Final Order.

(i)     After entry of the Sale Order, to the extent the Buyer is the Successful Bidder at the Auction, neither the Buyer nor the Sellers shall take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 5.9 <u>Name Change</u>. The Sellers shall, as promptly as practicable (but in no event later than thirty (30) days) after the Closing, cease using and displaying any Trademarks that are included in the Transferred Assets, and in accordance with such requirement, the Sellers shall use commercially reasonable efforts to, no later than forty-five (45) days after the Closing, legally change their corporate and business names (to the extent such names include such Trademarks or a confusingly similar Trademarks) to names that are not confusingly similar to such Trademarks, and file notices of such name changes with the Bankruptcy Court. Under no circumstance shall the Sellers, after the Closing, use or otherwise exploit the Trademarks included in the Transferred Assets or any other indicia confusingly similar to the Trademarks included in the Transferred Assets, Copyrights included in the Transferred Assets, or any work substantially similar to the Copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name. Notwithstanding the foregoing, the Sellers are not prohibited from using the Trademarks for non-trademark uses, including to factually describe their prior ownership of the Business or in a manner that constitutes fair use under applicable Law.

Section 5.10 <u>Assumed Liabilities; Adequate Assurance of Future Performance</u>. The Buyer will use commercially reasonable actions to provide the evidence required to establish that the Buyer can provide adequate assurance of future performance of the Transferred Contracts, including such affidavits, non-confidential financial information and other documents or information as may be necessary or desirable for filing with the Bankruptcy Court and making the Buyer's Representatives available to testify before the Bankruptcy Court.

Section 5.11 <u>Sale Free and Clear</u>. The Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances, against or created by the Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and (b) the Buyer is not a successor to any Seller or the bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets shall be transferred to the Buyer free and clear of all obligations, Liabilities and Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

Section 5.12 <u>Intellectual Property Registrations</u>. Prior to the Closing Date, upon the reasonable and specific request of Buyer, the Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (i) where Intellectual Property of any Seller is still recorded in the name of legal predecessors of any Seller or any Person other than a Seller or (ii) where, to the Knowledge of the Sellers, the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to any Seller's Intellectual Property, are materially incorrect for any other reason.

50

Section 5.13    Employee Incentive Plan.    The Sellers and the Buyer may determine to seek Bankruptcy Court authorization to implement an employee incentive plan, in a mutually agreed upon form (which form shall be agreed by each of the Parties in their sole discretion) (the "Employee Incentive Plan").

## ARTICLE VI
## TAX MATTERS

Section 6.1    Transfer Taxes.    Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Stock or the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by the Sellers. The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes, and shall each sign and file (or cause its respective Affiliates to sign and file) all documentation with the relevant Governmental Authority relating to such Transfer Taxes as it may be required to sign or file under applicable Law. The Party responsible under applicable Law for filing the Tax Returns with respect to such Transfer Taxes shall prepare and file all necessary Tax Returns or other documents with respect thereto and shall promptly provide a copy of any such Tax Returns or other documents to the other Party.

Section 6.2    Tax Cooperation.    The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax; provided, however, that the Buyer shall not be required to disclose the contents of its Tax Returns to any Person. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 6.2 shall be borne by the Party requesting it.

Section 6.3    Bulk Sales.    Notwithstanding any other provisions in this Agreement, the Buyer and the Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    General Conditions.    The respective obligations of the Buyer and the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (provided that such waiver shall only be effective as to the obligations of such Party):

(a) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "Legal Restraint").

(b) Any waiting period (and any extension thereof) under the HSR Act or any other Antitrust Law applicable to the transactions contemplated by this Agreement and the Ancillary Agreements shall have expired or shall have been terminated or the necessary clearance thereunder shall have been received.

(c) The Bankruptcy Court shall have entered the Sale Order, and the Sale Order and the Sale Procedures Order shall each be a Final Order.

Section 7.2    Conditions to Obligations of the Sellers.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Seller Parent in its sole discretion:

(a) The representations and warranties of the Buyer contained in this Agreement shall be true and correct both when made and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such specified date), except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

(b) The Buyer shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c) The Sellers shall have received the documents listed in Section 2.8(c).

Section 7.3    Conditions to Obligations of the Buyer.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyer in its sole discretion:

(a) Representations and Warranties.

(i) Each Fundamental Representation that is qualified by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect") shall be true and correct in all respects both when made and as of the Closing Date (other than in the case of Fundamental Representations that are made as of a specified date, which Fundamental Representations shall be true and correct as of such specified date), and each Fundamental Representation that is not qualified by a materiality standard (including "in all material respects,"

52

"material" or "Material Adverse Effect") shall be true and correct in all but *de minimis* respects both when made and as of the Closing Date (other than in the case of Fundamental Representations that are made as of a specified date, which Fundamental Representations shall be true and correct as of such specified date).

(ii)     The representations and warranties of the Sellers contained in this Agreement (other than the Fundamental Representations) shall be true and correct both when made and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such specified date), except where the failure to be so true and correct (without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect")) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     The Sellers shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)     The Buyer shall have received the documents listed in <u>Section 2.8(b)</u>.

(d)     A "Termination Date" (as defined in the DIP Credit Agreement) shall not have occurred and the indebtedness outstanding under the DIP Credit Agreement shall not have otherwise been paid off.

