UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) Case No. 19-06741 (RSM) |
| Debtors. | ) (Jointly Administered) |
| | ) Judge Randal S. Mashburn |

## DIP LENDERS' STATEMENT IN SUPPORT OF
## DEBTORS' EXPEDITED DIP MOTION

Patriarch Partners Agency Services, LLC and Dura Automotive Angels, LLC, the proposed DIP Agent and DIP Lender (together, the "**DIP Lenders**"),[2] respectively, submit this statement in support of the *Expedited Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, and (V) Modifying the Automatic Stay* [Docket No. 19] (the "**DIP Motion**"[3]) filed by the debtors and debtors in possession (the "**Dura Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), and respectfully represent as follows:

---

[1] The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

[2] Dura Automotive Angels, LLC now holds the DIP Loans and the Prepetition ABL Loans previously held by Ark II CLO-2001-1, Ltd.

[3] Terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion.

## PRELIMINARY STATEMENT

1. The DIP Lenders have proposed much needed financing to the Dura Debtors, in the form of a $77 million DIP facility (the "**DIP Facility**"). This financing provides liquidity to fund operations, capital expenditures, pay employees, and, together with the proposed stalking horse bid, provides stability to the Dura Debtors.[4]

2. Since the first-day hearing last Friday, the DIP Lenders have worked with the Dura Debtors to improve the DIP Facility, including:

- Eliminating the Case Milestone requirement from the DIP Term Sheet that the Dura Debtors would have an event of default arising from not filing the sale and bid procedures motion;

- Eliminating the "roll-up" of the Prepetition ABL Facility and instead providing that, as Priority ABL Collateral is monetized, the Prepetition ABL Facility will be paid down as adequate protection, with a dollar-for-dollar increase in the New Money DIP Loan Commitments, for a total commitment of up to $77 million; and

- Reducing certain DIP Lender consent rights from "sole and absolute discretion" to "reasonable discretion."

3. Moreover, to be clear, notwithstanding the unsubstantiated assertions to the contrary, nothing in the proposed DIP order purports to release the DIP Lenders or the Prepetition ABL Lenders *other than in their capacity as lenders*, nor does it seek releases (whether relating to the Zohar bankruptcy or otherwise) from the Zohar Debtors.

4. No parties have filed written objections to the DIP Motion,[5] and only two parties have objected to DIP Motion. Specifically, the debtors in the Delaware chapter 11 cases captioned *In re: Zohar III Corp. et al.*, Case No. 18-10512 (KBO) (the "**Zohar Debtors**") and

---

[4] Notably, under the terms set forth in the proposed stalking horse bid, executory contracts will be assumed and assigned to the stalking horse bidder and, subject to certain qualifications, the Dura Debtors' trade creditors will be paid in full.

[5] Ford Motor Company filed a reservation of rights. *See* [Docket No. 144].

2

one of the Zohar Debtors' creditors ("**Bardin Hill**," and, together with the Zohar Debtors, the "**Objecting Parties**") objected to the DIP Motion at the Dura Debtors' first-day hearing, raising two principal concerns. *First*, the Objecting Parties make the truly remarkable assertion that, due to the pending chapter 11 cases of the Zohar Debtors, this Court cannot authorize DIP financing with priming liens – financing that is consistent with the Intercreditor Agreement between the Prepetition Term Loan Agent, the applicable Zohar Debtors, and the Prepetition ABL Agent, and the Prepetition ABL Lenders – without overstepping its jurisdictional mandate. *Second*, the Objecting Parties contend that the DIP Facility improperly imposes "case controls" on the Dura Debtors, specifically the event of default under the DIP Facility if the DIP Lender is not approved as the "stalking horse" bidder in connection with the upcoming bid procedures hearing.

5. As discussed herein, the Objecting Parties are wrong on both grounds. The DIP Facility contains "case controls" for debtor-in-possession financings that are now more commonly seen in chapter 11 cases. Indeed, courts on numerous occasions – including in cases involving counsel to the Objecting Parties, as well as counsel to the DIP Lenders – have approved DIP financings that were tied to the approval of bid procedures and the selection of the DIP lender as the stalking horse bidder. *See, e.g.*, *In re Church St. Health Mgmt., LLC*, Case No. 12-01573 (Bankr. M.D. Tenn. Mar. 15, 2012) (KML) [Docket No. 182]; *In re Curae Health, Inc.*, Case No. 18-05665 (CMW) (Bankr. M.D. Tenn. Aug. 29, 2018) [Docket No. 60]; *In re ISR Grp., Inc.*, Case No. 14-11077 (JLC) (Bankr. W.D. Tenn. May 14, 2014) [Docket No. 91]; *In re Stearns Holdings, LLC*, Case No. 19-12226 (JLG) (Bankr. S.D.N.Y. July 11, 2019) [Docket No. 91]; *In re Pernix Sleep, Inc.*, Case No. 19-10323 (Bankr. D. Del. Feb. 21, 2019) [Docket No. 61]; *In re Empire Generating Co., LLC*, Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. June 22, 2019) [Docket No. 166]; *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (Bankr.

