# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-06741 (RSM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Judge Randal S. Mashburn |

**EXPEDITED SECOND INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS, AND (V) MODIFYING THE AUTOMATIC STAY**

Upon consideration of the motion (the "**Motion**")[2] filed on October 17, 2019, by Dura Automotive Systems, LLC ("**Dura**") and certain of its affiliates, each as a debtor and debtor-in-possession (each a "**Debtor**" and collectively, the "**Debtors**") in the above captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rules 2081-1 and 4001-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Middle District of Tennessee (the "**Local Rules**"), and upon consideration of the requests stated on the record at the hearing held by this

---

[1]   The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are:  Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693).  Dura Automotive Systems, LLC's service address is:  1780 Pond Run, Auburn Hills, Michigan 48326.

[2]   Unless otherwise indicated, capitalized terms used but not defined herein have the meanings assigned to them in the Motion.

Court on October 18, 2019 (the "**First Interim Hearing**"), pursuant to which the Debtors have sought, pursuant to an interim order (this "**Second Interim Order**"):

<blockquote>

A. authority for Dura to obtain postpetition debtor-in-possession financing (the "**DIP Facility**") consisting of:

<blockquote>

(i) a $77,000,000 senior secured superpriority revolving loan facility providing for $50,000,000 in initial "new money" loan commitments (the "**Initial New Money DIP Loan Commitments**" and the loans made thereunder, the "**Initial New Money DIP Loans**"), with (x) $10,000,000 of Initial New Money DIP Loan Commitments (the "**First Initial New Money DIP Loan Commitments**") becoming available upon entry of the First Interim Order (as defined below), (y) an additional $10,000,000 of Initial New Money DIP Loan Commitments (the "**Second Initial New Money DIP Loan Commitments**") becoming available upon the entry of this Second Interim Order (and upon the occurrence of certain other conditions specified in the DIP Term Sheet), and (z) the remaining $30,000,000 of Initial New Money DIP Loan Commitments (the "**Remaining Initial New Money DIP Loan Commitments**") becoming available upon entry of the Final Order and a final order, in form and substance acceptable to the DIP Agent in its reasonable discretion, approving the bid procedures for an Acceptable 363 Sale (as defined in the DIP Term Sheet) and

</blockquote>

</blockquote>

2

naming the DIP Agent (or its designee) as "stalking horse" bidder, *plus*

(ii)     up to $27,000,000 of incremental "new money" loan commitments (the "**Incremental New Money DIP Loan Commitments**," and, together with the Initial New Money DIP Loan Commitments, the "**New Money DIP Loan Commitments**") (the loans made under the Incremental New Money DIP Loan Commitments, the "**Incremental New Money DIP Loans**," and, together with the Initial New Money DIP Loans, the "**New Money DIP Loans**") available on a dollar for dollar basis to the extent proceeds of Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement referred to below) are used as described under **paragraph 15(e)** below to discharge approximately $26,898,702.80 of the indebtedness (the "**Prepetition ABL Obligations**") of the Debtors under that certain Loan and Security Agreement (as amended, modified, supplemented, or waived from time to time on or prior to the date hereof, the "**Prepetition ABL Credit Agreement**"), dated as of January 21, 2010, among Dura, the other borrowers and guarantors party thereto (the "**Prepetition ABL Loan Parties**"), the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), and Patriarch Partners Agency Services, LLC ("**Patriarch Agency**") (as successor by assignment to Wells Fargo Capital Finance, LLC, successor by merger to

1061646.04B-CHISR01A - MSW

Wachovia Capital Finance Corporation (Central)), as administrative and collateral agent (the "**Prepetition ABL Agent**" and collectively with the Prepetition ABL Lenders, the "**Prepetition ABL Secured Parties**"), equal to the sum of (x) outstanding principal, *plus* (y) accrued and unpaid interest under the Prepetition ABL Credit Agreement, including accrued and unpaid postpetition interest at the default rate specified in the Prepetition ABL Credit Agreement from the Petition Date through and including the date such obligations are so discharged, *plus* (z) any and all unreimbursed costs, fees and expenses of the Prepetition ABL Secured Parties (including contingent indemnification expenses) incurred in accordance with the Prepetition ABL Credit Agreement;

B.    authority for each of the entities that is a borrower or a guarantor under the Prepetition ABL Credit Agreement or the Prepetition Term Loan Credit Agreement and all other Debtors (such entities, the "**DIP Guarantors**," and, together with Dura, the "**DIP Loan Parties**") to guarantee on a secured basis Dura's obligations in respect of the DIP Facility;

C.    authority for the DIP Loan Parties to execute, deliver, perform, and enter into the Superpriority DIP Facility Term Sheet, among Dura, the DIP Guarantors, the lenders from time to time party thereto, including Dura Automotive Angels, LLC (collectively, the "**DIP Lenders**"), and Patriarch Agency as administrative and collateral agent (in such capacity, the "**DIP**

**Agent**," and together with the DIP Lenders, the "**DIP Secured Parties**"), substantially in the form attached hereto as **Exhibit 2** (as amended, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Term Sheet**," and, together with the schedules and exhibits attached thereto and all agreements (including any credit agreement, security agreements, and/or guarantees), documents, instruments and/or amendments executed and delivered in connection therewith, and any applicable Financing Orders (as defined below), the "**DIP Documents**") and the other DIP Documents;

D.      authority for Dura to incur Incremental New Money DIP Loans in an amount up to the amount of proceeds of Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement) that are used to discharge, on a dollar-for-dollar basis, a corresponding amount of the outstanding indebtedness under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letter of credit guarantees thereunder and any default rate interest accrued through the date of such discharge;

E.      subject to the restrictions set forth in this Second Interim Order and the other DIP Documents and consistent with the Budget (as defined in the DIP Term Sheet), the initial form of which is attached hereto in summary form as **Exhibit 1** (the "**Initial Budget**" together with any supplemental, modified, replacement, or extended budgets approved from time to time in accordance herewith and with the DIP Documents, the "**Approved**

5

**Budget**"), authority for the Debtors to (i) use the Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined below), in each case in accordance with the relative priorities set forth more fully below, but subject in all respects to the Carve Out (as defined below), and (ii) provide adequate protection on the terms set forth in this Second Interim Order to the Prepetition ABL Agent and the Prepetition ABL Lenders for the use of the Cash Collateral and other Prepetition Collateral securing the Prepetition ABL Obligations;

F.       subject to the Carve Out (as defined below), the terms of this Second Interim Order, and the other DIP Documents, the granting of superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' chapter 11 estates (other than any Avoidance Actions (as defined below)) and all proceeds thereof (including, subject only to and effective upon entry of the Final Order, any Avoidance Action Proceeds (as defined below));

G.       subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

H.       modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the this Second Interim Order and the other DIP Documents;

6

I.    a waiver of any applicable stay with respect to the effectiveness and enforceability of this Second Interim Order (including under Bankruptcy Rule 6004); and

J.    that the Court schedule a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held no later than November 12, 2019 to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Order**," and, together with the Interim Orders (as defined below), the "**Financing Orders**").

The Court having held a hearing on October 23, 2019 (the "**Second Interim Hearing**," and, together with the First Interim Hearing, the "**Interim Hearings**"); and based upon the record made by the Debtors in the Motion, in the *Declaration of Richard W. Morgner in Support of the Motion* [Docket No. 37], in the *Declaration of Matthew Ray in Support of the Motion* [Docket No. 36], and in the *Declaration of Kevin Grady, Executive Vice President and Chief Financial Officer of Dura Automotive Systems, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 20], and at the Interim Hearings; and the court having granted the *Expedited Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, and (V) Modifying the Automatic Stay* [Docket No. 86] (the "**First Interim Order**," and, together with this Second Interim Order, the "**Interim Orders**"); and the Court having noted the appearance of all parties in interest; and it appearing that the relief granted in this Second Interim Order as requested in the Motion and at the First Interim Hearing is in the best interests of the Debtors and the Debtors' estates and creditors; and the Debtors

1061646.04B-CHISR01A - MSW

having provided notice of the Motion as set forth in the Motion and it appearing that no further or other notice of the Motion need be given; and after due deliberation and sufficient cause appearing therefor and there being no objections to the relief sought in the Motion that have not previously been withdrawn, waived, settled, or resolved;

IT IS FOUND, DETERMINED, ORDERED, AND ADJUDGED, that:

1.      *Disposition.* The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Second Interim Order. Any objections to the Motion with respect to the entry of this Second Interim Order that have not been withdrawn, waived, settled, or resolved solely for the purposes of this Second Interim Order, and all reservations of rights included therein are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

1.      This Second Interim Order shall become effective immediately upon its entry.

2.      *Jurisdiction.* This Court has core jurisdiction over the Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice.* Proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Second Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

4.      *Debtors' Stipulations.* Without prejudice to the rights of any official committee of general unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") or any other

parties in interest (other than the Debtors) contained in **paragraph 20** below, the Debtors admit, stipulate and agree that:

(a)     as of the Petition Date, the Prepetition ABL Loan Parties were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $26,898,702.80 in respect to the Prepetition ABL Obligations;

(b)     as of the Petition Date and pursuant to that Credit Agreement, dated as of January 10, 2010 (as amended, modified, supplemented, or waived from time to time on or prior to the date hereof, the "**Prepetition Term Loan Credit Agreement**"), among Dura Operating, LLC ("**Dura Operating**"), the guarantors party thereto (together with Dura Operating, the "**Prepetition Term Loan Obligors**"), the lenders party thereto (the "**Prepetition Term Loan Lenders**"), and Ankura Trust Company, LLC (as successor to Patriarch Agency) as administrative and collateral agent (in such capacity, the "**Prepetition Team Loan Agent**," and, together with the Prepetition Term Loan Lenders, the "**Prepetition Term Loan Secured Parties**," and the Prepetition Term Loan Secured Parties, together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**"), the Prepetition Term Loan Obligors were justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $104,000,000 in respect of loans made

9

pursuant to, and in accordance with, the terms of the Prepetition Term Loan Credit Agreement, *plus* accrued and unpaid interest thereon and any fees, premiums, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Term Loan Documents (as defined below)), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Term Loan Documents (the "**Prepetition Term Loan Obligations**" and, together with the Prepetition ABL Obligations, the "**Prepetition Secured Obligations**");

(c)     (i) the Prepetition Secured Obligations constitute legal, valid, and binding obligations of the Prepetition ABL Loan Parties and Prepetition Term Loan Obligors as applicable, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (ii) no portion of the Prepetition Secured Obligations, nor any payments made to the Prepetition ABL Secured Parties or Term Loan Secured Parties, or applied to or paid on account of the obligations owing under the Prepetition Financing Documents (as defined below) prior to the Petition Date, in each case, is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination (subject to the Intercreditor Agreement (as defined below)), recharacterization, avoidance or other claim, cause of action or other

10

challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(d)     the Prepetition ABL Obligations are secured by liens and security interests granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties (the "**Prepetition ABL Liens**"), pursuant to and in connection with the Prepetition ABL Credit Agreement (collectively with all other agreements and documentation executed in connection therewith, the "**Prepetition ABL Documents**"), which Prepetition ABL Liens are: (i) valid, binding, perfected (subject to the limitations set forth in the Prepetition ABL Credit Agreement), enforceable liens and security interests in the Collateral (as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Collateral**") and as further described in the Motion; (ii) not subject to avoidance, recharacterization, subordination (subject to the Intercreditor Agreement), recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to valid, perfected and unavoidable liens permitted under the Prepetition ABL Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition ABL Liens;

(e)     the Prepetition Secured Obligations and the Prepetition ABL Liens and the liens and security interests granted to the Prepetition Term Loan Agent, as applicable, are subject to that certain Intercreditor Agreement dated as of January 21, 2010, by and among the among the Prepetition ABL Agent

11

and the other agents named therein (as amended, modified, supplemented, or waived from time to time on or prior to the date hereof, the "**Intercreditor Agreement**"), pursuant to which (i) the Prepetition ABL Liens are afforded priority over and are senior in all respects to the liens and security interests granted to the Prepetition Team Loan Agent with respect to certain property identified herein (the "**Prepetition Term Loan Collateral**," and, together with the Prepetition ABL Collateral, the "**Prepetition Collateral**"), for the benefit of the Prepetition Term Loan Secured Parties (the "**Prepetition Term Loan Liens**," and, together with the Prepetition ABL Liens, the "**Prepetition Liens**"), pursuant to and in connection with that certain Security Agreement, dated as of January 21, 2010, among the Prepetition Term Loan Obligors and the Prepetition Term Loan Agent (as amended, modified, supplemented, replaced, extended, or restructured) (collectively with the Prepetition Term Loan Credit Agreement, the Credit Documents (as defined in the Prepetition Term Loan Credit Agreement), and all other agreements and documentation executed in connection therewith, the "**Prepetition Term Loan Documents**," and the Prepetition Term Loan Documents, together with the Prepetition ABL Documents, the "**Prepetition Financing Documents**") with respect to the Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement), and (ii) the Prepetition Term Loan Liens are afforded priority over and are senior in all respects to the

1061646.04B-CHISR01A - MSW

Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
Document    Page 12 of 121

Prepetition ABL Liens with respect to the Term Loan Priority Collateral (as defined in the Intercreditor Agreement);

(f)     Section 4.5 of the Intercreditor Agreement sets forth the relative rights and priorities among the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties in the event of a chapter 11 filing, specifically:

> If Debtor or any U.S. Grantor shall become subject to an Insolvency Proceeding and if Revolving Loan Agent and any Revolving Loan Lender desires to permit the use of cash collateral or to provide financing to Debtor or U.S. Grantor under either Section 363 or Section 364 of the U.S. Bankruptcy Code or other applicable statute, Term Loan Agent and Term Loan Lenders, European 2008 Term Loan Agent and European 2008 Lenders, and European 2009 Term Loan Agent and European 2009 Lenders agree as follows: (a) adequate notice to Term Loan Agent and Term Loan Lenders, European 2008 Term Loan Agent and European 2008 Lenders, and European 2009 Term Loan Agent and European 2009 Lenders shall have been provided for such financing or use of cash collateral if each of Term Loan Agent , European 2008 Term Loan Agent and European 2009 Term Loan Agent receives notice two (2) Business Days' prior to the entry of the order approving such financing or use of cash collateral and (b) no objection will be raised by any of such Agents or Lenders to any such financing or use of cash collateral on the ground of a failure to provide "adequate protection" for the Liens of Term Loan Agent, European 2008 Term Loan Agent and European 2009 Term Loan Agent or any other grounds, provided Term Loan Agent, European 2008 Term Loan Agent and European 2009 Term Loan Agent retains a Lien on the post-petition Collateral with the same priority as existed prior to the commencement of such case or proceeding to the extent it is entitled thereto under applicable law. For purposes of this Section 4.5, notice of a proposed financing or use of cash collateral shall be deemed given when given, in the manner prescribed by Section 4.8 hereof, to Term Loan Agent, European 2008 Term Loan Agent and European 2009 Term Loan Agent or their counsel.

(g)     [reserved.]

13

(h)     effective as of the date of entry of this Second Interim Order, but subject,

for the avoidance of doubt, to the provisions of **paragraph 20** hereof, the

Debtors hereby absolutely and unconditionally release and forever

discharge and acquit the Prepetition ABL Secured Parties and their

respective subsidiaries, officers, directors, managers, principals,

employees, agents, financial advisors, attorneys, accountants, investment

bankers, consultants, representatives, and other professionals and the

respective permitted successors and assigns thereof, in each case in their

respective capacity as such (each, a "**Representative**" and collectively,

the "**Representatives**," and together with the Prepetition ABL Secured

Parties, the "**Released Parties**") from any and all obligations and

liabilities to the Debtors (and their permitted successors and assigns) and

from any and all claims, counterclaims, demands, debts, accounts,

contracts, liabilities, actions and causes of action arising prior to the date

of this Second Interim Order (collectively, the "**Released Claims**") of any

kind, nature or description, whether known or unknown, foreseen or

unforeseen or liquidated or unliquidated, arising in law or equity or upon

contract or tort or under any state or federal law or otherwise, arising out

of or related to (as applicable) the Prepetition ABL Documents, the

obligations owing and the financial obligations made thereunder, the

negotiation thereof and of the transactions reflected thereby, and the

obligations and financial obligations made thereunder, in each case that

the Debtors at any time had, now have or may have, or that their

14

successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Second Interim Order, whether such Released Claims are matured or unmatured or known or unknown, *provided* that the foregoing shall not release any claims against a Released Party that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence, bad faith, or willful misconduct of such Released Party;

(i)     all or substantially all cash, securities, or other property of the DIP Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the DIP Loan Parties in any account or accounts with any depository institution, were either subject to rights of set-off, valid, perfected, enforceable, first priority liens under the Prepetition Financing Documents and applicable law, or constituted proceeds of the Prepetition Collateral and therefore are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

5.     *Findings Regarding the DIP Facility and Cash Collateral.* Based on the evidence presented at the Interim Hearings and the representations made by the Debtors in the Motion and on the record of the Interim Hearings:

1061646.04B-CHISR01A - MSW

(a)     Good and sufficient cause has been shown for the entry of this Second
Interim Order.