(e)     (i) Each Transferred Contract with a customer of the Business (the "<u>Seller Customer Contracts</u>") shall have been validly assigned to the Buyer (or its designee) in accordance with this Agreement and the Sale Order, (ii) each Seller Customer Contract and each Contract with a customer of the Business to which any Transferred Subsidiary is a party or by which its assets are bound (the "<u>Transferred Subsidiary Customer Contracts</u>" and, together with the Seller Customer Contracts, the "<u>Customer Contracts</u>") shall be, and will be immediately after the Closing, in full force and effect, (iii) none of the Asset Sellers or Transferred Subsidiaries shall be in material breach of or material default under any Customer Contract, and no event shall have occurred or circumstance shall exist (including the occurrence of the Closing) that would, with or without notice or lapse of time or both, be a material breach or material default or give rise to a termination or acceleration right under any Customer Contract, (iv) there shall not have been made in writing any threatened material default, breach, or violation, cancellation, or termination by any counterparty to any Customer Contract that has not been withdrawn in writing by such counterparty, (v) none of the counterparties to the Customer Contracts shall have given written notice that any Customer Contract has terminated or will be terminating or alleging that any Asset Seller or Transferred Subsidiary is in material breach of, or material default under, any Customer Contract that has not been withdrawn in writing by such counterparty, and (vi) none of the counterparties to the Customer Contracts shall have given written notice of or, to the Knowledge of the Sellers, be engaging in, any re-sourcing under any such Customer Contract, provided, however, that the condition in this <u>Section 7.3(e)</u> shall be deemed satisfied unless the condition is unsatisfied with respect to Customer Contracts (and in respect of clause (vi), solely to the extent of any such re-sourcing) in the aggregate representing more than 20% of the total booked business of the Business as of the date hereof.

Case 3:19-bk-06741   Doc 154   Filed 10/23/19   Entered 10/23/19 08:24:34   Desc Main
Document      Page 134 of 174

(f) The applicable Governmental Authority shall have approved the transfer of the Permit set forth on <u>Section 7.3(f)</u> of the Disclosure Schedules to Buyer or its designee, or shall have issued a new Permit to Buyer or its designee substantively similar to such existing Permit.[5]

(g) There shall not have occurred any event, change, condition, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h) The Bankruptcy Court shall have approved and authorized the Buyer's ability, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in satisfaction of the Credit Bid Amount portion of the Purchase Price set forth in <u>Section 2.7</u>.

**ARTICLE VIII**
**TERMINATION**

Section 8.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing (the date on which this Agreement terminates in accordance with its terms):

(a) by mutual written consent of the Buyer and Seller Parent;

(b) either Seller Parent or the Buyer, if:

(i) a Legal Restraint is in effect that has become final and nonappealable; <u>provided</u> that no Party may terminate this Agreement pursuant to this <u>Section 8.1(b)(i)</u> unless it has complied in all material respects with <u>Section 5.5</u>;

(ii) any Seller enters into a definitive agreement with respect to an Alternative Transaction because the Buyer is not the Successful Bidder at the Auction; <u>provided</u>, <u>however</u>, that if the Buyer is the Back-Up Bidder, then the Buyer may not terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u> for a period of ninety (90) days from the entry of an Order of the Bankruptcy Court approving such definitive agreement and the transactions contemplated thereby (for the avoidance of doubt, nothing in this <u>Section 8.1(b)(ii)</u> shall restrict the ability of the Buyer to terminate this Agreement in accordance with any other provision of this Agreement); or

(iii) the Closing shall not have occurred on or before March 2, 2020 (the "<u>Outside Date</u>"); <u>provided</u> that the right to terminate this Agreement under this Section 8.1(b)(iii) shall not be available to any Party if such Party is then in material breach of this Agreement that is the cause of the failure of the Closing to occur prior to such date;

(c) by the Buyer, if:

(i) the Buyer is not in material breach of this Agreement such that the conditions in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied, and the Sellers breach or

---

[5]    **Note to Draft**:  Schedule to list the radioactive materials license issued by the Tennessee Department of Environment & Conservation.

54

fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u> and (2) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date;

(ii)     the Sale Hearing is not held on or before February 5, 2020, or if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iii)     the Auction is not held on or before January 27, 2020;

(iv)     the Bankruptcy Court has not entered the Sale Order on or before February 7, 2020, or if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(v)     if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(vi)     the Sellers withdraw or seek authority to withdraw the Sale Motion;

(vii)     a "Termination Date" (as defined in the DIP Credit Agreement) occurs or the indebtedness outstanding under the DIP Credit Agreement is otherwise paid off;

(viii)     a Material Adverse Effect has occurred;

(ix)     notices of assumption of the Transferred Contracts, including designation of Cure Claims, are not served on all material parties by the twenty-eighth (28th) Business Day following the Sale Procedures Hearing;

(x)     the Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party, other than any such transaction related to the wind down of the Sellers and that would not prevent or materially delay the Closing from occurring in accordance with the terms of this Agreement; or

(xi)     for any reason (including an Order of the Bankruptcy Court), the Buyer is legally prohibited, pursuant to Section 363(k) of the Bankruptcy Code or otherwise, to credit bid up to the full Credit Bid Amount in satisfaction of all or any portion of the Purchase Price (other than the Wind-Down Amount) as set forth in <u>Section 2.7</u>; or

(d)     by Seller Parent, if:

(i)     the Sellers are not in material breach of this Agreement such that the conditions in <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u> would not be satisfied, and the Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a

55

condition set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> and (2) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date;

(ii) (1) the Buyer's conditions to Closing set forth in <u>Section 7.1</u> and <u>Section 7.3</u> have been satisfied (or waived by the Buyer), other than those conditions that by their nature can only be satisfied at the Closing (which are capable of being satisfied), (2) the Buyer shall have failed to consummate the Closing on or prior to the date that is three (3) Business Days following the day the Closing was required to occur under <u>Section 2.8(a)</u>, (3) on or after such date, the Sellers have confirmed in a written notice to the Buyer that they are ready, willing and able to consummate the transactions contemplated by this Agreement and that Sellers' conditions to Closing set forth in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied (or waived by the Sellers), other than those conditions that by their nature can only be satisfied at the Closing, and (4) the Closing Date does not occur within three (3) Business Days of the Sellers providing the Buyer with such notice; or

(iii) any Seller or the board of directors, board of managers or similar governing body of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

The Party seeking to terminate this Agreement pursuant to this <u>Section 8.1</u> (other than <u>Section 8.1(a)</u>) shall, if such Party is Seller Parent, give prompt written notice of such termination to the Buyer, and if such Party is the Buyer, give prompt written notice of such termination to the Sellers.

Section 8.2    <u>Effect of Termination</u>.