S.D.N.Y. Nov. 9, 2018) [Docket No. 51]; *In re EMAS Chioyoda Subsea Ltd.*, Case No. 17-31146 (MI) (Bankr. S.D. Tex. Mar. 1, 2017) [Docket No. 50]; *In re Katy Indus., Inc.*, Case No. 17-11101 (LSS) (Bankr. D. Del. May 16, 2017) [Docket No. 48]; *In re GST Autoleather, Inc.*, Case No. 17-12100 (LSS) (Bankr. D. Del. Oct. 5, 2017) [Docket No. 73]; *In re TAH Windown, Inc. (f/k/a SynCardia Sys., Inc.)*, Case No. 16-11599 (MFW) (Bankr. D. Del. July 6, 2016) [Docket No. 35]; *In re The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13. 2015) [Docket No. 59]; *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. May 3, 2013) [Docket No. 46]; *In re AGC, Inc.*, Case No. 13-30681 (JBR) (Bankr. D. Conn. Apr. 19, 2013) [Docket No. 59].[6]

6. Approving the DIP Facility is necessary, and well within the purview of this Court's jurisdiction over the estates of the Dura Debtors. As the court presiding over the Dura Debtors' chapter 11 cases, this Court can (and should) grant the relief requested in the DIP Motion.

**ARGUMENT**

**A.    This Court Has the Authority to Grant the Relief Requested in the DIP Motion.**

7. The Zohar Debtors have asserted, without citation to authority, that, because the terms of the proposed interim DIP order (the "**DIP Order**") would prime the liens of the Prepetition Term Loan Agent, this Court does not have jurisdiction to approve a DIP financing order. This argument is flawed for several reasons. Most basically, it is flawed because it demands that this Court decline to exercise its properly-vested jurisdiction over the most crucial issue in these Chapter 11 Cases (the DIP Facility) because a technical reading of the Bankruptcy

---

[6] These motions and orders are voluminous, but the DIP Lenders will have copies of these documents available at the hearing. A chart setting out the key comparable provisions in other DIP and cash collateral orders is attached hereto as **Exhibit A**.

Code may vest the court presiding over the Zohar Debtors' bankruptcy cases (the "**Delaware Court**") with overlapping exclusive jurisdiction over the indirect, beneficial lien interest held by the Zohar Debtors.

8. This argument ignores the foundational and fundamental truth that this Court (and no other court) has jurisdiction over the Dura Debtors and their property. *See* 28 U.S.C. § 1334(e). For the avoidance of any doubt, the Dura Debtors and their property are not property of the Zohar Debtors' estates. *See In re Residential Capital*, *LLC*, 556 B.R. 555 (Bankr. S.D.N.Y. 2016) (citing *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198 (1983)) (finding that the mere fact that the debtor possessed a mortgage over certain property was insufficient to convert the mortgaged property into property of the debtors' estates); *see also Farmers Bank v. March (In re March)*, 140 B.R. 387 (E.D. Va. 1992), *aff'd*, 998 F.2d 498 (4th Cir. 1993). Instead, under the plain text of 28 U.S.C. § 1334(e), this Court has exclusive jurisdiction over the Dura Debtors' property (which property is proposed to be pledged as collateral in the proposed DIP Facility).

9. What *is* arguably property of the Zohar Debtors' estates are their rights as indirect beneficiaries of the lien securing the Dura Debtors' obligations under the Prepetition Term Loan Agreement. To be sure, such lien was granted, not to the Zohar Debtors themselves, but rather to the Prepetition Term Loan Agent, Ankura. *See Prepetition Term Loan Security Agreement* § 1. Ankura is not a chapter 11 debtor. Moreover, upon an event of default under the applicable credit documents, "the [Prepetition Term Loan Agent] may (on behalf of itself and [the Prepetition Term Loan Lenders]) demand, sue for, collect, or make any settlement or compromise it deems desirable with respect to the [Prepetition Term Loan Collateral]." *Id.* § 10(a). For these reasons, it is the Prepetition Term Loan Agent (as lienholder) who has the power, subject to the terms of the Intercreditor Agreement, to request adequate protection of the lien, and to make decisions

5

with respect to the Prepetition Term Loan Agent's lien on the Prepetition Term Loan Collateral (albeit at the direction of the required Prepetition Term Loan Lenders). This makes the Zohar Debtors' interest in the lien remote and indirect.