(b)     The DIP Loan Parties have an immediate need to obtain the financing
provided for under the DIP Facility and to use Prepetition Collateral
(including Cash Collateral) to allow for, among other things, the orderly
continuation of the Debtors' businesses, to maintain relationships with
vendors, suppliers and customers, to make payroll, to make capital
expenditures permitted by the DIP Documents, and to satisfy other
working capital and operational needs. The DIP Loan Parties' access to
sufficient working capital and liquidity through the DIP Facility and use of
Cash Collateral and other Prepetition Collateral is necessary and vital to
the preservation and maintenance of the going concern values of the
Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from
sources other than the DIP Lenders under the DIP Documents and are
unable to obtain adequate unsecured credit allowable under section
503(b)(1) of the Bankruptcy Code as an administrative expense. The
Debtors are also unable to obtain secured credit allowable under section
364 of the Bankruptcy Code without the Debtors granting to the DIP
Agent and the DIP Lenders, the DIP Liens and the DIP Superpriority
Claims (as defined below) under the terms and conditions set forth in this
Second Interim Order and in the DIP Documents.

16

(d)     Based on the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearings, (i) the terms of the DIP Facility, (ii) the terms of the Adequate Protection Provisions (as defined below) granted to the Prepetition Secured Parties, and (iii) the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral and Cash Collateral pursuant to this Second Interim Order and the other DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Prepetition Secured Parties have either consented, or are deemed to have consented pursuant to the Intercreditor Agreement, or had their objection to the Motion overruled, to the use of Cash Collateral and the other Prepetition Collateral, the priming of the Prepetition Liens pursuant to section 364(d)(1) of the Bankruptcy Code, and the Debtors' entry into the DIP Documents in accordance with and subject to the terms of this Second Interim Order and the DIP Documents.

(f)     The terms and conditions of the DIP Facility, the DIP Documents, the Adequate Protection Provisions, and the use of the Prepetition Collateral and Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition ABL Secured Parties, and therefore all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Documents, including, without limitation: (i) the New

1061646.04B-CHISR01A - MSW
Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
                                Document      Page 17 of 121

Money DIP Loans (including principal and interest); and (ii) any other obligations of the DIP Loan Parties owing to the DIP Agent, any DIP Lender or any of their respective affiliates, in accordance with the terms of the DIP Documents, including any obligation, to the extent provided for in the DIP Documents, to indemnify the DIP Secured Parties and to pay any fees, reasonable and documented out-of-pocket expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable by the DIP Loan Parties under the DIP Documents), charges, costs, and other obligations that are chargeable or reimbursable by the DIP Loan Parties under the First Interim Order, the Second Interim Order, the Final Order, or the DIP Documents (the foregoing in clauses **(i)** and **(ii)** collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Second Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)     The Prepetition Secured Parties are entitled to the adequate protection provided in this Second Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based

1061646.04B-CHISR01A - MSW

on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral) and the priming of the Prepetition Liens by the DIP Liens; *provided* that nothing in this Second Interim Order or the other DIP Documents shall (i) be construed as the affirmative consent by any of the Prepetition ABL Secured Parties for the use of Prepetition Collateral (including Cash Collateral), other than on the terms set forth in this Second Interim Order and in the context of the DIP Facility authorized by this Second Interim Order, (ii) be construed as a consent by any party to the terms of any other financing, or (iii) prejudice, limit, or otherwise impair the rights, if any, of any of the Prepetition ABL Secured Parties to seek new, different, or additional adequate protection.

(h)    The Prepetition ABL Secured Parties have also acted in good faith regarding the DIP Facility and the DIP Loan Parties' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (each as defined below)), in accordance with the terms hereof, and therefore the Prepetition ABL Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of

1061646.04B-CHISR01A - MSW
Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
Document    Page 19 of 121

the Bankruptcy Code in the event that this Second Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(i)     The Debtors have requested immediate entry of this Second Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Second Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Second Interim Order and the DIP Documents are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

6.     *Authorization of the DIP Facility and the DIP Documents.*

(a)     The Loan Parties are hereby authorized to execute, enter into, and perform all of their respective obligations (including the DIP Obligations) under the DIP Documents. Dura is hereby authorized on an interim basis to borrow money pursuant to the DIP Documents, and the DIP Guarantors are hereby authorized to guarantee Dura's obligations with respect to such borrowings, in an aggregate principal or face amount not to exceed the sum of (i) the First Initial New Money DIP Loan Commitments, (ii) the Second Initial New Money DIP Loan Commitments and (iii) Incremental New Money DIP Loan Commitments in a principal amount equal to the amount of proceeds of Revolving Loan Priority Collateral used to discharge, on a dollar for dollar basis, a corresponding amount of

20

outstanding Prepetition ABL Obligations as described under **paragraph 15(e)** below until, prior to the entry of the Final Order, the aggregate amount of such Incremental New Money DIP Loan Commitments equals $20,000,000, subject to any additional limitations on borrowing under the DIP Documents (including the Carve Out), which borrowing shall be for purposes permitted hereunder, consistent with the Approved Budget (subject to any Permitted Variances (as defined below)), and under the DIP Documents and for other general corporate purposes of the Debtors, including the payment of expenses of administration of the Chapter 11 Cases (including the payment of estate professional fees, costs, and expenses allowed by the Court), subject to the terms and conditions set forth herein and therein; provided that notwithstanding anything to the contrary in this Second Interim Order or any other DIP Document, availability of the Initial New Money DIP Loan Commitment is not subject to any borrowing base calculation set forth in the Prepetition ABL Credit Agreement.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the DIP Loan Parties' performance of their

1061646.04B-CHISR01A - MSW

obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents, supplements or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties, the DIP Agent and the requisite DIP Lenders may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents that do not shorten the scheduled maturity of the extensions of credit thereunder or increase the aggregate New Money DIP Loan Commitments or the rate of interest or fees payable thereunder;

(iii)   subject to **paragraph 20** hereof, the non-refundable payment to the DIP Secured Parties of all fees (which fees shall be, and shall be deemed to have been, approved upon entry of this Second Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law

or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in each case in their respective capacities as such, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party, except as expressly set forth herein; and

(iv)     the performance of all other acts required under or in connection with the this Second Interim Order and the other DIP Documents, including, subject to the Carve Out (as defined below), the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens and the DIP Superpriority Claims as provided for therein and herein.

(c)     Upon execution and delivery of the DIP Documents by all parties to the DIP Facility, the DIP Documents shall constitute valid, binding, and unavoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party in accordance with the terms of the this Second Interim Order and the other DIP Documents. No obligation, payment, transfer or grant of security under this Second Interim Order or the other DIP Documents to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d),

23

548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

7.      [Reserved]

8.      *DIP Superpriority Claims.* Subject to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) (including the Adequate Protection Superpriority Claims (as defined below)) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the DIP Loan Parties (other than the DIP Loan Parties' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy

1061646.04B-CHISR01A - MSW

Code (collectively, "**Avoidance Actions**")) and all proceeds thereof (including, subject to and effective upon the entry of the Final Order, proceeds of Avoidance Actions (the "**Avoidance Action Proceeds**")). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Second Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

9. *Carve Out Provisions*.

(a) <u>Carve Out</u>. As used in this Second Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "**Statutory Fees**"); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") or the Committee, if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of

1061646.04B-CHISR01A - MSW

a Carve Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to (x) a monthly cap of $50,000 (the "**Committee Monthly Cap**") with respect to Allowed Professional Fees incurred by Professional Persons retained by the Committee, if any, and (y) any limits by the Financing Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses of any Prepetition Secured Parties pursuant to the Financing Orders; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice (the "**Trigger Date**"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Committee Monthly Cap, the "**Carve Out Cap**")); *provided*, that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described in **clauses (iii)** or **(iv)** above, on any grounds. For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP

Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    <u>Fee Estimates</u>. Not later than 7:00 p.m. prevailing Central time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); provided, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the DIP Agent). If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due,

27

1061646.04B-CHISR01A - MSW

such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget (as defined in the DIP Documents, the "**Budget**") for such period for such Professional Person; provided, that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to **paragraph 9(c)** below (i.e., the Pre-Carve Out Trigger Notice Reserve). Any deemed draw and borrowing pursuant to **paragraph 9(c)(i)(x)** for amounts under **paragraph 9(a)(iii)** above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date plus, without duplication, (II) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date, and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the

28

Termination Declaration Date (such amount, the "**Professional Fee Carve Out Cap**"). For the avoidance of doubt, the DIP Agent and DIP Lenders shall be entitled to maintain at all times a reserve (the "**Carve Out Reserve**") in an amount (the "**Carve Out Reserve Amount**") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, plus (ii) the Post-Carve Out Trigger Notice Cap, plus (iii) the amounts contemplated under **paragraphs 9(a)(i)** and **9(a)(ii)** above. In addition, the DIP Agent shall be entitled to maintain a reserve in the amount of a reasonable estimate of other amounts that may be included in the Carve Out, including amounts which are or may become payable to any investment bankers or financial advisors of the Debtors or any Creditors' Committee. Not later than 7:00 p.m. prevailing Central time on the fourth business day of each week starting with the first full calendar week following the Petition Date, the Debtors shall deliver to the DIP Agent and the DIP Lenders, a report setting forth the Carve Out Reserve Amount as of such time, and, in setting the Carve Out Reserve, the DIP Agent and DIP Lenders shall be entitled to rely upon such reports. Prior to the delivery of the first report setting forth the Carve Out Reserve Amount, the DIP Agent and DIP Lenders shall calculate the Carve Out Reserve

Amount by reference to the Budget for subsection (i) of the Carve Out Reserve Amount.

(c)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for New Money DIP Loans under the New Money DIP Loan Commitments (each, as defined in the DIP Term Sheet) (on a pro rata basis based on the then outstanding New Money DIP Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) up to the Professional Fee Carve Out Cap, and any Statutory Fees then due and owing,  and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar-for-dollar basis, the draw requests pursuant to **clause (i)** of this sentence).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for New Money

DIP Loans under the New Money DIP Loan Commitments (on a pro rata basis based on the then outstanding New Money DIP Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute New Money DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar-for-dollar basis, the draw requests pursuant to **clause (i)** of this sentence). The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such DIP Lenders (as defined in the DIP Term Sheet), notwithstanding anything in the DIP Term Sheet to the contrary, including with respect to the existence of a Default (as defined in the DIP Term Sheet) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Revolving Loans under the Revolving Facility, any termination of the New Money DIP Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment

1061646.04B-CHISR01A - MSW

(on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.

(d)     <u>Application of Carve Out Reserves</u>.    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in **clauses (i)** through **(iii)** of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.  Notwithstanding anything to the contrary in this Second Interim Order or the other DIP Documents, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this **paragraph 9**, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this **paragraph 9**, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to

the contrary in this Second Interim Order or the other DIP Documents, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Second Interim Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (ii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Second Interim Order, the other DIP Documents, or in any Prepetition Financing Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

1061646.04B-CHISR01A - MSW

(e)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, or the Prepetition Secured Creditors shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Second Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Second Interim Order, the other DIP Documents, the Bankruptcy Code, and applicable law.

10.     *DIP Liens*. Subject to the Carve Out, as security for the DIP Obligations, effective and perfected upon the date of this Second Interim Order and without the necessity of the execution, recordation of filings by the DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders on the following, subject to customary exceptions (all property identified in clauses **(a)**, **(b)** and **(c)** below being collectively referred to herein as the "**DIP Collateral**," and all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Second Interim Order and the other DIP Documents, the "**DIP Liens**"):

(a)     <u>First Lien on Unencumbered Property</u>. Subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all assets and property (except such assets and property that are subject to Prior Senior Liens (as defined below) and subject to exceptions set forth in the Prepetition ABL Credit Agreement, *provided* that, to the extent the DIP Administrative Agent and Dura reasonably determine that no material adverse consequences would result therefrom, there shall be no limitation on the percentage of capital stock of controlled foreign corporations included in the DIP Collateral) of each DIP Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including,

35

without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the DIP Agent and Dura, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the DIP Loan Parties (but excluding any property subject to a purchase money lien, capital lease or similar arrangement permitted under the DIP Documents to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder), and all

36

proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)) and (b) subject to the Final Order, the Avoidance Action Proceeds; *provided* that the DIP Collateral shall not include the Dura's directors and officers insurance policy or any proceeds thereof;

(b)     <u>Priming Liens</u>. Subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, perfected, first priority, senior priming lien on all of the property of the Debtors (including, without limitation, inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries, membership interests in limited liability companies) constituting the Prepetition Collateral. Subject to **subparagraph (c)** below and the immediately prior sentence, such security interests and liens shall be senior in all respects to the interests in the Prepetition Collateral of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition ABL Secured Parties hereunder) (collectively, the "**Primed Liens**") and to any liens and security interests to which such Primed Liens are senior or *pari passu*.

1061646.04B-CHISR01A - MSW

(c)     <u>Liens Junior to Certain Other Liens</u>. Subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each DIP Loan Party subject to valid, binding, and unavoidable liens (other than Primed Liens) on the Petition Date, which DIP Liens shall be junior and subordinate to (i) the Carve Out, (ii) certain legal, valid, properly-perfected, non-avoidable and senior in priority liens otherwise permitted by the Prepetition Loan Documents (and only to the extent any such permitted liens were valid, binding, enforceable, non-avoidable, properly perfected and senior in priority to the Prepetition Liens as of the Petition Date or after the Petition Date pursuant to section 546(b) of the Bankruptcy Code) (items **(i)** and **(ii)** of this **subparagraph (c)**, collectively, the "**Prior Senior Liens**"); and

(d)     <u>Liens Senior to Certain Other Liens</u>. Subject to the Carve Out, other than the Prior Senior Liens, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Second Interim Order or the other DIP Documents, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or

1061646.04B-CHISR01A - MSW

Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
Document    Page 38 of 121

court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code. The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is expressly subject to the DIP Liens and Prepetition Liens.

11. *Protection of DIP Lenders' Rights.*

(a) So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding New Money DIP Loan Commitments under the DIP Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted pursuant to the Prepetition Financing Documents or this Second Interim Order, or otherwise seek to exercise or enforce any rights or remedies against or with respect to the DIP Collateral, the Prepetition Collateral, or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Loan Parties, the DIP Collateral, or the Prepetition Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the New Money DIP Loan Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take

1061646.04B-CHISR01A - MSW

any action to perfect their security interests in the DIP Collateral unless, solely as to this **clause (iii)**, the DIP Agent or the DIP Lenders also file financing statements or other documents to perfect the liens granted pursuant to this Second Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition authorized or permitted under the DIP Documents.

(b)     To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and the Prepetition Agents shall comply with the instructions of the DIP Agent with respect to the exercise of such control. In furtherance of the foregoing, the DIP Agent shall be deemed to be the controlling secured party with respect to, and exercise

40

full dominion and control over the accounts (the "**Prepetition Controlled Accounts**") subject to, all deposit account control agreements in existence on the Petition Date applicable to the Debtors' accounts and naming either or both of the Prepetition Agents as secured party, including the following deposit account control agreements (the "**Prepetition DACAs**"): (i) that certain Deposit Account Control Agreement between Dura Operating, Patriarch Agency (as successor to Wells Fargo Capital Finance, LLC), Ankura Trust Company, and Bank of America, N.A., entered into on June 18, 2019 (as has been or will be amended from time to time); and (ii) that certain Deposit Account Control Agreement between Dura Operating, Patriarch Agency (as successor to Wells Fargo Capital Finance, LLC), Ankura Trust Company, and Bank of America, N.A., entered into on October 8, 2019 (as has been or will be amended from time to time). The banks maintaining the Prepetition Controlled Accounts are hereby directed to treat the DIP Agent as the controlling secured party with respect to such accounts and to maintain in favor of the DIP Agent any "sweeps" (daily or otherwise) of cash from such accounts that were in effect prior to the Petition Date for the benefit of either of the Prepetition Agents as if the DIP Agent were originally named "secured party" or "controlling secured party" or similar term therein. Each Debtor shall cause all Cash Collateral, other than the proceeds of the New Money DIP Loans, to be promptly deposited into the Prepetition Controlled Accounts in the same or substantially similar manner as prior to the Petition Date. Prior to the

1061646.04B-CHISR01A - MSW

deposit of Cash Collateral into the Prepetition Controlled Accounts, each Debtor shall be deemed to hold such proceeds in trust for the benefit of the DIP Agent and the DIP Lenders. The DIP Agent shall be entitled to apply such Cash Collateral to the payment of outstanding New Money DIP Loans as authorized by this Second Interim Order and the other DIP Documents. Notwithstanding the foregoing or any other provisions of this Second Interim Order or the other DIP Documents, no cash advanced as New Money DIP Loans shall be applied to pay the Prepetition ABL Obligations.

(c)     Any proceeds of Prepetition Collateral or DIP Collateral subject to the Primed Liens received by any Prepetition Agent or Prepetition Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral, the DIP Collateral, or otherwise shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Party. This authorization is coupled with an interest and is irrevocable, subject to entry of the Final Order.

(d)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of this Second Interim Order or

1061646.04B-CHISR01A - MSW

the Final Order, as the case may be, upon the Maturity Date (as defined in the DIP Term Sheet) (whether by acceleration or otherwise), the DIP Secured Parties shall be entitled to immediate payment of all obligations under the DIP Facility and to enforce the remedies provided for under the DIP Documents or under applicable law, without further notice, motion or application to, hearing before, or order from, the Court, but subject, other than in the case of the Final Order not being entered on or prior to November 12, 2019, to the following conditions (the "**Waiting Period Procedures**"):

(i)     The DIP Agent shall notify the DIP Loan Parties in writing that the Maturity Date has occurred (such notice, a "**Maturity Date Notice**" and the date of any such notice, the "**Maturity Date Notice Date**"). A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel.