(a) In the event of termination of this Agreement as provided in <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of <u>Section 5.7</u> (Public Announcements), <u>Section 9.2</u> (Fees and Expenses), <u>Section 9.6</u> (Notices), <u>Section 9.9</u> (Parties in Interest), <u>Section 9.10</u> (Governing Law), <u>Section 9.11</u> (Submission to Jurisdiction) and this <u>Article VIII</u> and (ii) that no such termination shall relieve any Party from liability for any willful and material breach of this Agreement.

(b) If, following entry of the Sale Procedures Order, this Agreement is terminated in the circumstances set forth in <u>Section 8.3(a)</u>, then the Sellers, jointly and severally, shall pay to the Buyer the Expense Reimbursement Amount, as applicable, subject to and in accordance with <u>Section 8.3(a)</u>, and the Buyer's right to enforce payment thereof shall survive the termination of this Agreement.

Section 8.3    <u>Expense Reimbursement Amount</u>.

(a) If this Agreement is terminated in accordance with the terms set forth in <u>Section 8.1</u> (other than any termination pursuant to <u>Section 8.1(a)</u> or <u>Section 8.1(d)(i)</u> or <u>(ii)</u>, unless the Buyer at the time of any such termination under <u>Section 8.1(d)(i)</u> or <u>(ii)</u> would have been entitled to terminate this Agreement), then the Sellers, jointly and severally, shall pay to the Buyer in cash not later than (i) in the case of a termination pursuant to <u>Section 8.1(b)(ii)</u>, the

56

closing of an Alternative Transaction and (ii) five (5) Business Days following receipt of documentation supporting the request for reimbursement of out-of-pocket costs, fees and expenses, an amount equal to the reasonable out-of-pocket costs, fees and expenses incurred by the Buyer and its Affiliates (including fees and expenses of legal, accounting and financial advisors) in connection with the development, execution, delivery and approval by the Bankruptcy Court of this Agreement and the transactions contemplated hereby, and not otherwise reimbursed or required to be reimbursed pursuant to the DIP Credit Agreement, in an amount not to exceed $2,000,000 (the "Expense Reimbursement Amount"), in each case by wire transfer of immediately available funds to an account specified by the Buyer to the Sellers in writing.

(b)     The obligations of the Sellers to pay the Expense Reimbursement Amount as provided herein shall be entitled to superpriority administrative expense status pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general administrative expense claims and superpriority administrative expense claims granted such status pursuant to Sections 503(b)(1) and 507(a)(2) other than superpriority administrative expense claims granted in favor of the DIP Credit Parties, in the Bankruptcy Case.

(c)     The Sellers agree and acknowledge that the Buyer's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by the Buyer and its Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to the Sellers and, in the Sellers' reasonable business judgment, is necessary for the preservation of the value of the Sellers' estate.  The Sellers further agree and acknowledge that the Expense Reimbursement Amount is reasonable in relation to the Buyer's efforts, the Buyer's lost opportunities from pursuing this transaction, and the magnitude of the transactions contemplated hereby.  The provision of the Expense Reimbursement Amount is an integral part of this Agreement, without which the Buyer would not have entered into this Agreement.  The Sellers' obligation to pay the Expense Reimbursement Amount shall be joint and several among the Sellers.

## ARTICLE IX
## GENERAL PROVISIONS

Section 9.1     Nonsurvival of Representations, Warranties and Covenants.  The respective representations, warranties and covenants of the Sellers and the Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 9.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 9.2     Fees and Expenses.     Except as otherwise provided herein (including Section 5.5(a) and Section 6.1), all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

57

Section 9.3    <u>Transition of Permits</u>.    To the extent that the Buyer has not obtained all of the Permits included in the Transferred Assets that are necessary for the Buyer to take title to all of the Transferred Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in the same manner in all material respects as it was operated by the Sellers immediately prior to the Closing, the Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that the Buyer reasonably requests, at the Buyer's sole expense, until the earlier of the time the Buyer has obtained such Permits and six (6) months following the Closing (or the remaining term of any such Permit or the closing of the Bankruptcy Case, if shorter).  The Buyer shall indemnify the Sellers for and hold the Sellers harmless against any claim, expense, or liability incurred (and not resulting from the bad faith or willful misconduct on the part of the Sellers) in connection with the Buyer's use of such Permits.

Section 9.4    <u>Amendment and Modification</u>.    This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.5    <u>Waiver</u>.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 9.6    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i) if to the Sellers, to:

Dura Automotive Systems, LLC
[•]
[•]
[•]
Attention: [•]
Email: [•]

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention: Ryan Blaine Bennett, P.C.
Steve Toth
Mariska S. Richards
Email: ryan.bennett@kirkland.com
steve.toth@kirkland.com
mariska.richards@kirkland.com

(ii) if to the Buyer, to:

Dura Automotive Angels, LLC
c/o Patriarch Partners, LLC
32 Avenue of the Americas
New York, New York 10013
Attention: Lynn Tilton
Email: Lynn.Tilton@PatriachPartners.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention: Ron E. Meisler
Richard L. Oliver
Carl T. Tullson
Email: ron.meisler@skadden.com
richard.oliver@skadden.com
carl.tullson@skadden.com

Section 9.7    <u>Interpretation</u>.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

59

All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement. The term "or" is not exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified.

Section 9.8    Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 9.9    Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including employees of the Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Governing Law. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware

Section 9.11    Submission to Jurisdiction. Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Bankruptcy Case is closed or declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in

a Delaware state court or a federal court sitting in Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 9.12    <u>Disclosure Generally</u>.    Notwithstanding anything to the contrary contained in the Disclosure Schedules or in this Agreement, the information and disclosures contained in any Disclosure Schedule corresponding to a Section in <u>Article III</u> of this Agreement shall be deemed to be disclosed and incorporated by reference in any other Disclosure Schedule corresponding to a Section in <u>Article III</u> of this Agreement as though fully set forth in such Disclosure Schedule for which applicability of such information and disclosure is reasonably apparent on its face. The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation with respect thereto or to mean that such information is material or immaterial, within or outside of the Ordinary Course of Business, or required to be disclosed by this Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item, which terms will be deemed disclosed for all purposes of this Agreement.