10. Additionally, as the Supreme Court correctly stated in the *Whiting Pools* case, the Bankruptcy Code "does not expand the rights of the debtors in the hands of the estate . . . [and] the estate succeeds to no more or greater causes of action against third parties than those held by the Debtor." *Whiting Pools*, 462 U.S. at 204 n.8; *see also Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("[p]roperty interests are created and defined by state law."). Here, under the express terms of the Prepetition Term Loan Security Agreement, the liens granted to the Zohar Debtors are subjected to and limited by the Intercreditor Agreement. *See Prepetition Term Loan Security Agreement* § 1 ("To secure . . . the Obligations . . . *subject to the [Intercreditor Agreement]*, each grantor hereby pledges, charges, assigns, and grants, to Agent, for the benefit of itself and for the benefit of the other Secured Parties, a continuing security interest in and Lien on . . . [Prepetition Term Loan Collateral]") (emphasis added). The Intercreditor Agreement expressly contemplates and authorizes the Debtors' entry into the DIP Facility (including the priming liens associated therewith). A copy of the Intercreditor Agreement is attached hereto as **Exhibit B**.

11. In short, the Zohar Debtors demand that this Court decline to exercise its *in rem* and *in personam* jurisdiction over the Dura Debtors and their property with respect to the Dura Debtors' DIP Facility (which, as indicated by the first-day hearing, is the single most crucial element of the Dura Debtors' chapter 11 cases), on the grounds that the Delaware Court has exclusive jurisdiction over the Zohar Debtors' indirect interest in a lien that is expressly conditioned on compliance with the Intercreditor Agreement. This demand represents the proverbial "tail wagging the dog" and flies in the face of the policy underlying 28 U.S.C.

§ 1334(e), namely, that a "bankruptcy court's *in rem* jurisdiction over a debtor's estate . . . permits a determination of all claims that anyone, whether named in the action or not, has to the property or thing in question." *Universal Oil Ltd. v. Allfirst Bank (In re Millennium Seacarriers, Inc.)*, 419 F.3d 83, 92 (2d Cir. 2005).

12. This Court's *in rem* jurisdiction permits it to determine claims (including claims arising under the DIP Facility) against the Dura Debtors' property. The Delaware Court's *in rem* jurisdiction permits it to determine claims against the relevant property of the Zohar Debtors' estates (namely, any claims against the Zohar Debtors' indirect interest in the lien on the Prepetition Term Loan Collateral). The Delaware Court cannot determine claims against the Dura Debtors or their property, nor can the Delaware Court approve DIP financing to be extended to the Dura Debtors. Those tasks are properly within the ambit of this Court's jurisdiction over these Chapter 11 Cases. Moreover, the purpose of the Delaware Court's *in rem* jurisdiction with respect to the Zohar Debtors' interest in the lien on the Prepetition Term Loan Collateral would not be violated by this Court's approval of the DIP Order, because such approval does not, in any way, determine what rights the Zohar Debtors' creditors may have with respect to such lien.

13. Finally, applying 28 U.S.C. § 1334(e) to prevent this Court from entering the DIP Order violates two critical canons of statutory construction: namely, that statutes not be construed to produce absurd results,[7] and that specific words in a statue should not be read in a vacuum, but with reference to the statutory context and purpose.[8] The Zohar's application of 28 U.S.C. § 1334(e) leads to the absurd result that this Court—the Court with exclusive jurisdiction

---

[7] *See, e.g.*, *Contreras Aybar v. Sec'y U.S. Dep't of Homeland Sec.*, 916 F.3d 270, 274 (3d Cir. 2019); *U.S. v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018).

[8] *See Borenstein v. Comm'r of Internal Revenue*, 919 F.3d 746, 752 (2d Cir. 2019).

7

over the Dura Debtors' property—exceeds its jurisdictional mandate when it enters any order that has any impact on the Zohar Debtors' interest in the Prepetition Term Loan Agent's lien. This reasoning also ignores the statutory context and purpose of 28 U.S.C. § 1334(e), which, as discussed herein, is to provide this Court with sufficient jurisdiction over the Debtors' property evaluate claims made against such property. The Zohar Debtors' application of 1334(e) would, in fact, have the exact opposite result, by prohibiting this Court from making any such determinations without the Delaware Court's permission.