(ii)    A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire five (5) business days after the Maturity Date Notice Date (the "**Waiting Period**"). During the Waiting Period, the Debtors shall be entitled to seek an emergency hearing before the Court solely for the purpose[s] of contesting the occurrence of the Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default (as defined below) alleged to underlie the occurrence of

43

1061646.04B-CHISR01A - MSW
Case 3:19-bk-06741     Doc 157     Filed 10/23/19     Entered 10/23/19 09:23:18     Desc Main
Document     Page 43 of 121

the Maturity Date) or requesting the nonconsensual use of Cash Collateral.

(iii) During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral, so long as such DIP Collateral (including Cash Collateral) is used solely to pay any expenses which are (a) necessary to preserve the Debtors' going concern value or (b) necessary to contest in good faith the occurrence of the Maturity Date or underlying Event of Default.

(e) None of the DIP Secured Parties or the Prepetition Secured Parties shall object to any motion filed by the Debtors during the Waiting Period seeking such expedited hearing nor seek to reduce such Waiting Period. The Debtors will request that the Final Order provide that (i) in no event shall the DIP Agent, the DIP Lenders or the Prepetition ABL Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, and (ii) the Debtors waive the right to apply the "equities of the case" exception in section 552(b) of the Bankruptcy Code to the secured claims of the Prepetition ABL Secured Parties.

(f) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Waiting Period Procedures and any other applicable provisions of the Financing Orders, as the case may be, if any Event of Default (as defined below) occurs and is continuing, the DIP Secured

1061646.04B-CHISR01A - MSW

Parties may, as the direction of the Required DIP Lenders (as defined in the DIP Term Sheet), take any or all of the following actions:

(i)     declare by a Maturity Date Notice that the commitment of the DIP Lenders to make New Money DIP Loans and consent to use of Cash Collateral to be terminated, whereupon such commitment and consent shall be terminated;

(ii)    declare by a Maturity Date Notice that the unpaid amount of the DIP Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Documents, the DIP Term Sheet and the Financing Orders to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the DIP Loan Parties; or

(iii)   take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Agent and the DIP Lenders and including as set forth below in **paragraph 31**) permitted under the DIP Documents, or by applicable law.

(g)     No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Second Interim Order or the other DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported

1061646.04B-CHISR01A - MSW

termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

12.     *Limitation on Charging Expenses Against Collateral.* Subject only to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition ABL Agent, or the Prepetition ABL Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, or the Prepetition ABL Lenders, as applicable, and nothing contained in this Second Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, or the Prepetition ABL Lenders to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

13.     *Payments Free and Clear.* Subject to **paragraph 20,** any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Second Interim Order or Final Order (if and when entered) or the other DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section

46

506(c) of the Bankruptcy Code (subject to the entry of the Final Order approving the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed by, through or on behalf of the Debtors.

14. *Use of Cash Collateral and New Money DIP Loans.*

(a) The Loan Parties are hereby authorized, subject to the terms and conditions of this Second Interim Order, the Approved Budget, and any budget variances permitted under the DIP Documents (the "**Permitted Variances**"), to use Cash Collateral and the New Money DIP Loans, *provided* that the DIP Loan Parties shall operate their cash management system in a manner that is the same as or substantially similar to their prepetition cash management system, including daily "sweeps" of cash from the applicable deposit accounts of the DIP Loan Parties which shall continue in the same or substantially similar manner as prior to the Petition Date, subject to the adequate protection rights of the Prepetition ABL Secured Parties as set forth below.

(b) The Debtors shall use the proceeds of the DIP Facility and Cash Collateral in a manner consistent with the terms and conditions of this Second Interim Order and the other DIP Documents and the Approved Budget (subject to Permitted Variances) solely for: (i) working capital and general corporate purposes, including capital expenditures, of the Debtors and, to the extent funded through intercompany loans evidenced by promissory notes pledged to the DIP Agent to secure the DIP Obligations on a first-priority basis in accordance with this Second Interim Order, their direct

1061646.04B-CHISR01A - MSW

and indirect subsidiaries; (ii) the pursuit of an Acceptable 363 Sale (as defined the DIP Term Sheet); (iii) and bankruptcy-related costs and expenses, subject to the Carve Out (as defined below).

(c)     As contemplated by the DIP Term Sheet, the Initial Budget depicts, on a weekly and line item basis, among other things, (i) cash receipts of the DIP Loan Parties (the "**Cash Receipts**"), (ii) cash operating disbursements of the DIP Loan Parties (the "**Cash Operating Disbursements**"), and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Loan Parties (the "**Cash Bankruptcy Disbursements**") for a thirteen (13) week period commencing on the Petition Date. The DIP Loan Parties shall provide to the DIP Agent and its counsel, so as to actually be received by the DIP Agent and its counsel, at or before the end of the fourth (4th) week following the Petition Date (and every four (4) weeks thereafter), a supplement to the Approved Budget (each such supplement, an "**Updated Budget**"), updating and/or extending the period covered by the Approved Budget so that it covers at least the period ending 13 weeks from the week in which an Updated Budget is delivered. Each Updated Budget shall be subject to the DIP Agent's approval in its reasonable discretion and without further order of the Court. The Approved Budget shall remain in effect with respect to period covered by such Approved Budget until such time as the DIP Agent approves such Updated Budget. Upon (and subject to) the approval of any such Updated Budget by the DIP Agent in its reasonable discretion, such Updated Budget shall then constitute the

Approved Budget. A copy of any Approved Budget shall be delivered via email to the U.S. Trustee and any official statutory committee following its approval by the DIP Agent.

(d)     The DIP Loan Parties shall be deemed to be in compliance with the Approved Budget for all purposes under the DIP Term Sheet, this Second Interim Order, and the other DIP Documents unless, as of any applicable date of determination, the DIP Loan Parties' (x) cumulative Cash Receipts or (y) cumulative Cash Operating Disbursements, as applicable, vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date (as defined in the DIP Term Sheet); *provided*, *however*, that with respect to cumulative Cash Receipts, the DIP Loan Parties shall not be deemed to have failed to comply with the Approved Budget unless the DIP Loan Parties' cumulative Cash Receipts fall beneath the amounts set forth in the Approved Budget as measured on any two consecutive Testing Dates during the four week period beginning as of the first day of the first full week following the week of the Petition Date.

(e)     As required under the DIP Documents and in a manner consistent with the DIP Documents, the Debtors shall also deliver to the DIP Agent and its counsel, so as to actually be received by the DIP Agent and its counsel (which may be via email) on the date that is three (3) weeks following the Petition Date and every week thereafter, a budget variance report (the "**Variance Report**") setting forth on a line item basis for Cash Receipts,

1061646.04B-CHISR01A - MSW

Cash Operating Disbursements and Cash Bankruptcy Disbursements (i) detail of the variance, if any, of actual cash disbursements and actual cash receipts from the Approved Budget and (ii) an explanation of any per line item variance greater than 5.00%.

15.    *Adequate Protection of Prepetition ABL Secured Parties.* The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Secured Parties it represents, is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code, to adequate protection of its respective interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition ABL Agent's interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of the Prepetition ABL Agent's security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to this Second Interim Order and the other DIP Documents, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Prepetition ABL Adequate Protection Obligations**"). In consideration of the foregoing, the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, as applicable, are hereby granted the following (collectively, the "**Prepetition ABL Adequate Protection Provisions**"):

(a)    <u>Prepetition ABL Adequate Protection Liens</u>. The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of this Second Interim Order and without the necessity of the execution of any mortgages,

50

security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition ABL Adequate Protection Obligations owing to it, a valid, perfected replacement security interest in and lien upon all of the Prepetition Collateral, junior only to (i) the Carve Out, (ii) the DIP Liens, (iii) any liens to which the DIP Liens are junior (including the Prior Senior Liens), and (iv) solely in the case of Term Loan Priority Collateral, to the Prepetition Term Loan Liens (collectively, the "**Prepetition ABL Adequate Protection Liens**").

(b)     <u>Adequate Protection Payments.</u> Until the Prepetition DIP Obligations are discharged with the proceeds of Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement) as provided in clause (e) below, Dura is directed and authorized to pay to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, on or about the last business day of each month, adequate protection payments (the "**Adequate Protection Payments**") in an amount equal to all accrued and unpaid prepetition and postpetition interest due and payable and required to be paid in cash under the Prepetition ABL Documents, calculated based on the applicable default rate set forth in the Prepetition ABL Documents, it being understood for purposes of this clause that the default rate will accrue to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved.

(c)     <u>Prepetition ABL 507(b) Claims</u>. The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted, subject

1061646.04B-CHISR01A - MSW

to the Carve Out, the DIP Superpriority Claims, and the priorities set forth in **clause (d)** below, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Obligations owing to it, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition ABL 507(b) Claims**"); which Prepetition ABL 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Action Proceeds.

(d)     Priority of Adequate Protection Liens and Prepetition ABL 507(b) Claims. Except to the extent expressly set forth in this Second Interim Order or the DIP Term Sheet, the Prepetition ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition ABL Adequate Protection Obligations and Prepetition ABL Party 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all New Money DIP Loan Commitments have been terminated.

(e)     Discharge of Prepetition ABL Obligations with Proceeds of Revolving Loan Priority Collateral. Commencing on the date of this Second Interim Order, the Prepetition ABL Secured Parties are hereby authorized and

directed to repay and discharge the outstanding Prepetition ABL Obligations with proceeds of Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement) "swept" from the applicable deposit accounts of the DIP Loan Parties in the same or substantially similar manner as prior to the Petition Date. In the event that the Prepetition ABL Agent or any Prepetition ABL Lenders (each in their capacities as such) are ordered by the Court to disgorge, refund or in any manner repay to the Debtors or their estates any amounts of the discharged Prepetition ABL Obligations (the "**Disgorged Amounts**"), subject to the Waiting Period (during which time the Debtors shall have access to use such amounts in accordance herewith), the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account in which the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) shall have the first lien upon, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition ABL Agent and the Prepetition ABL Lenders, distributing such amounts to the Debtors or otherwise); *provided* that, to the extent the Disgorged Amounts are returned to the Prepetition ABL Agent or any Prepetition ABL Lender, they shall receive such amounts *plus* any interest accrued at the default rate set forth in the Prepetition ABL Credit Agreement.

16.     *Adequate Protection of Prepetition Term Loan Secured Parties.* Subject to the Carve Out, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties it represents, is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code, to adequate protection of its respective interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Term Loan Agent's interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of the Prepetition Term Loan Agent's security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to this Second Interim Order and the other DIP Documents, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Prepetition Term Loan Adequate Protection Obligations**" and together, with the Prepetition ABL Adequate Protection Obligations, the "**Adequate Protection Obligations**"). In consideration of the foregoing and subject to the Carve Out, the DIP Liens, the DIP Superpriority Claims, the Prepetition ABL Adequate Protection Liens, and Prepetition ABL Adequate Protection Obligations, the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Lenders, as applicable, are hereby granted the following (collectively, the "**Prepetition Term Loan Adequate Protection Provisions**", and together with the Prepetition ABL Adequate Protection Provisions, the "**Adequate Protection Provisions**"):

> (a)     Prepetition Term Loan Adequate Protection Liens. The Prepetition Term Loan Agent (for itself and for the benefit of the Prepetition Term Loan

Lenders) is hereby granted (effective and perfected upon the date of this Second Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition Term Loan Adequate Protection Obligations owing to it, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, junior only to (i) the Carve Out, (ii) the DIP Liens, (iii) any liens to which the DIP Liens are junior (including the Prior Senior Liens), and (iv) solely in the case of ABL Priority Collateral, to the Prepetition ABL Liens (collectively, the "**Prepetition Term Loan Adequate Protection Liens**," and, together with the Prepetition ABL Adequate Protection Liens, the "**Adequate Protection Liens**").

(b)     Prepetition Term Loan Section 507(b) Claims. The Prepetition Term Loan Agent (for itself and for the benefit of the Prepetition Term Loan Lenders) is hereby granted, subject to the Carve Out, the DIP Superpriority Claims, and the priorities set forth in **clause (c)** below, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Term Loan Adequate Protection Obligations owing to it, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition Term Loan 507(b) Claims**" and, together with the Prepetition ABL 507(b) Claims, the "**Adequate Protection Superpriority Claims**"); which Prepetition Term

1061646.04B-CHISR01A - MSW
Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
Document     Page 55 of 121

Loan 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Action Proceeds.

(c) <u>Priority of Prepetition Term Loan Adequate Protection Liens and Prepetition Term Loan 507(b) Claims</u>. Except to the extent expressly set forth in this Second Interim Order or the DIP Term Sheet, the Prepetition Term Loan Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Term Loan Adequate Protection Obligations and Prepetition Term Loan 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all New Money DIP Loan Commitments have been terminated.

17. *Reservation of Rights of Prepetition ABL Secured Parties*. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition ABL Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided* that any of the Prepetition ABL Secured Parties, upon a change in circumstances, may request further or different adequate protection, and the Debtors or any other party may contest any such request.

18. *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     The DIP Agent and, subject to **paragraph 11(a)(iii)** hereof, the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, patent filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent, on behalf of the DIP Lenders or any of the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, trademark filings, patent filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to Prior Senior Liens), at the time and on the date of entry of this Second Interim Order. Upon the request of the DIP Agent, each Prepetition Secured Party and DIP Loan Party, without any further consent of any other party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition ABL Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any

57

kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Second Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Second Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this **subparagraph (b)** and the immediately preceding **subparagraph (a)**.

(c)     Notwithstanding anything to the contrary in the Motion, this Second Interim Order or the DIP Documents, for purposes of this Second Interim Order, in no event shall the DIP Collateral include, or the DIP Liens or Adequate Protection Liens attach to, (a) any lease, license, contract, property rights or agreement to which any DIP Loan Party is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of such DIP Loan Party therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term would be rendered

1061646.04B-CHISR01A - MSW

ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity); *provided*, *however*, that the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) above; (b) any of the outstanding Capital Stock of a controlled foreign corporation (as defined in the Internal Revenue Code) in excess of 65% of the voting power of all classes of Capital Stock of such controlled foreign corporation entitled to vote; *provided* that, to the extent DIP Agent and Dura reasonably determine that no material adverse consequences would result therefrom, there shall be no limitation on the percentage of Capital Stock of a controlled foreign corporation included in the DIP Collateral; (c) property subject to a purchase money lien, capital lease or similar arrangement permitted under the DIP Documents to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder; (d) any trademark application filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed

1061646.04B-CHISR01A - MSW

with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act; (e) Dura's directors and officers insurance policy or any proceeds thereof; or (f) any Capital Stock to the extent the pledge of which would cause adverse tax consequences as reasonably determined by the DIP Agent and Dura or to the extent such pledge is limited by applicable law (such assets collectively referred to as the "**Excluded Assets**"), *provided* that the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, Adequate Protection Obligations and shall in all events attach to or have recourse against all proceeds, products, offspring, or profits from any and all Excluded Assets (including from the sale, transfer, disposition or monetization thereof), in each case, in accordance with the terms of this order (including the priorities set forth herein).

19. *Preservation of Rights Granted Under This Second Interim Order.*

    (a)    Subject to the Carve Out and other than the Prior Senior Liens, or as permitted under the DIP Documents, no claim or lien having a priority superior to or *pari passu* with those granted by this Second Interim Order to the DIP Agent or the Prepetition ABL Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise provided in this Second Interim Order or permitted under the DIP Documents, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit

1061646.04B-CHISR01A - MSW
Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
Document    Page 60 of 121

of the DIP Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, unless expressly permitted under the DIP Documents; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors. No lien or security interest shall be granted to any other party in any of the Excluded Assets without first granting such lien or security interest to the DIP Agent, and the Prepetition Agents (solely with respect to the Adequate Protection Obligations).