Section 9.13    <u>Personal Liability</u>.    This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect stockholder of the Sellers or the Buyer or any officer, director, employee, Representative or investor of any Party hereto.

Section 9.14    <u>Assignment; Successors</u>.    Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of the Buyer, and by the Buyer without the prior written consent of Seller Parent, and any such assignment without such prior written consent shall be null and void; <u>provided</u>, <u>however</u>, that no

61

assignment shall limit the Buyer's obligations hereunder. Notwithstanding the foregoing, subject to the terms of Section 2.10, Buyer may, assign any of their rights and/or obligations under this Agreement to any of its Affiliates without obtaining the prior written consent of any Seller. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 9.15 <u>Enforcement</u>. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. Accordingly, (x) each of the Parties shall be entitled to specific performance of the terms hereof or other equitable relief, including an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages or otherwise (this being in addition to any other remedy to which any such Party may be entitled under this Agreement) and (y) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement. Each of the Parties hereby further waives (a) any defense in any Action for specific performance that a remedy at law would be adequate and (b) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

Section 9.16 <u>Currency</u>. All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 9.17 <u>Severability</u>. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.18 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.19 <u>Counterparts</u>. Notwithstanding anything else herein to the contrary, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

Section 9.20 <u>Facsimile or .pdf Signature</u>. This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

Section 9.21   <u>No Presumption Against Drafting Party</u>.   Each of the Buyer and the Sellers acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the Sellers and the Buyer have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**DURA AUTOMOTIVE SYSTEMS, LLC**

By: _____
    Name:
    Title:

**DURA OPERATING, LLC**

By: _____
    Name:
    Title:

**DURA MEXICO HOLDINGS, LLC**

By: _____
    Name:
    Title:

**NAMP, LLC**

By: _____
    Name:
    Title:

**DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC**


By: _____
    Name:
    Title:


**DURA FREMONT L.L.C.**


By: _____
    Name:
    Title:


**DURA HOLDING GERMANY GMBH**


By: _____
    Name:
    Title:


**DURA G.P.**


By: _____
    Name:
    Title:


**<u>BUYER:</u>**


**DURA AUTOMOTIVE ANGELS, LLC**


By: _____
    Name:
    Title:

**Exhibit B**

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Judge Randal S. Mashburn |

**ORDER (I) APPROVING THE PURCHASE AGREEMENT WITH THE SUCCESSFUL
BIDDER, (II) AUTHORIZING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS, (III) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] filed on October 23, 2019, by Dura

Automotive Systems, LLC ("**Dura**") and certain of its affiliates, each as a debtor and debtor in

possession (each a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned chapter 11

cases (collectively, the "**Chapter 11 Cases**"), requesting entry of an order (this "**Sale Order**"):

(a) approving the asset purchase agreement between the Debtors and [BUYER] (the "**Buyer**")

attached to this Sale Order as <u>**Exhibit 1**</u>, as it may be amended, modified, or supplemented in

accordance with the terms thereof (the "**Purchase Agreement**"); (b) authorizing and approving

the Sale of the Transferred Assets and the Transferred Stock (together, the "**Assets**") free and

clear of liens, claims, encumbrances, and other interests to the extent set forth in the Purchase

---

[1]   The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

[2]   Unless otherwise indicated, capitalized terms used but not defined herein have the meanings assigned to them in the Motion or the Purchase Agreement, as applicable; to the extent there is a conflict between a capitalized term in the Motion and a capitalized term in the Purchase Agreement, the meaning ascribed to such term in the Purchase Agreement shall control and govern.

Agreement; (c) authorizing the assumption and assignment of the executory contracts and unexpired leases (collectively, "**Executory Contracts**") as set forth in the Purchase Agreement and pursuant to the procedures set forth in the Bid Procedures; and (d) granting related relief; and the Court having entered an order on [Date] [Docket No. __] (the "**Bid Procedures Order**") approving the bid procedures in connection with the Sale as attached as <u>**Exhibit 1**</u> to the Bid Procedures Order (the "**Bid Procedures**"), and approving the form of notice of the Auction and the Sale Hearing as attached as <u>**Exhibit 2**</u> to the Bid Procedures Order; and upon the Buyer and the Debtors having entered into the Purchase Agreement; [and after conducting the Auction in accordance with the Bid Procedures and Bid Procedures Order / no Auction being necessary because no other Qualified Bids other than the Stalking Horse Bid by the Buyer having been received]; and the Debtors having determined, after an extensive marketing and sale process, that the Buyer has submitted the highest or otherwise best bid for the Assets and having selected the Buyer as the Successful Bidder in accordance with the Bid Procedures; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale and the Purchase Agreement and all relief related thereto; and the Court having conducted the Sale Hearing to consider entry of the Sale Order on [Date]; and upon the full record of these Chapter 11 Cases, the Sale Hearing, and all of the proceedings had before the Court; and the Court having jurisdiction over this matter; and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found and determined that the relief granted herein is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and that the legal and factual bases set forth in the Motion, the Declaration of [Name] [Docket No. _____] and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing establish good and sufficient cause for the relief granted herein,

2

including based on the findings and determinations set forth below and as stated by the Court in

its bench rulings at the Hearing; and at the hearing held on [DATE] with respect to the Debtors'

request for approval of the Bid Procedures Order; now, therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A. <u>Jurisdiction</u>. The Court has jurisdiction to hear and determine the Motion and to

grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), and the

standing *Administration of Bankruptcy System*, Adm. Order No. 28-11 (M.D. Tenn. 1984).

B. <u>Venue</u>. Venue of these Chapter 11 Cases and the Motion in this district is proper

under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2). The Court may enter a final order with respect to the Motion, the Sale, and all

related relief, in each case, consistent with Article III of the United States Constitution.