**B.     The Terms of the DIP Facility are Appropriate.**

14.     The Dura Debtors and the DIP Lenders negotiated the DIP Facility at arm's length, in good faith, and with the goal of maximizing value and preserving the value of the Dura Debtors as a going concern. The DIP Lenders' proposed financing, which the Dura Debtors support, offers materially better economic terms than the prior bids proposed by the Objecting Parties, while proposing milestones for a sale process on the exact same timeline proposed by the Objecting Parties in their prepetition financing proposals to the Dura Debtors. Indeed, the only difference is that the bid procedures supported by the DIP Lenders contemplate approval of a stalking horse bid at an upcoming hearing, the existence of which should generate interest in the assets and create a sense of confidence in the value of the assets among prospective buyers. *See In re Reagan*, 403 B.R. 614, 619 (B.A.P. 8th Cir. 2009), *aff'd*, 374 F. App'x 683 (8th Cir. 2010).

15.     Although the Objecting Parties suggest that the DIP Facility contains egregious, never-before-seen terms, the reality is that the terms of the DIP Facility are in line with postpetition financings that have been approved by courts on numerous occasions. The primary terms of the DIP Facility with respect to which the Objecting Parties have raised concerns are discussed in further detail below.

8

### 1. The Sale-Related Case Controls Under the DIP Facility are Not Extraordinary.

16. The Objecting Parties contend that the proposed DIP financing provides the DIP Lenders excessive control over the Dura Debtors' sale and bidding process, going as far as to suggest that the proposed sale-related milestones are unprecedented for a DIP financing. This assertion is simply untrue.[9] Courts in this district and others have approved DIP financings with similar case controls on numerous occasions, including at least one occasion involving counsel to the Zohar Debtors. *See, e.g.*, *In re Church St. Health Mgmt., LLC*, Case No. 12-01573 (Bankr. M.D. Tenn. Mar. 15, 2012) (KML) [Docket No. 182]; *In re ISR Grp., Inc.*, Case No. 14-11077 (JLC) (Bankr. W.D. Tenn. May 14, 2014) [Docket No. 91]; *In re Stearns Holdings, LLC*, Case No. 19-12226 (JLG) (Bankr. S.D.N.Y. July 11, 2019) [Docket No. 91]; *In re Pernix Sleep, Inc.*, Case No. 19-10323 (Bankr. D. Del. Feb. 21, 2019) [Docket No. 61]; *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (Bankr. S.D.N.Y. Nov. 9, 2018) [Docket No. 51]. A chart setting out the key provisions from the motions and orders in these and other cases is attached hereto as **Exhibit A**.

17. The bidding procedures required by the DIP Facility are calibrated to drive an efficient, value maximizing sale process. The proposed bidding procedures strike a balance, protecting the Patriarch Parties' interests as DIP lender without stacking the deck so as to chill the market for competing bids. Indeed, where stalking horse bids frequently include bid protections such as break-up fees, the bidding procedures contemplated by the DIP Facility only require the reimbursement of the stalking horse bidder's expenses.

---

[9] *See, e.g.*, Stuart Gilson, Edith Hotchkiss, and Matthew Osborn, *Cashing out: The Rise of M&A in Bankruptcy*, Harvard Business School Working Paper 15-057, Table 3 (January 8, 2015) (showing that, in a sample of 207 chapter 11 DIP financings from 2002 to 2011, 32 (15.5%) gave control over the 363 sale process to the DIP lender).

9

### 2. The Proposed Good Faith Finding and Limited Releases of Claims Against the DIP Secured Parties Are Typical of DIP Financings.

18. The Objecting Parties argue that the DIP Financing contains unnecessary, out-of-the-ordinary "bells and whistles" in the form of a provision governing the release of prepetition claims against the DIP Lender and a provision finding that the DIP financing negotiations were conducted in good faith. Both provisions, however, are typical of orders approving debtor-in-possession financing, and each provides a reasonable and necessary protection of the DIP Lenders' interests.