(b)      Except as otherwise provided in this Second Interim Order, or as otherwise agreed in writing by the DIP Agent, the Debtors' right to use the proceeds of New Money DIP Loans or Cash Collateral hereunder shall terminate if any of the following occurs (each, an "**Event of Default**"):

(i)      the failure by the DIP Loan Parties to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the DIP Documents or any of the Financing Orders which, in the case of affirmative covenants (other than the requirements set forth herein or in the other DIP

Documents regarding the use of proceeds of New Money DIP Loans, delivery of the Approved Budget or Variance Report, cash management or Case Milestones), continues for ten (10) days from the earlier of written notice to Dura or knowledge of a senior officer of the DIP Loan Parties;

(ii)     the cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability of any provision of the DIP Facility being contested by any DIP Loan Party or any DIP Loan Party denying in writing that it has any further liability or obligation under any provision of the DIP Facility or the DIP Lenders ceasing to have the benefit of the liens granted by the Financing Orders;

(iii)     until the DIP Obligations are repaid in full (other than contingent obligations for which no claim has been made) and all commitments under the DIP Facility terminated, the DIP Loan Parties shall make any payment of prepetition principal or interest or otherwise on account of any prepetition indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Facility or other than as is consistent with the Approved Budget or the Financing Orders;

(iv)     Dura fails to make any interest payments due under any of the DIP Documents or the Financing Orders within three (3) business days of when due;

(v)    the entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief;

(vi)    the entry of an order dismissing the Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief without the consent of the DIP Lenders holding more than 50% of the aggregate amount of the loans and unused commitments under the DIP Facility (the "**Required DIP Lenders**");

(vii)    the entry of an order in the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any material part of Dura's business;

(viii)    the entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property with a value in excess of $2,000,000, including the DIP Collateral and the Prepetition ABL Collateral, of the Debtors or to commence or continue any prepetition litigation against the DIP Loan Parties involving potential liability not covered by insurance, in excess of $2,000,000 in the aggregate;

(ix)    the entry of an order in the Chapter 11 Cases charging any of the DIP Collateral or the Prepetition Collateral under Section 506(c) of the Bankruptcy Code against the DIP Secured Parties or the Prepetition ABL Secured Parties or the commencement of other

1061646.04B-CHISR01A - MSW

actions by any DIP Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Secured Parties under the DIP Facility or Prepetition ABL Secured Parties under the Prepetition ABL Credit Agreement in any of the Chapter 11 Cases or in a manner inconsistent with the DIP Documents;

(x) without the prior written consent of the DIP Agent and other than in respect of the DIP Facility and the Carve Out or as expressly permitted in the DIP Documents, the bringing of any motion or taking of any action, seeking entry of an order, or the entry of an order by the Court, in any of the Chapter 11 Cases (i) granting any claim or lien, or superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the DIP Secured Parties or the Prepetition ABL Secured Parties, (ii) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (iii) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (iv) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (v) authorizing the Debtors to take other actions adverse to any DIP Secured Party or any Prepetition ABL Secured Party (in each case, in their role as DIP Secured Party or Prepetition ABL Secured Party, respectively) or their rights and remedies under the DIP Documents, the Prepetition ABL Credit Agreement,

1061646.04B-CHISR01A - MSW

or their interest in Prepetition Collateral or the DIP Collateral under Section 364 of the Bankruptcy Code;

(xi)   the entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization;

(xii)  the entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Debtor of similar relief in favor of any one or more of any Debtor's prepetition creditors, contrary to the terms and conditions of any of the Financing Orders or the DIP Documents;

(xiii) the DIP Loan Parties or any of their subsidiaries or affiliates, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, fail to object to after DIP Agent so requests, or otherwise participate as an adverse party in any suit or other proceeding against any DIP Secured Party or any Prepetition ABL Secured Party (in each case, in their role as DIP Secured Party or Prepetition ABL Secured Party, respectively) regarding the DIP Facility or the Prepetition ABL Credit Agreement;

(xiv)  a plan of reorganization shall be filed by the Debtors, or be confirmed in any of the Chapter 11 Cases, or any order shall be entered which dismisses any of the Chapter 11 Cases and which plan or order (i) (x) does not provide for termination of the unused

1061646.04B-CHISR01A - MSW

commitments under the DIP Facility and payment in full in cash of the DIP Loan Parties' obligations under the DIP Facility and the Prepetition ABL Obligations or (y) is not satisfactory to the DIP Agent and the Prepetition ABL Administrative Agent in their sole and absolute discretion, and (ii) does not provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Secured Parties and the Prepetition ABL Secured Parties that are satisfactory to the DIP Agent and the Prepetition ABL Administrative Agent in their sole and absolute discretion, or any of the DIP Loan Parties or any of their subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(xv)     any final judgment or order as to liability not covered by insurance or third-party indemnity, or debt for the payment of money, in excess of $2,000,000 shall be rendered against the DIP Loan Parties (individually or in the aggregate), and, in each case, there shall be a period of ten (10) consecutive business days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(xvi)    the Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors unless such order contemplates indefeasible repayment in full in cash of the DIP

Facility and all Prepetition ABL Obligations upon consummation of the sale process unless the DIP Agent and the Prepetition ABL Administrative Agent consent in their sole and absolute discretion;

(xvii) the entry of an order in the Chapter 11 Cases avoiding or permitting avoidance of any portion of the payments made on account of the obligations under the DIP Facility, the DIP Documents, the Prepetition ABL Credit Agreement, or any related documents or any other indebtedness provided to the Debtors and their subsidiaries by any DIP Lender or any Prepetition ABL Lender, or the taking of any action by any DIP Loan Party to challenge or support a challenge of any such payments;

(xviii) the Financing Orders and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral (other than an immaterial portion thereof);

(xix) the Final Order does not include a waiver, in form and substance satisfactory to the DIP Agent in its sole and absolute discretion, of (i) the right to surcharge the Prepetition Collateral and/or the DIP Collateral under Section 506(c) of the Bankruptcy Code; (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition Administrative Agent on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any

67

DIP Loan Party after the Petition Date, and (iii) the doctrine of marshaling;

(xx)   the filing or support of any pleading by any DIP Loan Party (or any subsidiary thereof) seeking, or otherwise consenting to, any relief the granting or prosecution of which could reasonably be expected to result in the occurrence of an Event of Default, including the support or acceptance of any bid in a 363 sale that does not provide for the indefeasible repayment in full in cash of the DIP Facility and any Prepetition ABL Obligations that have not been discharged with as described in **paragraph 15(e)** upon consummation of the sale unless the DIP Agent and the Prepetition ABL Agent consent in their sole and absolute discretion;

(xxi)   any non-monetary final judgment or order with respect to a post-petition event shall be rendered against any Debtor which does or could reasonably be expected to have a Material Adverse Effect (as defined in the DIP Term Sheet), and, in each case, there shall be a period of ten (10) consecutive business days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(xxii)   any of the Financing Orders being amended or modified without the consent of the DIP Agent granted in its sole and absolute discretion;

68

(xxiii) any Vendor Contract or Customer Contract is terminated or modified and such modification or termination does or could reasonably be expected to cause a Material Adverse Effect;

(xxiv) the commencement of any investigation of any Debtor by any federal or state agency or other governmental or judicial entity, and such investigation does or could reasonably be expected to cause a Material Adverse Effect;

(xxv) the closing of an Acceptable 363 Sale (as defined in the DIP Term Sheet) shall not have occurred on or prior to February 17, 2020, *and* the Approved Budget shall not have been modified by the DIP Loan Parties (with the consent of the DIP Agent in its sole and absolute discretion) to reflect and forecast the DIP Loan Parties' Cash Receipts, Cash Operating Disbursements, and Cash Bankruptcy Disbursements for the two-week period after such closing (subject to Permitted Variances); and

(xxvi) Lynn Tilton is removed as a director or chief executive officer of Dura for any reason (it being understood and agreed that a resignation by Lynn Tilton will not constitute an Event of Default under this **clause (xxvi)**).

(c) Notwithstanding the foregoing, (i) to the extent the DIP Documents include an event of default similar to (or are deemed to include such event of default pursuant to the terms of the DIP Term Sheet or this Second Interim Order) the event of default set forth in Section 10.1(k) of the

Prepetition ABL Credit Agreement, such event of default shall be subject to a Material Adverse Effect qualifier and (ii) the DIP Documents shall not include (and shall not be deemed to include pursuant to the terms of the DIP Term Sheet or this Second Interim Order) the events of default set forth in Section 10.1(g), Section 10.1(h), Section 10.1(i) and Section 10.1(n) of the Prepetition ABL Credit Agreement.

(d)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the Adequate Protection Obligations, the Adequate Protection Provisions, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect as provided herein and shall maintain their priorities as provided in this Second Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, Adequate Protection Obligations, the Adequate Protection Provisions, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Second Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Second Interim Order.

1061646.04B-CHISR01A - MSW

(e)     If any or all of the provisions of this Second Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation, or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, modification, vacation or stay, the DIP Obligations, DIP Liens, the Adequate Protection Provisions, Adequate Protection Obligations, and Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Agent, the DIP Lenders or the Prepetition ABL Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, shall be governed in all respects by the original provisions of this Second Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition ABL Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Second Interim Order, and the DIP Documents with respect thereto.

(f)     Except as expressly provided in this Second Interim Order or in the other DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the

1061646.04B-CHISR01A - MSW

DIP Agent, the DIP Lenders and the Prepetition ABL Secured Parties, as applicable, granted by the provisions of this Second Interim Order and the other DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral or Prepetition Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Second Interim Order and the other DIP Documents shall continue in the Chapter 11 Cases, in any successor cases if the Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition ABL Secured Parties granted by the provisions of this Second Interim Order and the other DIP Documents shall continue in full force and effect until the DIP Obligations or Adequate Protection Obligations are indefeasibly paid in full in cash, as

set forth herein and in the DIP Documents, and the New Money DIP Loan Commitments have been terminated.

20. *Effect of Stipulations on Third Parties*. The Debtors' stipulations, admissions, agreements and releases contained in this Second Interim Order, including, without limitation, in **paragraph 4** of this Second Interim Order, shall be binding upon the Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in this Second Interim Order, including, without limitation, in **paragraph 4** of this Second Interim Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless and solely to the extent that:

> (a) such party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely commenced an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this **paragraph 20**) (a "**Challenge**") (A) objecting to or challenging the amount, validity, or enforceability of the Prepetition Obligations or the perfection or priority of the Prepetition Liens, (B) objecting to or challenging the "roll up" of the Prepetition ABL Obligations, or (C) otherwise asserting or prosecuting any objections,

1061646.04B-CHISR01A - MSW

claims, or causes of action (including, without limitation, any actions for preferences, fraudulent transfers or conveyances, or other avoidance power claims) on behalf of the Debtors' estates against any of the Prepetition Secured Parties or their respective Representatives in connection with matters related to the Prepetition Financing Documents, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Collateral, by no later than (i) with respect to parties in interest (other than any of the Debtors) with requisite standing, the earlier of December 31, 2019 (*i.e.* 75 calendar days after the Petition Date) and 60 calendar days after the date the Committee is formed, (ii) any such later date as has been agreed to, in writing, by the relevant Prepetition Agent, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing **clauses (i)**, **(ii)**, and **(iii)**, the "**Challenge Period**"); and

(b)     there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred. If or to the extent no such Challenge is timely and properly filed during the Challenge Period or (to the extent) the Court does not rule in

74

favor of the plaintiff in any such proceeding then (except as expressly filed or ruled): (i) the Debtors' stipulations, admissions, agreements and releases contained in this Second Interim Order, including, without limitation, those contained in **paragraph 4** of this Second Interim Order, shall be binding on all parties in interest, including, without limitation, the Committee (if any), (ii) the obligations of the DIP Loan Parties under the Prepetition Financing Documents, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination (other than as provided in the Intercreditor Agreement and this Second Interim Order), offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s), (iii) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense but subject to the priorities described herein; and (iv) the Prepetition Secured Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims,

75

causes of action, counterclaims and offsets, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition ABL Secured Parties and their Representatives arising out of or relating to any of the Prepetition Financing Documents or this Second Interim Order shall be deemed forever waived, released and barred.

(c)     If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Second Interim Order, including, without limitation, those contained in **paragraph 4** of this Second Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases, including the Committee (if any), and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Second Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if any) or any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Financing Documents, the Prepetition Secured Obligations, or the Prepetition Liens.

76

21.  *Limitation on Use of DIP Facility and Collateral*. Notwithstanding any other provision of this Second Interim Order or any other order entered by the Court, without the consent of the DIP Agent, no New Money DIP Loans, DIP Collateral, Prepetition Collateral, Cash Collateral, or any portion of the Carve Out may be used directly or indirectly by any Debtor, any DIP Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor case, including any chapter 7 case, or any other person, party or entity (a) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Agent, the DIP Lenders, or the Prepetition ABL Secured Parties, or their respective predecessors-in-interest or Representatives, or any action purporting to do the foregoing in respect of the Prepetition Secured Obligations, Prepetition Liens on the Prepetition Collateral, DIP Obligations, DIP Liens, DIP Superiority Claims and/or the Adequate Protection Obligations, Adequate Protection Liens, and superiority claims granted to the Prepetition ABL Secured Parties under this Second Interim Order or the Final Order, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Secured Obligations, the DIP Obligations and/or the liens, claims, rights, or security interests granted under this Second Interim Order, the Final Order, the other  DIP Documents, or the Prepetition Financing Documents including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) to prevent, hinder, or otherwise delay the Prepetition ABL Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Prepetition ABL Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, and the

1061646.04B-CHISR01A - MSW

liens, claims and rights granted to such parties under the Financing Orders, each to the extent permitted under the DIP Documents, the Prepetition Financing Documents, the Intercreditor Agreement, and this Second Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition ABL Secured Parties, the DIP Agent, or the DIP Lenders under this Second Interim Order, the Prepetition Financing Documents, or other the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and superpriority claims and liens granted to the Prepetition ABL Secured Parties hereunder, unless all DIP Obligations and Adequate Protection Obligations have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit); or (e) to seek to pay any amount on account of any claims arising prior to the Petition Date (other than with respect to the Adequate Protection Provisions) unless such payments are otherwise included in the Approved Budget and approved by the Court; *provided* that, notwithstanding the foregoing or anything else to the contrary herein, advisors to the Committee, if any, may incur fees and expenses in investigating, but not litigating, the claims and liens of the Prepetition ABL Secured Parties, including, for the avoidance of doubt, the Prepetition ABL Obligations discharged with Incremental New Money DIP Loans, prior to the expiration of the Challenge Period in an amount not to exceed $25,000 in the aggregate; *provided* that any fees, expenses or costs incurred by the advisors to the Committee in excess of $25,000 shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

1061646.04B-CHISR01A - MSW

22. *Loss or Damage to Collateral.* Nothing in this Second Interim Order, the other DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender, or any of the Prepetition ABL Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral (the DIP Agent shall be deemed to have exercised reasonable care in the custody and preservation of any DIP Collateral in its possession if such DIP Collateral is accorded treatment substantially equal to that which it accords its own property), (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

23. *Second Interim Order Governs.* In the event of any inconsistency between the provisions of this Second Interim Order and the other DIP Documents (other than the Final Order, if and when entered) or any other order entered thus far by this Court, the provisions of this Second Interim Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth

1061646.04B-CHISR01A - MSW

in this Second Interim Order and the other DIP Documents, including, without limitation, the Approved Budget.

24. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Second Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition ABL Secured Parties, the Committee (if any), any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition ABL Secured Parties, the Debtors, and their respective successors and assigns; *provided* that the DIP Agent, the DIP Lenders and the Prepetition ABL Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

25. *Limitation of Liability.* In determining to make any loan or other extension of credit under the DIP Term Sheet, to permit the use of Cash Collateral or DIP Collateral or in exercising any rights or remedies as and when permitted pursuant to this Second Interim Order or the other DIP Documents, the mere entry of this Second Interim Order in no way deems the DIP Agent and the DIP Lenders to (a) be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the

operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

26.     *Master Proof of Claim.* The Prepetition ABL Agent shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of itself and the Prepetition ABL Lenders for payment of the Prepetition ABL Obligations arising under the Prepetition ABL Credit Agreement, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition ABL Credit Agreement. The statements of claim in respect of the Prepetition ABL Obligations set forth in this Second Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearings, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, the Prepetition ABL Agent is authorized to file in the Debtors' lead chapter 11 case *In re Dura Automotive Systems, LLC,* Case No. 19-06741, a single, master proof of claim on behalf of the Prepetition ABL Secured Parties, as applicable, on account of any and all of their respective claims arising under the Prepetition Credit Agreement and hereunder (the "**Master Proof of Claim**") against each of the Debtors. The provisions of this **paragraph 26** and the Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition ABL Secured Party (or its successors in interest) to vote separately on any plan proposed in the Chapter 11 Cases. The Master Proof of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition ABL Secured Parties, which instruments,

81

1061646.04B-CHISR01A - MSW

Case 3:19-bk-06741   Doc 157   Filed 10/23/19   Entered 10/23/19 09:23:18   Desc Main
Document      Page 81 of 121

agreements, or other documents will be provided upon written request to counsel to the Prepetition ABL Agent.

27.     *Insurance*. To the extent that the Prepetition Agents are listed as loss payee under Dura's or the DIP Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies on a senior basis and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and *second*, to the payment of the Prepetition Secured Obligations.

28.     *Effectiveness*. This Second Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Second Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Second Interim Order.

29.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Second Interim Order.

30.     *Payments Held in Trust*. Except as expressly permitted in this Second Interim Order or the other DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior

to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the New Money DIP Loan Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the this Second Interim Order and the other DIP Documents.

31. *Credit Bidding*. (a) Subject to entry of the Final Order, the DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations, *plus* the full amount of any outstanding Prepetition ABL Obligations, in any sale of the DIP Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

32. *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

33. *Necessary Action*. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Second Interim Order.

34. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Second Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

1061646.04B-CHISR01A - MSW

35. *Third Interim Hearing*. The Third Interim Hearing is scheduled for November 5, 2019 at 9:30 a.m. Central Time before this Court.

36. *Final Hearing*. The Final Hearing is scheduled for November 12, 2019 at [●] Central Time before this Court.

**37.** *Objections*. Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) proposed counsel to the Debtors, Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, NY 10022, Attention: Christopher Marcus, christopher.marcus@kirkland.com and Kirkland & Ellis, LLP, 300 North LaSalle Street, Chicago, IL 60654, Attention: Ryan B. Bennett, ryan.bennett@kirkland.com and Gregory F. Pesce, gregory.pesce@kirkland.com; (b) the Office of the United States Trustee for the Middle District of Tennessee; (c) counsel to the DIP Agent and the Prepetition Term Loan Secured Parties, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Upper Wacker Drive, Chicago, IL 60606, Attention: Ron E. Meisler, ron.meisler@skadden.com and 920 N. King Street, Wilmington, DE 19801, Attention: Carl T. Tullson, carl.tullson@skadden.com; (d) counsel to the Committee, if one has been appointed; and (e) any other party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than November 1, 2019 at 4:00 p.m., prevailing Central Time.