C. <u>Statutory and Legal Predicates</u>. The statutory and legal predicates for the relief

requested in the Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11

U.S.C. §§ 101, <u>et</u> seq. (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9007, and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

D. <u>Notice</u>. In accordance with the Bid Procedures Order, and as evidenced by the

[Affidavit of Service of _____ filed with this Court] [Docket No. ___] (the "_____

**Affidavit**"), the Debtors served the Sale Notice, together with a copy of the Bid Procedures

Order and the Bid Procedures on (i) the Office of the United States Trustee for the Middle

District of Tennessee; (ii) the Committee [(if any)]; (iii) counsel to the Agent; (iv) all taxing

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing. This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

3

authorities in the states where the Debtors are located, including the Internal Revenue Service, and all other federal, state and local taxing and regulatory authorities known to the Debtors to assert jurisdiction over the Debtors or which are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the Assets, or to have any known interest in the relief requested by the Motion; (v) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Assets; (vii) the non-Debtor parties to the Debtors' executory contracts and unexpired leases; (viii) all persons known or reasonably believed to have expressed an interest in acquiring the Assets within six months prior to the Petition Date; (ix) the United States Attorney's office for the Middle District of Tennessee; (x) the Stalking Horse Bidder; (xi) any applicable federal, state and local environmental agencies; and (xii) all parties to any litigation involving the Debtors (collectively, the "**Notice Parties**").

E. <u>Notice Sufficient</u>. Based upon the [＿＿＿＿＿] Affidavit and the evidence presented at the Sale Hearing, actual written notice of the Motion, the Bid Procedures Order, the Bid Procedures, the Sale Hearing, the Sale, the assumption and assignment of the Executory Contracts, and the transactions contemplated thereby, has been provided in accordance with the Bid Procedures Order, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9006. A reasonable opportunity to object to or be heard regarding the Motion and the relief requested therein and to the entry of this Sale Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a). With respect to entities whose identities are not readily ascertainable by the Debtors, publication of the Sale Notice in *The New York Times (National Edition)*, [*The Detroit Free Press*, and *The Tennessean*] on [Date]

was sufficient and reasonably calculated under the circumstances to reach all such entities].  As evidenced by the affidavits of service and publication previously filed with the Court [Docket Nos. __, __], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sale, and the assumption of the Executory Contracts to be assumed and assigned at Closing pursuant to this Sale Order has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and the Local Bankruptcy Rules and in compliance with the Bid Procedures Order.  Notice of the Sale Motion, the Sale Hearing, the Auction, the Sale, and the assumption and assignment of the Executory Contracts to be assumed and assigned at Closing pursuant to this Sale Order was and is timely, proper, sufficient, appropriate under the particular circumstances, and reasonably calculated to provide the Notice Parties and all other interested parties with timely and proper notice under the circumstances of these Chapter 11 Cases, and no other or further notice with respect to such matters is, or shall be, required.

F.    <u>Interests Property of the Estate</u>.  The Assets sought to be transferred by Debtors to the Buyer pursuant to the Purchase Agreement are property of the Debtors' estates and title thereto is vested in the Debtors' estates.  The Debtors are the sole and rightful owners of such Assets with all right, title and interest to transfer and convey the Assets to the Buyer, and no other person has any ownership right, title, or interests therein.

G.    <u>Sufficiency of Marketing</u>.  (i) The Debtors and their advisors engaged in a robust and extensive marketing and sale process for the Assets through their prepetition marketing efforts and the postpetition sale process pursuant to the Bid Procedures Order and the Bid Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the

sale process, the Bid Procedures and the Auction and the actions of the Debtors and the Buyer in connection therewith were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Assets; and (iv) the process conducted by the Debtors pursuant to the Bid Procedures obtained the highest or otherwise best value for the Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.

        H.    <u>Stalking Horse Purchase Agreement</u>.  On [Date], the Bid Procedures Order authorized the Debtors' entry into the Stalking Horse Purchase Agreement, subject to higher or better offers.  In accordance with the Bid Procedures Order and the Bid Procedures, the transactions contemplated by the Stalking Horse Purchase Agreement were deemed a Qualified Bid and the Stalking Horse Bidder was eligible to participate in the Auction.

        I.    <u>Bid Deadline [and Selection of Successful Bidder / Cancelled Auction]</u>. [The Bid Deadline passed on [Date] at [Time] (prevailing Central Time) in accordance with the Bid Procedures and Bid Procedures Order.  The Debtors cancelled the Auction in accordance with the Bid Procedures and Bid Procedures Order because no other Qualified Bids (as defined in the Bid Procedures) were submitted. / Following the conclusion of the Auction, the Debtors determined that the Buyer submitted the highest or otherwise best offer and selected the Buyer as the Successful Bidder in accordance with the Bid Procedures Order].  Pursuant to the terms of the Bid Procedures, the Purchase Agreement constituted the highest and best bid and, therefore, was designated as the Successful Bid.  On [Date], the Debtors filed the Notice of Successful Bidder [Docket No. __] identifying the Buyer as the Successful Bidder in accordance with the Bid Procedures Order.  As established by the record of the Sale Hearing, the bidding and related procedures established by the Bid Procedures Order have been complied with in all material

6

respects by the Debtors and the Buyer. The Bid Procedures afforded a full, fair and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Assets, and the Purchase Agreement constitutes the best and highest offer for the Assets.

J.    <u>Corporate Authority</u>.  Subject to the entry of this Sale Order, each Debtor:  (i) has full requisite corporate or other organizational power and authority to execute, deliver, and perform the Purchase Agreement and all other documents contemplated thereby; and (ii) has taken all requisite corporate or other organizational actions and formalities necessary to authorize and approve the execution, delivery and performance of the Purchase Agreement and to consummate the transactions contemplated by the Purchase Agreement (including the Sale) (collectively, the "**Transactions**"), including as required by their respective organizational documents, and, upon execution thereof, the Purchase Agreement and the related documents will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, will constitute a valid and binding obligation of each such Debtor.   No government, regulatory, or other consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the execution, delivery, and performance by the Debtors of the Purchase Agreement and the consummation of the Transactions (including the Sale) contemplated thereby.  No consents or approvals of the Debtors, other than those expressly provided for in the Purchase Agreement or this Sale Order, are required for the Debtors to consummate the Sale.