19. Contrary to the Objecting Parties' assertions, Bankruptcy Courts typically allow the waiver of prepetition claims against DIP lenders and prepetition lenders consenting to the use of cash collateral in interim orders approving DIP financing. *See, e.g.*, *In re Church St. Health Mgmt., LLC*, Case No. 12-01573 (Bankr. M.D. Tenn. Mar. 15, 2012) (KML) [Docket No. 182]; *In re Curae Health, Inc.*, Case No. 18-05665 (CMW) (Bankr. M.D. Tenn. Aug. 29, 2018) [Docket No. 60]; *In re ISR Grp., Inc.*, Case No. 14-11077 (JLC) (Bankr. W.D. Tenn. May 14, 2014) [Docket No. 91]; *In re Stearns Holdings, LLC*, Case No. 19-12226 (JLG) (Bankr. S.D.N.Y. July 11, 2019) [Docket No. 91]; *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (Bankr. S.D.N.Y. Nov. 9, 2018) [Docket No. 51]; *In re Katy Indus., Inc.*, Case No. 17-11101 (LSS) (Bankr. D. Del. May 16, 2017) [Docket No. 48]; *In re GST Autoleather, Inc.*, Case No. 17-12100 (LSS) (Bankr. D. Del. Oct. 5, 2017) [Docket No. 73]; *In re TAH Window, Inc. (f/k/a SynCardia Systems, Inc.)*, Case No. 16-11599 (MFW) (Bankr. D. Del. July 6, 2016) [Docket No. 35]; *In re The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13. 2015) [Docket No. 59]; *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. May 3, 2013) [Docket No. 46]. The proposed DIP Order includes an exception to the release provision whereby the Dura Debtors will not release claims that result primarily from

gross negligence or willful misconduct. A chart setting out the key provisions from the motions and orders in these and other cases is attached hereto as **Exhibit C**.

20. Provisions that find good faith are routine and necessary in order to satisfy the requirements of section 363(e) of the Bankruptcy Code, without which few lenders would extend financing to a chapter 11 debtor. *See, e.g.*, *In re Church St. Health Mgmt., LLC*, Case No. 12-01573 (Bankr. M.D. Tenn. Mar. 15, 2012) (KML) [Docket No. 182]; *In re Curae Health, Inc.*, Case No. 18-05665 (CMW) (Bankr. M.D. Tenn. Aug. 29, 2018) [Docket No. 60]; *In re ISR Grp., Inc.*, Case No. 14-11077 (JLC) (Bankr. W.D. Tenn. May 14, 2014) [Docket No. 91]; *In re Stearns Holdings, LLC*, Case No. 19-12226 (JLG) (Bankr. S.D.N.Y. July 11, 2019) [Docket No. 91]; *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (Bankr. S.D.N.Y. Nov. 9, 2018) [Docket No. 51]; *In re Katy Indus., Inc.*, Case No. 17-11101 (LSS) (Bankr. D. Del. May 16, 2017) [Docket No. 48]; *In re GST Autoleather, Inc.*, Case No. 17-12100 (LSS) (Bankr. D. Del. Oct. 5, 2017) [Docket No. 73]; *In re TAH Windown, Inc. (f/k/a SynCardia Sys., Inc.)*, Case No. 16-11599 (MFW) (Bankr. D. Del. July 6, 2016) [Docket No. 35]; *In re The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13. 2015) [Docket No. 59]; *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. May 3, 2013) [Docket No. 46]. The key provisions from the motions and orders in these and other cases are set out in **Exhibit D**.

21. Release provisions and good faith findings (including the accompanying protection of section 364(e)) are indispensable in DIP financings. Without these protections, lenders be wary of the constant threat of litigation from disgruntled parties in interest, even after the bankruptcy court has approved postpetition financing. The release provisions and good faith finding contained in the proposed DIP Order are in line with the sorts of provisions in typical financing orders and should accordingly pose no barrier to granting the DIP Motion.

Dated: October 23, 2019
Nashville, Tennessee

RESPECTFULLY SUBMITTED:

*/s/ Robert V. Sartin*
Robert V. Sartin
Benjamin Katz
**FROST BROWN TODD LLC**
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201
Telephone: (615) 251-5550
Facsimile: (615) 251-5551
Email: rsartin@fbtlaw.com
bkatz@fbtlaw.com

- and -

Ronald Gold (admitted *pro hac vice*)
**FROST BROWN TODD LLC**
301 East Fourth Street, Suite 3300
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
Email: rgold@fbtlaw.com

Ron E. Meisler (admitted *pro hac vice*)
Albert E. Hogan III (admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
155 North Upper Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
Email: ron.meisler@skadden.com
al.hogan@skadden.com

- and -

Carl T. Tullson (admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Facsimile: (302) 651-3001
Email: carl.tullson@skadden.com

*Co-Counsel to the DIP Lenders*

12

Case 3:19-bk-06741    Doc 156    Filed 10/23/19    Entered 10/23/19 08:51:15    Desc Main
Document      Page 12 of 12