38. The Debtors shall promptly serve copies of this Second Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Second Interim Hearing, to any party that has filed a request for notices with this Court and to the Committee

1061646.04B-CHISR01A - MSW

after the same has been appointed, or such Committee's counsel, if the same shall have been appointed.

*[Remainder of page intentionally left blank.]*

1061646.04B-CHISR01A - MSW

**This Order Was Signed and Entered Electronically As Indicated At The Top Of The First Page**

**APPROVED FOR ENTRY:**

*/s/ draft*
_____
William L. Norton III (TN 10075)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1600 Division Street, Suite 700
Nashville, Tennessee 37203
Telephone:      (615) 252-2397
Facsimile:      (615) 244-6380

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

- and -

Christopher Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**DIP Term Sheet**

1061646.04B-CHISR01A - MSW

# DURA AUTOMOTIVE SYSTEMS, LLC

## SUPERPRIORITY DIP FACILITY

### Term Sheet

### October 23, 2019

This term sheet (the "***Term Sheet***") sets forth a summary of the terms and conditions with respect to the New Money DIP Loans (as defined below), the DIP Facility (as defined below) and the treatment of the Prepetition ABL Obligations (as defined below), in each case from and after, and subject to, the entry of the Second Interim Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Second Interim Order with respect to the New Money DIP Loans but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Loan Documents (as defined below). The obligations of the DIP Lenders (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Second Interim Order, the terms of the Second Interim Order shall govern.

| | |
|---|---|
| **Borrower:** | Dura Automotive Systems, LLC, a Delaware limited liability company and a contemplated debtor in possession in the cases (the "***Chapter 11 Cases***") to be filed with respect to itself and each of its domestic subsidiaries (each a "***Debtor***" and, collectively, the "***Debtors***") under Chapter 11 of Title 11 of the United States Code (as amended, the "***Bankruptcy Code***") and filed with the United States Bankruptcy Court for the Middle District of Tennessee (the "***Bankruptcy Court***"). (As used herein, the term "***Petition Date***" shall mean the date upon which the Chapter 11 Cases are commenced in the Bankruptcy Court.) |
| **Guarantors:** | Each of the entities that is a borrower or a guarantor under the Prepetition ABL Credit Agreement or the Prepetition Term Loan Agreement and all other Debtors (the Borrower and the Guarantors, together, the "***DIP Loan Parties***"). |
| **DIP Lenders:** | Dura Automotive Angels, LLC and/or other entities owned or controlled by Lynn Tilton and/or her affiliated entities to be determined. |
| **Administrative Agent and Collateral Agent:** | Patriarch Partners Agency Services, LLC (the "***DIP Administrative Agent***" and collectively with the DIP Lenders, the "***DIP Secured Parties***"). |
| **Prepetition ABL Credit Agreement:** | That certain Loan and Security Agreement (as amended, modified, supplemented or waived from time to time on or prior to the date hereof, the "***Prepetition ABL Credit Agreement***"), dated as of January 21, 2010, among the Borrower, the other borrowers and guarantors party thereto, the lenders party thereto (the "***Prepetition ABL Lenders***"), and Patriarch Partners Agency Services, LLC (as |

1061560.03D-CHISR01A - MSW

| | |
|---|---|
| | successor by assignment to Wells Fargo Capital Finance, LLC, successor by merger to Wachovia Capital Finance Corporation (Central)), as agent (the "***Prepetition ABL Administrative Agent***" and collectively with the Prepetition ABL Lenders, the "***Prepetition ABL Secured Parties***"). Unless otherwise defined herein, terms defined in the Prepetition ABL Credit Agreement are used herein with such defined meanings. |
| **DIP Facility:** | $77,000,000 debtor-in-possession senior secured superpriority revolving loan facility, comprised of $50,000,000 of initial "new money" loan commitments (the "***Initial New Money DIP Loan Commitments***" and the loans made thereunder, the "***Initial New Money DIP Loans***"), plus up to $27,000,000 of incremental "new money" loan commitments (the "***Incremental New Money DIP Loan Commitments***" and together with the Initial New Money DIP Loan Commitments, the "***New Money DIP Loan Commitments***"; the loans made under the Incremental New Money DIP Loan Commitments, the "***Incremental New Money DIP Loans***" and together with the Initial New Money DIP Loans, the "***New Money DIP Loans***") available on a dollar for dollar basis to the extent proceeds of "Revolving Loan Priority Collateral" (as defined in the Prepetition Intercreditor Agreement referred to below) are used as described under the caption "Adequate Protection" to discharge Prepetition ABL Obligations (as defined below) equal to the sum of (i) outstanding principal in the amount of $26,749,376.52, plus (ii) accrued and unpaid interest under the Prepetition ABL Credit Agreement, including accrued and unpaid postpetition interest at the default rate specified in the Prepetition ABL Credit Agreement from the Petition Date through and including the date such obligations are so discharged, plus (iii) any and all unreimbursed costs, fees and expenses (including contingent indemnification expenses) of the Prepetition ABL Secured Parties incurred in accordance with the Prepetition ABL Credit Agreement. Notwithstanding anything to the contrary, availability of the Initial New Money DIP Loan Commitments is not subject to any borrowing base calculation set forth in the Prepetition ABL Credit Agreement. |
| **Interest Rate:** | Interest shall accrue on the New Money DIP Loans at the rate of Libor + 5.00% per annum (subject to a 2.00% Libor floor, provided that the non-default interest rate shall not exceed Libor + 6.50% at any time as a result of such Libor floor), and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget (defined below). |
| **Default Rate:** | At all times while an Event of Default (as defined in the DIP Loan Documents) exists, at the election of the Required DIP Lenders, principal, interest and other amounts under the DIP Facility shall bear interest at a rate per annum equal to 2.00% in excess of the interest rate set forth in "Interest Rate" above. |
| **New Money DIP Loan Unused** | The Borrower shall pay an unused line fee of 0.375% per annum on |

| | |
|---|---|
| **Line Fee:** | the average daily unused portion of the available New Money DIP Loan Commitments, payable on the first (1st) business day of each month, in arrears, in accordance with the Budget. |
| **Expenses of DIP Secured Parties:** | The reasonable and documented professional fees and out-of-pocket expenses incurred by the DIP Secured Parties (limited, in the case of counsel, to one primary counsel for the DIP Secured Parties taken as a whole plus local, litigation and special counsel), including expenses incurred in connection with defending the validity and enforceability of the Prepetition ABL Obligations, the DIP Obligations or any of the liens or adequate protection securing the same, shall be promptly paid by the DIP Loan Parties on no less than a monthly basis. |
| **Maturity Date:** | The earliest of (a) March 2, 2020 (or such later date as the DIP Lenders in their sole discretion may agree in writing with the Borrower); (b) the consummation of a sale of all or substantially all of the assets of the DIP Loan Parties; (c) acceleration of the New Money DIP Loans pursuant to the DIP Loan Documents (as defined below); (d) November 12, 2019 (or such later date as the DIP Administrative Agent in its sole discretion may agree in writing with the Borrower), if the Final Order (as defined below) has not been entered on or prior to such date; and (e) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court. |
| **Budget:** | All advances under the DIP Facility and any Cash Collateral shall be used by the DIP Loan Parties consistent (subject to Permitted Variances) with a rolling budget (the "***Budget***"), for the period commencing on the Petition Date through at least January 19, 2020 (the "***Budget Period***"), setting forth all forecasted (i) cash receipts of the DIP Loan Parties (the "***Cash Receipts***"), (ii) cash operating disbursements of the DIP Loan Parties (the "***Cash Operating Disbursements***"), and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Loan Parties (the "***Cash Bankruptcy Disbursements***"), which Budget shall be approved by the DIP Administrative Agent in its reasonable discretion and may be modified by the DIP Loan Parties with the written consent of the DIP Administrative Agent in its reasonable discretion and without further order of the Bankruptcy Court; <u>provided</u>, that (i) the total amount of DIP funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by each of the Financing Orders (as defined below), and (ii) the reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall not be subject to a cap. A copy of the initial |

1061560.03D-CHISR01A - MSW

Case 3:19-bk-06741    Doc 157    Filed 10/23/19    Entered 10/23/19 09:23:18    Desc Main
Document    Page 90 of 121

Budget approved by the DIP Administrative Agent is attached hereto as Exhibit A.

At the end of the fourth (4th) week following the Petition Date (and every four (4) weeks thereafter), the DIP Loan Parties shall furnish a supplement to the initial Budget (or the previously supplemented Budget), updating and/or extending the period covered by the initial Budget (or the previously supplemented Budget) so that it covers at least the period ending 13 weeks from the week in which the supplement is delivered. Such supplemental Budgets shall be subject to the DIP Administrative Agent's approval in its reasonable discretion and without further order of the Bankruptcy Court. The initial Budget (or the previously supplemented and approved Budget) shall remain the Budget in effect with respect to the period covered by such Budget until such time as the DIP Administrative Agent approves such supplemental Budget.

Compliance with the Budget will be measured every other week, starting with the third week following the Petition Date, for the period beginning as of the first day of the first full week following the week of the Petition Date and ending the last day of the week prior to the week on which compliance is measured. For purposes of illustration, on the third week following the Petition Date, the DIP Loan Parties' compliance with the Budget for the first two weeks following the Petition Date shall be measured. Each date on which compliance with the Budget is measured is referred to herein as a "***Testing Date***". As of any applicable Testing Date:

1.      the cumulative Cash Receipts may vary from the Budget by no more than 20.00% for each Testing Date (the "***Cash Receipt Variance***"); and

2.      the cumulative Cash Operating Disbursements may vary from the Budget by no more than 20.00% for each Testing Date (the "***Cash Operating Variance***" and together with the Cash Receipt Variance, the "***Permitted Variances***").

The DIP Loan Parties shall be deemed to be in compliance with the Budget for all purposes under this Term Sheet, the DIP Loan Documents, and the Financing Orders unless, as of any applicable date of determination, the DIP Loan Parties' (x) cumulative Cash Receipts or (y) cumulative Cash Operating Disbursements, as applicable, vary from the Budget by more than the applicable Permitted Variance as measured on any Testing Date; provided, however, that with respect to cumulative Cash Receipts, the DIP Loan Parties shall not be deemed to have failed to comply with the Budget unless the DIP Loan Parties' cumulative Cash Receipts fall beneath the amounts set forth in the Budget as measured on any two consecutive Testing Dates during the four week period beginning as

| | |
|---|---|
| | of the first day of the first full week following the week of the Petition Date. |
| | As further set forth below, after the first three weeks following the Petition Date, the Debtors shall provide the DIP Administrative Agent with weekly and cumulative variance reporting on a line item basis for Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall (i) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and (ii) provide an explanation of any per line item variance greater than 5.00% (the "***Variance Report***"). |
| **DIP Obligations:** | As used herein, the term "***DIP Obligations***" means (a) the due and punctual payment by the DIP Loan Parties of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the New Money DIP Loans and interest accruing after the commencement of the Chapter 11 Cases) the New Money DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the DIP Loan Parties to the DIP Secured Parties under the DIP Loan Documents and the Financing Orders, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the DIP Loan Parties to the DIP Secured Parties under or pursuant to the DIP Loan Documents and the Financing Orders. |
| **Prepetition ABL Obligations:** | As used herein, the term "***Prepetition ABL Obligations***" means, as of the Petition Date, the indebtedness of the Debtors to the Prepetition ABL Secured Parties under the Prepetition ABL Credit Agreement and all other Financing Agreements (as defined therein) (collectively, the "***Prepetition ABL Loan Documents***"), which amount is the sum of: (i) principal in the amount of $26,749,376.52, plus (ii) accrued and unpaid interest, plus (iii) unreimbursed costs, fees and expenses (including contingent indemnification expenses) in accordance with the Prepetition ABL Loan Documents. |
| **Cash Collateral:** | The Prepetition ABL Lenders shall consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"), all subject to and in accordance with the terms and conditions set forth in this Term Sheet, the Financing Orders, and the Budget; provided, that the DIP Loan Parties shall operate their cash management system in a manner that is the same as or substantially similar to their prepetition cash management system, including daily "sweeps" of cash from the applicable deposit accounts of the DIP Loan Parties which shall continue in the same or substantially similar manner as prior to the Petition Date, subject to the adequate protection rights of the Prepetition ABL Secured Parties |

5

| | |
|---|---|
| | as set forth below.. |
| **Use of New Money DIP Loan Proceeds and Cash Collateral:** | The proceeds of the New Money DIP Loans and Cash Collateral shall be available to finance, in each case consistent (subject to Permitted Variances) with the Budget (as defined below): |
| | 1. working capital and general corporate purposes, including capital expenditures, of the Debtors and, to the extent funded through intercompany loans evidenced by promissory notes pledged to the DIP Administrative Agent to secure the DIP Obligations on a first-priority basis in accordance with the Financing Orders, their direct and indirect subsidiaries, |
| | 2. the pursuit of an Acceptable 363 Sale (as defined below), and |
| | 3. bankruptcy-related costs and expenses, subject to the Carve Out. |
| **Initial Approval by the Bankruptcy Court:** | The interim terms and conditions of the DIP Facility were set forth and approved by the Bankruptcy Court in the Expedited Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, and (V) Modifying the Automatic Stay, entered by the Bankruptcy Court on October 18, 2019 (the "***First Interim Order***"). The continued use of Cash Collateral, this Term Sheet and the terms and conditions of the DIP Facility set forth herein (collectively, the "***Transactions***") shall be subject to the entry in the Bankruptcy Court of a second interim order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the Transactions (the "***Second Interim Order***"). In the event that the Final Order is not entered in the Bankruptcy Court on or prior to November 12, 2019 (or such later date as the DIP Administrative Agent in its sole discretion may agree in writing with the Borrower), the consent of the Prepetition ABL Lenders to the use of Cash Collateral and the consent of the DIP Lenders to the use of their cash collateral shall automatically terminate. |
| **Documentation:** | Definitive financing documentation with respect to the New Money DIP Loans, including this Term Sheet, shall be reasonably satisfactory in form and substance to the DIP Secured Parties and the Borrower (the "***DIP Loan Documents***"), shall be executed and delivered by the parties thereto, and shall be approved upon the entry in the Bankruptcy Court of the Final Order. |
| **Documentation Principles:** | The DIP Loan Documents shall, except as otherwise set forth herein, be based on and consistent with the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents, as modified by the terms set forth in this Term Sheet (it being |

6

| | |
|---|---|
| | understood and agreed that "Material Adverse Effect" shall have the meaning assigned to such term in this Term Sheet for all purposes of the DIP Loan Documents) and subject to (i) materiality qualifications and other exceptions that give effect to, permit and/or accommodate the structure of any Acceptable 363 Sale, (ii) modifications to reflect the status of the DIP Loan Parties as debtors-in-possession in the Chapter 11 Cases and the transactions and business operations contemplated by the Budget, (iii) negotiation in good faith within a reasonable (consistent with the term of this Term Sheet) time period and (iv) removal of the "Material Contracts" provisions included in the Prepetition ABL Loan Documents. This paragraph collectively referred to herein as the "***Documentation Principles***". |
| **Availability of Initial New Money DIP Loan Commitments:** | Subject to the terms and conditions set forth in the DIP Loan Documents and this Term Sheet, including the Conditions Precedent (defined below):<br><br>1. Upon the entry in the Bankruptcy Court of the Second Interim Order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the New Money DIP Loans and this Term Sheet, the continued use of Cash Collateral in accordance with this Term Sheet and the other applicable DIP Loan Documents, and providing Adequate Protection for the Prepetition ABL Lenders in accordance with this Term Sheet: (i) $20,000,000 of the Initial New Money DIP Loan Commitments (inclusive of the $10,000,000 of New Money DIP Loan Commitments that was made available to the Debtors pursuant to the First Interim Order) will be available for the liquidity needs of the Debtors consistent with the Budget (subject to Permitted Variances) and the other terms and conditions set forth herein and in the other DIP Loan Documents (the "***First Initial New Money DIP Loan Commitments***"), and (ii) Incremental New Money DIP Loan Commitments in a principal amount equal to the amount of proceeds of "Revolving Loan Priority Collateral" (as defined in the Prepetition Intercreditor Agreement) that are used on or prior to the date thereof to discharge, on a dollar for dollar basis, a corresponding amount of outstanding Prepetition ABL Obligations as described under the caption "Adequate Protection" will be available for the liquidity needs of the Debtors consistent with the Budget (subject to Permitted Variances) and the other terms and conditions set forth herein and in the other DIP Loan Documents. After the date thereof, additional Incremental New Money DIP Loan Commitments, in a principal amount equal to the amount of proceeds of "Revolving Loan Priority Collateral" used to discharge, on a dollar for dollar basis, a corresponding amount of outstanding Prepetition ABL Obligations as described under the caption "Adequate Protection" until the |

| | |
|---|---|
| | aggregate amount of such Incremental New Money DIP Loan Commitments equals $20,000,000, will be available for the liquidity needs of the Debtors consistent with the Budget (subject to Permitted Variances) and the other terms and conditions set forth herein and in the other DIP Loan Documents. |
| | 2. Upon the entry in the Bankruptcy Court of (x) a final order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving (among other things) the full New Money DIP Loan Commitments and the New Money DIP Loans (the "**Final Order**" and collectively with the First Interim Order and the Second Interim Order, the "**Financing Orders**") and (y) a final order, in form and substance acceptable to the DIP Administrative Agent in its reasonable discretion, approving the bid procedures for an Acceptable 363 Sale and naming the DIP Administrative Agent (or its designee) as "stalking horse" bidder: (i) the remaining $30,000,000 of the Initial New Money DIP Loan Commitments will be available for the liquidity needs of the Debtors consistent (subject to Permitted Variances) with the Budget and the other terms and conditions set forth herein and in the other DIP Loan Documents (the "**Second Initial New Money DIP Loan Commitments**"), and (ii) the remaining Incremental New Money DIP Loan Commitments, in a principal amount equal to the amount of proceeds of "Revolving Loan Priority Collateral" used to discharge, on a dollar for dollar basis, a corresponding amount of outstanding Prepetition ABL Obligations as described under the caption "Adequate Protection", will be available for the liquidity needs of the Debtors consistent with the Budget (subject to Permitted Variances) and the other terms and conditions set forth herein and in the other DIP Loan Documents. |
| **Security:** | As security for the DIP Obligations, each DIP Loan Party shall grant to the DIP Lenders a security interest in and continuing lien on all of such DIP Loan Party's right, title and interest in, to and under all the DIP Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**") (subject to exceptions set forth in the Prepetition ABL Credit Agreement, provided that, to the extent the DIP Administrative Agent and Borrower reasonably determine that no material adverse consequences would result therefrom, there shall be no limitation on the percentage of capital stock of controlled foreign corporations included in the DIP Collateral): (a) all assets and property of each DIP Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract |

1061560.03D-CHISR01A - MSW

| | |
|---|---|
| | rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the DIP Administrative Agent and the Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the DIP Loan Parties (but excluding any property subject to a purchase money lien, capital lease or similar arrangement permitted under the DIP Loan Documents to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)) and (b) subject to the Final Order, proceeds of any actions under *sections* 544, 545, 547, 548 and 550 of the Bankruptcy Code (the "***Avoidance Actions***"); <u>provided</u>, that the DIP Collateral shall not include the Borrower's directors and officers insurance policy or any proceeds thereof. |
| **Priority and Liens:** | All of the claims of the DIP Administrative Agent and the DIP Lenders under the DIP Facility with respect to the New Money DIP Loans and the DIP Obligations shall at all times: |
| | 1. pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); |
| | 2. pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or subject to valid liens in existence at the time of such commencement that are |

1061560.03D-CHISR01A - MSW

<table>
<tr>
<td></td>
<td>

perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the "***Prior Senior Liens***");

3.    pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all DIP Collateral of the Debtors that is subject to a Prior Senior Lien; and

4.    pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the DIP Collateral of the Debtors (including, without limitation, inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries, membership interests in limited liability companies and interests in partnerships and joint ventures) that is subject to the existing liens that secure the obligations of the Debtors to (i) the Prepetition ABL Lenders under or in connection with the Prepetition ABL Loan Documents and the Prepetition ABL Obligations and (ii) the lenders under or in connection with the Credit Agreement (as amended, modified, supplemented or waived from time to time on or prior to the date hereof, the "***Prepetition Term Loan Agreement***" and the obligations thereunder, the "***Prepetition Term Loan Obligations***"), dated as of January 10, 2010, among Dura Operating, LLC, the guarantors party thereto, the lenders party thereto, and Ankura Trust Company, LLC (as successor to Patriarch Partners Agency Services, LLC), as agent (the "***Prepetition Term Loan Agent***") (all of which being hereafter collectively referred to as the "***Prepetition Collateral***").

</td>
</tr>
<tr>
<td>**Adequate Protection:**</td>
<td>

The Interim Order shall provide, as adequate protection for the use of the collateral securing the Prepetition ABL Obligations and the priming of the liens and security interests granted to the Prepetition ABL Secured Parties under the Prepetition ABL Loan Documents (the "***Prepetition ABL Liens***"), the Prepetition ABL Lenders shall be entitled to receive, solely to the extent of any use of, or diminution in the value of, the Prepetition Collateral:

1.    superpriority claim status;

2.    replacement liens on all Prepetition Collateral, junior only to the liens of the DIP Administrative Agent and the DIP Lenders, but subject to any Prior Senior Liens and, solely in the case of "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement (as amended, modified, supplemented or waived from time to time on or prior to the date hereof, the "***Prepetition Intercreditor Agreement***"), dated as of January 21, 2010, among the Prepetition ABL Administrative Agent, the Prepetition Term Loan Agent and the other agents named therein) retaining the same relative priority with respect to the existing liens that secure the

</td>
</tr>
</table>

1061560.03D-CHISR01A - MSW

| | |
|---|---|
| | Prepetition Term Loan Obligations (the "***Prepetition Term Loan Liens***") to the extent provided in the Prepetition Intercreditor Agreement; |
| | 3. commencing on the Petition Date, payment of accrued postpetition interest on a monthly basis at the applicable default rate specified in the Prepetition ABL Credit Agreement until such obligations are discharged as described under the caption "Adequate Protection"; and |
| | 4. commencing on the date of entry of the Second Interim Order, repayment and discharge of Prepetition ABL Obligations with proceeds of "Revolving Loan Priority Collateral" (as defined in the Prepetition Intercreditor Agreement) "swept" from the applicable deposit accounts of the DIP Loan Parties in the same or substantially similar manner as prior to the Petition Date. |
| **Carve Out:** | The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject to the Carve Out. For purposes hereof, "***Carve Out***" shall have the meaning assigned to such term in the Interim Order. |
| **Acceptable 363 Sale:** | As used herein, the term "***Acceptable 363 Sale***" means a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, subject to the following conditions: |
| | 1. the DIP Administrative Agent shall have reviewed and approved in writing in its reasonable discretion any bid procedures and "stalking horse" asset purchase agreement that satisfies clause (2) below (the "***Stalking Horse Purchase Agreement***"); |
| | 2. to the extent not part of a credit bid by the DIP Administrative Agent (or its designee) for such sale, the sale order and the Stalking Horse Purchase Agreement shall provide for the indefeasible repayment in full in cash of the DIP Facility and any Prepetition ABL Obligations that have not been discharged as described under the caption "Adequate Protection"; and |
| | 3. the sale shall be consummated not later than February 17, 2020. |
| **Credit Bidding:** | The Final Order and the DIP Loan Documents shall provide that, in connection with an Acceptable 363 Sale that provides for the sale of the DIP Collateral, the DIP Administrative Agent and the Prepetition ABL Administrative Agent shall have the right to credit bid up to and including the full amount of the DIP Obligations plus the full amount of any Prepetition ABL Obligations that have not been discharged as described under the caption "Adequate Protection" for the DIP Collateral. Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a sub-agent |

11

| | |
|---|---|
| | or a newly formed acquisition vehicle. |
| **Marshaling and Waiver of 506(c) Claims 552(b) Rights:** | (i) Each of the Financing Orders shall provide, effective upon the entry of the Final Order, that in no event shall the DIP Administrative Agent, the DIP Lenders, the Prepetition ABL Administrative Agent or the Prepetition ABL Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, (ii) the Interim Order shall approve the waiver of all 506(c) on account of amounts covered by the Carve-Out, and (iii) the Final Order shall approve the waiver of all 506(c) claims and similar rights under 552(b). |
| **Automatic Stay:** | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the DIP Secured Parties shall be entitled to immediate payment of all obligations under the DIP Facility and to enforce the remedies provided for under the DIP Loan Documents or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court, but subject, other than in the case of the Final Order not being entered on or prior to November 12, 2019, to the following conditions (the "***Waiting Period Procedures***"): |
| | 1. The DIP Administrative Agent shall notify the DIP Loan Parties in writing that the Maturity Date has occurred (such notice, a "***Maturity Date Notice***" and the date of any such notice, the "***Maturity Date Notice Date***"). A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel. |
| | 2. A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire five (5) business days after the Maturity Date Notice Date (the "***Waiting Period***"). During the Waiting Period, the Debtors shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting the occurrence of the Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default alleged to underlie the occurrence of the Maturity Date). |
| | 3. During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral, so long as such DIP Collateral (including Cash Collateral) is used solely to pay any expenses which are (i) necessary to preserve the Debtors' going concern value or (b) necessary to contest in good faith the occurrence of the Maturity Date or underlying Event of Default. |
| | None of the DIP Secured Parties or the Prepetition ABL Secured |

| | |
|---|---|
| | Parties shall object to any motion filed by the Debtors during the Waiting Period seeking such expedited hearing nor seek to reduce such Waiting Period. |
| **Conditions Precedent:** | The several obligations of the DIP Lenders to make any New Money DIP Loans in excess of the $10,000,000 of Initial New Money DIP Loan Commitments that were made available following entry of the First Interim Order shall be conditioned on the satisfaction or waiver of the following:<br><br>1. with respect to the full availability of the $20,000,000 of First Initial New Money DIP Loan Commitments and the initial availability of Incremental New Money DIP Loan Commitments:<br><br>    a. the entry by the Bankruptcy Court of the Second Interim Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion;<br>    b. no "first day" order relating to cash management or permitted Debtor payments shall have been amended or otherwise modified after the initial entry thereof except with the consent of the DIP Administrative Agent in its reasonable discretion; and<br>    c. the DIP Administrative Agent shall be satisfied that daily "sweeps" of cash from the applicable deposit accounts of the DIP Loan Parties shall continue in the same or substantially similar manner as prior to the Petition Date, subject to the adequate protection rights of the Prepetition ABL Secured Parties as set forth below;<br><br>2. with respect to the availability of the Second Initial New Money DIP Loan Commitments and the full availability of Incremental New Money DIP Loan Commitments, the entry of (i) the Final Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion and (ii) a final order, in form and substance acceptable to the DIP Administrative Agent in its reasonable discretion, approving the bid procedures for an Acceptable 363 Sale and naming the DIP Administrative Agent (or its designee) as "stalking horse" bidder;<br><br>3. no trustee or examiner having expanded powers shall have been appointed with respect to the DIP Loan Parties or their properties;<br><br>4. all reasonable and documented out-of-pocket costs, fees and expenses required to be paid to the DIP Secured Parties or the Prepetition ABL Secured Parties pursuant to this Term Sheet, the DIP Loan Documents or the Financing Orders |

13

| | shall have been paid; |
|---|---|
| | 5. since the Petition Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than (i) as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by the Debtors and (ii) as a result of the litigation surrounding ownership of the assets of Zohar III, Corp. et al. (the "***Zohar Litigation***") and the related settlement agreement) that, individually or in the aggregate, (a) has had or could reasonably be expected to have, a material adverse effect on the business, operations, properties, assets, performance or financial condition of the DIP Loan Parties and their subsidiaries, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Secured Parties under, any DIP Loan Document or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Borrower and the other DIP Loan Parties to perform their obligations under any DIP Loan Document (any of the foregoing being a "***Material Adverse Effect***"); |
| | 6. there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the DIP Loan Parties) threatened in writing in any court or before any arbitrator or governmental instrumentality (other than (i) the Chapter 11 Cases or the consequences that would normally result from the commencement and continuation of the Chapter 11 Cases and (ii) the Zohar Litigation or the consequences that would normally result from the commencement and continuation of the Zohar Litigation) that could reasonably be expected to have a Material Adverse Effect; |
| | 7. no Default or Event of Default shall have occurred or be continuing under the DIP Loan Documents; |
| | 8. the representations and warranties of the DIP Loan Parties under the DIP Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); and |
| | 9. the Borrower shall have delivered to the DIP Administrative Agent a customary borrowing notice. |
| **Prepayments / Commitment Reductions:** | Voluntary prepayments of the New Money DIP Loans and termination or reduction of the commitments in whole or in part shall |

14

| | |
|---|---|
| | be permitted at any time, in minimum principal amounts and upon reasonable notice to be mutually agreed upon between the Borrower and the DIP Administrative Agent, without premium or penalty. |
| **Representations and Warranties:** | The representations and warranties of the DIP Loan Parties under the DIP Loan Documents shall include representations and warranties that are substantially similar to those set forth in the Prepetition ABL Credit Agreement, subject to the Documentation Principles, and, in any event, include the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents, in accordance with the Documentation Principles and subject to, and based on the terms and conditions of, the Financing Orders, as applicable:<br><br>a. Each of the DIP Loan Parties is duly organized, validly existing, in good standing and qualified to do business in the jurisdiction of its organization.<br><br>b. As of the Petition Date, the approximate aggregate outstanding amount of the Prepetition ABL Obligations is $[26,898,702.80][1], which amount is the sum of: (i) principal in the amount of $26,749,376.52, <u>plus</u> (ii) accrued and unpaid interest in the amount of $[72,255.47][2], <u>plus</u> (iii) accrued and unpaid unused line fees in the amount of $[1,070.81][3], <u>plus</u> (iv) accrued and unpaid collateral monitoring fee of $1,000, <u>plus</u> (v) unpaid agency fee of $75,000, <u>plus</u> (vi) other unreimbursed costs, fees and expenses in accordance with the Prepetition ABL Loan Documents.<br><br>c. The stipulations of the Debtors in each of the Financing Orders are true, accurate and correct in all material respects.<br><br>d. Subject to the Financing Orders, each of the DIP Loan Parties has full power and authority to operate and conduct its business, to execute, deliver and perform this Term Sheet and associated documents and to incur obligations under this Term Sheet, the DIP Loan Documents and the Financing Orders.<br><br>e. Neither the DIP Obligations nor the Prepetition ABL Obligations shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the Debtors may have against the DIP Lenders arising on or before the Petition Date. |

---

[1] NTD: Subject to final reconciliation.
[2] NTD: Subject to final reconciliation.
[3] NTD: Subject to final reconciliation.

1061560.03D-CHISR01A - MSW

| | |
|---|---|
| | f. All material contracts and agreements with critical vendors identified in the "first day" critical vendor order (the "***Vendor Contracts***") and key customers (to be defined as any set of customers representing in excess of 25% of current or projected cash receipts and to include in any event the Daimler Battery Tray contract) (the "***Customer Contracts***"), shall remain in full force and effect and no termination events (or events of default that would permit the applicable critical vendor or key customer to terminate such Vendor Contract or Customer Contract, as applicable) exist or have been asserted with respect to any such contracts, other than a default resulting from the commencement of the Chapter 11 Cases, or the insolvency or financial condition of the DIP Loan Parties; provided, that no such default shall result in a termination of any such Vendor Contracts or Customer Contracts. |
| | Notwithstanding the foregoing, (i) to the extent the DIP Loan Documents include representations and warranties similar to (or are deemed to include such representations and warranties pursuant to the terms of this Term Sheet), the representations and warranties set forth in Section 8.5, Section 8.9, Section 8.11 or Section 8.13 of the Prepetition ABL Credit Agreement, such representations and warranties shall be subject to Material Adverse Effect qualifiers, (ii) to the extent the DIP Loan Documents include representations and warranties similar to (or are deemed to include such representations and warranties pursuant to the terms of this Term Sheet) the representations and warranties set forth in Section 8.2(b) and Section 8.18 of the Prepetition ABL Credit Agreement, such representations and warranties shall be subject to materiality qualifiers and (iii) the DIP Loan Documents shall not include (and shall not be deemed to include pursuant to the terms of this Term Sheet) the representations and warranties set forth in Section 8.2(a), Section 8.3 (other than the first sentence thereof), the first sentence of Section 8.7(a), Section 8.10, Section 8.12, Section 8.14, Section 8.15, Section 8.16 and Section 8.17 of the Prepetition ABL Credit Agreement or representations and warranties regarding solvency. |
| **Affirmative Covenants:** | The affirmative covenants of the DIP Loan Parties under the DIP Loan Documents shall include, without limitation, the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents, in accordance with the Documentation Principles and subject to, and based on the terms and conditions of, the Financing Orders, as applicable: |
| | a. use the advances made under the DIP Facility and/or the Cash Collateral consistent (subject to Permitted Variances) with the Budget, and shall not use such funds to commence |