K.    <u>Compliance with Bid Procedures and Bid Procedures Order</u>.  As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have adequately

7

marketed the Assets and conducted the sale process in compliance with the Bid Procedures and the Bid Procedures Order, and the bidding process was conducted in a non-collusive, fair, and good faith manner. The Debtors and their professionals conducted the sale process in compliance with the Bid Procedures and the Bid Procedures Order and have afforded potential buyers a full and fair opportunity to participate in the bidding process for the Assets and make higher or better offers. In accordance with the Bid Procedures Order, the Purchase Agreement was deemed a Qualified Bid and the Buyer was a Qualified Bidder eligible to participate at the Auction. The Buyer acted in compliance with the Bid Procedures and the Bid Procedures Order and conducted itself in a noncollusive, fair, and good faith manner. In accordance with the Bid Procedures and the Bid Procedures Order, the Debtors determined that the bid submitted by the Buyer and memorialized by the Purchase Agreement is the Successful Bid.

L.  <u>Arms-Length and Buyer's Good Faith</u>. The Purchase Agreement and each of the Transactions were negotiated, proposed and are undertaken by the Debtors, their management, independent boards of directors or equivalent governing bodies, and representatives and the Buyer and its management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, from arm's-length bargaining positions without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Buyer has proceeded in good faith, including by: (i) recognizing that the Debtors were free to deal with any other party interested in acquiring the Assets; (ii) complying with the applicable Bid Procedures and the Bid Procedures Order in all respects, including the provisions prohibiting collusion with other prospective bidders; and (iii) willingly subjecting its bid to the competitive Bid Procedures approved in the Bid Procedures Order. Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the

8

Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. The Debtors and the Buyer have not engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed, neither the Buyer, nor the Debtors have violated section 363(n) of the Bankruptcy Code by any action or inaction. As a result of the foregoing, the Buyer is an entity that purchased the Assets in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to the full rights, benefits, privileges, and protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and each of the Buyer and Debtors otherwise have proceeded in good faith in all respects in connection with the Sale specifically and these Chapter 11 Cases generally.

M. <u>Highest or Best Offer</u>. The total consideration provided by the Buyer for the Assets (including the Credit Bid Amount) as reflected in the Purchase Agreement is the highest and best offer received by the Debtors for the Assets. [No other person or entity or group of persons or entities has submitted a Qualified Bid prior to the Bid Deadline. Therefore, in accordance with the Bid Procedures Order, (i) the Debtors did not conduct the Auction, and (ii) the Debtors determined that the Purchase Agreement constituted the highest and best offer in accordance with the process set forth in the Bid Procedures and selected the Purchase Agreement as the Successful Bid. / Following the Auction, the Debtors determined that the Purchase Agreement constituted the highest and best offer in accordance with the process set forth in the Bid Procedures and selected the Purchase Agreement as the Successful Bid] The Debtors' determination that the Purchase Agreement constitutes the highest and best offer and the

9

Debtors' selection of the Purchase Agreement as the Successful Bid each constitute a valid and sound exercise of the Debtors' business judgment, and the Debtors' decision to enter into the Purchase Agreement and the Transactions constitutes a proper exercise of the fiduciary duties of the Debtors and their officers and managers. The offer of the Buyer, upon the terms and conditions set forth in the Purchase Agreement, including the total consideration [(including the Credit Bid Amount)] to be realized by the Debtors thereunder, (i) is the highest and best offer received by the Debtors after extensive marketing, including through the Bid Procedures and (ii) is in the best interests of the Debtors, their creditors, their estates and other parties in interest. Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Assets for greater economic value to the Debtors or their estates than that provided by the Purchase Agreement.

N.  <u>No Fraudulent Purpose</u>. The Purchase Agreement was not entered into, and none of the Debtors nor the Buyer have entered into the Purchase Agreement, or propose to consummate the Sale, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors. None of the Debtors nor the Buyer have entered into the Purchase Agreement, or are proposing to consummate the Sale, fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or the laws of the United States, any state, territory, possession thereof, the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

O.  <u>Assumption and Assignment of Executory Contracts</u>. The assumption and assignment of the Executory Contracts is integral to the Purchase Agreement, is in the best

10

interests of the Debtors and their estates, and represents the valid and reasonable exercise of the Debtors' sound business judgment.

P. <u>No Successor Liability</u>. The Buyer is not a mere continuation of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer and the Debtors. The Buyer is not holding itself out to the public as a continuation of the Debtors or their estates. The transfer of the Assets to the Buyer, and the assumption of the Assumed Liabilities by the Buyer, except as otherwise explicitly set forth in the Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability or law, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "**Successor or Other Liabilities**"). Pursuant to the Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities and shall have no liability for the Excluded Liabilities.

Q. <u>Sale as an Exercise of Business Judgment</u>. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Sale Motion, the Sale, the Purchase Agreement, and all related agreements (the "**Related**

11

**Agreements**").  The Debtors' entry into and performance under the Purchase Agreement and Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances.  Business justifications for the Sale include, but are not limited to, the following: (x) the Purchase Consideration set forth in the Purchase Agreement constitutes the highest or otherwise best offer received for the Assets; (y) the Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Assets; and (z) the value of the Debtors' estates will be maximized through the sale of the Assets pursuant to the Purchase Agreement.

R.      <u>Compelling Reasons for an Immediate Sale.</u>  Good and sufficient reasons for approval of the Purchase Agreement have been articulated by the Debtors, and the Debtors' decision to enter into the Purchase Agreement and the Transactions contemplated thereby represents an exercise of sound business judgment.  The Debtors have demonstrated compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code; and (b) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transactions contemplated by this Sale Order.

S.      <u>No Sub Rosa Plan</u>.  The Purchase Agreement and the Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protection that a

disclosure statement would afford. Neither the Purchase Agreement nor the Sale impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors.

T.     Final Order.   This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the Purchase Agreement.  Buyer, being a good faith Buyer under section 363(m) of the Bankruptcy Code, may close the Sale contemplated by the Purchase Agreement at any time after entry of this Sale Order.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT**:

1.     Motion Granted.   The relief requested in the Motion is GRANTED as set forth herein.

2.     Findings of Fact and Conclusions.   The Court's findings of fact and conclusions of law in the Bid Procedures Order and the record of the hearings with respect to the Bid Procedures Order are incorporated herein by reference.