16

any action against the DIP Administrative Agent, the DIP Lenders, the Prepetition ABL Administrative Agent, the Prepetition ABL Lenders or their respective affiliates, employees, directors, officers or principals;

b.    permit the DIP Administrative Agent and its representatives and designees to visit and inspect the properties, books and records of the DIP Loan Parties upon reasonable notice at the DIP Loan Parties' expense (subject to frequency and cost reimbursement limitations to be mutually agreed and other than information subject to confidentiality obligations, attorney-client privilege or attorney work product);

c.    subject to the Budget, pay all material taxes, assessments, contributions and other governmental charges imposed upon any DIP Loan Party or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases;

d.    maintain in good working order all material properties used in the business of the DIP Loan Parties (other than ordinary wear and tear, casualty and condemnation and to the extent not causing a Material Adverse Effect), as and to the extent in good working order as of the Petition Date;

e.    maintain insurance with respect to the business and property of the DIP Loan Parties against loss of the kind and in the amounts substantially maintained by the DIP Loan Parties as of the Petition Date;

f.    comply with the requirements of all applicable laws unless failure to comply could not reasonably be expected to result in a Material Adverse Effect;

g.    cause its financial professionals to provide the DIP Secured Parties and the Prepetition ABL Secured Parties with detailed weekly status reports (which may be via teleconference) regarding the post-petition marketing efforts;

h.    comply with the schedule of Case Milestones (as defined below);

i.    promptly upon request execute and deliver such documents and do such other acts as the DIP Secured Parties may reasonably request in connection with the DIP Facility, and in accordance with the DIP Loan Documents (including but not limited to execution of any additional security documents that may be reasonably requested); and

j.    if requested by DIP Administrative Agent, the applicable

| | |
|---|---|
| | DIP Loan Parties and/or their subsidiaries shall use commercially reasonable efforts to enter into accommodation agreements (each, an "**_Accommodations Agreement_**") in form and substance reasonably satisfactory to the DIP Administrative Agent and the Borrower with such customers as the DIP Administrative Agent may reasonably request (the "**_Accommodation Parties_**"), which may provide for acceleration of payment of receivables, a prohibition on the applicable Accommodation Party re-sourcing business for a period of time, an inventory backstop provision, a waiver of rights of set-off and recoupment, other support and liquidity to the business, prospects and operations of the applicable DIP Loan Parties and/or an agreement to provide the DIP Administrative Agent with prompt written notice of any default under such Accommodations Agreement. |
| | Notwithstanding the foregoing, (i) to the extent the DIP Loan Documents include an affirmative covenant similar to (or are deemed to include such affirmative covenant pursuant to the terms of this Term Sheet) the affirmative covenant set forth in Section 9.1(a) of the Prepetition ABL Credit Agreement, such affirmative covenant shall be subject to Material Adverse Effect qualifiers, (ii) to the extent the DIP Loan Documents include an affirmative covenant similar to (or are deemed to include such affirmative covenant pursuant to the terms of this Term Sheet) the affirmative covenant set forth in Section 9.4 of the Prepetition ABL Credit Agreement, such affirmative covenant shall be subject to the automatic stay in all respects and (iii) the DIP Loan Documents shall not include (and shall not be deemed to include pursuant to the terms of this Term Sheet) the affirmative covenants set forth in Section 9.6(a)(iii) and (iv) of the Prepetition ABL Credit Agreement or an affirmative covenant requiring delivery of audited financial statements. |
| **Negative Covenants:** | The negative covenants of the DIP Loan Parties under the DIP Loan Documents shall include, without limitation, the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents (it being understood and agreed that (i) such negative covenants shall include any ordinary course of business exceptions set forth in the Prepetition ABL Loan Documents and (ii) transactions permitted under the "first day orders" and any transactions in effect on the Petition Date shall be permitted), in accordance with the Documentation Principles and subject to, and based on the terms and conditions of, the Financing Orders, as applicable: |
| | a. incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred consistent with the Budget, scheduled indebtedness, any other indebtedness permitted to be incurred by the DIP Administrative Agent and the Bankruptcy Court, and any |

18

unsecured obligations incurred in the ordinary course of business by the DIP Loan Parties and a general debt basket not to exceed $1,000,000 at any time);

b.  incur any liens (other than liens securing indebtedness permitted by the DIP Loan Documents to be secured, scheduled liens, customary nonconsensual liens, a general lien basket not to exceed $1,000,000 at any time and other liens permitted by the DIP Administrative Agent to be incurred or exist);

c.  make any investments in any other person or make any loan to any other person (other than investments contemplated by and consistent with the Budget, intercompany loans made with the proceeds of New Money DIP Loans that are evidenced by promissory notes pledged to the DIP Administrative Agent to secure the DIP Obligations on a first-priority basis, scheduled investments, a general investment basket not to exceed $1,000,000 at any time and other investments permitted by the DIP Administrative Agent to be made);

d.  engage in any business other than the business engaged in by the DIP Loan Parties on the Petition Date and other business activities which are reasonably related or ancillary to the foregoing or otherwise permitted by the DIP Administrative Agent;

e.  sell any assets outside the ordinary course of business, unless such sale results in the indefeasible payment in full in cash of the DIP Obligations (other than dispositions contemplated by and consistent with the Budget, scheduled dispositions, a general dispositions basket not to exceed $1,000,000 and other dispositions permitted by the DIP Administrative Agent to be made);

f.  acquire any material assets or other person, merge, consolidate or dissolve (other than acquisitions of assets contemplated by and consistent with the Budget or permitted by the DIP Administrative Agent) (for the avoidance of doubt, the DIP Loan Documents will not include exceptions for the Permitted GAS Acquisition or Permitted Acquisitions (each as defined in the Prepetition ABL Credit Agreement));

g.  terminate or make any modification to any organizational documents of any DIP Loan Party that would be adverse to

the DIP Secured Parties in any material respect;

h.  engage in any transactions with insiders, except as set forth in the Budget or otherwise as permitted by the DIP Administrative Agent;

i.  use proceeds of the Carve Out, DIP Collateral or Prepetition Collateral except as set forth herein, including, but not limited to, to investigate or challenge the validity, perfection, priority, extent, or enforceability of Prepetition ABL Liens; provided, that not more than $25,000 of the proceeds of the Carve Out, DIP Collateral or Prepetition Collateral may be set aside for use by any statutory committees appointed in the Chapter 11 Cases for purposes of investigating such validity, perfection, priority, extent or enforceability of Prepetition ABL Liens;

j.  amend any of the Financing Orders, any Bankruptcy Court order relating to cash management or the Budget without the written consent of the DIP Administrative Agent in its sole and absolute discretion;

k.  agree to entry of any order precluding or modifying the DIP Lenders' and Prepetition ABL Lenders' rights to credit bid up to the full amount of the outstanding New Money DIP Loans plus any Prepetition ABL Obligations that have not been discharged as described under the caption "Adequate Protection" for the Debtors' assets; and

l.  other than the Carve Out and as contemplated by the Financing Orders, consent to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having priority senior to or *pari passu* with those granted to the DIP Lenders or Prepetition ABL Lenders, except as permitted by the DIP Loan Documents.

| Case Milestones: | The milestone schedule with which the Debtors shall comply shall be as set forth on <u>Exhibit B</u> hereto. |
| --- | --- |
| Events of Default: | The Events of Default under the DIP Loan Documents shall include, without limitation, the following, in accordance with the Documentation Principles and subject to, and based on the terms and conditions of, the Financing Orders, as applicable:<br><br>a.  The failure by the DIP Loan Parties to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the DIP Loan Documents |

20

1061560.03D-CHISR01A - MSW

Case 3:19-bk-06741   Doc 157   Filed 10/23/19   Entered 10/23/19 09:23:18   Desc Main
Document   Page 107 of 121

or any of the Financing Orders which, in the case of affirmative covenants (other than the requirements set forth herein or in the other DIP Loan Documents regarding the use of proceeds of New Money DIP Loans, delivery of the Budget or Variance Report, cash management or Case Milestones), continues for ten (10) days from the earlier of written notice to the Borrower or knowledge of a senior officer of the DIP Loan Parties.

b.  The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Bankruptcy Court to be null and void or the validity or enforceability of any provision of the DIP Facility being contested by any DIP Loan Party or any DIP Loan Party denying in writing that it has any further liability or obligation under any provision of the DIP Facility or the DIP Lenders ceasing to have the benefit of the liens granted by the Financing Orders.

c.  Until the DIP Obligations are repaid in full (other than contingent obligations for which no claim has been made) and all commitments under the DIP Facility terminated, the DIP Loan Parties shall make any payment of prepetition principal or interest or otherwise on account of any prepetition indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Facility or other than as is consistent with the Budget or the Financing Orders.

d.  The Borrower fails to make any interest payments due under any of the DIP Loan Documents or the Financing Orders within three (3) business days of when due.

e.  The entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

f.  The entry of an order dismissing the Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief without the consent of the DIP Lenders holding more than 50% of the aggregate amount of the loans and unused commitments under the DIP Facility (the "***Required DIP Lenders***").

g.  The entry of an order in the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any material part of the Borrower's business.

h.  The entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property with a value in

excess of $2,000,000, including the DIP Collateral and the Prepetition Collateral, of the Debtors or to commence or continue any prepetition litigation against the DIP Loan Parties involving potential liability not covered by insurance in excess of $2,000,000 in the aggregate.

i.  The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral or Prepetition Collateral under Section 506(c) of the Bankruptcy Code against the DIP Secured Parties or Prepetition ABL Secured Parties or the commencement of other actions by any DIP Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Secured Parties under the DIP Facility or Prepetition ABL Secured Parties under the Prepetition ABL Credit Agreement in any of the Chapter 11 Cases or in a manner inconsistent with the DIP Loan Documents.

j.  Without the prior written consent of the DIP Administrative Agent and other than in respect of the DIP Facility and the Carve-Out or as expressly permitted in the DIP Loan Documents, the bringing of any motion or taking of any action, seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (i) granting any claim or lien, or superpriority administrative expense status to any claim, *pari passu* with or senior to the claims of the DIP Secured Parties or the Prepetition ABL Secured Parties, (ii) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (iii) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (iv) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code or (v) authorizing the Debtors to take other actions adverse to any DIP Secured Party or any Prepetition ABL Secured Party (in each case, in their role as DIP Secured Party or Prepetition ABL Secured Party, respectively) or their rights and remedies under the DIP Loan Documents, the Prepetition ABL Credit Agreement or their interest in Prepetition Collateral or the DIP Collateral under Section 364 of the Bankruptcy Code.

k.  The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization.

l.  The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Debtor of similar relief in favor of any one or more of any Debtor's prepetition creditors, contrary to the terms and conditions of any of the Financing Orders or the DIP Loan Documents.

m.  The DIP Loan Parties or any of their subsidiaries or

affiliates, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, fail to object to after DIP Administrative Agent so requests, or otherwise participate as an adverse party in any suit or other proceeding against any DIP Secured Party or any Prepetition ABL Secured Party (in each case, in their role as DIP Secured Party or Prepetition ABL Secured Party, respectively) regarding the DIP Facility or the Prepetition ABL Credit Agreement.

n. A plan of reorganization shall be filed by the Debtors, or be confirmed in any of the Chapter 11 Cases, or any order shall be entered which dismisses any of the Chapter 11 Cases and which plan or order (i) (x) does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash on the effective date of such plan of the DIP Loan Parties' obligations under the DIP Facility and the Prepetition ABL Obligations or (y) is not satisfactory to the DIP Administrative Agent and the Prepetition ABL Administrative Agent in their sole and absolute discretion, and (ii) does not provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Secured Parties and the Prepetition ABL Secured Parties (in their capacities as such) that are satisfactory to the DIP Administrative Agent and the Prepetition ABL Administrative Agent in their sole and absolute discretion, or any of the DIP Loan Parties or any of their subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

o. Any final judgment or order as to liability not covered by insurance or third party indemnity, or debt for the payment of money, in excess of $2,000,000 shall be rendered against the DIP Loan Parties (individually or in the aggregate) and, in each case, there shall be a period of ten (10) consecutive business days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

p. The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors unless such order contemplates indefeasible repayment in full in cash of the DIP Facility and all Prepetition ABL Obligations upon consummation of the sale process unless the DIP Administrative Agent and the Prepetition ABL Administrative Agent consent in their sole and absolute discretion.

q. The entry of an order in the Chapter 11 Cases avoiding or permitting avoidance of any portion of the payments made

23

on account of the obligations under the DIP Facility, the DIP Loan Documents, the Prepetition ABL Credit Agreement or any related documents or any other indebtedness provided to the Debtors and their subsidiaries by any DIP Lender or any Prepetition ABL Lender, or the taking of any action by any DIP Loan Party to challenge or support a challenge of any such payments.

r. The Financing Orders and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral (other than an immaterial portion thereof).

s. The Final Order does not include a waiver, in form and substance satisfactory to the DIP Administrative Agent in its sole and absolute discretion, of (i) the right to surcharge the Prepetition Collateral and/or the DIP Collateral under Section 506(c) of the Bankruptcy Code; (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition ABL Administrative Agent on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any DIP Loan Party after the Petition Date and (iii) the doctrine of marshaling.

t. The filing or support of any pleading by any DIP Loan Party (or any subsidiary thereof) seeking, or otherwise consenting to, any relief the granting or prosecution of which could reasonably be expected to result in the occurrence of an Event of Default, including the support or acceptance of any bid in a 363 sale that does not provide for the indefeasible repayment in full in cash of the DIP Facility and any Prepetition ABL Obligations that have not been discharged as described under the caption "Adequate Protection" upon consummation of the sale unless the DIP Administrative Agent and the Prepetition ABL Agent consent in their sole and absolute discretion.

u. Any non-monetary final judgment or order with respect to a post-petition event shall be rendered against any Debtor which does or could reasonably be expected to have a Material Adverse Effect, and, in each case, there shall be period of ten (10) consecutive business days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

v. Any of the Financing Orders being amended or modified without the consent of the DIP Administrative Agent granted in its sole and absolute discretion.

w. Any Vendor Contract or Customer Contract is terminated or modified and such modification or termination does or could

24

| | |
|---|---|
| | reasonably be expected to cause a Material Adverse Effect. |
| | x.  The commencement of any investigation of any Debtor by any federal or state agency or other governmental or judicial entity, and such investigation does or could reasonably be expected to cause a Material Adverse Effect. |
| | y.  The closing of an Acceptable 363 Sale shall not have occurred on or prior to February 17, 2020, <u>and</u> the Budget shall not have been modified by the DIP Loan Parties (with the consent of the DIP Administrative Agent in its sole and absolute discretion) to reflect and forecast the DIP Loan Parties' Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements for the two-week period after such closing (subject to Permitted Variances). |
| | z.  Lynn Tilton is removed as a director or chief executive officer of the Borrower for any reason (it being understood and agreed that a resignation by Lynn Tilton will not constitute an Event of Default under this clause (cc)). |
| | Notwithstanding the foregoing, (i) to the extent the DIP Loan Documents include an event of default similar to (or are deemed to include such event of default pursuant to the terms of this Term Sheet) the event of default set forth in Section 10.1(k) of the Prepetition ABL Credit Agreement, such event of default shall be subject to a Material Adverse Effect qualifier and (ii) the DIP Loan Documents shall not include (and shall not be deemed to include pursuant to the terms of this Term Sheet) the events of default set forth in Section 10.1(g), Section 10.1(h), Section 10.1(i) and Section 10.1(n) of the Prepetition ABL Credit Agreement. |
| **Remedies:** | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Waiting Period Procedures and any other applicable provisions of the Financing Orders, as the case may be, if any Event of Default occurs and is continuing, the DIP Secured Parties may, at the direction of the Required DIP Lenders, take any or all of the following actions: |
| | a.  declare by a Maturity Date Notice that the commitment of the DIP Lenders to make New Money DIP Loans and consent to use of Cash Collateral to be terminated, whereupon such commitment and consent shall be terminated; |
| | b.  declare by a Maturity Date Notice that the unpaid amount of the DIP Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Loan Documents, this Term Sheet and the Financing Orders to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the DIP Loan Parties; or |

| | |
|---|---|
| | c. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Administrative Agent and the DIP Lenders and including as set forth above under "Credit Bidding") permitted under the DIP Loan Documents, or by applicable law. |
| **Expenses and Indemnification:** | The DIP Administrative Agent and the DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "***Indemnitee***") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or their respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (ii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the DIP Loan Parties and that is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its capacity or in fulfilling its role as DIP Administrative Agent or any similar role under the DIP Loan Documents). |
| **Governing Law:** | New York and, on and after the Petition Date, the Bankruptcy Code. |

*{Signatures follow.}*

1061560.03D-CHISR01A - MSW

**IN WITNESS WHEREOF**, the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

**DIP LOAN PARTIES:**

DURA AUTOMOTIVE SYSTEMS, LLC, as Borrower

By: _____
Name:
Title:

DURA OPERATING, LLC, as Guarantor

By: _____
Name:
Title:

DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC, as Guarantor

By: _____
Name:
Title:

DURA FREMONT L.L.C., as Guarantor

By: _____
Name:
Title:

DURA MEXICO HOLDINGS, LLC, as Guarantor


By: _____
Name:
Title:


NAMP, LLC, as Guarantor


By: _____
Name:
Title:

**DIP ADMINISTRATIVE AGENT:**

PATRIARCH PARTNERS AGENCY SERVICES, LLC**,** as DIP Administrative Agent


By: _____
Name: Lynn Tilton
Title: Manager


**DIP LENDERS:**

DURA AUTOMOTIVE ANGELS, LLC


By: _____
Name: Lynn Tilton
Title: Manager

## EXHIBIT A: BUDGET


[SEE ATTACHED.]

1061560.03D-CHISR01A - MSW

## EXHIBIT B: CASE MILESTONE SCHEDULE

**DIP Facility**

1. Not later than October 24, 2019, the Bankruptcy Court shall have entered the Second Interim Order.

2. Not later than 14 days after entry of the Second Interim Order, the DIP Loan Parties shall have executed and delivered a loan and security agreement, a pledge and security agreement and a guarantee, together with customary closing deliverables, in each case, in form and substance reasonably satisfactory to the DIP Secured Parties and the Borrower.

3. Not later than November 12, 2019, the Bankruptcy Court shall have entered the Final Order.

**Acceptable 363 Sale**

1. Not later than November 12, 2019, a bid procedures hearing shall be held in the Bankruptcy Court and the Bankruptcy Court shall have entered a final order, in form and substance reasonably acceptable to the DIP Administrative Agent, approving the bid procedures for an Acceptable 363 Sale and naming the DIP Administrative Agent (or its designee) as "stalking horse" bidder.