3.     Objections Overruled.   All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

13

4.    _Notice_.  Notice of the Motion, Bid Procedures, Bid Procedures Order, Sale (and the Transactions and Purchase Agreement contemplated in connection therewith), Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, and the Bid Procedures Order.

5.    _Approval_.  Pursuant to sections 105 and 363 of the Bankruptcy Code, the Purchase Agreement, Sale, the Related Agreements, and the other Transactions are hereby approved and the Debtors are authorized and directed to consummate the Sale, [including, without limitation, the credit bid of the Credit Bid Amount], and the sale and transfer of the Assets to the Buyer in accordance with the terms of the Purchase Agreement.  The Debtors and the Buyer are each hereby authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the Sale of the Assets to the Buyer and the Closing of the Sale and the Transactions pursuant to the Purchase Agreement and this Sale Order and (b) perform, consummate, implement and close fully the Purchase Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement.  The Debtors are hereby authorized and directed to perform each of their respective covenants and undertakings as provided in the Purchase Agreement prior to or after the Closing of the Sale without further order of the Court.  The failure to specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety. All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors

14

to transfer the Assets to the Buyer in accordance with the Purchase Agreement and this Sale Order.

6.    <u>Fair Purchase Price</u>.  The consideration provided by the Buyer under the Purchase Agreement, [including the portion of the Purchase Consideration that is the Credit Bid Amount], is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

7.    <u>Validity of Credit Bid</u>. The credit bid of the Credit Bid Amount constitutes a valid, duly authorized credit bid and is proper under sections 363(b) and 363(k) of the Bankruptcy Code, and applicable law.

8.    <u>Discharge of Credit Bid Claims</u>.  Upon the Closing Date, all obligations under the DIP Credit Agreement and the Prepetition ABL Credit Agreement, and any related obligations which are used as part of the Credit Bid Amount, shall be deemed discharged against the Debtors and satisfied in full.

9.    <u>Amendments to Purchase Agreement</u>.  The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, supplemented, waived or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement, waiver or restatement does not have a material adverse effect on the Debtors' estates.  The Purchase Agreement and the Debtors' obligations therein shall not be

altered, amended, rejected, discharged or otherwise affected by any chapter 11 plan proposed or confirmed in the Chapter 11 Cases without the prior written consent of the Buyer.

10.    <u>Transfer Free and Clear</u>.   One or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Pursuant to sections 105 and 363 of the Bankruptcy Code, the Assets are transferred by the Debtors to the Buyer free and clear of any lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, or other interest in the subject property, including, without limitation, any right of recovery, tax (including foreign, federal, state, and local tax), order of any governmental authority, or other claim with respect thereto, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any claims based on any theory that the Buyer is a successor, transferee or continuation of the Debtors or the Transferred Assets, and (iv) any leasehold interest, license or other right, in favor of a person other than the Buyer, to use any portion of the Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown (collectively, "**Encumbrances**"), except for the Permitted Encumbrances.  The Debtors are authorized to transfer the Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Sale Order.  The Assets shall be transferred to the Buyer in accordance with the terms of the Purchase Agreement and this Sale Order, and upon the Closing, such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Buyer with all right, title and interest of the Debtors in the Assets; and (iii) be free and clear of all

16

Encumbrances and any other claims and interests in accordance with section 363(f) of the Bankruptcy Code (except for the Permitted Encumbrances). All Persons having claims or interests of any kind or nature whatsoever against the Debtors or the Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such claims or interests against the Buyer or any of its assets, property, affiliates, successors, assigns, or the Assets.

11.     <u>Surrender of Possession</u>.  Any Assets in the possession or control of any person or entity (including without limitation the Agent) shall be delivered to the Buyer and deemed delivered at the time of Closing (or such other time as provided in the Purchase Agreement).

12.     <u>Vesting of Assets in the Buyer</u>.  Effective upon the Closing, the transfer to the Buyer of the Assets pursuant to the Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Assets, and vests with or will vest in the Buyer all the Assets free and clear of Encumbrances (except for the Permitted Encumbrances).

13.     <u>Injunction</u>.  Except as expressly provided in the Purchase Agreement or by this Sale Order, effective upon the Closing all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons holding liens on the Assets shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such liens.  All persons are hereby enjoined from taking any action that would interfere with or adversely affect the ability of the Debtors to transfer the Assets in accordance with the terms of the Purchase Agreement and this Sale Order.

14.     <u>Direction to Creditors and Parties in Interest</u>.   On the Closing, each of the Debtors' creditors and the holders of any claims are authorized and directed to execute such

Case 3:19-bk-06741    Doc 154    Filed 10/23/19    Entered 10/23/19 08:24:34    Desc Main
Document      Page 164 of 174

documents and take all other actions as may be necessary to terminate, discharge or release their claims against and interests in in the Assets, if any, as such claims and interests may otherwise exist.

15.    <u>Direction to Government Agencies</u>.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale and any other Transactions contemplated by the Purchase Agreement and approved by this Sale Order.

16.    <u>Good Faith Buyer</u>.  The Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code, and the Buyer has proceeded in good faith in all respects in connection with the Sale.

17.    <u>Consummation of Sale Transaction</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Purchase Agreement and the Related Agreements and to close and consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale and each of the Transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Purchase Agreement, the Related Agreements, and this Sale Order.

18.     Transfer of Marketable Title.     Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Buyer at the Closing pursuant to the terms of the Purchase Agreement, free and clear of all Encumbrances (except for the Permitted Encumbrances).

19.     No Successor Liability.     By virtue of the Sale, the Buyer and its affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be a consolidation with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity.

20.     Approval to Release Encumbrances.     If any person or entity that has filed financing statements or other documents or agreements evidencing Encumbrances on the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of all Encumbrances that the person or entity has or may assert with respect to the Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.  The Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances on the Assets.

19

21.     _Effect of Recordation of Order_.   This Sale Order, once filed, registered, or otherwise recorded, (a) shall be effective as a conclusive determination that, upon the Closing, all Encumbrances, of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities.