2. The deadline for bidding shall be a date not later than January 16, 2020.

3. The date specified for an auction, if necessary, shall be a date not later than January 27, 2020.

4. Not later than February 5, 2020, a sale hearing shall be held in the Bankruptcy Court.

5. The closing of the Acceptable 363 Sale shall occur on or before February 17, 2020.

**<u>Exhibit 1</u>**

**Initial Budget**

1061646.04B-CHISR01A - MSW

| | Filing Actuals 10/18/19 | Forecast 10/25/19 | Forecast 11/1/19 | Forecast 11/8/19 | Forecast 11/15/19 | Forecast 11/22/19 | Forecast 11/29/19 | Forecast 12/6/19 | Forecast 12/13/19 | Forecast 12/20/19 (Holiday Shutdown) | Forecast 12/27/19 (Holiday Shutdown) | Forecast 1/3/20 | Forecast 1/10/20 | Forecast 13-Weeks Total | Forecast January[1] Total | Forecast February Total | Forecast March[2] Total | Forecast Proceeding Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Week --> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | | | |
| Fiscal Week --> | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 1 | 2 | | | | | |
| **Revenue** | $ 5,915 | $ 4,534 | $ 4,534 | $ 5,393 | $ 5,393 | $ 5,393 | $ 5,393 | $ 5,652 | $ 5,652 | $ 5,652 | $ 5,652 | $ 1,652 | $ 1,776 | $ 5,776 | $ 62,715 | $ 23,880 | $ 22,899 | $ 12,011 | $ 113,952 |
| *Collections* | | | | | | | | | | | | | | | | | | |
| Operating Receipts - Production | $ 5,141 | $ 5,628 | $ 5,828 | $ 6,107 | $ 4,984 | $ 4,984 | $ 5,915 | $ 4,534 | $ 4,534 | $ 5,393 | $ 5,393 | $ 5,393 | $ 5,393 | $ 69,226 | $ 27,742 | $ 14,980 | $ 10,552 | $ 111,715 |
| Operating Receipts - Tooling | | 22 | 1,218 | - | 611 | 1,190 | - | 558 | - | - | - | - | - | 3,598 | - | - | - | 3,598 |
| Related Party Receipts | 435 | - | - | 125 | - | 125 | 230 | 125 | - | 125 | - | 125 | 230 | 1,520 | 835 | 250 | 355 | 2,605 |
| **Total Collections** | $ 5,576 | $ 5,650 | $ 7,046 | $ 6,232 | $ 5,595 | $ 6,299 | $ 6,145 | $ 5,217 | $ 4,534 | $ 5,518 | $ 5,393 | $ 5,518 | $ 5,623 | $ 74,345 | $ 28,577 | $ 15,230 | $ 10,907 | $ 117,919 |
| *Disbursements* | | | | | | | | | | | | | | | | | | |
| Payroll | $ - | $ 2,200 | - | $ 2,200 | - | $ 2,200 | - | $ 2,200 | - | $ 2,200 | - | $ 2,150 | - | $ 13,150 | $ 6,450 | $ 4,300 | $ 2,150 | $ 23,900 |
| 401k | 208 | - | 139 | - | 139 | - | 139 | - | 139 | - | 139 | - | 135 | 1,038 | 269 | 267 | 137 | 1,577 |
| Pension | 346 | - | - | - | - | - | - | - | - | - | - | - | - | 346 | 346 | - | - | 692 |
| Healthcare Benefits | - | 451 | 214 | 214 | 214 | 214 | 214 | 214 | 214 | 214 | 214 | 174 | 170 | 2,723 | 856 | 455 | 200 | 3,890 |
| Rent | - | - | 70 | - | - | - | 70 | - | - | - | 70 | - | - | 211 | 70 | 70 | 70 | 351 |
| Operating Leases | - | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 84 | 35 | 28 | 14 | 147 |
| Dura De Mexico Transfer - Maquila | 427 | 200 | 400 | 200 | 400 | 200 | 400 | 200 | 400 | 200 | 400 | 200 | 400 | 4,027 | 1,400 | 1,200 | 600 | 6,627 |
| Management Fee | - | - | 100 | - | - | - | - | 100 | - | - | - | 100 | - | 300 | 100 | 100 | 100 | 500 |
| Taxes | - | 1 | 7 | - | 11 | - | - | - | - | 15 | - | 62 | - | 95 | 73 | 331 | - | 437 |
| Insurance Policies / Renewals | - | 1,000 | - | - | - | - | - | - | 5,722 | - | - | - | - | 6,722 | - | - | - | 6,722 |
| Utilities | - | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 698 | 291 | 233 | 116 | 1,221 |
| Materials | 1,368 | 2,919 | 2,845 | 2,807 | 2,489 | 2,171 | 1,907 | 2,043 | 2,086 | 2,157 | 1,061 | 1,422 | 3,101 | 28,379 | 13,628 | 11,039 | 6,319 | 54,841 |
| Freight / Shipping | 203 | 295 | 44 | 53 | - | - | - | - | 74 | 88 | 141 | 141 | 141 | 1,181 | 726 | 392 | 276 | 2,293 |
| General Admin | 100 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 1,356 | 523 | 419 | 209 | 2,293 |
| Other G&A | 33 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 753 | 300 | 240 | 120 | 1,293 |
| IT | - | 154 | 154 | 154 | 154 | 154 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 1,663 | 640 | 512 | 256 | 2,814 |
| Other | 35 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 593 | 233 | 186 | 93 | 1,012 |
| **Total Disbursements** | $ 2,720 | $ 7,497 | $ 4,249 | $ 5,904 | $ 3,683 | $ 5,215 | $ 3,134 | $ 5,161 | $ 9,041 | $ 5,279 | $ 2,359 | $ 4,724 | $ 4,352 | $ 63,318 | $ 25,939 | $ 19,771 | $ 10,661 | $ 110,614 |
| **Operating Cash Flow** | $ 2,856 | $ (1,847) | $ 2,797 | $ 329 | $ 1,912 | $ 1,084 | $ 3,011 | $ 56 | $ (4,507) | $ 239 | $ 3,033 | $ 793 | $ 1,271 | $ 11,027 | $ 2,638 | $ (4,541) | $ 246 | $ 7,305 |
| **Cumulative Operating Cash Flow** | 2,856 | 1,009 | 3,806 | 4,134 | 6,047 | 7,131 | 10,142 | 10,197 | 5,690 | 5,929 | 8,962 | 9,756 | 11,027 | 11,027 | 11,600 | 7,059 | 8,188 | 7,305 |
| Net Capital Expenditures | $ - | $ 14,497 | $ 711 | $ 2,305 | $ 2,305 | $ 2,305 | $ 2,305 | $ 91 | $ 739 | $ 739 | $ 739 | $ 695 | $ 775 | $ 28,205 | $ 3,734 | $ 750 | $ 296 | $ 31,576 |
| *Restructuring Costs* | | | | | | | | | | | | | | | | | | |
| Debtor Advisors | 1,323 | - | - | - | - | - | - | 1,000 | 300 | - | - | 702 | 150 | 3,476 | 1,532 | 150 | 1,232 | 6,239 |
| Secured Lender Advisors | - | - | 260 | - | - | - | - | - | 550 | - | - | - | 315 | 1,125 | 315 | 270 | 270 | 1,665 |
| Other Professional Fees | - | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 100 | 700 | 50 | 50 | 900 |
| Critical Vendor Motion | - | - | 500 | 500 | 500 | 3,000 | 3,000 | 2,500 | - | - | - | - | - | 10,000 | - | - | - | 10,000 |
| Shippers Motion | - | - | 1,000 | 1,000 | - | 1,200 | - | - | - | - | - | - | - | 3,200 | - | - | - | 3,200 |
| Utility Fee Deposit | - | - | - | - | 250 | - | - | - | - | - | - | - | - | 250 | - | - | - | 250 |
| Insurance - D&O | - | - | 566 | - | - | - | - | - | - | - | - | - | - | 566 | - | - | - | 566 |
| Tax - Past Due Payments | - | - | 132 | - | - | - | - | - | - | - | - | - | - | 132 | - | - | - | 132 |
| **Total Restructuring Costs** | $ 1,323 | $ 2,198 | $ 1,760 | $ 500 | $ 4,450 | $ 3,050 | $ 3,500 | $ 850 | - | $ 50 | $ 702 | $ 465 | $ - | $ 18,848 | $ 2,547 | $ 470 | $ 1,552 | $ 22,952 |
| Total Receipts | 5,576 | 5,650 | 7,046 | 6,232 | 5,595 | 6,299 | 6,145 | 5,217 | 4,534 | 5,518 | 5,393 | 5,518 | 5,623 | 74,345 | 28,577 | 15,230 | 10,907 | 117,919 |
| Total Disbursements | 4,043 | 24,192 | 6,720 | 8,709 | 10,438 | 10,570 | 8,939 | 6,102 | 9,780 | 6,068 | 3,801 | 5,884 | 5,127 | 110,372 | 32,280 | 20,991 | 12,509 | 165,141 |
| **Pre-Financing Cash Flow** | $ 1,533 | $ (18,542) | $ 326 | $ (2,476) | $ (4,843) | $ (4,271) | $ (2,794) | $ (885) | $ (5,246) | $ (550) | $ 1,592 | $ (366) | $ 496 | $ (36,027) | $ (3,703) | $ (5,761) | $ (1,602) | $ (47,223) |
| *Draw / Repayment* | | | | | | | | | | | | | | | | | | |
| ABL Facility | (1,701) | (5,650) | (7,046) | (6,232) | (5,595) | (526) | - | - | - | - | - | - | - | (26,750) | - | - | - | (26,750) |
| DIP Financing[3] | - | 24,192 | 7,027 | 8,709 | 10,438 | 4,797 | 2,794 | 1,207 | 5,246 | 550 | (1,212) | 366 | (496) | 63,617 | 4,086 | 6,187 | 1,602 | 75,621 |
| **Total** | (1,701) | 18,542 | (18) | 2,476 | 4,843 | 4,271 | 2,794 | 1,207 | 5,246 | 550 | (1,212) | 366 | (496) | 36,867 | 4,086 | 6,187 | 1,602 | 48,871 |
| Beginning Book Cash | $ 169 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 169 | - | - | - | $ 169 |
| Pre-Financing Cash Flow | 1,533 | (18,542) | 326 | (2,476) | (4,843) | (4,271) | (2,794) | (885) | (5,246) | (550) | 1,592 | (366) | 496 | (36,027) | (3,703) | (5,761) | (1,602) | (47,223) |
| Interest - ABL Facility & DIP | - | - | (307) | - | - | - | - | - | (322) | - | (379) | - | - | (1,009) | (383) | (425) | - | (1,817) |
| Draw / (Repayment) - ABL Facility & DIP[3] | (1,701) | 18,542 | (18) | 2,476 | 4,843 | 4,271 | 2,794 | 1,207 | 5,246 | 550 | (1,212) | 366 | (496) | 36,867 | 4,086 | 6,187 | 1,602 | 48,871 |
| **Ending Book Cash** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - | - | - | $ - |
| *Total Liquidity* | | | | | | | | | | | | | | | | | | |
| Available DIP | 40,000 | 15,808 | 8,781 | 72 | 26,635 | 21,838 | 19,045 | 17,838 | 12,592 | 12,041 | 13,254 | 12,887 | 13,383 | 13,383 | 9,167 | 2,981 | 1,379 | 1,379 |
| Ending DIP Balance | - | 24,192 | 31,219 | 39,928 | 50,365 | 55,162 | 57,955 | 59,162 | 64,408 | 64,959 | 63,746 | 64,113 | 63,617 | 63,617 | 67,833 | 74,019 | 75,621 | 75,621 |
| **Total Liquidity** | $ 40,000 | $ 15,808 | $ 8,781 | $ 72 | $ 26,635 | $ 21,838 | $ 19,045 | $ 17,838 | $ 12,592 | $ 12,041 | $ 13,254 | $ 12,887 | $ 13,383 | $ 13,383 | $ 9,167 | $ 2,981 | $ 1,379 | $ 1,379 |

*1. January 2020 includes two weeks during 13-week forecast period*
*2. March 2020 includes two weeks per the proposed DIP and Sales Order timelines*
*3. Under the $77 million new money DIP, $55 million will be available on an interim basis and the remaining $22 million is assumed to be available during week ending November 22, 2019*

*Dura Automotive*
Second Interim Hearing DIP Budget
Amounts in Thousands

| | Filing Actuals 10/18/19 | Forecast 10/25/19 | Forecast 11/1/19 | Forecast 11/8/19 | Forecast 11/15/19 | Forecast 11/22/19 | Forecast 11/29/19 | Forecast 12/6/19 | Forecast 12/13/19 | Forecast 12/20/19 | Forecast 12/27/19 | Forecast 1/3/20 | Forecast 1/10/20 | Forecast 13-Weeks Total | Forecast January [1] Total | Forecast February Total | Forecast March [2] Total | Forecast Proceeding Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Week --> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | | | |
| Fiscal Week --> | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 1 | 2 | | | | | |
| **Debt Schedule** | | | | | | | | | | | | | | | | | | |
| ***ABL Facility*** | | | | | | | | | | | | | | | | | | |
| Beginning | $ 26,750 | $ 25,049 | 19,399 | 12,353 | 6,121 | 526 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 26,750 | $ - | $ - | $ - | $ 26,750 |
| Draw / (Repayment) | (1,701) | (5,650) | (7,046) | (6,232) | (5,595) | (526) | - | - | - | - | - | - | - | (26,750) | - | - | - | (26,750) |
| **Ending** | **$ 25,049** | **$ 19,399** | **12,353** | **6,121** | **526** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| ***DIP Financing*** | | | | | | | | | | | | | | | | | | |
| Beginning | $ - | - | 24,192 | 31,219 | 39,928 | 50,365 | 55,162 | 57,955 | 59,162 | 64,408 | 64,959 | 63,746 | 64,113 | $ - | $ 63,746 | $ 67,833 | $ 74,019 | $ - |
| Draw / (Repayment) | | 24,192 | 7,027 | 8,709 | 10,438 | 4,797 | 2,794 | 1,207 | 5,246 | 550 | (1,212) | 366 | (496) | 63,617 | 4,086 | 6,187 | 1,602 | 75,621 |
| **Ending** | **$ -** | **24,192** | **31,219** | **39,928** | **50,365** | **55,162** | **57,955** | **59,162** | **64,408** | **64,959** | **63,746** | **64,113** | **63,617** | **63,617** | **67,833** | **74,019** | **75,621** | **75,621** |
| *Availability* | | *15,808* | *8,781* | *72* | *26,635* | *21,838* | *19,045* | *17,838* | *12,592* | *12,041* | *13,254* | *12,887* | *13,383* | *13,383* | *9,167* | *2,981* | *1,379* | *1,379* |
| **Accounts Receivable ("AR") Roll-Forward** | | | | | | | | | | | | | | | | | | |
| ***Pre-Petition*** | | | | | | | | | | | | | | | | | | |
| Beginning | $ 41,800 | 36,224 | 30,574 | 23,528 | 17,296 | 11,701 | 5,402 | - | $ - | $ - | $ - | $ - | $ - | $ 41,800 | $ - | $ - | $ - | $ 41,800 |
| Sales on Credit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Collections | (5,576) | (5,650) | (7,046) | (6,232) | (5,595) | (6,299) | (5,402) | - | - | - | - | - | - | (41,800) | - | - | - | (41,800) |
| **Ending** | **$ 36,224** | **30,574** | **23,528** | **17,296** | **11,701** | **5,402** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| ***Post-Petition*** | | | | | | | | | | | | | | | | | | |
| Beginning | $ - | 5,915 | 10,449 | 14,983 | 20,376 | 25,769 | 31,161 | 35,810 | 36,245 | 37,364 | 37,498 | 33,758 | 30,016 | $ - | $ 33,758 | $ 29,061 | $ 36,730 | $ - |
| Sales on Credit | 5,915 | 4,534 | 4,534 | 5,393 | 5,393 | 5,393 | 5,393 | 5,652 | 5,652 | 5,652 | 1,652 | 1,776 | 5,776 | 62,715 | 23,880 | 22,899 | 12,011 | 113,952 |
| Collections | - | - | - | - | - | - | (744) | (5,217) | (4,534) | (5,518) | (5,393) | (5,518) | (5,623) | (32,545) | (28,577) | (15,230) | (10,907) | (76,118) |
| **Ending** | **$ 5,915** | **10,449** | **14,983** | **20,376** | **25,769** | **31,161** | **35,810** | **36,245** | **37,364** | **37,498** | **33,758** | **30,016** | **30,170** | **30,170** | **29,061** | **36,730** | **37,834** | **37,834** |
| ***Summary*** | | | | | | | | | | | | | | | | | | |
| Beginning | $ 41,800 | 42,139 | 41,024 | 38,512 | 37,672 | 37,470 | 36,563 | 35,810 | 36,245 | 37,364 | 37,498 | 33,758 | 30,016 | $ 41,800 | 33,758 | 29,061 | 36,730 | $ 41,800 |
| Sales on Credit | 5,915 | 4,534 | 4,534 | 5,393 | 5,393 | 5,393 | 5,393 | 5,652 | 5,652 | 5,652 | 1,652 | 1,776 | 5,776 | 62,715 | 23,880 | 22,899 | 12,011 | 113,952 |
| Collections | (5,576) | (5,650) | (7,046) | (6,232) | (5,595) | (6,299) | (6,145) | (5,217) | (4,534) | (5,518) | (5,393) | (5,518) | (5,623) | (74,345) | (28,577) | (15,230) | (10,907) | (117,918) |
| **Ending** | **$ 42,139** | **$ 41,024** | **38,512** | **37,672** | **37,470** | **36,563** | **35,810** | **36,245** | **37,364** | **37,498** | **33,758** | **30,016** | **30,170** | **30,170** | **29,061** | **36,730** | **37,834** | **37,834** |

*Holiday Shutdown* (spanning weeks ending 12/20/19 – 1/3/20)