22.     _Assumption and Assignment of Contracts_. Subject to the occurrence of the Closing Date, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Executory Contracts free and clear of all claims and interests. With respect to each of the Executory Contracts, the Buyer, in accordance with the provisions of the Purchase Agreement, has cured or will cure, or has or will have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Contracts under section 365(b)(1) of the Bankruptcy Code, and the Buyer has provided adequate assurance of future performance under the Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-Debtor counterparties to such Executory Contracts.  Upon the applicable effective date of the assumption and assignment of the applicable Executory Contract (such date the "**Assumption Effective Date**") with respect to an Executory Contract, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Executory Contract and, pursuant to section 365 of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the breach of such Executory Contract occurring after such assumption as provided in section 365. Buyer acknowledges and agrees that from and after the applicable Assumption Effective Date, with respect to an Executory Contract,

20

subject to and in accordance with the Purchase Agreement, it shall comply with the terms of each Executory Contract in its entirety, including any indemnification obligations expressly contained in such Contract that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order. The assumption and assignment by the Debtors of any Executory Contract shall not be a default under any such Executory Contract.

23. Upon the applicable Assumption Effective Date, any provision in any Executory Contract that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and all Executory Contracts shall remain in full force and effect notwithstanding assumption and assignment thereof. No sections or provisions of any Executory Contracts, that in any way purport to: (i) unreasonably prohibit, restrict, or condition the Debtors' assumption or assignment of such Executory Contract (including, but not limited to, the conditioning of such assumption or assignment on the consent of any non-Debtor party to such Executory Contract); provided, however, that any direct prohibition, restriction or condition on such assumption shall be deemed to be unreasonable; (ii) provide for the cancellation, or modification of the terms of the Executory Contract based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-Debtor third party to such Executory Contracts upon assumption thereof; or (iv) provide for any rights of first refusal to a counterparty of an Executory Contract, or any recapture or termination rights in favor of a counterparty to an Executory Contract, or any right of a landlord to take an assignment or sublease from a tenant, shall have any force or effect with respect to the assumption or

21

assignment of Executory Contracts by the Debtors in accordance with the Purchase Agreement, because they constitute unenforceable antiassignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

24.     Except as otherwise specifically provided for by order of this Court, upon the assumption of the Executory Contracts under the provisions of this Sale Order and full payment of all Cure Claims as required under section 365(b) of the Bankruptcy Code, no default shall exist under any Executory Contracts, and no counterparty to any Executory Contracts shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Executory Contract.  The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Executory Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Executory Contract.

25.     [Next Highest Bidder.  [_____] is hereby declared the Backup Bidder pursuant to its Backup Bid (each as defined in the Bid Procedures) for the Assets in the amount of $_____.  Pursuant to the Bidding Procedures, the Backup Bidder shall keep the Backup Bid open and irrevocable until the first to occur: (x) two (2) business days after the closing of the transaction(s) to the Buyer; and (y) [•] days after the date of the Auction.]

26.     Wind-Down Amount and Professional Fee Amount.  For the avoidance of doubt, pursuant to the Purchase Agreement, (a) an amount of cash equal to the Wind-Down Amount shall remain with the Debtors following the Closing, and (b) prior to Closing, the Professional

Case 3:19-bk-06741   Doc 154   Filed 10/23/19   Entered 10/23/19 08:24:34   Desc Main
Document      Page 169 of 174

Fee Amount shall be deposited into the Professional Fee Escrow Account and shall be held in escrow for the benefit of the Professionals.

27. <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>.  To the extent this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.  To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

28. <u>Subsequent Orders and Plan Provisions</u>.  Unless otherwise agreed to by the Debtors and the Buyer, this Sale Order shall not be modified by any chapter 11 plan confirmed in these Chapter 11 Cases or any subsequent order(s) of this Court.

29. <u>Binding Effect of Sale Order</u>.  This Sale Order and the Purchase Agreement shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of liens on the Assets (whether known or unknown), the Buyer and all successors and assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons" or other fiduciaries in the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.

30. <u>No Avoidance of Purchase Agreement</u>.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, the Purchase Agreement and the Sale shall not be avoidable under section 363(n) or chapter 5 of the

23

Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement or the Sale.

31.  <u>Entire Purchase Agreement Approved</u>.  The failure to specifically include any particular provisions of the Purchase Agreement or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Buyer that the Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order prior to Closing.

32.  <u>Nonseverable</u>.  The provisions of this Sale Order are nonseverable and mutually dependent.

33.  <u>Immediate Effect</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the terms of this Order shall be immediately effective and enforceable upon its entry and not subject to any stay, notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d)  or otherwise.

34.  <u>Satisfaction of Conditions Precedent</u>.  Neither the Buyer nor the Debtor shall have an obligation to close the Transactions until all conditions precedent in the Purchase Agreement to each of their respective obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.

35.  <u>Bulk Sales; Taxes</u>.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion or this Sale Order.  Except as otherwise expressly provided in the Purchase Agreement, all obligations of the Debtors relating to taxes, whether

24

arising under any law, by the Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

36. <u>Lease Deposits and Security</u>. The Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Contract to the extent not previously provided by the Debtors.

37. <u>Automatic Stay</u>. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement, and Related Agreements, documents or other instruments. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the provisions of this Sale Order.

38. <u>Retention of Jurisdiction</u>. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the Purchase Agreement, all amendments thereto, in connection with any disputes involving the Debtors, and to adjudicate, if necessary, any and all disputes concerning the Debtors and related in any way to the Sale; provided, however, that in the event the Court abstains from exercising or declines to exercise jurisdiction or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

**This Order Was Signed and Entered Electronically As Indicated At The Top Of The First Page**

**APPROVED FOR ENTRY:**

*/s/ William L. Norton III*
—————————————————————
William L. Norton III (TN 10075)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1600 Division Street, Suite 700
Nashville, Tennessee 37203
Telephone:    (615) 252-2397
Facsimile:    (615) 244-6380

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Christopher Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

Purchase Agreement